K. Lee Marshall (SBN 277092)
Alexandra C. Whitworth (SBN 303046)
BRYAN CAVE LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4078
Telephone:  (415) 675-3444
Facsimile:  (415) 675-3434
klmarshall@bryancave.com
alex.whitworth@bryancave.com

J. Bennett Clark (to appear *pro hac vice*)
BRYAN CAVE LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102
Telephone:  (314) 259-2000
Facsimile:  (314) 259-2020
ben.clark@bryancave.com

Erik W. Kahn (to appear *pro hac vice*)
Joseph J. Richetti (to appear *pro hac vice*)
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY  10104
Telephone:  (212) 541-2000
Facsimile:  (212) 541-4630
erik.kahn@bryancave.com
joseph.richetti@bryancave.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| XPERTUNIVERSE, INC.,<br>a Delaware Corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>CISCO SYSTEMS, INC.,<br>A California Corporation<br><br>        Defendant. | Case No. 17-cv-3848<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>**JURY TRIAL DEMANDED** |

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4078

Plaintiff, XpertUniverse, Inc. ("XpertUniverse"), makes the following allegations in support of its Complaint against Defendant, Cisco Systems, Inc. ("Cisco"):

**THE NATURE OF THE ACTION**

1.     This is an action for patent infringement, arising out of Cisco's deliberate, willful, and ongoing infringement of XpertUniverse's well-established patent rights.  Cisco has embedded XpertUniverse's patented technology in its most critical and successful commercial offerings.

2.     Cisco first pursued a business relationship with XpertUniverse in 2004 in connection with XpertUniverse's innovative expert location technology and live customer interaction and management solutions.  Cisco initiated discussions with XpertUniverse to explore the possibility of forming a partnership in order to commercialize XpertUniverse's patent technology.

3.     Cisco and XpertUniverse memorialized their relationship in a mutual non-disclosure agreement that was entered into by the parties in August 2004.

4.     With Cisco's continued encouragement, XpertUniverse worked closely with Cisco for approximately two and a half years.  As part of this relationship, XpertUniverse disclosed to Cisco all of its intellectual property, including its patent applications and patented technology, and directed all of its resources and efforts toward the proposed partnership with Cisco involving XpertUniverse's technology.

5.     Instead of partnering with XpertUniverse, Cisco abruptly ended the relationship with XpertUniverse in 2007.  Shortly thereafter, XpertUniverse became aware that Cisco was introducing and commercializing competing expert location software products and technology.

6.     In March 2009, XpertUniverse brought suit against Cisco in the United States District Court for the District of Delaware for patent infringement (as well as fraud and other causes of action), stemming from Cisco's unauthorized use and infringement of two of XpertUniverse's patents, which covered and protected technology at the heart of XpertUniverse's business: *XpertUniverse, Inc. v. Cisco Systems, Inc*., Case No. 1:09-cv-00157-RGA (the "First Case").

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4078

7.     After more than four years of litigation, the jury reached a verdict in the First Case: (1) upholding the validity of XpertUniverse's patents; and (ii) finding that Cisco had infringed both patents.  The jury specifically found that one of Cisco's expert location software products, branded by Cisco as "Remote Expert," practiced XpertUniverse's patented technology and, as such, infringed XpertUniverse's U.S. Patent No. 7,499,903 ("the '903 Patent").  The jury also found that Cisco had failed to prove that either of the patents was invalid as anticipated or obvious despite Cisco's extensive arguments seeking to prove otherwise based on various prior art references.  Based on these findings, the jury awarded damages to XpertUniverse for Cisco's patent infringement.

8.     Following the jury verdict, Cisco requested the court to set aside the jury's findings and to determine as a matter of law that Cisco had not infringed XpertUniverse's patents, and that both patents were invalid and unenforceable.  The Delaware court denied Cisco's request and upheld the jury's verdict of patent infringement.  The District Court also rejected Cisco's renewed attempts to challenge the validity and enforceability of XpertUniverse's patents.

9.     In addition to patent infringement, the jury also found that Cisco had committed fraud by concealment, and awarded XpertUniverse $70 million in damages.  In its post-trial rulings, however, the court set aside the jury's verdict and damage award based on the fraud claim.

10.     XpertUniverse appealed the court's post-trial rulings concerning the fraud claim to the U.S. Court of Appeals for the Federal Circuit, which culminated in the issuance by the Federal Circuit of its decision on January 21, 2015, upholding the Delaware court's post-trial rulings.

11.     Cisco did not appeal any aspects of the jury verdict or the court's post-trial rulings against it pertaining to Cisco's infringement, or the validity and enforceability, of XpertUniverse's two patents.

12.     The First Case constitutes a final judgment against Cisco with respect to Cisco's infringement of XpertUniverse's patents and a final decision concerning the issues of patent validity and enforceability, both of which were confirmed.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

13.     With disregard for the jury verdict and final judgment in the First Case, Cisco has not only continued to infringe XpertUniverse's patents but also, on information and belief, its infringement has grown dramatically and become widespread.

14.     For example, on information and belief, since the First Case, Cisco has continued to develop, sell, and distribute various products and technologies that use and infringe upon XpertUniverse's patented inventions, including several subsequent versions of the Remote Expert product that were found to infringe XpertUniverse's patents in the First Case, as well as other products and components that incorporate, rely upon, or are designed to operate in conjunction with Cisco's Remote Expert technology.

15.     According to publicly available information regarding Cisco's subsequent versions of Remote Expert released after the trial in the First Case, these products still include the same infringing features and functionality that were included in the earlier versions of the product and that were found to infringe XpertUniverse's '903 Patent.

16.     On information and belief, Cisco has embedded these infringing products and technologies as critical components of an extensive and interconnected suite of product offerings, including Cisco's "Unified Communications" and "Contact Center" products, which Cisco promotes as its groundbreaking solution for connecting consumers with the multi-trillion dollar market referred to as the "Internet of Things" or the "Internet of Everything."

17.     In summary, XpertUniverse's patents were determined by a jury verdict and final judgment in the First Case to be infringed by Cisco's adoption of the patented inventions as part of its Remote Expert family of software products and certain other Cisco technologies, solutions, and offerings.  The validity and enforceability of XpertUniverse's patents were upheld by the jury and court despite extensive challenges raised by Cisco.  On information and belief, Cisco has continued a pattern of willful infringement and misconduct that is a direct and blatant violation of XpertUniverse's valuable patent rights.  On information and belief, Cisco has continued to knowingly and willfully infringe XpertUniverse's patents on a wide scale by incorporating XpertUniverse's patented inventions into the heart of Cisco's Remote Expert products, solutions,

and offerings, as well as various other related technologies, solutions and offerings, including Cisco's Unified Communications product suite and Contact Center product suite.

18. XpertUniverse is filing this lawsuit to put an end to, and seek redress for, Cisco's ongoing, widespread, and willful infringement of XpertUniverse's patented technology.

## THE PARTIES

19. XpertUniverse is a Delaware corporation with a principal place of business located at 366 Broadway, Suite 410, Jericho, New York 11753.

20. On information and belief, Cisco is a California corporation with a principal place of business within this judicial district at 170 West Tasman Drive, San Jose, California.

21. Cisco offers for sale, sells, and distributes expert location and collaboration systems, products, offerings, and solutions, including its Remote Expert family of software products and solutions, which infringe XpertUniverse's '903 Patent.

## JURISDICTION AND VENUE

22. This action arises under the patent laws of the United States, Title 35 U.S.C. §§ 1, *et seq.* Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

23. Cisco is subject to this Court's personal jurisdiction because it is incorporated in the State of California and has a principal place of business within this District, and also because it is doing and has done substantial business in this District, including business related to the development, sale and/or distribution of infringing products and services, and is committing and has committed acts of infringement in this District from which it has derived and continues to derive substantial revenue.

24. Venue is proper in this District under 28 U.S.C. § 1400(b) because, among other reasons, Cisco is subject to personal jurisdiction in this District, is incorporated in the State of California and has a principal place of business in this District, has committed and continues to commit acts of infringement in this District, and a substantial part of the events giving rise to the claims occurred in this District.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

## BACKGROUND

### XpertUniverse's Patented Technology

25.     XpertUniverse is a technology company, which, since its formation in 1999, has been dedicated to developing innovative computer software and systems related to expert location, real-time interaction, and business intelligence solutions.  XpertUniverse has devoted considerable resources and time creating new and improved computerized expert location systems that are designed to, among other things, facilitate customer interactions and relationships, increase customer retention and satisfaction, streamline business transactions and services, and optimize resource management.

26.     XpertUniverse has focused on developing improved computer-based systems and techniques that enable individuals (such as customers or employees) who need assistance or have questions about certain topics to connect and interact in real-time with the best available experts who have the appropriate knowledge and expertise.

27.     XpertUniverse has employed many engineers and computer experts to address the shortcomings in the existing technology, namely: connecting live experts having the best skills and knowledge with consumers who need assistance via a system architecture that is flexible and easily scalable (e.g., to meet the needs of larger organizations and companies across a wide range of industries, including financial services, healthcare, manufacturing, retail, energy, government services, and education).

28.     Expert location and connection mechanisms were and continue to be utilized by companies to provide different forms of contact centers and real-time customer or user assistance, including telephone-based call centers and Internet-based help services.

29.     Although some contact centers existed prior to the time when XpertUniverse invented and developed its patented technology, XpertUniverse discovered that the then-existing computer-based expert location systems suffered from substantial drawbacks and limitations.

30.     For example, the existing computer-based expert location systems were ineffective and inefficient because they merely connected users with the next (or any) available agent or expert, rather than locating and assigning the best available expert, who could immediately

provide the necessary guidance to a customer or individual seeking assistance, thereby significantly improving the quality of service and reducing the time and cost associated with assisting customers.

31.     The existing computer-based expert location systems typically required all of the necessary expert location data to be hard-coded and manually entered into the system.  This included manual entry of the categories and sub-categories of assistance and the available experts, as well as manual construction of fixed, direct links between each expert and one or more categories for which the expert has relevant skills or knowledge.  As a result, these systems required a manual, time-consuming construction and the resulting systems were fixed and fragile (*i.e.*, difficult to modify or update, such as when the categories of assistance evolved or experts needed to be added or removed from the system).

32.     The existing computer-based expert location systems also relied upon fixed, hard-coded rules for providing the routing and connection process between an individual seeking assistance and an identified expert.  Thus, these existing systems lacked the capability to take advantage of new or alternate methodologies and algorithms for locating experts and/or new communication technologies and modalities for establishing connections between individuals and experts.

33.     As another example, the existing computer-based expert location systems were custom-made and manually constructed for a particular organization.  As a result, these existing systems were not flexible or scalable (*e.g.*, to support multiple organizations) and typically required a time-consuming and labor-intensive complete rewrite of the system in response to changes in the organization (*e.g.*, a merger).

34.     Through substantial innovation and effort, XpertUniverse invented and developed new and improved computer hardware and software based expert location technology platforms and solutions that utilize novel algorithms, database structures, data representation architectures, and multi-layered interfaces in order to locate the best available experts to connect with individuals who are seeking assistance. XpertUniverse's much improved computer-based expert location systems and methods provide significant benefits over the prior computer-based

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4078

technologies and address many problems with these prior computer-based systems, including the drawbacks and limitations discussed above.

35.     XpertUniverse has protected various aspects of its inventive solutions and cutting-edge technologies with a range of intellectual property rights.  In particular, as a result of its significant innovations, XpertUniverse has been granted a number of patents by the U.S. Patent and Trademark Office ("the Patent Office"), which protect various aspects of its expert location technology.

36.     Among the patents that XpertUniverse has been awarded is the '903 Patent, entitled "Semantic to Non-Semantic Routing For Locating a Live Expert."  The '903 Patent was filed on January 24, 2005 and issued on March 3, 2009.

37.     XpertUniverse is the owner by assignment of the '903 Patent, with ownership of all substantial rights in the '903 Patent, including the right to exclude others and to sue and recover damages for the past and future infringement thereof.  A true and correct copy of the '903 Patent is attached hereto as Exhibit A.

38.     The Patent Office examined the '903 Patent over a period of several years.  After this thorough examination, the Patent Office found that the inventions described and claimed in the '903 Patent are both new and not obvious in light of prior patents, publications, and other art, and determined that the claimed systems and methods are inventive and patentable.

39.     The claims of the '903 Patent are generally directed to, *inter alia*, new and improved computer-based expert location systems and methods that utilize a novel data representation architecture and multi-layered interface to locate appropriate experts and connect them with individuals who need assistance with a particular inquiry.  For example, certain of these systems generally include at least two networked, multimedia computing devices, a host server configured to establish real-time interactive communication sessions between experts and individuals seeking assistance, and databases that store a number of predetermined, semantically expressed inquiry types that are organized from an underlying plurality of criteria groupings, and may be presented to and selected by individuals who are seeking assistance, as well as various associations between the experts, inquiry types, and criteria groupings.  Based on a particular

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

1    inquiry type selected by an individual, certain of these systems use a unique numerical identifier to

2    locate an appropriate expert (or experts) from a skill-set database having the relevant skills or

3    expertise pertaining to the selected inquiry type and/or its underlying criteria.  After an appropriate

4    expert has been identified, certain of these systems may then establish a real-time interactive

5    communication session between the individual and the expert via a network connection.

6         40.    The improved computer-based expert location systems and methods described and

7    claimed in the '903 Patent provide significant advantages and benefits over the prior art

8    computerized expert matching systems.  For example, the claimed systems utilize a novel, multi-

9    layered data structure that provides different interfaces for organizing the available topics or

10   categories of assistance (*e.g.*, inquiry types) and enables the system to be automatically

11   customized and individualized based on the particular user or type of user who is seeking

12   assistance.  As another example, the novel data architecture used by the claimed invention

13   provides a much more flexible, configurable, and scalable computer-based expert location

14   platform that enables changes and updates (*e.g.*, new categories, inquiries, experts, etc.) to be

15   made with substantially less time and effort.

16        **The Prior Patent Infringement Verdict Against Cisco**

17        41.    On information and belief, Cisco is a public company, with more than 49 billion

18   dollars of revenue in fiscal year 2016, and is in the business of developing and commercializing a

19   wide array of technology products and services, including networking solutions, communications

20   hardware, unified contact center, data center, and collaboration product suites, business

21   intelligence solutions, and consumer electronics.

22        42.    In 2004, rather than pursuing independent product development in connection with

23   Cisco's anticipated expert location needs, Cisco sought out and established a relationship with

24   XpertUniverse for its innovative expert location solutions and intellectual property.  The parties

25   memorialized their relationship by signing a mutual non-disclosure agreement in August 2004.

26   Under the guise of forming a partnership to further develop and commercialize XpertUniverse's

27   technology, and while (upon information and belief) considering the possibility of purloining the

28

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4078

technology for itself, Cisco maintained the relationship with XpertUniverse for approximately two and a half years.

43.     During this two and a half year period, XpertUniverse disclosed its proprietary technologies, patented inventions, and intellectual property to Cisco and focused all of its efforts and resources on furthering its cooperation with Cisco in an effort to collaborate with Cisco on the development of a Cisco branded technology incorporating XpertUniverse's proprietary expert location and customer interaction and management systems.

44.     Instead of partnering with XpertUniverse, however, Cisco abruptly ended the parties' relationship in 2007, and introduced and commercialized its own competing expert location software products and offerings, which unlawfully incorporated XpertUniverse's patented solutions and technology and infringed its intellectual property rights, including the '903 Patent.

45.     In March 2009, XpertUniverse filed the First Case against Cisco, seeking redress for, among other things, Cisco's infringement of the '903 Patent.

46.     In connection with the First Case, one of Cisco software products, solutions, and offerings that was found to infringe the claims of the '903 Patent was Cisco's Remote Expert product suite.

47.     In general, Cisco's Remote Expert software products provided a computer-based expert location system that allowed users to either directly, or with the assistance of a "concierge," select categories of assistance or inquiry topics through a graphical user interface and then connect and interact in real-time with experts who had the relevant skills to assist the user with the selected inquiry.

48.     As XpertUniverse proved in the First Case, Cisco's Remote Expert software products included, among other things: (i) a database storing a number of "expert types," which were descriptions of categories of assistance (*i.e.*, semantically-expressed inquiry types); (ii) an expert database storing a list of experts (*i.e.*, a skill-set database) and related information, including one or more expert skills associated with each expert (*i.e.*, criteria groupings); (iii) IVR phone numbers for linking the available expert types and experts  to the expert skills (*i.e.*, unique numerical identifiers); and (iv)  a "multi-lingual support" feature and/or "Locales" functionality

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

that enabled the expert types to be represented and stored in multiple different languages and/or dialects, thereby allowing the system to present different interfaces to different users (*i.e.*, multiple layers of inquiry types).

49.    After more than four years of litigation, the First Case culminated in a jury trial and verdict on March 22, 2013.  Notwithstanding Cisco's extensive arguments throughout the case and during the trial that its accused products did not infringe, the jury in the First Case found, among other things, that Cisco had infringed XpertUniverse's '903 Patent.

50.    As shown in the following excerpt from the jury verdict in the First Case, the jury specifically found that Cisco's Remote Expert software product (and another Cisco product called Expert Advisor) infringed the '903 Patent.

> 2.    Did XpertUniverse prove, by a preponderance of the evidence, that Cisco infringed claim 12 of U.S. Patent No. 7,499,903? *(Please answer Yes or No for each accused product)*
>
> Expert Advisor: **Answer "Yes" or "No"** : Yes
>
> Remote Expert: **Answer "Yes" or "No"** : Yes

51.    Following the jury verdict, Cisco filed a post-trial motion requesting that the court set aside the jury's infringement verdict.  The Delaware court upheld the jury's verdict with respect to patent infringement, including the finding that Cisco's Remote Expert products infringed the '903 Patent.

52.    The jury awarded XpertUniverse damages for Cisco's infringement of the '903 Patent, which was upheld by the Delaware court's post-trial rulings.

53.    The damages award was based on Cisco's representations that it had very limited sales and distribution of the infringing products (*e.g.*, a pilot program with only one customer for its Remote Expert product).

54.    Throughout the litigation in the First Case, Cisco raised a number of alternate theories and arguments in an attempt to challenge the validity and enforceability of XpertUniverse's '903 Patent.

55.     For example, in each of its answers to XpertUniverse's original and amended complaints, Cisco raised affirmative defenses and/or filed counterclaims asserting that the '903 Patent was invalid under 35 U.S.C. §§ 101-103 and 112 and/or unenforceable.

56.     Similarly, in its preliminary invalidity contentions, Cisco challenged the validity of the '903 Patent claims as anticipated under § 102 and/or obvious under § 103 based on numerous asserted prior art references.  Cisco also argued that one or more claims of the '903 Patent were indefinite under § 112 for lack of written description support.

57.     Cisco subsequently moved the Delaware court for summary judgment on various issues, including that: (i) Cisco had not infringed the '903 Patent; (ii) the '903 Patent was invalid under §§ 102 and 103; and (iii) the '903 Patent was unenforceable due to alleged inequitable conduct during its prosecution at the Patent Office.  On March 13, 2013, the Delaware court rejected Cisco's summary judgment motion, denying it with respect to all grounds related to the '903 Patent.

58.     Following the jury trial in the First Case, during which Cisco once again argued that the '903 Patent was invalid under §§ 102 and 103, the jury upheld the validity of the '903 Patent.

59.     As shown in the following excerpt from the jury verdict in the First Case, the jury specifically found that Cisco had failed to prove that the '903 Patent was invalid based on Cisco's extensive anticipation or obviousness arguments.

> 3.     Did Cisco prove, by clear and convincing evidence, that claim 12 of U.S. Patent No. 7,499,903 is invalid due to anticipation?
>
> **Answer "Yes" or "No":** No
>
> 4.     Did Cisco prove, by clear and convincing evidence, that claim 12 of U.S. Patent No. 7,499,903 is invalid due to obviousness?
>
> **Answer "Yes" or "No":** No

60.     In its post-trial motion, Cisco argued that the jury's verdict concerning validity should be set aside and the court should find as a matter of law that the '903 Patent was invalid. Cisco also reiterated its arguments that the court should find the '903 Patent unenforceable for

Bryan Cave LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4078

inequitable conduct. The Delaware court, however, upheld the jury's findings that Cisco had failed to prove that the '903 Patent was invalid and, once again, rejected Cisco's arguments that the patent was unenforceable.

61. Notwithstanding Cisco's extensive and repeated attempts to challenge the validity and enforceability of the '903 Patent during the First Case, both the jury and the Delaware court upheld the validity and enforceability of XpertUniverse's '903 Patent.

62. Cisco chose not to appeal any of the jury findings or the Delaware court's post-trial rulings concerning the '903 Patent and, therefore, the First Case constitutes a final judgment of patent infringement against Cisco.

63. Cisco had a full and fair opportunity to challenge the validity and enforceability of the '903 Patent and, in fact, did challenge the patent's validity and enforceability under numerous theories, during the First Case. These issues of the validity and enforceability of the '903 Patent were fully adjudicated and decided in the First Case and were critical and necessary to the jury's ultimate verdict that Cisco had infringed the '903 Patent.

64. As a result, Cisco is precluded from rearguing any issues related to the validity and/or enforceability of the '903 Patent in any lawsuit following the First Case.

**Cisco's Continued Infringement**

65. Undeterred by the final judgment of patent infringement in the First Case, Cisco has willfully continued to infringe XpertUniverse's '903 Patent.

66. Cisco's infringing products, services, offerings, solutions, and technology include, but are not limited to, its expert location software products and technology. On information and belief, these products include systems for storing data pertaining to various inquiry topics or categories of assistance and experts or agents who have skills and/or knowledge related to these topics and categories, and enabling individuals who are in need of assistance to submit inquiries and locate and connect in real-time with an appropriate expert or agent based on the selected inquiry.

67. By way of example, Cisco has continued and is continuing to offer for sale, sell and distribute its Remote Expert family of products, which comprise software for locating and

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

connecting experts in real-time with customers or other individuals needing assistance with various inquiries.  As stated on Cisco's website, "Remote Expert creates a virtual pool of specialists, manages their availability, and quickly connects customers with experts across multiple channels and devices, using high-quality audio and video."

68.    On information and belief, Cisco has also introduced and commercialized various other software products, platforms, offerings, and solutions that incorporate Cisco's infringing Remote Expert software and technology as a critical component within certain interconnected suites of product and service offerings, including, for example, Cisco's Unified Communications and Unified Contact Center product suites and solutions.

69.    On information and belief, all of the versions of Cisco's Remote Expert family of software products that were released after the First Case (*i.e.*, release 1.9 and all versions released thereafter), including the latest version, referred to by Cisco as "Remote Expert Release 11.0," include, among other things: (i) a database storing a number of "expert types," which describe categories of assistance; (ii) an expert database storing a list of experts and information pertaining to the experts, including one or more expert skills associated with each expert; (iii) IVR phone numbers for linking the available expert types and experts  to the expert skills; and (iv)  "Locales" that represent and store the expert types in multiple layers corresponding to different languages and/or dialects.

70.    Notwithstanding Cisco's representations during the First Case that it was implementing a workaround in Remote Expert and that its subsequent versions of these products (beginning with release 1.9) would no longer be infringing XpertUniverse's '903 Patent, on information and belief, Cisco's purported modifications are wholly unrelated to the subject matter of the inventions described and claimed in the '903 Patent and, as such, have no impact on the infringement determination.

71.    On information and belief, with respect to the claimed invention in the '903 Patent, the subsequent versions of Cisco's Remote Expert family of products include precisely the same functionality and features as the previous versions of the product that were found to infringe by the

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA  94111-4078

1   jury in the First Case.  Therefore, these supposedly "modified" versions of Remote Expert infringe

2   the '903 Patent for at least the same reasons as their predecessors.

3        72.     Cisco is precluded from re-litigating its claim that these Remote Expert products do

4   not infringe the '903 Patent.

5        73.     XpertUniverse continues to be grievously harmed by Cisco's flagrant unauthorized

6   use and infringement of XpertUniverse's patented solutions and technologies.  Cisco has received

7   substantial revenue and increased market share by selling and distributing its various software

8   products, solutions, and offerings, as well as related hardware, software, and services that

9   improperly incorporate and rely upon XpertUniverse's patented technology.

### CAUSE OF ACTION FOR

### INFRINGEMENT OF U.S. PATENT NO. 7,499,903

12        74.     XpertUniverse incorporates by reference the preceding averments set forth in

13   paragraphs 1-73.

14        75.     On March 3, 2009, the Patent Office duly and legally issued the '903 Patent,

15   entitled "Semantic to Non-Semantic Routing For Locating a Live Expert."  A true and correct

16   copy of the '903 Patent is attached hereto as Exhibit A.

17        76.     XpertUniverse is the owner, by assignment, of all right, title, and interest in and to

18   the '903 Patent, including the right to recover damages for past and future infringement.

19        77.     Cisco has been and is directly infringing, literally and/or under the doctrine of

20   equivalents, the '903 Patent in violation of 35 U.S.C. § 271 by, among other things, making,

21   using, selling, offering for sale, and/or causing others to make, use, sell, and/or offer for sale in the

22   United States systems and methods which comprise hardware and software systems, products,

23   services and/or technology, including, but not limited to, Cisco's Remote Expert products, as well

24   as other products, platforms, offerings, and solutions that incorporate Cisco's Remote Expert

25   products or similar technology (including, but not limited to, Cisco's Unified Communications

26   and Unified Contact Center product suites), which locate experts and connect them in real-time

27   with individuals seeking assistance in a manner covered by one or more claims of the '903 Patent,

28   including, but not limited to, claim 12.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

78.     On information and belief, at least with respect to the subject matter of the inventions described and claimed in the '903 Patent, all of the subsequently-released versions of Cisco's Remote Expert products, starting with release 1.9 up through and including its latest version, referred to as Remote Expert Release 11.0 ("RE 11.0"), include the same, or substantially the same, features and functionality that were in the earlier versions of Remote Expert, including the versions that the jury in the First Case found to be infringing claim 12 of the '903 Patent (collectively referred to below as the "Prior Infringing RE Versions") and, therefore, all of these subsequently-released versions of Remote Expert directly infringe at least claim 12 of the '903 Patent.

79.     By way of example, on information and belief, Cisco's most recent version of its Remote Expert family of products, RE 11.0, is directly infringing at least claim 12 of the '903 Patent.

80.     On information and belief, Cisco's RE 11.0 solution is a match and route system operable to locate a live expert.  Like with the Prior Infringing RE Versions, Cisco's RE 11.0 solution locates an expert (or agent) and establishes a real-time connection between the expert and a customer or other individual (*i.e.*, a seeker) based on the type of assistance requested by the seeker.  For example, Cisco describes its Remote Expert solutions as "delivering a superior, on-demand customer video collaboration experience—an immersive, lifelike experience between customers and subject-matter experts wherever they may be located."

81.     On information and belief, Cisco's RE 11.0 solution includes at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device.  Like with its Prior Infringing RE Versions, Cisco's RE 11.0 solution uses various multimedia computing systems and devices connected to a network in order to enable real-time bidirectional communications between experts and seekers. For example, Cisco describes its RE 11.0 solution as requiring the use of one or more PCs, touchscreens, TelePresence Endpoints, Webcams, and/or Optical Scanners that are connected to a network (e.g., the Internet) at both the expert's location and the seeker's location.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

82.     On information and belief, Cisco's RE 11.0 solution includes a host server connected to the communication network and operable to support interactive communication between a seeker and an expert.  Like with the Prior Infringing RE Versions, Cisco's RE 11.0 solution includes various servers connected to the network in order to establish and facilitate real-time interactive communications between the experts and seekers.  For example, Cisco describes its RE 11.0 solution as including Remote Expert Manager (REM), Remote Expert Session Controller (RESC), and Interactive Experience Manager (IEM) servers, each of which are connected to the Internet and are used, among other things, to establish, manage, and/or control the interactive, real-time communication sessions between experts and seekers.

83.     On information and belief, the host server of Cisco's RE 11.0 solution is communicably connected with an inquiry-type database and a skill-set database.  Like with the Prior Infringing RE Versions, Cisco's RE 11.0 solution includes and/or interfaces with a number of databases that contain various types of information, such as information pertaining to experts or agents, expert types, skill and resource groups, and Locales, as well as interrelationships and mappings therebetween.  For example, Cisco's RE 11.0 solution includes a database of "expert types," which represent categories of assistance, such as "home mortgage," "private banking," retirement savings" (*i.e.*, a database of inquiry types).  As another example, Cisco's RE 11.0 solution includes a database of "experts," who are "the call center agents designated as remote experts in the Remote Expert Manager."  Each expert is associated in the database(s) with one or more expert types and/or Locales, and are "assigned to different skill group[s] or resource group[s] . . . so that they can receive selective calls" (*i.e.*, a skill-set database).

84.     On information and belief, the inquiry-type database in Cisco's RE 11.0 solution contains at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types.  For example, Cisco's RE 11.0 solution includes a database of "expert types," which represent predefined categories of assistance expressed in human-understandable language, such as "home mortgage," "private banking," retirement savings" from which a seeker can choose (*i.e.*, a layer of

predetermined, semantically-expressed inquiry types).   Like with the Prior Infringing RE Versions, Cisco's RE 11.0 solution includes a "Locale" feature, which provides separate layers for the representing the expert types in multiple different languages or dialects, such as an English layer of expert types and a French layer of expert types (i.e., two or more layers of inquiry types). On information and belief, these layers of inquiry types are, in turn, organized from predefined skill groups and/or resource groups, each of which correspond to a "common set of skills" or categories of "services," such as types of caller needs, which are represented in humanly understandable language (*i.e.*, organized from an underlying plurality of criteria groupings that are humanly understandable descriptors).

85.     On information and belief, the skill-set database of Cisco's RE 11.0 solution contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping.  For example, like with the Prior Infringing RE Versions, Cisco's RE 11.0 solution includes a database of "experts," each of whom are associated with one of the expert types (*i.e.*, inquiry types) and assigned to the skill groups and/or resource groups corresponding to that expert type (*i.e.*, the underlying criteria grouping).

86.     On information and belief, Cisco's RE 11.0 solution includes a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database.  For example, like with the Prior Infringing RE Versions, Cisco's RE 11.0 solution utilizes "IVR Phone Numbers," which are unique numbers linked to a particular expert type and Locale combination and a particular expert or group of experts associated with the corresponding underlying skill and/or resource group, and used to route calls from seekers to the appropriate experts (i.e., a unique numeric routing identifier).

87.     On information and belief, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, the host sever of Cisco's RE 11.0 solution, is operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier.   For example, like with the Prior Infringing RE Versions, when a user requests assistance by selecting a particular expert type, Cisco's RE 11.0  solution utilizes the unique IVR number (and/or other

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

unique identifiers) linked to that expert type and Locale in order to identify the expert (or group of experts) associated with the expert type (i.e., inquiry type) requested by the user.

88.   At all relevant times, Cisco's acts of infringement of the '903 Patent have been committed and are being committed with full knowledge of XpertUniverse's rights in the '903 Patent.

89.   XpertUniverse disclosed its patented technologies and intellectual property, including the patent application that ultimately issued as the '903 Patent, to Cisco during their two and a half year relationship from around 2004-2007 pursuant to the parties' mutual non-disclosure agreement.  Cisco was made aware of the '903 Patent again when XpertUniverse filed the First Case and notified Cisco of its infringement.  Since the final judgment of patent infringement against Cisco in the First Case, Cisco has known that its Remote Expert product infringes the '903 Patent.

90.   With no regard for the patent infringement verdict in the First Case, Cisco has continued to deliberately and wantonly infringe the '903 Patent by, among other things, selling, offering for sale, and distributing its Remote Expert products and technology.

91.   On information and belief, Cisco has acted and is continuing to act despite an objectively high likelihood that its actions constitute infringement of a valid patent and Cisco knew or should of known of that objectively high risk.  Cisco's acts constitute willful and deliberate infringement, entitling XpertUniverse to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

92.   As a direct and proximate result of Cisco's infringement of the '903 Patent, XpertUniverse has suffered and continues to suffer damage.  XpertUniverse is entitled to recover from Cisco the damages adequate to compensate for such infringement, in an amount to be determined at trial.

93.   As a direct and proximate result of Cisco's acts of infringement, XpertUniverse has been irreparably harmed and will continue to be harmed unless and until Cisco's infringing acts are enjoined and restrained by order of this Court.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

**PRAYER FOR RELIEF**

Wherefore, XpertUniverse respectfully requests that this Court enter judgment and provide relief as follows:

A.    A judgment in favor of XpertUniverse declaring that Cisco has infringed and is infringing one or more claims of the '903 Patent;

B.    A judgment declaring that Cisco's infringement of the '903 Patent has been and continues to be willful and deliberate;

C.    A judgment and order declaring that Cisco and its officers, directors, agents, employees, representatives, servants, attorneys, and all others acting in privity or in concert with them, and their subsidiaries, divisions, successors and assigns be permanently enjoined from further infringement of the '903 Patent;

D.    A judgment and order awarding XpertUniverse all damages, costs, and expenses adequate to compensate for Cisco's infringement of the '903 Patent, and in no event less than a reasonable royalty, for Cisco's acts of infringement, with pre-judgment and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

E.    An accounting for any infringing sales not presented at trial and an award by the Court of additional damages for any such infringing sales;

F.    A judgment and order increasing the amount of damages as a result of Cisco's infringement of the '903 Patent to three times the amount found or assessed by the Court because of the willful and deliberate nature of the infringement in accordance with 35 U.S.C. § 284;

G.    A judgment and order finding that this case is an exceptional case pursuant to 35 U.S.C. § 285 and awarding XpertUniverse its reasonable attorneys' fees and costs incurred in connection with this action; and

H.    Any and all such further equitable or legal relief which the Court may deem just and proper under the circumstances.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111-4078

## DEMAND FOR JURY TRIAL

XpertUniverse hereby respectfully requests a trial by jury on all issues raised in this

Complaint so triable by right pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:   July 6, 2017

K. Lee Marshall
**BRYAN CAVE LLP**


By: */s/ K. Lee Marshall*
         K. Lee Marshall
Attorneys for XpertUniverse, Inc.

Exhibit A

Case 3:17-cv-03848-JSC   Document ▮▮▮ Filed ▮▮/▮▮/▮▮   Page 23 of ▮▮

US007499903B2

## (12) United States Patent
### Nevin et al.

(10) Patent No.: **US 7,499,903 B2**
(45) Date of Patent: **Mar. 3, 2009**

(54) **SEMANTIC TO NON-SEMANTIC ROUTING FOR LOCATING A LIVE EXPERT**

(76) Inventors: **James B. Nevin**, 230 Mulberry St., #3,
New York, NY (US) 10012; **John
Steinhoff**, 131 Perry St., Apt. 2B, New
York, NY (US) 10014; **Richard W.
Mason**, 348 Valley Rd., Cos Cob, CT
(US) 06807; **Abraham Zelkin**, 27
Amber La., Oyster Bay, NY (US) 11771

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 297 days.

(21) Appl. No.: **11/043,014**

(22) Filed: **Jan. 24, 2005**

(65) **Prior Publication Data**
US 2006/0167846 A1     Jul. 27, 2006

(51) **Int. Cl.**
*G06F 17/00* (2006.01)
*G06N 7/00* (2006.01)
(52) **U.S. Cl.** .......................................... **706/60**; 706/55
(58) **Field of Classification Search** .................. 706/50,
706/60, 55; 379/219; 707/1, 3, 100; 715/765
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,862,223 A     1/1999   Walker et al.

6,615,199 B1 *   9/2003   Bowman-Amuah .......... 706/50
2001/0024497 A1 *  9/2001   Campbell et al. ...... 379/265.09

* cited by examiner

*Primary Examiner*—David Vincent
*Assistant Examiner*—Kalpana Bharadwaj

(57) **ABSTRACT**

A system and method of semantic to non-semantic routing for
locating an expert. An inquiry-type database has a first layer
of inquiry types organized from underlying criteria group-
ings, (humanly understandable descriptors). Additional lay-
ers are associated in a one-to-one correspondence with the
first layer of inquiry types. Experts, having individualized
knowledge, are listed in a skill-set database associated with
the inquiry types. The skill-set database entries are linked to
the associated inquiry-type by a numerical routing identifier.
An expert is selected from the skill-set database entry linked
by the numerical routing identifier. In another embodiment,
multiple enterprises are mapped to separate layers of inquiry
types having a one-to-one correspondence with the underly-
ing groupings. A skill-set database entry is related to the
inquiry type through a numerical routing identifier, the iden-
tifier being selected from a respective range of identifiers
associated with the respective multiple enterprises.

**26 Claims, 3 Drawing Sheets**







FIGURE 1



Figure 2



START
310
Populate a database with a first layer of semantically-expressed inquiry types organized from predetermined groupings of underlying criteria
320
Associate one or more other layers of semantically-expressed inquiry types with the predetermined groupings of underlying criteria
330
Include in a skill-set database entries which associate an expert with at least one of the inquiry types
340
Map each skill-set database entry to the associated inquiry type through a unique numerical routing identifier
350
Upon a user's request for assistance, identify the expert mapped through the unique numerical routing identifier to the inquiry type of interest to the user
END
300

FIGURE 3

US 7,499,903 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## SEMANTIC TO NON-SEMANTIC ROUTING FOR LOCATING A LIVE EXPERT

### FIELD OF INVENTION

The present invention relates to a match and route system, and in particular to a match and route system that matches a seeker having an inquiry to an expert having individualized knowledge of the seeker's inquiry.

### BACKGROUND OF THE INVENTION

An enterprise having a multitude of personnel has a vast asset of information available, but yet is often faced with difficulties in matching a seeker needing assistance with an inquiry to an expert within the enterprise. Match and route systems have been developed which are capable of connecting a seeker requesting information to an expert. The seeker's inquires are criteria organized into categories of information and are helpful in matching a seeker's request for assistance with the skills of a pool of qualified experts. The result is a live collaboration session between the seeker and a selected expert.

The systems prior to the present invention utilize a technique that matches inquires to skill sets identifying experts by utilizing a fixed identifier, which is dedicated to the associated inquiry and skill set. The data records needed for such systems for even a moderate sized enterprise are labor intensive to create and populate. Extensive effort is expended in "hardwiring" the connections between the categories of organized criteria and the skills of the qualified expert. Any change in the criteria organization requires an equally extensive and labor intensive effort.

Building and loading the data records is expensive and prohibitive. Missing from the art are techniques that add flexibility to the match and route systems. There exist a need in the art for a technique which facilitates reconfiguring a match and route system with an inexpensive and efficient approach.

Further missing from the art is a system in which a seeker's inquiry is routed to an expert using semantic to non-semantic routing techniques. Also, missing from the art is a system in which a pool of experts can be easily and readily be made accessible to multiple organizations and enterprises. The present invention can satisfy one or more of these and other needs.

### SUMMARY OF THE INVENTION

The present invention relates to semantic to non-semantic routing for locating a live expert. In accordance with one aspect of the invention, an inquiry type database is populated with a first layer of inquiry types organized from underlying criteria groupings, which are humanly understandable descriptors. Additional layers of inquiry types are associated in the database with the underlying criteria groupings in a one-to-one correspondence with the first layer of inquiry types. A skill-set database includes entries that associate one or more experts with one or more of the inquiry types and its corresponding layers. The experts each have individualized knowledge of at least one criterion of the underlying criteria grouping for that inquiry type. The skill-set database entries are linked to the associated inquiry-type in the inquiry-type database by a unique numerical routing identifier. Upon a user's request for assistance with a particular inquiry type, an expert is selected from the skill-set database entry linked by the numerical routing identifier.

In another aspect of the invention, multiple enterprises are mapped to separate layers that have a one-to-one correspondence with the inquiry types organized from underlying criteria groupings. For each of the multiple enterprises, a skill-set database entry related to the inquiry type is mapped through a unique numerical routing identifier, the numerical routing identifier being selected from a respective range of numeric routing identifiers associated with the respective multiple enterprises.

These and other aspects, features, steps and advantages can be further appreciated from the accompanying figures and description of certain illustrative embodiments.

### BRIEF DESCRIPTION OF THE DRAWING FIGURES

FIG. 1 illustrates an embodiment of a communication network suitable for implementing semantic to non-semantic routing of inquiry requests;

FIG. 2 depicts a table of semantic routing criteria; and

FIG. 3 is a flow diagram illustrating steps in accordance with an illustrated embodiment.

### DETAILED DESCRIPTION OF THE ILLUSTRATIVE EMBODIMENTS

By way of overview and introduction, presented and described are embodiments of a match and route system that supports semantic to non-semantic routing of inquiry requests received from a user to an expert having individualized knowledge of at least some portion of the inquiry topic. The match and route system presents a user seeking assistance on a topic with a selection of underlying criteria that are humanly understandable descriptors (semantic identifiers). After the seeker responds to several iterations of semantic identifier presentations, the system is able to select a predetermined semantically-expressed inquiry type that is organized from the underlying criteria grouping selected by the seeker. A skill set is linked to the semantic inquiry type by a unique numeric identifier. The skill set contains the identity of an expert, or group of experts that have the individualized knowledge on the topic being requested by the seeker.

In an embodiment of the invention, a combination of Internet technology and communication queuing/routing systems provide the interactive communication infrastructure to support the semantic to non-semantic routing process which locates a live expert. One such infrastructure can be an automated call distribution system, which is a computerized phone system that routes incoming telephone calls to operators or agents. Alternatively the infrastructure can be a system that supports instant messaging and Web conferencing, as is known in the art. Other infrastructure and applications suitable for routing an information request received from a seeker to an available expert are also within the scope of this embodiment.

FIG. 1 illustrates an embodiment of a communication network suitable for implementing semantic to non-semantic routing of inquiry requests. FIG. 1 shows components of an exemplary environment in which processes embodying the invention can be implemented. Variations in the arrangement and type of the components may be made without departing from the spirit or scope of the invention. The particular component configuration is not critical to the present invention. FIG. 1 shows enough components sufficient to disclose an illustrative environment for practicing embodiments of the present invention.

US 7,499,903 B2

**3**

The depicted embodiment includes multimedia personal computers, workstations, or computer terminals **10**A, **10**B (hereinafter collectively referred to as multimedia computer) connected to a communication network **12** (e.g., the Internet) to access a host server **14** at some remote location. The multimedia computer can also be a thin client (e.g., a network computer that is designed to serve as the client for client/server architectures), a term known to persons of skill in the art. The multimedia computers **10**A, **10**B may, for example, include bidirectional audio/visual capability, e.g., speakers, microphone, or audio/video webcam. Optionally, connected to the multimedia computer is an electronic whiteboard, tablet, or other device (not shown) that permits interactive document creation, viewing, and mark-up across the communication network **12**.

Communication network **12** can include a local area network ("LAN"), a wide area network ("WAN"), the Internet, or a combination of all three interconnected by routers (not shown). A router is a intermediary communications network device that links many computers through a mesh of possible connections, a router receives transmitted messages and forwards them to their correct destinations over available routes. On an interconnected set of networks—including those based on differing architectures and protocols—a router acts as a link between the networks, enabling messages to be sent from one to another. The communication links within a network typically use twisted pair, fiber optics, or coaxial cable, while communication links between networks may utilize analog telephone lines, full or fractional dedicated digital lines, Digital Subscriber Lines (DSLs), wireless links, hybrids of the foregoing or future technologies, or other communications links known to those skilled in the art.

At least one multimedia computer **10**A is provided at a remote location accessible to a seeker, an individual user (or group of users) desiring to locate an expert in a particular field of interest. At least one other multimedia computer **10**B is provided at another remote location accessible to the expert, an individual (or group of individuals) having individualized knowledge of a subject of interest to the seeker.

Multimedia computer **10**A, **10**B includes a central processing unit (CPU), a video display adapter, and memory. The memory generally includes RAM, ROM, and a permanent mass storage device, such as a disk drive. The memory stores an operating system, a BIOS, and programs for controlling the operation of the multimedia computer. The memory can also be loaded with software specific to practicing embodiments of the present invention. It will be appreciated that these components may be stored on a computer-readable medium and loaded into memory of multimedia computer **10**A, **10**B using a drive mechanism associated with the computer-readable medium, such as a floppy disk drive, an optical drive, such as a CD-ROM/DVD-ROM drive, and/or a hard disk drive. An input/output interface can also be provided for receiving input from a mouse, keyboard, or other input device. The memory, network interface unit, video display adapter, and input/output interface are all connected to the processing unit via a bus. Other peripherals may also be connected to the processing unit in a similar manner. For example, the interface may also be provided at a terminal, for displaying accessed data, computed scores, and so on.

It should be understood that the multimedia computer **19**A, **10**B could also be embodied as any one of a great variety of electronic devices ranging from general purpose computing machines to less general devices such as personal digital assistants (PDAs) or smart phones, to a special purpose devices such as DVB-H enabled mobile devices. Regardless of the physical form of the multimedia computer **10**A, **10**B, it

**4**

includes a local memory, a processor, and input/output capabilities to permit interaction with a user.

The host server **14** provides a user interface, such as a Web page(s), using an Internet facility such as the World Wide Web. The host server includes at least one processor and operating instructions, and is operable to perform a selection process that matches the seeker to an expert. The host server is capable of connecting the seeker and expert via the aforementioned infrastructure. In a preferred embodiment the seeker is put in communication with the next best available expert. The host server processor can also be a distributed processor architecture as is known to persons of ordinary skill in the art.

The communication path is an interactive real time path that supports participants engaging in a dialog and discussion. Exhibits (e.g., view graphs, PowerPoint presentations) can be displayed across the network. Typical communication paths can be the Internet, a telephony connection, a video connection, and a voice-over-internet protocol. Devices that can support such communication and are suitable for implementation of the present invention can include, but are not limited to, cell phones, personal digital assistants, hand-held computers, and two-way audio-visual devices. These devices are within the collective term "multimedia computer" as used herein.

The host server **14** can be configured in a multi-server architecture, which has distributed servers performing particular functions. In such an embodiment, the multiple servers are interconnected via a local area network, a wide area network, or any other network (local or remote) **22**. For example, the multi-server architecture can include, but is not limited to, portal servers **16**A, **16**B interfacing with the multimedia computers **10**A, **10**B (alternatively, a single portal server can interface with multimedia computers **10**A and **10**B), an application server **17**, a multiplex (MUX) server **18** to manage end-user connections, and a database server **19** to connect to a database **20**. The databases themselves are records organized in computer readable/writeable memory, and can be located in a datastore, or any other suitable data mass storage device. The database **20** can be connected to network **22**, communication network **12**, or both.

FIG. **2** depicts a table of semantic routing criteria **200** which is stored in the database **20**. The particular semantic routing criteria is retrieved from the database for a specific organization. The semantic routing criteria are organized into predetermined groups that identify an inquiry type. The predetermined groups are setup in accordance with the specific organization's preferences. For example, a user seeking information is presented with a Get Assistance Page **220**. The Get Assistance Page presents criterion selections that a seeker selects before the system can locate an expert. For example, FIG. **2** depicts a Get Assistance Page **220** related to the insurance industry, and presents four criterion selections. However, the presentation of fewer or greater criterion selections is also within the scope of the invention. Criterion selection **201** is labeled "Line of Business." In this example, the user can choose between the criteria of property or inland marine businesses. A second criterion selection **204** is then presented. The underlying criteria of criterion selection **204** are predetermined and can be dependent on criterion selection **201**, or can be independent of criterion selection **201**. Here, the underlying criteria that are to be presented as criterion selection **204** are dependent on the selection made for criterion selection **201**. Similarly, the underlying criteria presented for criterion selection **207** is dependent on the previous selection of criterion selection **204**. In this manner, the criterion selections **201**, **204**, **207** have a hierarchal relationship.

US 7,499,903 B2

5

However, the underlying criteria presented for criterion selection **210** is independent of criterion selection **207**, and is presented regardless of the previous choice.

It can be easily understood by a person of ordinary skill in the art that all the criterion selections **201**, **204**, **207**, **210** can have a hierarchal relationship, can be independent, or a combination of hierarchal and independent relationship. Each subsequent criterion selection **204**, **207**, **210** available for presentation to a seeker has been predetermined in accordance with the organization's preferences. The organization can choose to limit the combination of criterion selections to fit within a prescribed notion of what areas are relevant to the organization. After all the criterion selections are made, the system can identify the inquiry type, which is the specific grouping of underlying criteria predetermined by the organization.

Additional layers of criterion selections are setup in accordance with the organization's preferences. These additional layers are related to the first layer by having a one-to-one correspondence with the inquiry types, which are the groupings of underlying criteria predetermined by the organization. The selection of a particular layer for presentation to a seeker can be determined by a user profile or an organization profile. These profiles can be specified by the organization, or the organization can specify that seekers can have at least some control of their own individual profile. The additional layers of criterion selections are different semantic presentations of the first layer. These layers can be in different languages, or can be composed in jargon specific to differing levels of knowledge within a field of interest. The layers can also present the underlying criteria in user-centric terms, e.g., part numbers, paper form numbers, functional block identifiers, etc.

FIG. **3** is a flow diagram illustrating process **300**. At step **310**, an inquiry-type database is populated with the first layer of inquiry-types organized from groupings of underlying criteria. Optionally, the groupings of criteria can be predetermined by an organization or enterprise in accordance with rules selected by that organization or enterprise. One or more other layers of inquiry types are associated with the groupings of underlying criteria, step **320**. The other layers of inquiry types have a one-to-one correspondence with the first layer. In this embodiment for every inquiry-type member of the first layer, there is a member for each of the other layers of inquiry types.

At step **330**, entries in a skill-set database associate one or more experts with the inquiry-types. The experts each have individualized knowledge of one of more of the criteria that form the underlying grouping of criteria. The skill-set database entries are each mapped, step **340**, to the inquiry types associated with the experts in step **330**. This mapping is accomplished by associating the skill-set entry and the inquiry type to a unique numerical routing identifier. When a user (seeker) requests assistance with a particular inquiry type, step **350**, the expert(s) associated with the skill-set entry mapped to the inquiry type by the numerical routing identifier are located and identified.

When more than one expert is associated with a skill-set entry, multiple experts will be located and identified at step **350**. In such a case, a further embodiment of the invention provides a ranking of the experts. The most meritorious ranked expert among the set of experts located is placed in communication with the seeker. Should the most meritorious ranked expert not be available, the next best available expert is selected. The ranking can be based on such factors as the level of the expert's individualized knowledge of the underlying criteria for the inquiry type; predetermined indicators

6

obtained from a profile associated with the seeker, or the organization to which the seeker belongs; the financial costs associated with the expert; the status of the seeker and/or the expert, as well as the importance of the seeker and/or expert to the organization to which they belong. As can be understood by a person of ordinary skill in the art, there are other metrics and techniques available to rank the expert.

In another embodiment, the skill-set database contains entries that associate at least one expert, by a numerical routing identifier, to an inquiry type organized from underlying criteria. The skill-set database can be maintained as a service bureau that provides the experts to seekers originating from multiple enterprises. Each of the respective multiple enterprises is assigned a range of numerical routing identifiers that are unique to the respective enterprise. A first layer of inquiry types organized from underlying criteria, and residing in an inquiry-type database, is associated with one of the respective enterprises. Additional layers of inquiry types having a one-to-one correspondence with the inquiry types of the first layer are associated with other respective enterprises. Mapping the skill-set entries to the respective enterprise related to the respective layers of inquiry types is accomplished by utilizing a numerical routing identifier selected from the range of numerical routing identifiers assigned to each of the respective multiple enterprises. Upon a seeker's request for assistance with an inquiry type related to the seeker's enterprise, the service bureau identifies and locates an expert through the numerical routing identifier for that enterprise.

Thus, while there have been shown, described, and pointed out fundamental novel features of the invention as applied to several embodiments, it will be understood that various omissions, substitutions, and changes in the form and details of the illustrated embodiments, and in their operation, may be made by those skilled in the art without departing from the spirit and scope of the invention. Substitutions of elements from one described embodiment to another are also fully intended and contemplated. The invention is defined solely with regard to the claims appended hereto, and equivalents of the recitations therein.

We claim:

**1**. A method of semantic to non-semantic routing to locate a live expert comprising the steps of:

provided an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors;

associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types;

supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type;

mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and

upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user.

**2**. The method of claim **1**, further comprising the step of establishing a real time communication path between the user and the expert.

**3**. The method of claim **2**, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection.

**4**. The method of claim **1**, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user.

**5**. The method of claim **4**, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member.

**6**. The method of claim **1**, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages.

**7**. The method of claim **1**, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest.

**8**. The method of claim **1**, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms.

**9**. The method of claim **1**, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile.

**10**. The method of claim **9**, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and

the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order.

**11**. The method of claim **10**, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement.

**12**. A match and route system operable to locate a live expert comprising:

at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device;

a host server connected to the communication network and operable to support interactive communication between a seeker and an expert;

the host server communicably connected with an inquiry-type database and a skill-set database;

the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types;

the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping;

a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and

the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-

expressed inquiry type requested by the user by use of the numeric routing identifier.

**13**. The match and route system of claim **12**, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet.

**14**. The match and route system of claim **12**, wherein the communication network is the Internet.

**15**. The match and route system of claim **12**, wherein the interactive communication is instant messaging, web conferencing, of a combination of instant messaging and web conferencing.

**16**. The match and route system of claim **12**, wherein the host server is communicably connected with the databases by the Internet.

**17**. The match and route system of claim **12**, wherein the host server is communicably connected with the databases by a local area network, or a wide area network.

**18**. The match and route system of claim **12**, wherein the host server is configured in a multi-server architecture.

**19**. A method of semantic to non-semantic routing to locate a live expert comprising the steps of:

populating an inquiry-type database with a first layer of predetermined semantically-expressed inquiry types organized from predetermined underlying pluralities of criteria groupings, the first layer associated with a first enterprise;

supplying a skill-set database that includes an entry that associates an expert with at least one of the inquiry types, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type;

assigning a first range of unique numerical routing identifiers to the first enterprise;

mapping each skill-set database entry to the associated predetermined semantically-expressed inquiry type of the first layer through one of the numerical routing identifiers assigned to the first enterprise;

assigning at least one respective additional range of unique numerical routing identifiers to a respective additional enterprise;

associating in the inquiry-type database at least one respective additional layer of inquiry type with the underlying criteria groupings of the first layer, the respective additional layer of inquiry type having a one-to-one correspondence with the first layer of inquiry types;

relating the respective additional layer of inquiry types to said respective additional enterprises;

for each respective additional enterprise, mapping each skill-set database entry to the related inquiry type of the respective additional layer through one of the numerical routing identifiers in the range assigned to the respective additional enterprise; and

upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type related to the user's enterprise, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user.

**20**. The method of claim **19**, further comprising the step of establishing a real time communication path between the user and the expert.

**21**. The method of claim **20**, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection.

US 7,499,903 B2

9

**22**. The method of claim **19**, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user.

**23**. The method of claim **22**, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member.

**24**. The method of claim **19**, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile.

10

**25**. The method of claim **24**, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and

the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order.

**26**. The method of claim **25**, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement.

*   *   *   *   *