1   K. Lee Marshall (SBN 277092)
    Alexandra C. Whitworth (SBN 303046)
2   BRYAN CAVE LLP
    Three Embarcadero Center, 7th Floor
3   San Francisco, CA  94111-4078
    Telephone: (415) 675-3444
4   Facsimile: (415) 675-3434
    klmarshall@bryancave.com
5   alex.whitworth@bryancave.com

6   J. Bennett Clark (*pro hac vice*)
    Daniel A. Crowe (*pro hac vice*)
7   BRYAN CAVE LLP
    One Metropolitan Square
8   211 North Broadway, Suite 3600
    St. Louis, MO  63102
9   Telephone: (314) 259-2000
    Facsimile: (314) 259-2020
10  ben.clark@bryancave.com
    dacrowe@bryancave.com
11
    Joseph J. Richetti (*pro hac vice*)
12  BRYAN CAVE LLP
    1290 Avenue of the Americas
13  New York, NY  10104
    Telephone:  (212) 541-2000
14  Facsimile:  (212) 541-4630
    erik.kahn@bryancave.com
15  joseph.richetti@bryancave.com

16  *Attorneys for Plaintiff XpertUniverse, Inc.*

17

18          **IN THE UNITED STATES DISTRICT COURT**

19             **NORTHERN DISTRICT OF CALIFORNIA**

20

21  XPERTUNIVERSE, INC.,                  Case No. 17-cv-3848
    a Delaware Corporation,
22                                        **REQUEST FOR JUDICIAL NOTICE IN**
                                          **SUPPORT OF PLAINTIFF**
23              Plaintiff,                **XPERTUNIVERSE, INC.'S MOTION**
                                          **FOR PARTIAL SUMMARY JUDGMENT**
24          v.                            **ON INVALIDITY COLLATERAL**
                                          **ESTOPPEL**
25  CISCO SYSTEMS, INC.,
    a California Corporation,             Date: March 29, 2018
26                                        Time: 1:30 p.m.
               Defendant.                 Courtroom: 3
27                                        Judge: Hon. Richard Seeborg

28
    ─────────────────────────────────────────────────────────
    11429154.1

    REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON
    INVALIDITY COLLATERAL ESTOPPEL

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

Pursuant to Federal Rule of Evidence 201, Plaintiff XpertUniverse, Inc. ("XpertUniverse") by and through its attorneys of record, hereby requests that the Court take judicial notice of the following documents in support of its Motion for Partial Summary Judgment:

**Exhibit A:** Complaint and Demand for Jury Trial filed by Plaintiff XpertUniverse, Inc. in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on March 10, 2009.

**Exhibit B:** Answer to XpertUniverse's Fourth Amended Complaint and Counterclaims filed by Defendant Cisco Systems, Inc. in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on February 3, 2012.

**Exhibit C:** Defendant Cisco Systems, Inc.'s Preliminary Invalidity Contentions, served on Plaintiff XpertUniverse, Inc. on December 1, 2011.

**Exhibit D:** Opening Brief in Support of its Motion for Partial Summary Judgment No. 2 for Invalidity of U.S. Patent Nos. 7,366,709 and 7,499,903 Based on 35 U.S.C. § 102(b) (Counts I & II) filed by Defendant Cisco Systems, Inc. in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on November 7, 2012.

**Exhibit E:** Memorandum Opinion denying in part Defendant Cisco Systems, Inc. Motion for Partial Summary Judgment No. 2 for Invalidity of U.S. Patent Nos. 7,366,709 and 7,499,903, entered in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on March 8, 2013.

**Exhibit F:** Portions of the Trial Transcript, Vol. 7, in United States District Court for the District of  Delaware, Case No. 1:09-cv-00157-RGA on March 20, 2013.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

**Exhibit G:**   Jury Verdict, entered in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on March 22, 2013.

**Exhibit H:**   Opening Brief in Support of Motion for Judgment as a Matter of Law, and, in the Alternative, for Remittitur or New Trial filed by Defendant Cisco Systems, Inc. in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on May 6, 2013.

**Exhibit I:**   Memorandum Opinion on Post-Trial Motions, entered in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on November 20, 2013.

**Exhibit J:**   Notice of Cross-Appeal filed by Defendant Cisco Systems, Inc. in the United States Court of Appeals for the Federal Circuit on March 6, 2014.

**Exhibit K:**   Final Judgment, entered in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on January 30, 2014.

**Exhibit L:**   Motion to Alter or Amend the Judgment and Motion for Attorneys' Fees filed by Plaintiff XpertUniverse, Inc. in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on May 6, 2013.

**Motion M:**   Motion for Leave to File a Motion for Partial Summary Judgment filed by Defendant Cisco Systems, Inc. in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on February 28, 2012.

Federal Rule of Evidence 201(b) allows this Court to take judicial notice of any fact "not subject to reasonable dispute because it" is either (1) "generally known within the trial court's territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned."

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON INVALIDITY COLLATERAL ESTOPPEL

This Court may take judicial notice of pleadings and court orders in related proceedings. *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n. 1 (9th Cir. 1996).  This Court may therefore take judicial notice of the pleadings and court orders from the related proceeding attached as Exhibits A, B, C, D, E, G, H, I, J, K, L, and M.  Additionally, this Court may take judicial notice of trial transcripts from related proceedings "because the contents of the trial transcripts can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Allstate Ins. Co. v. Pira*, No. C 11-3511 CW, 2012 WL 1997212, at *4 (N.D. Cal. June 4, 2012) (internal quotations omitted).  This Court may therefore take judicial notice of the trial transcripts attached as Exhibit F.


Dated:      February 15, 2018            **BRYAN CAVE LLP**

                                   By: _/s/ K. Lee Marshall_____
                                        K. Lee Marshall
                                        Attorneys for Plaintiff
                                        XPERTUNIVERSE, INC.

BRYAN CAVE LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON INVALIDITY COLLATERAL ESTOPPEL

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC., )
                 )    **Civil Action No. 09-157-UNA**
        Plaintiff )
                 )
    vs. )    **JURY TRIAL DEMANDED**
                 )
                 )    **PUBLIC VERSION**
CISCO SYSTEMS, INC., )
                 )
        Defendant. )

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff XpertUniverse, Inc. ("XpertUniverse"), for its Complaint against defendant Cisco Systems, Inc. ("Cisco") alleges:

## THE PARTIES

1.     Plaintiff XpertUniverse is a Delaware corporation with a principal place of business located at 253 West 35th Street, New York, New York.

2.     On information and belief, Defendant Cisco is a California corporation with a principal place of business at 170 West Tasman Drive, San Jose, California.

## JURISDICTION AND VENUE

3.     This is a civil action concerning: (i) patent infringement in violation of the United States Patent Act of 1952, as amended, 35 U.S.C. § 271 et seq.; (ii) misappropriation of trade secrets under Delaware's Uniform Trade Secrets Act, Del. Code § 6-2001 et seq.; (iii) unfair competition in violation of Section 43(a) of the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a); (iv) related claims of breach of contract, unfair competition, trademark infringement, unjust enrichment, and conversion in violation of the laws of the State

of Delaware and the common law; and (v) deceptive and unfair trade practices in violation of Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2531 et seq.

4.     This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338 (a)-(b), as it involves substantial claims arising under the United States Patent Act of 1952, as amended, 35 U.S.C. § 271 et seq. and the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1125(a).  Personal jurisdiction over Defendant Cisco comports with the United States Constitution and 10 Del. C. § 3104 because, on information and belief, Defendant Cisco has committed the acts complained of within Delaware such that it has purposefully availed itself of the privilege of conducting activities within this District.

5.     This Court has supplemental jurisdiction over the claims in this Complaint which arise under state statutory and common law pursuant to 28 U.S.C. § 1367(a), since the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391 and 1400(b).

## FACTS UNDERLYING THE DISPUTE

7.     XpertUniverse, then known as Homework911.com, was founded in 1999 and is in the business of developing innovative expert location, live interaction, and business intelligence technology for use over the Internet and other media.

8.     In or about 1999, XpertUniverse realized that the then current technology used by call centers did not possess an effective capability of connecting a customer's need with the appropriate expert or problem solver.  Call centers were inadequate and inefficient in locating the

2

optimal expert for solving the specific needs of a customer. In particular, call centers required substantial human intervention and the call center agent receiving the customer's request for an expert usually did not have access to available data to locate the best or optimal expert to solve the problems of the caller. Call centers were also limited by the location of its resources (*i.e.*, its experts or problem solvers had to operate out of call centers).

9.      XpertUniverse recognized that the expertise possessed by the employees that operate outside the call center, especially in large organizations, was a highly valuable asset and untapped resource. XpertUniverse realized that this resource could be made available, free of the limitations of the traditional call center model, to other employees, as well as customers of those organizations around the world.

10.     Through substantial innovation and effort, XpertUniverse developed a unique, proprietary platform and technology ("XpertSHARE") that permits locating an expert in an efficient and effective manner via the Internet or other electronic means with limited human intervention. The technology, among other things, combines aspects of call center technology with a rich set of collaboration tools and customer relationship management functionality, coupled with business intelligence capabilities.

11.     The technology also uses a configurable taxonomy to determine the best expert and enables, among other things, the person seeking specific expertise to engage in a real time, live interaction(s) with the expert(s), as desired. Based on this platform and technology, XpertUniverse created a service offering called "Expert On Demand." The information obtained and exchanged between the expert and the expertise seeker can be archived, thereby creating a significant asset, while providing corporations with valuable real-time information for analysis, reporting and training purposes.

12. XpertUniverse saw that its technology would be particularly valuable to companies providing call center software and/or services. Call centers often require operators to connect callers with experts who have the requisite knowledge or expertise to answer a caller's question. For example, a person interested in a new mortgage for an owner-occupied house in Delaware may call a bank's call center seeking information regarding the types of mortgages available and the terms of such products. The call center agent would typically transfer the call to the next available agent, but would have no means by which to locate the best available expert based on the mortgage applicant's specific issues, *e.g.*, an expert in residential mortgages for Delaware owner-occupied dwellings, who also speaks Spanish. As a result, the process was ineffective, inefficient and costly because there was no way to ensure that the caller reached the appropriate or optimal expert. This resulted in poor customer satisfaction, high cost of delivery and lower revenues.

13. In about 2004, XpertUniverse began a business relationship with Genesys Telecommunications Laboratories, Inc. ("Genesys"), a leading call center technology company, with the goal of offering XpertUniverse's platform to Genesys' customers. Genesys had expressed serious interest in the XpertUniverse technology and platform, as it realized and appreciated the importance and potential of XpertUniverse's technology on a global scale. During their business relationship, XpertUniverse worked with Genesys' middle and executive level management. In or about the summer of 2004, literally weeks away from Genesys' introduction of the XpertUniverse platform to its customer base, Genesys' CEO, who had been XpertUniverse's most senior contact, left Genesys to join Cisco as Cisco's new General Manager of the CCBU (Call Center Business Unit).

14.     Shortly after leaving Genesys, this individual advised XpertUniverse that (a) Cisco did not possess anything similar to XpertUniverse's technology and platform, (b) Cisco had great interest in commercializing XpertUniverse's technology and platform, (c) given Cisco's market focus, as well Cisco's global business contacts, Cisco would be the best distributor/partner in the sales and marketing of XpertUniverse's technology and platform, (d) XpertUniverse should, accordingly, focus its efforts on building a relationship with Cisco, rather than Genesys , (e) Cisco would fully support XpertUniverse's efforts and would, *inter alia*, introduce XpertUniverse's platform to Cisco's global customer base, and (f) Cisco would ensure that the trade secrets and confidential information of XpertUniverse were protected.

15.     Based upon the foregoing representations, XpertUniverse ceased pursuing business opportunities with Genesys in favor of a new business relationship with Cisco.  In particular, despite the substantial time and effort it had expended in developing a platform that incorporated Genesys' routing technology, XpertUniverse changed its focus to devote substantially all its time and effort to building a platform specific to Cisco's needs.

16.     Prior to working with Cisco, XpertUniverse insisted that Cisco agree to an appropriate non-disclosure agreement because the technology and platform was and remains the heart of XpertUniverse and was developed by XpertUniverse through the expenditure of great time, intellectual efforts and resources.

17.     In or about August 2004, Cisco provided XpertUniverse with Cisco's Mutual Non-Disclosure Agreement.  On or about August 2, 2004, XpertUniverse and Cisco executed the mutual non-disclosure agreement ("NDA"), whereby each party agreed ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮.  A copy of the NDA is attached as Exhibit A.

18.     Cisco acknowledged pursuant to the NDA that ████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████

19.     After signing the NDA, XpertUniverse began substantive talks with Cisco regarding forming a business relationship around XpertUniverse's expert location, live interaction, and business intelligence technology. Over the next several years, XpertUniverse dedicated most of its work force and millions of dollars in order to integrate Cisco's routing technology into the XpertUniverse platform, thereby replacing Genesys' routing technology.

20.     Given the protection afforded by the NDA, XpertUniverse in good faith shared each and every facet of its knowledge with Cisco, believing that Cisco would abide by its obligations pursuant to the NDA. For example, XpertUniverse disclosed to Cisco all of its valuable trade secrets, and proprietary and confidential information, including, by way of example, and without limitation: technical development documents, schematics, system architecture, integration charts, sales and marketing strategies, marketing forecasts, and pricing schedules.

21.     The project, which was undertaken pursuant to the NDA, concerned a new concept and a new product, and XpertUniverse not only taught Cisco how to build the system using XpertUniverse's trade secrets and proprietary and confidential information, but also how to market and sell the new product to Cisco's customers. By supplying various white papers on the application of XpertUniverse's technology to different industries, XpertUniverse outlined in great detail the value proposition for various vertical markets.

22. XpertUniverse and its key personnel were, for approximately three years, in constant and almost daily contact with Cisco technologists and software developers, as well as marketing and business development personnel. The relationship was so close that Cisco and XpertUniverse attended numerous trade shows together, where XpertUniverse, at Cisco's request, would demonstrate and explain to potential customers the value and various uses of its technology and platform.

23. Cisco recognized the substantial business potential of XpertUniverse's technology.

24. Cisco, realizing the importance of XpertUniverse's technology, placed XpertUniverse in a special program known as "Solutions Plus," putting XpertUniverse on a fast track or priority status.

25. Cisco recognized that the XpertUniverse technology would have great demand and, at the same time, would enable Cisco to increase sales of companion hardware and software products.

26. Given the importance of the project, the highest management levels of Cisco, including its current Chief Executive Officer, the Chief Technology Officer at the time, as well as the current head of its software division, were involved and/or had knowledge of XpertUniverse's capabilities.

27. XpertUniverse applied for patent protection in order to protect aspects of its novel and innovative intellectual property. On April 2, 2004, XpertUniverse filed a provisional patent application entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles." On March 31, 2005, XpertUniverse filed U.S. Patent Application Serial No. 11/097,967, claiming the benefit of the filing date of the previously filed provisional patent

7

application.  The patent application issued to XpertUniverse on April 29, 2008 as U.S. Patent No. 7,366,709.

28.     XpertUniverse advised Cisco that it was seeking patent protection for aspects of its intellectual property.

29.     At the behest of Cisco, XpertUniverse provided on a confidential basis both pricing and marketing information to Cisco, including White Papers regarding how the product could be positioned in various vertical markets and related value propositions.  XpertUniverse did so because Cisco had no prior knowledge or experience concerning this new product and relied heavily on the expertise of XpertUniverse and the confidential information and trade secrets developed by XpertUniverse.

30.     XpertUniverse also coined and commercially used the mark "Expert On Demand" to identify and brand its services.  This mark was used as early as 2005 in presentations given to Citibank.  The mark was also used in presentations and marketing materials to Cisco and its prospective customers.

31.     Cisco was well aware that the mark was coined, used and developed by XpertUniverse.

32.     In or about January 2005, XpertUniverse began to involve IBM as a potential partner in its relationship with Cisco.  IBM, like Cisco, understood that the XpertUniverse technology and platform could deliver significant benefits to its customers.

33.     At the request of both IBM and Cisco, XpertUniverse prepared various marketing materials to use with potential customers explaining the purpose and prospective uses and benefits of the XpertUniverse technology and platform.  Such presentations were made to customers, including Citibank.

8

34. Upon information and belief, Citibank personnel were told by Cisco that Cisco was committed to working with XpertUniverse and that Cisco was not planning on offering its own platform or technology similar to that of XpertUniverse.

35. At no time did Cisco ever convey any problems, issues or objections to XpertUniverse concerning its technology or platform.

36. Cisco openly and repeatedly stated its support for XpertUniverse and its technology.

37. In or about January 2007, without any advance notice, Cisco advised XpertUniverse that it needed to reevaluate its business relationship with XpertUniverse, because Cisco did not have the resources to continue the Solutions Plus program.

38. As of 2007, XpertUniverse had expended most of its resources, both financially and intellectually, to modify its platform in order for it to work with Cisco's routing technology and related platforms.

39. XpertUniverse employed over 15 people full time to meet the demands and requirements of Cisco for almost three years.

40. XpertUniverse expended millions of dollars to modify and supplement its technology and platform to meet Cisco's demands. That work was custom developed for Cisco and has little, if any, value as applied to other routing software and/or call center technologies.

41. Cisco effectively usurped all of the intellectual property, monetary resources, time and effort of XpertUniverse during its relationship with XpertUniverse. On information and belief, as a consequence of Cisco's decision to reevaluate its business relationship with XpertUniverse, other companies, such as IBM, decided to cease pursuing business opportunities with XpertUniverse.

42.     In or about September 2008, XpertUniverse learned for the first time that Cisco was offering a new "collaboration portfolio" product line.

43.     In an article appearing in *The New York Times*, dated September 24, 2008, entitled "Cisco Tries to Break Out of the Data Center Role," Cisco announced that it was calling its new product "Expert On Demand." The same "Expert On Demand" mark coined and used by XpertUniverse. A copy of the article is annexed hereto as Exhibit B.

44.     In an article appearing in *The Wall Street Journal*, dated September 24, 2008, entitled "Cisco Sets Sights on $34 Billion Market," Cisco announced that it estimated that such collaboration products represent a $34 billion market opportunity. A copy of the article is annexed hereto as Exhibit C.

45.     As evidenced by both articles, Cisco enthusiastically announced that it was committed to the technology.

46.     Information concerning Cisco's new Expert On Demand product offering, including, among other things, architectural diagrams and other documents describing the product's functionality can be found in various product manuals, specifications and reference materials available from Cisco's web site including, but not limited to, the "Cisco Telepresence Expert On Demand", "Cisco Unified Expert Advisor", and the "Cisco Unified Expert Advisor Quick Reference" documents, which are attached hereto as Exhibit D.

47.     Other available Cisco documents describing the structure and functionality of the Cisco product offering include, but are not limited to, "Chapter 7: Cisco Unified Expert Advisor Option," at http://www.cisco.com/en/US/docs/voice_ip_comm/cust_contact/contact_center/ ipcc_enterprise/srnd/75/exprtadv.pdf and the "Cisco Unified Expert Advisor – Data Sheet," at

http://www.cisco.com/en/US/prod/collateral/voicesw/custcosw/ps5693/ps9675/data_sheet_c78-480625.pdf.

48.     Upon information and belief, these and other Cisco documents show that the Cisco software platforms, including but not limited to, its "Cisco Unified Expert Advisor" and its "Expert On Demand" systems, embody the subject matter of one or more claims of the '709 Patent, use of XpertUniverse's mark, and use and/or are based on the trade secrets and/or confidential information of XpertUniverse.

49.     Cisco has sold, offered for sale and marketed, and continues to sell, offer for sale and market, products and technology in contravention of and based on XpertUniverse's rights in and to its intellectual property, including, without limitation, its trademarks, trade secrets, confidential information, patent rights and contractual rights.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 7,366,709

50.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

51.     XpertUniverse is the sole owner by assignment of all right, title, and interest in and to United States Patent No. 7,366,709, entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles" ("the '709 Patent"), which was duly and legally issued by the United Stated Patent and Trademark Office on April 29, 2008. A copy of the '709 Patent is attached hereto as Exhibit E.

52.     On information and belief, Cisco has been and still is infringing, contributing to and/or actively inducing infringement of the '709 Patent in this judicial district and elsewhere in the United States by the manufacture, use, sale and/or offer for sale in the United States, or importation into the United States, of products, including but not limited to, its "Cisco Unified

Expert Advisor" and its "Expert On Demand" products, which embody the subject matter of and infringe one or more claims of the '709 Patent.

53.     On information and belief, Cisco's infringement of the '709 Patent has been and continues to be willful, wanton, deliberate and without license, thereby rendering this case exceptional within the meaning of 35 U.S.C. § 285.

54.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

55.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of infringement of the '709 Patent to XpertUniverse's substantial and irreparable harm.

**COUNT II**

**MISSAPROPRIATION OF TRADE SECRETS**
**UNDER THE DELAWARE UNIFORM TRADE SECRETS ACT**

56.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

57.     XpertUniverse has expended significant resources in acquiring and developing its trade secrets and confidential information concerning its Expert On Demand offering.  Those trade secrets and confidential information include, at a high level, information relating to the design, development, marketing and sale of a system that matches a user seeking expert services to  the best, qualified expert.

58.     On information and belief, in connection with the efforts undertaken on behalf of Cisco pursuant to the NDA, XpertUniverse made significant additional developments and/or modifications to its XpertSHARE platform and Expert On Demand service offering, including significant additional research, development and marketing of the Expert On Demand service offering for use in connection with certain Cisco products and systems.

59.     These development efforts on the part of XpertUniverse resulted in XpertUniverse developing numerous additional trade secrets and confidential information, including, but not limited to, technical development documents, schematics, system architecture, integration charts, as well as sales and marketing forecasts and pricing schedules for integrating XpertUniverse's technology with Cisco's. These trade secrets were not publicly available, but only existed with XpertUniverse and were only available through the knowledge and know-how of the employees of XpertUniverse that worked on the Cisco project.

60.     On information and belief, numerous employees of Cisco had ready access to these trade secrets and confidential information by reason of the Cisco project, and/or were provided with the trade secrets and confidential information pursuant to the NDA entered into between the parties in connection with the Cisco project.

61.     XpertUniverse possesses valuable trade secrets as defined by Delaware's version of the Uniform Trade Secrets Act, Del. Code § 6-2001 et seq. These trade secrets include information disclosed in the XpertUniverse patent applications, which were confidential until published, as well as additional trade secrets and confidential information, including trade secrets and confidential information, developed as a result of the Cisco project, as described above.

62.     XpertUniverse's trade secrets derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by proper means, and would be of great value to others.

63.     On information and belief, reasonable measures, including but not limited to requiring Cisco to execute the NDA, have been taken by XpertUniverse to maintain the secrecy of its trade secrets and confidential information.

64.     XpertUniverse's trade secrets were disclosed to Cisco, pursuant to the NDA, in connection the Cisco project. Cisco understood the technical details of the trade secrets, and appreciated the importance of the trade secrets in the development, marketing and sale of competing products. Cisco knew or should have known that it was not authorized to use the trade secret information owned by XpertUniverse, and yet Cisco subsequently misappropriated XpertUniverse's trade secrets and confidential information for use in Cisco's products, including but not limited to Cisco's Unified Expert Advisor and its Expert On Demand products.

65.     Cisco's unauthorized use of XpertUniverse's trade secrets and confidential information is a misappropriation of XpertUniverse's trade secrets and confidential information. As a consequence of Cisco's misappropriation, XpertUniverse has been and will continue to be damaged, and Cisco has been and will continue to be unjustly enriched at XpertUniverse's expense in an amount to be proved at trial. In addition, XpertUniverse has suffered and will continue to suffer irreparable harm that can only be remedied through equitable relief, including a preliminary and permanent injunction from any further misappropriation.

66.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

67.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of misappropriation to XpertUniverse's irreparable harm.

68.     Because Cisco has acted with fraud and/or malice and in conscious disregard of XpertUniverse's rights, XpertUniverse is entitled to exemplary damages including attorney's fees.

## COUNT III

## BREACH OF CONTRACT

69.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

70.     On or about August 2, 2004, XpertUniverse and Cisco entered into a "Cisco System, Inc. Mutual Non-Disclosure Agreement" ("the NDA").  As described above, the NDA

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████      As described above, on information and belief, Cisco materially breached the terms of the NDA ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

71.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████.

72.     XpertUniverse has performed all conditions to be performed on its part under the NDA.

73.     XpertUniverse has suffered damages resulting from Cisco's breach of the NDA, including, but not limited to, actual, compensatory and incidental damages, lost profits, customers, potential investors and business goodwill, and misuse of confidential information and trade secrets.

## COUNT IV

## FEDERAL UNFAIR COMPETITION

74. XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

75. XpertUniverse authored the mark "Expert On Demand" for use in promoting its services, and has and continues to use that term to promote its services. By reason of all of the foregoing, XpertUniverse has acquired common law rights in the Expert On Demand mark.

76. Cisco was aware that XpertUniverse used the Expert On Demand mark in promoting the XpertUniverse offering.

77. The actions complained of herein constitute false designations of origin and false descriptions in that Cisco's use of the term "Expert On Demand" in connection with Cisco's products and/or services is likely to cause confusion or to deceive as to the affiliation, connection or association of XpertUniverse's mark with Cisco's products and/or services, as to the origin, sponsorship or approval of Cisco's products and/or services.

78. The foregoing acts of Cisco constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

79. By reason of all the foregoing, XpertUniverse is being damaged by Cisco's willful use of XpertUniverse's mark in the manner set forth above and will continue to be damaged unless Cisco is enjoined from using the "Expert On Demand" term in connection with Cisco's products and/or services.

80. Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

81. Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

## COUNT V

## COMMON LAW TRADEMARK INFRINGEMENT

82.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

83.     Despite XpertUniverse's common law trademark rights in the mark "Expert On Demand," on information and belief Cisco has used and continues to use the same exact mark in describing and promoting its products and/or services.  The actions of Cisco are likely to create confusion, mistake and deception by causing consumers to believe that Cisco is authorized by, licensed by, sponsored by or otherwise associated with common law trademark rights in the Expert On Demand mark.

84.     Upon information and belief, the acts and conduct of Cisco constitute willful and deliberate infringement of XpertUniverse's common law rights in the Expert On Demand mark.

85.     The foregoing acts of Cisco constitute infringement of the Expert On Demand mark in violation of the common law of the State of Delaware.

86.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

87.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of the "Expert On Demand" mark to XpertUniverse's irreparable harm.

## COUNT VI

## DECEPTIVE TRADE PRACTICES

88.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

17

89.     By reason of all of the foregoing, XpertUniverse has valuable trade secrets and confidential information, and has acquired common law trademark rights in the Expert On Demand mark.

90.     On information and belief Cisco has used and continues to use XpertUniverse's trade secrets and confidential information in its products, and has used and continues to use XpertUniverse's common law mark "Expert On Demand" in describing and promoting its product.

91.     Upon information and belief, the acts and conduct of Cisco constitute willful and deliberate infringement of XpertUniverse's trade secrets and confidential information, and rights in the Expert On Demand mark and will continue in willful and wanton disregard of XpertUniverse's rights.

92.     The foregoing acts of Cisco constitute deceptive trade practices in violation of Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2531 et seq.

93.     Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

94.     Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of XpertUniverse's trade secrets and confidential information, as well as the "Expert On Demand" mark, to XpertUniverse's irreparable harm.

95.     In addition to an injunction, Cisco's willful engagement of deceptive trade practices as described herein entitle XpertUniverse to treble damages and attorney's fees.

## COUNT VII

## COMMON LAW UNJUST ENRICHMENT

96.     XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

97.     On information and belief, Cisco has been enriched by reason of its unauthorized use of XpertUniverse's trade secrets and confidential information in its products, and its unauthorized use of XpertUniverse's common law mark "Expert On Demand" in promoting and identifying its product.

98.     Cisco has not compensated XpertUniverse for its unauthorized use of XpertUniverse's trade secrets, confidential information, and mark, nor is there any justification for Cisco's unauthorized use of the same.  There is no adequate remedy at law for Cisco's unauthorized use of XpertUniverse's trade secrets, confidential information, and mark.

99.     By reason of all the foregoing, XpertUniverse is being damaged by Cisco's willful use of XpertUniverse's trade secrets, confidential information, and the Expert On Demand mark and will continue to be damaged unless Cisco is enjoined from using the same.

100.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

101.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its willful use of XpertUniverse's trade secrets and confidential information, as well as the "Expert On Demand" mark, to XpertUniverse's irreparable harm.

## COUNT VIII

## COMMON LAW UNFAIR COMPETITION

102.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

103.    XpertUniverse had a reasonable expectation of having a successful business relationship with Cisco.  Cisco defeated XpertUniverse's legitimate expectations and wrongfully interfered with the business relationship by misappropriating XpertUniverse's trade secrets, confidential information, and misappropriating XpertUniverse's common law trademark and the

19

goodwill associated therewith, all of which caused and continues to cause harm to XpertUniverse.

104.    The foregoing acts of Cisco constitute unfair competition under the common law of the State of Delaware.

105.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

106.    Unless preliminarily and permanently enjoined by this Court, Cisco will continue its acts of unfair competition to XpertUniverse's irreparable harm.

## COUNT IX

## CONVERSION

107.    XpertUniverse repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

108.    XpertUniverse had and continues to have a property interest in its intellectual property relating to its XpertSHARE platform and Expert On Demand service offering. Cisco misappropriated that intellectual property in developing its own offerings, as described above, which are based on, and incorporate, XpertUniverse's trade secrets, concepts, know-how, and strategies.

109.    The foregoing acts of Cisco constitute conversion under the common law of the State of Delaware.

110.    Cisco's acts have caused irreparable injury and damage to XpertUniverse for which XpertUniverse has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff XpertUniverse respectfully requests this Court enter a judgment against Cisco as follows:

A.    For judgment that Cisco has infringed and continues to infringe one or more claims of the '709 Patent under 35 U.S.C. § 271;

B.    For judgment that Cisco's infringement of the '709 Patent has been, and continues to be willful;

C.    For judgment that Cisco has misappropriated the trade secrets and confidential information of XpertUniverse in violation of Delaware's Uniform Trade Secrets Act;

D.    For judgment that Cisco has materially breached its obligations under the August 2, 2004 Mutual Non-Disclosure Agreement;

E.    For judgment that Cisco has committed acts of unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a);

F.    For judgment that Cisco has infringed XpertUniverse's mark in violation of the common law of Delaware;

G.    For judgment that Cisco has committed acts of deceptive trade practices in violation of Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2531 et seq.

H.    For judgment that Cisco has committed acts of unfair competition and conversion, and that Cisco has been unjustly enriched, under the common law of Delaware;

I.    For a preliminary and permanent injunction against Cisco its officers, directors, agents, servants, employees, successors and assigns, and all persons in privity or in concert with them,

(i) From making, using, selling, offering to sell, and/or importing any products that infringe the '709 patent;

(ii) From any further disclosure or use of XpertUniverse's technology, trade secrets or confidential information and from developing or offering any products that incorporate the trade secrets, confidential information or any other intellectual property of XpertUniverse;

(iii) From making statements to consumers and members of the public that mislead or have a tendency to mislead consumers and members of the trade to believe that Cisco is the innovator and originator of the technology and platform encompassed by the trade secrets and confidential information of XpertUniverse or covered under the claims of the '709 Patent;

(iv) From using the "Expert On Demand" mark or any trade name or mark similar thereto;

(v) From using, affixing, offering for sale, selling, advertising, promoting, or rendering goods or services with the Expert On Demand mark or any other trade name or mark similar thereto;

J.     For a mandatory injunction in the form of corrective advertising whereby Cisco shall take all steps necessary, to be approved by the Court, including the issuance of a press release and statements on Cisco's web site and marketing materials, alerting and communicating to consumers and members of the trade that it is XpertUniverse that is the innovator of the technology and platform encompassed by the trade secrets and confidential information of XpertUniverse and covered under the claims of the '709 Patent, not Cisco;

K.     That Cisco and any entity owned, in whole or in part by Cisco, be ordered that all catalogs, signs, displays, labels, brochures, advertising and promotional material bearing XpertUniverse's "Expert On Demand" mark or other similar terms in Cisco's possession or

subject to its control or direction shall be delivered to the Clerk of the Court for maintenance during the pendency of this action and for destruction upon entry of a Final Judgment.

L.      Pursuant to 35 U.S.C. § 284, for an award of damages adequate to compensate XpertUniverse for Cisco's patent infringement, but in no event less than a reasonable royalty together with prejudgment interest;

M.      For trebling of any and all damages awarded to XpertUniverse by reason of Cisco's willful, wanton and deliberate acts of infringement of the '709 Patent, pursuant to 35 U.S.C. § 284;

N.      For judgment that the case is exceptional under 35 U.S.C. § 285 and that the Court award XpertUniverse its attorney's fees and costs in preparing for and pursuing this action;

O.      For an award of damages by reason of Cisco's misappropriation of the trade secrets and confidential information of XpertUniverse, including, but not limited to, the actual losses suffered by XpertUniverse and the amount by which Cisco has been unjustly enriched due to its misappropriation;

P.      For an award of exemplary damages and attorney's fees by reason of Cisco's willful and malicious misappropriation of the trade secrets and confidential information of XpertUniverse;

Q.      For an award of damages for the profits of Cisco and for the direct and compensatory damages sustained by XpertUniverse as a result of Cisco's material breach of the NDA;

R.      For an award of damages, pursuant to the Lanham Act, including corrective advertising to purge the effects of Cisco's unauthorized use of the Expert On Demand mark.

23

S.      For an award of damages resulting from Cisco's infringement of XpertUniverse's common law trademark rights, including, but not limited to, an award of Cisco's profits and/or XpertUniverse's damages;

T.      For an award of damages resulting from Cisco's willful deceptive trade practices including, but not limited to, an injunction from any further deceptive trade practices, and award of XpertUniverse's costs and attorney's fees;

U.      For an award of damages resulting from Cisco's unfair competition and conversion under the common law of Delaware, including, but not limited to ordering Cisco to transfer ownership of the converted property to XpertUniverse;

V.      For trebling of any and all damages awarded to XpertUniverse by reason of Cisco's willful, wanton and deliberate acts of unfair competition pursuant to Delaware's Uniform Deceptive Trade Practices Act, Del. Code § 6-2533(c);

W.      For a monetary award disgorging Cisco of ill-gotten gains resulting from its unjust enrichment at the expense of XpertUniverse in an amount to be proven at trial;

X.      For an award of XpertUniverse's actual damages and punitive damages to be proven at trail;

Y.      That Cisco and any entity owned, in whole or in part by Cisco, be ordered to report to the Court in writing under oath with a copy to counsel for XpertUniverse within 30 days of service of notice of any Orders setting forth in detail the manner and form in which Cisco has complied with any order issued hereunder;

Z.      For an award of pre-judgment and post-judgment interest and costs, as appropriate, and an award of XpertUniverse's fees, costs, expenses and disbursements in this action, including reasonable attorney's fess; and

AA.     For such other and further relief both in law and equity to which XpertUniverse is

entitled.

## DEMAND FOR JURY TRIAL

Plaintiff XpertUniverse hereby demands a trial by jury for all issues triable to a jury.


POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph Diamante                          By: /s/ Philip A. Rovner
STROOCK & STROOCK & LAVAN LLP                 Philip A. Rovner (#3215)
180 Maiden Lane                               Hercules Plaza
New York, NY 10038                            P.O. Box 951
(212) 806-5400                                Wilmington, DE  19899
                                              (302) 984-6000
Dated:  March 10, 2009                        provner@potteranderson.com
906342

*Attorney for Plaintiff XpertUniverse, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that, on March 10, 2009, the within document was electronically filed with the Clerk of the Court using CM-ECF ; that the document was served on the following as indicated; and the document is available for viewing and downloading from CM-ECF:

### BY HAND DELIVERY

Cisco Systems, Inc.
c/o Registered Agent
The Prentice-Hall Corporation System, Inc.
2711 Centerville Road
Suite 400
Wilmington, DE 19808/

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | |
| Plaintiff and Counterdefendant, | ) | C.A. No. 09-157 (RGA) |
| | ) | REDACTED - PUBLIC VERSION |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | **DEMAND FOR JURY TRIAL** |

**DEFENDANT AND COUNTERCLAIMANT CISCO SYSTEMS, INC.'S
ANSWER TO XPERTUNIVERSE, INC.'S FOURTH AMENDED
COMPLAINT AND CISCO SYSTEMS, INC.'S COUNTERCLAIMS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant/Counterclaimant
Cisco Systems, Inc.*

OF COUNSEL:

Colm F. Connolly
MORGAN LEWIS & BOCKIUS LLP
1007 Orange Street, Suite 501
Wilmington, DE  19801
(302) 574-3000

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

February 3, 2012 - Original Filing Date
February 9, 2012 - Redacted Filing Date

## ANSWER TO FOURTH AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Defendant Cisco Systems, Inc. ("Cisco"), by and through its undersigned counsel, hereby responds to Plaintiff XpertUniverse ("XU")'s Fourth Amended Complaint and Demand for Jury Trial ("FAC") as follows:

### THE PARTIES

1.      Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 1 and on that basis denies them.

2.      Cisco admits the allegations in Paragraph 2.

### JURISDICTION AND VENUE

3.      Cisco admits that the FAC purports to assert the various claims set forth in Paragraph 3.  Cisco notes, however, that the Court dismissed XU's common law trade secret misappropriation claim.  Cisco denies the remaining allegations in Paragraph 3.

4.      Cisco admits that the FAC includes claims arising under 35 U.S.C. § 271 *et seq.* and 15 U.S.C. § 1125(a) *et seq.*  The remaining allegations in Paragraph 4 are legal conclusions to which no responsive pleading is required.

5.      The allegations in Paragraph 5 are legal conclusions to which no responsive pleading is required.

6.      The allegations in Paragraph 6 are legal conclusions to which no responsive pleading is required.

### RESPONSE TO ALLEGED NATURE OF THE ACTION

7.      Cisco admits that this case is a civil action arising out of a relationship between Cisco and XU.  Cisco denies the remaining allegations in Paragraph 7.

8.      Cisco denies the allegations in Paragraph 8.

9. Cisco admits that it is valued at more than $1 billion and that it is a global company. Cisco admits that, on or about August 2, 2004, Cisco and XU executed a document titled "Cisco Systems, Inc. Mutual Non-Disclosure Agreement." Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU and on that basis denies them. Cisco denies the remaining allegations in Paragraph 9.

10. Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's alleged beliefs and the characterization as to the volume or nature of any information that was provided to Cisco and on that basis denies them. Cisco denies the remaining allegations in Paragraph 10.

11. Cisco admits that certain Cisco employees were in contact with XU over a period of approximately two and a half years. Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported dedication of resources, the amount of XU's purported "investment," or the present value of such purported investment and on that basis denies them. Cisco denies the remaining allegations in Paragraph 11.

12. Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12 regarding XU's purported beliefs or reliance and on that basis denies them. Cisco denies the remaining allegations in Paragraph 12.

13. Cisco denies the allegations in Paragraph 13.

14. Cisco denies the allegations in Paragraph 14.

15. Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 15 as the allegations do not identify any specific patent applications or Cisco personnel, and on that basis Cisco denies such allegations.

16. Cisco denies the allegations in Paragraph 16.

17.     Cisco denies the allegations in Paragraph 17.

18.     Cisco denies the allegations in Paragraph 18.

19.     Cisco denies the allegations in Paragraph 19.

20.     Cisco admits that the parties discussed various aspects of a potential relationship including potentially marketing XU and its products/services, potentially placing XU in Cisco's "Solutions Plus" program, and potential revenue/compensation arrangements.  Cisco admits that it conducted appropriate background analysis of XU.  Cisco also admits that XU employees appeared at Cisco-sponsored trade shows.  Cisco denies the remaining allegations in Paragraph 20.  Cisco specifically denies allegations regarding any misappropriation of XU's purported intellectual property and allegations regarding any fraudulent inducement.

21.     Cisco admits that, in or around January 2007, it advised XU that it was no longer in a position to pursue a joint business opportunity.  Cisco denies the remaining allegations in Paragraph 21.  Cisco specifically denies allegations regarding inducing XU to disclose its purported intellectual property and "us[ing] the same as its own."

22.     Cisco denies the allegations to the extent that they suggest that Cisco stated the value of Expert Advisor and Expert on Demand was $34 billion.  Cisco admits the remaining allegations in Paragraph 22.

23.     Cisco denies the allegations in Paragraph 23.

## RESPONSE TO ALLEGED FACTS UNDERLYING THE DISPUTE

24.     Cisco admits that XU purports to have formerly done business as "Homework911.com."  Cisco lacks sufficient information or belief to admit or deny the remaining allegations in Paragraph 24 and on that basis denies them.

25.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25 and on that basis denies them.

26.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 26 and on that basis denies them.

27.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27 and on that basis denies them.

28.     Cisco admits that XU referred to a product called XpertSHARE and the phrase "Expert on Demand." Cisco denies the allegations to the extent that they suggest XU acquired any trademark rights in such terms. Cisco lacks sufficient information or belief to admit or deny the remaining allegations in Paragraph 28 and on that basis denies them.

29.     Cisco admits that call centers may require operators to connect callers with individuals who have specific knowledge. Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 29 and on that basis denies them.

30.     The allegations in Paragraph 30 are merely a hypothetical factual situation incapable of admission or denial and Cisco denies them on that basis.

31.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31 and on that basis denies them.

32.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32 and on that basis denies them.

33.     Cisco admits that Mr. Philonenko was the General Manager of Cisco's Contact Center Business Unit, that he commenced his employment with Cisco in or around Summer 2004, and that he had been employed previously by Genesys Telecommunications Laboratories,

Inc. or a company related thereto ("Genesys"). Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 33 and on that basis denies them.

34.    Cisco admits that Mr. Philonenko communicated with XU personnel after his departure from Genesys. Cisco denies the characterization of those communications as set forth in Paragraph 34.

35.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 35 and on that basis denies them.

36.    Cisco admits that the parties discussed entering into a non-disclosure agreement. Cisco denies the remaining allegations in Paragraph 36.

37.    Cisco admits that, in or around August 2004, it provided XU with a document titled "Cisco Systems, Inc. Mutual Non-Disclosure Agreement." Cisco admits that Cisco and XU executed the mutual non-disclosure agreement ("NDA") on or about August 2, 2004. Cisco admits that the document attached as Exhibit A to the FAC appears to be a true and correct copy of the NDA. Cisco denies the remaining allegations in Paragraph 37.

38.    Cisco admits that the NDA contains the quoted language. The remaining allegations in Paragraph 38 are legal conclusions to which no responsive pleading is required.

39.    Cisco admits that a provisional patent application entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles" was filed on or about April 2, 2004. Cisco admits that U.S. Patent Application Serial No. 11/097,967 ("the '967 Patent Application") was filed on or about March 31, 2005, and that it purports to claim the benefit of the filing date of the provisional application. Cisco admits that the '967 Patent Application

issued on April 29, 2008 as U.S. Patent No. 7,366,709 ("the '709 Patent").  Except as expressly admitted, Cisco denies the allegations in Paragraph 39.

40.     Cisco admits that U.S. Patent Application Serial No. 11/043,014 entitled "Semantic To Non-Semantic Routing For Locating A Live Expert" ("the '014 Patent Application") was filed on or about January 24, 2005, and that the '014 Patent Application issued on March 3, 2009 as U.S. Patent No. 7,499,903 ("the '903 Patent").  Except as expressly admitted, Cisco denies the allegations in Paragraph 40.

41.     Cisco denies the allegations in Paragraph 41.

42.     Cisco admits that XU and Cisco discussed a business relationship after the NDA was signed, but denies XU's characterization of those discussions.  Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42 and on that basis denies them.

43.     Cisco admits that after the NDA was executed, Cisco and XU exchanged information.  Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 43 and on that basis denies them.

44.     Cisco admits that a few pieces of information XU provided to Cisco were marked "Confidential" but Cisco denies the characterization of the volume of information that was so marked.  Cisco denies the remaining allegations in Paragraph 44.  Cisco specifically denies any allegation regarding what it purportedly "knew or should have known."

45.     Cisco admits that XU and Cisco shared certain information with each other.  Cisco denies the remaining allegations in Paragraph 45.

46.     Cisco admits that Cisco personnel communicated with XU personnel and that such personnel attended more than one trade show together.    Cisco denies the remaining allegations in Paragraph 46.

47.     Cisco denies the allegations in Paragraph 47.

48.     Cisco denies the allegations in Paragraph 48.

49.     Cisco denies the allegations in Paragraph 49.

50.     Cisco admits that Cisco and XU shared certain information with each other. Cisco denies the remaining allegations in Paragraph 50.

51.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51 and on that basis denies them.

52.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52 and on that basis denies them.

53.     Cisco admits that it helped XU prepare certain materials for various presentations. Cisco denies the remaining allegations in Paragraph 53.

54.     Cisco denies the allegations in Paragraph 54.

55.     Cisco denies the allegations in Paragraph 55.

56.     Cisco denies the allegations in Paragraph 56.

57.     Cisco denies the allegations in Paragraph 57.

58.     Cisco denies the allegations in Paragraph 58.

59.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59 and on that basis denies them.

60.     Cisco denies the allegations in Paragraph 60.

61.     Cisco denies the allegations in Paragraph 61.

62.     Cisco admits that it has used the phrase "Expert On Demand" in marketing its products and services.  Cisco denies the remaining allegations in Paragraph 62.

63.     Cisco denies the allegations in Paragraph 63.

64.     Cisco admits that XU attempted to engage IBM in its relationship with Cisco and is informed and believes that such engagement may have begun in or about January 2005.  Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 64 and on that basis denies them.

65.     Cisco admits that XU prepared various marketing materials to use with prospective customers.  Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 65 and on that basis denies them.

66.     Cisco denies the allegations in Paragraph 66.

67.     Cisco denies the allegations in Paragraph 67.

68.     Cisco admits that it made certain supportive statements about XU but denies the allegations in Paragraph 68 to the extent they suggest that such statement were unequivocal and uniformly positive or optimistic.  Cisco denies the remaining allegations in Paragraph 68.

69.     Cisco denies the allegations in Paragraph 69.

70.     Cisco denies the allegations in Paragraph 70.

71.     Cisco denies the allegations in Paragraph 71.

72.     Cisco admits that the 2004 NDA was signed by the CEO of XU and a divisional director of Cisco.  Cisco denies the remaining allegations in Paragraph 72.

73.     Cisco admits that Cisco and XU were in contact over a period of approximately two and a half years.  Cisco admits that the parties exchanged information regarding various topics.  Cisco denies the remaining allegations in Paragraph 73.

74.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74 regarding the resources that XU dedicated to pursuing a relationship with Cisco as well as the exact number of Cisco employees who interacted with XU and on that basis denies them.  Cisco denies the remaining allegations in Paragraph 74.

75.     Cisco denies the allegations in Paragraph 75.

76.     Cisco denies the allegations in Paragraph 76.

77.     Cisco admits that it gave preliminary consideration to looking into purchasing XU, but denies that any formal investigation was undertaken in connection with this preliminary consideration.  Cisco denies the remaining allegations in Paragraph 77.

78.     Cisco admits that it emailed a copy of a contract called "Cisco Technology Developer Program Partner Agreement" to XU.  Cisco denies the remaining allegations in Paragraph 78.

79.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79 and on that basis denies them.  Cisco is informed and believes, however, that the agreement was accepted by Elizabeth Eiss, who was XU's president at the time of the acceptance, and authorized to accept the agreement on behalf of XU.

80.     Cisco denies the characterization of the conversations regarding XU's voluntary decision to enter into the Cisco Technology Developer Program ("CTDP").  Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 80 regarding the conduct of the XU employee who entered into the CTDP on XU's behalf and on that basis denies such allegations.  Cisco is informed and believes, however, that the agreement was accepted by Elizabeth Eiss, who was XU's president at the time of the acceptance, and authorized to accept the agreement on behalf of XU.

81.     Cisco admits that in 2005 and 2006, XU and Cisco made presentations to commercial entities, and that some materials may have included both the XU and Cisco logos. Cisco denies the remaining allegations in Paragraph 81.

82.     Cisco denies the allegations in Paragraph 82 relating to the "closeness of the relationship that had developed between the companies," and to the purported "promises that Cisco had made." Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 82 and on that basis denies them.

83.     Cisco denies the allegations in Paragraph 83.

84.     Cisco denies the allegations in Paragraph 84.

85.     Cisco admits the allegations in Paragraph 85.

86.     Cisco admits the allegations in Paragraph 86.

87.     Cisco admits the allegations in Paragraph 87.

88.     Cisco admits the allegations in Paragraph 88.

89.     Cisco admits that each of the listed inventors were employees of Cisco or a related company at the time the referenced applications were filed with the U.S. Patent and Trademark Office ("U.S.P.T.O.").

90.     Cisco admits that Messrs. Jordan and Lepore may have had some involvement in discussions between Cisco and XU at some point in time. Cisco denies the remaining allegations in Paragraph 90.

91.     Cisco denies the allegations in Paragraph 91.

92.     Cisco denies the allegations in Paragraph 92.

93.     Cisco denies the allegations in Paragraph 93.

94.     Cisco denies the allegations in Paragraph 94.

95.     Cisco denies the allegations in Paragraph 95.

96.     Cisco denies the allegations in Paragraph 96.

97.     Cisco admits that XU did not authorize it to file the referenced patent applications, and that Cisco did not advise XU that it was filing such applications, because neither action was required.

98.     Cisco denies the allegations in Paragraph 98 as they relate to purported representations and actions by Cisco. Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 98, and on that basis denies them.

99.     Cisco denies the allegations in Paragraph 99.

100.    Cisco denies that it has filed patent applications based on or claiming ownership to the purported intellectual property of XU.  Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 100, and on that basis denies them.

101.    Cisco admits that it emailed to XU a copy of a contract called "Cisco Technology Developer Program Partner Agreement" on or before August 21, 2006.  Cisco denies the remaining allegations in Paragraph 101.

102.    Cisco denies that it has "acted contrary to the interests of [XU]" and that it has filed patent applications based on XU's trade secrets or confidential information.  Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 102, and on that basis denies them.

103.    Cisco admits that XU accepted the "Cisco Technology Developer Program Partner Agreement."  Cisco notes that the agreement was accepted by Abraham Zelkin, whom Cisco is informed and believes was XU's Chief Technology Officer at the time of acceptance

11

and authorized to accept the agreement on behalf of XU. Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations pertaining to the characterization of the acceptance as "perfunctory", and on that basis denies them. Cisco denies the remaining allegations in Paragraph 103.

103.

104.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 104, and on that basis denies them

105.    Cisco denies the allegations in Paragraph 105.

106.    Cisco denies that it has filed patent applications based on, and claiming ownership to, the intellectual property of XU. Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 106, and on that basis denies them.

107.    Cisco denies the allegations in Paragraph 107.

108.    Cisco denies the allegations in Paragraph 108.

109.    Cisco denies the allegations in Paragraph 109.

110.    Cisco denies the allegations in Paragraph 110 to the extent that they assume or insinuate that Cisco shared XU confidential or proprietary information and/or purported intellectual property with a third party.

111.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported "reliance" and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 111.

112.    Cisco denies the allegations in Paragraph 112 to the extent they assume or insinuate that Cisco shared XU confidential or proprietary information and/or purported intellectual property with a third party. Cisco lacks knowledge or information sufficient to form

a belief about the truth of the allegations regarding what XU might or might not have done and on that basis denies such allegations.  Cisco denies the remaining allegations in Paragraph 112.

113.   Cisco denies the allegations in Paragraph 113.

114.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 114 and on that basis denies them.

115.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 115 and on that basis denies them.

116.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 116 and on that basis denies them.

117.   Cisco admits that in or about January 2007, it advised XU that it no longer wished to pursue a potential business relationship through the Solutions Plus program.  Cisco denies the remaining allegations in Paragraph 117.

118.   Cisco admits that in September 2008 it issued a press release in which it announced that it was introducing a broad collaboration portfolio, a small portion of which was called Expert on Demand.   Cisco admits that the stated estimate for the entire internet collaboration market was estimated at $34 billion.  Cisco denies remaining allegations in Paragraph 118.

119.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 119 and on that basis denies them.

120.   Cisco admits that the document attached as Exhibit B to the FAC appears to be the referenced *New* York *Times* article dated September 24, 2008, the contents of which speak for themselves.  Cisco denies remaining allegations in Paragraph 120.

121.    Cisco admits that the document attached as Exhibit C to the FAC appears to be the referenced *Wall Street Journal* article dated September 24, 2008, the contents of which speak for themselves.

122.    The contents of the documents speak for themselves, and Cisco denies the characterization of the contents of such documents in Paragraph 122. Cisco denies the remaining allegations in Paragraph 122.

123.    Cisco admits that certain information about its products is available on its website. Cisco admits that the documents attached as Exhibit D to the FAC are publicly available documents pertaining to Cisco's Expert Advisor product and Expert On Demand offering. Cisco denies the remaining allegations in Paragraph 123.

124.    Cisco admits that the referenced documents describe the functionality of various Cisco products and offerings. Cisco denies the remaining allegations in Paragraph 124.

125.    Cisco denies the allegations in Paragraph 125.

126.    Cisco admits that since this litigation commenced, Cisco has made additional products and offerings available to its customers. Cisco denies the remaining allegations in Paragraph 126

127.    Cisco denies the allegations in Paragraph 127.

128.    Cisco denies the allegations in Paragraph 128.

129.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding other companies' decisions to cease pursuing business opportunities with XU and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 129.

## RESPONSE TO COUNT I

130.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 129 of the FAC as set forth above.

131.    Cisco admits that XU purports to be the sole owner by assignment of all right, title, and interest in and to the '709 Patent, and that a copy of the '709 Patent is attached to the FAC as Exhibit E.  Except as expressly admitted, Cisco denies the remaining allegations in Paragraph 130.

132.    Cisco denies the allegations in Paragraph 132.

133.    Cisco denies the allegations in Paragraph 133.

134.    Cisco denies the allegations in Paragraph 134.

135.    Cisco denies the allegations in Paragraph 135.

## RESPONSE TO COUNT II

136.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 135 of the FAC as set forth above.

137.    Cisco admits that XU purports to be the sole owner by assignment of all right, title, and interest in and to the '903 Patent, and that a copy of the '903 Patent is attached to the FAC as Exhibit F.  Except as expressly admitted, Cisco denies the remaining allegations in Paragraph 137.

138.    Cisco denies the allegations in Paragraph 138.

139.    Cisco denies the allegations in Paragraph 139.

140.    Cisco denies the allegations in Paragraph 140.

141.    Cisco denies the allegations in Paragraph 141.

## RESPONSE TO COUNT III

142.     Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 141 of the FAC as set forth above.

143.     Cisco denies the allegations in Paragraph 143.

144.     Cisco denies the allegations in Paragraph 144.

145.     Cisco denies the allegations in Paragraph 145.

146.     Cisco denies the allegations in Paragraph 146.

147.     Cisco denies the allegations in Paragraph 147.

148.     Cisco denies the allegations in Paragraph 148.

149.     Cisco denies the allegations in Paragraph 149.

150.     Cisco denies the allegations in Paragraph 150.

151.     Cisco denies the allegations in Paragraph 151.

152.     Cisco denies the allegations in Paragraph 152.

153.     Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported reliance and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 153.  Cisco specifically denies allegations regarding the purported disclosure of intellectual property and purportedly "false promises and assurances."

154.     Cisco denies the allegations in Paragraph 154.

## RESPONSE TO COUNT IV

155.     Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 154 of the FAC as set forth above.

156.     Cisco denies the allegations in Paragraph 156.

157.    Cisco denies the allegations in Paragraph 157.

158.    Cisco denies the allegations in Paragraph 158.

159.    Cisco denies the allegations in Paragraph 159.

160.    Cisco denies the allegations in Paragraph 160.

161.    Cisco denies the allegations in Paragraph 161.

162.    Cisco denies the allegations in Paragraph 162.

163.    Cisco denies the allegations in Paragraph 163.

164.    Cisco denies the allegations in Paragraph 164.

165.    Cisco denies the allegations in Paragraph 165.

166.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported reliance and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 166. Cisco specifically denies allegations regarding the purported disclosure of intellectual property and purportedly "false promises and assurances."

167.    Cisco denies the allegations in Paragraph 167.

168.    Cisco admits that the FAC purports to seek rescission of the contracts that XU knowingly and willingly entered into. Cisco denies the remaining allegations in Paragraph 168.

## RESPONSE TO COUNT V

169.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 168 of the FAC as set forth above.

170.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported expenditure of resources and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 170.

171.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 171 and on that basis denies them.

172.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 172 and on that basis denies them.

173.    Cisco admits that a small portion of the information Cisco and XU shared with one another was marked "confidential."   Cisco denies the remaining allegations in Paragraph 173.

174.    Cisco admits that more than one Cisco employee, including Messrs. Jordan and Lepore, may have had access to some information from XU.   Cisco denies the remaining allegations in Paragraph 174.

175.    Cisco denies the allegations in Paragraph 175.

176.    Cisco denies the allegations in Paragraph 176.

177.    Cisco denies the allegations to the extent they relate to Cisco.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 177 and on that basis denies them.

178.    Cisco denies the allegations in Paragraph 178.

179.    Cisco denies the allegations in Paragraph 179.

180.    Cisco denies the allegations in Paragraph 180.

181.    Cisco denies the allegations in Paragraph 181.

182.    Cisco denies the allegations in Paragraph 182.

183.    Cisco denies the allegations in Paragraph 183.

## RESPONSE TO COUNT VI

184.   Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 183 of the FAC as set forth above.

185.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 185 and on that basis denies them.

186.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 186 and on that basis denies them.

187.   Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported efforts and on that basis denies such allegations.  Cisco denies the remaining allegations in Paragraph 187.

188.   Cisco denies the allegation that most of the information that XU provided it was marked "confidential."  Cisco lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 188 and on that basis denies them.

189.   Cisco admits that more than one Cisco employee, including Messrs. Jordan and Lepore, may have had access to some information from XU.  Cisco denies the remaining allegations in Paragraph 189.

190.   Cisco denies the allegations in Paragraph 190.

191.   Cisco denies the allegations in Paragraph 191.

192.   Cisco admits that certain information Cisco and XU exchanged was marked "confidential."  Cisco denies the remaining allegations in Paragraph 192.

193.   Cisco denies the allegations in Paragraph 193.

194.   Cisco denies the allegations in Paragraph 194.

195.   Cisco denies the allegations in Paragraph 195.

196.    Cisco denies the allegations in Paragraph 196.

197.    Cisco denies the allegations in Paragraph 197.

198.    Cisco denies the allegations in Paragraph 198.

199.    Cisco denies the allegations in Paragraph 199.

200.    Cisco denies the allegations in Paragraph 200.

201.    Cisco denies the allegations in Paragraph 201.

202.    Cisco denies the allegations in Paragraph 202.

203.    Cisco denies the allegations in Paragraph 203.

204.    Cisco denies the allegations in Paragraph 204.

205.    Cisco denies the allegations in Paragraph 205.

**RESPONSE TO COUNT VII**

206.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 205 of the FAC as set forth above.

207.    Cisco denies the allegations in Paragraph 207.

208.    Cisco denies the allegations in Paragraph 208.

209.    Cisco denies the allegations in Paragraph 209.

210.    Cisco denies the allegations in Paragraph 210.

211.    Cisco denies the allegations in Paragraph 211.

212.    Cisco denies the allegations in Paragraph 212.

213.    Cisco denies the allegations in Paragraph 213.

214.    Cisco denies the allegations in Paragraph 214.

215.    Cisco denies the allegations in Paragraph 215.

## RESPONSE TO COUNT VIII

216.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 216 of the FAC as set forth above.

217.    Cisco denies the allegations in Paragraph 217.

218.    Cisco denies the allegations in Paragraph 218.

219.    Cisco denies the allegations in Paragraph 219.

220.    Cisco denies the allegations in Paragraph 220.

221.    Cisco denies the allegations in Paragraph 221.

222.    Cisco denies the allegations in Paragraph 222.

223.    Cisco denies the allegations in Paragraph 223.

## RESPONSE TO COUNT IX

224.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 223 of the FAC as set forth above.

225.    Cisco admits that Cisco and XU executed a document titled "Cisco Systems, Inc. Mutual Non-Disclosure Agreement" on or about August 2, 2004.   Cisco denies the remaining allegations in Paragraph 225.

226.    Cisco denies the allegations in Paragraph 226.

227.    The contents of the documents speak for themselves.   Cisco denies the remaining allegations in Paragraph 227.

228.    Cisco denies the allegations in Paragraph 228.

229.    Cisco denies the allegations in Paragraph 229.

## RESPONSE TO COUNT X

230.   Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 229 of the FAC as set forth above.

231.   Cisco admits that XU contends the referenced agreement is void and unenforceable.  Cisco denies the remaining allegations in Paragraph 231.

232.   Cisco denies the allegations in Paragraph 232.

233.   Cisco denies the allegations in Paragraph 233.

234.   Cisco denies the allegations in Paragraph 234.

## RESPONSE TO COUNT XI

235.   Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 234 of the FAC as set forth above.

236.   Cisco admits that XU contends the referenced agreement is void and unenforceable.  Cisco denies the allegations in Paragraph 236.

237.   Cisco denies the allegations in Paragraph 237.

238.   Cisco denies the allegations in Paragraph 238.

239.   Cisco denies the allegations in Paragraph 239.

## RESPONSE TO COUNT XII

240.   Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 239 of the FAC as set forth above.

241.   Cisco denies the allegations in Paragraph 241.

242.   Cisco denies the allegations in Paragraph 242.

243.   Cisco denies the allegations in Paragraph 243.

244.   Cisco denies the allegations in Paragraph 244.

245.    Cisco denies the allegations in Paragraph 245.

246.    Cisco denies the allegations in Paragraph 246, particularly to the extent that they suggest or insinuate that it filed patent applications based on XU's trade secrets or confidential information or that it shared XU's purported "trade secrets, confidential information, concepts, know-how and strategies."

247.    Cisco denies the allegations in Paragraph 247.

248.    Cisco denies the allegations in Paragraph 248.

249.    Cisco denies the allegations in Paragraph 249.

250.    Cisco denies the allegations in Paragraph 250.

251.    Cisco denies the allegations in Paragraph 251.

252.    Cisco denies the allegations in Paragraph 252.

253.    Cisco denies the allegations in Paragraph 253.

254.    Cisco denies the allegations in Paragraph 254.

255.    Cisco denies the allegations in Paragraph 255.

256.    Cisco denies the allegations in Paragraph 256.

**RESPONSE TO COUNT XIII**

257.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 256 of the FAC as set forth above.

258.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported expectations and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 258.

259.    Cisco denies the allegations in Paragraph 259, particularly to the extent that they suggest or insinuate that Cisco committed any acts of unfair competition.

260.    Cisco denies the allegations in Paragraph 260, particularly to the extent they incorporate the alleged acts of unfair competition identified in the preceding paragraph.

261.    Cisco denies the allegations in Paragraph 261.

262.    Cisco denies the allegations in Paragraph 262.

## RESPONSE TO COUNT XIV

263.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 262 of the FAC as set forth above.

264.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported expectations and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 264.

265.    Cisco denies the allegations in Paragraph 265, particularly to the extent that they suggest or insinuate that Cisco committed any acts of unfair competition.

266.    Cisco denies the allegations in Paragraph 266, particularly to the extent that they suggest or insinuate that Cisco committed any acts of unfair competition.

267.    Cisco denies the allegations in Paragraph 267.

268.    Cisco denies the allegations in Paragraph 268.

## RESPONSE TO COUNT XV

269.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 268 of the FAC as set forth above.

270.    Cisco lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding XU's purported expectations and on that basis denies such allegations. Cisco denies the remaining allegations in Paragraph 270.

271.    Cisco denies the allegations in Paragraph 271.

272.    Cisco denies the allegations in Paragraph 272.

273.    Cisco denies the allegations in Paragraph 273.

274.    Cisco denies the allegations in Paragraph 274.

## RESPONSE TO COUNT XVI

275.    Cisco repeats and incorporates by reference its responses to Paragraphs 1 through 274 of the FAC as set forth above.

276.    Cisco denies the allegations in Paragraph 276.

277.    Cisco denies the allegations in Paragraph 277.

278.    Cisco denies the allegations in Paragraph 278.

279.    Cisco denies the allegations in Paragraph 279.

280.    Cisco denies the allegations in Paragraph 280.

281.    Cisco denies the allegations in Paragraph 281.

282.    Cisco denies the allegations in Paragraph 282.

## AFFIRMATIVE DEFENSES

1.    For its further and separate defenses to XU's claims and each purported cause of action therein, Cisco alleges as follows:

## FIRST AFFIRMATIVE DEFENSE
### (Non-Infringement)

2.    Cisco has not and is not infringing, contributing to the infringement of, or inducing infringement of any valid, enforceable claim of the '709 Patent or the '903 Patent.

## SECOND AFFIRMATIVE DEFENSE
### (Invalidity)

3.    The claims of the '709 Patent and the '903 Patent are invalid for failure to meet the statutory and decisional requirements for patentability under 35 U.S.C. §§ 101, *et. seq.*, including, but not limited to §§ 101-103 and/or 112.

25

## THIRD AFFIRMATIVE DEFENSE
(Inequitable Conduct I: Intentional Non-Disclosure of
Known Prior Art Offer To Sell "KnowledgeSHARE")

4.      Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

5.      Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability," 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

6.      On information and belief, XU has done business under the name "LearningIDEAS, Inc."

7.      On information and belief, XU, doing business as LearningIDEAS, Inc., sold or offered for sale a product referred to as "KnowledgeSHARE" by at least 2002.  A copy of a "KnowledgeSHARE" User Manual is attached hereto as Exhibit A.

8.      On information and belief, the "KnowledgeSHARE" product embodied every element of one or more claims of the '709 Patent.  For example, the figure shown on page 20 of the KnowledgeSHARE User Manual, and related text, depicts a user interface page that is substantively identical to the preferred embodiment shown in Figure 2 of the '709 Patent.

9.      On information and belief, the "KnowledgeSHARE" product embodied every element of one or more claims of the '903 Patent.   For example, pages 26-27 of the KnowledgeSHARE User Manual describe a skill-set database.

10.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively.

26

11.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent knew or should have known of the KnowledgeSHARE product during the application process for the '709 Patent and the '903 Patent.

12.     On or about January 30, 2004, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent admitted that the KnowledgeSHARE product embodied every element of one or more claims of the '709 Patent and the '903 Patent.  On or about January 30, 2004, these same XU personnel were told that the KnowledgeSHARE product was prior art relevant to the patentability of the inventions claimed in the '709 Patent and the '903 Patent.

13.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the sale or offer for sale of its KnowledgeSHARE product to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449 and did so with intent to deceive.

14.     XU's intentional failure to disclose the sale or offer for sale of its KnowledgeSHARE product allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.  In fact, in a recent Office Action on an application (U.S. Patent App. No. 11/200,520) claiming priority to the application that issued as the '709 Patent, the U.S.P.T.O. patent examiner rejected all claims in the pending application as unpatentable in the light of XU's offers to sell KnowledgeSHARE beginning in January 2003.  A copy of the Office Action is attached hereto as Exhibit B.  A copy of other documents reflecting XU's offers to sell

KnowledgeSHARE more than one year prior to filing of the applications that issued as the '709 Patent and '903 Patent are attached hereto as Exhibits C, D, and E (XU-0076543).

## FOURTH AFFIRMATIVE DEFENSE
(Inequitable Conduct II: Intentional Non-Disclosure of
Known Prior Art Offer To Sell "homework911")

15.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

16.    Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability", 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

17.    On information and belief, XU has done business under the name "Homework911.com, Inc." and "LearningIDEAS, Inc."

18.    On information and belief, more than one year prior to filing either the '709 Patent or the '903 Patent, XU sold or offered for sale a product referred to as "homework911." A copy of a published overview of the "homework911" product is attached hereto as Exhibit F.

19.    On information and belief, the "homework911" product embodied every element of one or more claims of the '709 Patent.  For example, the "Tutor Session SC Overview" of Exhibit F, dated March 19, 2002, depicts a match-and-route system using an interactive page "Problem_Definition_L."

20.    On information and belief, the "homework911" product embodied every element of one or more claims of the '903 Patent.  For example, the "Tutor Session SC Overview" of Exhibit F, dated March 19, 2002, depicts a system to locate and establish real time communications with a live expert.

21.    On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively.

22.    On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent knew or should have known of the "homework911" product during the application process for the '709 Patent and the '903 Patent.

23.    On or about January 30, 2004, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent admitted that the homework911 product embodied every element of one or more claims of the '709 Patent and the '903 Patent.  On or about January 30, 2004, these same XU personnel were told that the homework911 product was prior art relevant to the patentability of the inventions claimed in the '709 Patent and the '903 Patent.

24.    On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the sale or offer for sale of its homework911 product to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449 and did so with intent to deceive.

25.    XU's intentional failure to disclose the sale or offer for sale of its homework911 product allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

## FIFTH AFFIRMATIVE DEFENSE
### (Inequitable Conduct III: Intentional Non-Disclosure of Known Prior Art Offers To Sell "XpertSHARE")

26.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

27.     Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability," 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

28.     XU sold or offered for sale a product referred to as "XpertSHARE 2.0" by at least January 26, 2004.  A copy of a press release announcing the release of the XpertSHARE 2.0 product is attached hereto as Exhibit G.  A copy of an XpertSHARE 2.0 Product Tour is attached hereto as Exhibit H.

29.     XU sold or offered for sale prior versions of XpertSHARE on or before May 2003.

30.     On information and belief, one or more versions of the "XpertSHARE" product embodied every element of one or more claims of the '709 Patent.  For example, the "Get Assistance" page shown on page 4 of the XpertSHARE 2.0 Product Tour depicts a user interface page that is substantively identical to the preferred embodiment shown in Figure 2 of the '709 Patent.

31.     On information and belief, one or more versions of the "XpertSHARE" product embodied every element of one or more claims of the '903 Patent.  For example, page 5 of the XpertSHARE 2.0 Product Tour depicts a slide titled "XpertSHARE Match & Route to the best available expert" showing a system to locate and establish real time communications with a live expert.

32.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively.

33.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent knew or should have known of the XpertSHARE 2.0 product or its preceding versions during the application process for the '709 Patent and the '903 Patent.

34.     On or about January 30, 2004, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent admitted that the XpertSHARE 2.0 product or its preceding versions embodied every element of one or more claims of the '709 Patent and the '903 Patent.  On or about January 30, 2004, these same XU personnel were told that the XpertSHARE product was prior art relevant to the patentability of the inventions claimed in the '709 Patent and the '903 Patent.

35.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the sale or offer for sale of its XpertSHARE 2.0 product, or any prior version of XpertSHARE, to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449 and did so with intent to deceive.

36.     XU's intentional failure to disclose the sale or offer for sale of its XpertSHARE 2.0 product, or any prior version of XpertSHARE, allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.  In a recent Office Action on an application (U.S. Patent App. No. 11/200,520) claiming priority to the application that issued as the '709 Patent, the U.S.P.T.O. patent examiner rejected all claims in the pending application as unpatentable in the

light of XU's offers to sell XpertSHARE more than one year prior to filing of the applications that issued as the '709 Patent and '903 Patent. A copy of other documents confirming XU's offers to sell XpertSHARE more than one year prior to filing of the applications that issued as the '709 Patent and '903 Patent are attached hereto as Exhibits C, D, and E (XU-0076543).

## SIXTH AFFIRMATIVE DEFENSE
(Inequitable Conduct IV: Intentional Non-Disclosure of
Known Material Prior Art Reference "KnowledgeSHARE User Manual")

37.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

38.     Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability," 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

39.     The KnowlegeSHARE User Manual was published prior to the filing of the '709 Patent or the '903 Patent.

40.     The KnowlegeSHARE User Manual is material to patentability of one or more claims of the '709 Patent and the '903 Patent. In the recent Office Action (November 18, 2011 Office Action for U.S. Patent App. No. 11/200,520), the U.S.P.T.O. Examiner identified the KnowledgeSHARE User Manual as a basis for rejecting claims claiming priority to the application that issued as the '709 Patent.

41.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, and knew or should have known of the KnowledgeSHARE User Manual.

32

42.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent who was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, knew or should have known that the KnowledgeSHARE User Manual was material to the patentability of the '709 Patent and the '903 Patent.

43.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the KnowledgeSHARE User Manual to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

44.     XU's intentional failure to disclose the prior art KnowledgeSHARE User Manual allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

### SEVENTH AFFIRMATIVE DEFENSE
(Inequitable Conduct V: Intentional Non-Disclosure of
Known Material Prior Art Reference "homework911 overview")

45.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

46.     Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability," 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

47.     The homework911 overview was published prior to the filing of the '709 Patent or the '903 Patent.

33

48.     The homework911 overview is material to patentability of one or more claims of the '709 Patent and the '903 Patent.

49.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, and knew or should have known of the homework911 overview.

50.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent who was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, knew or should have known that the homework911 overview was material to the patentability of the '709 Patent and the '903 Patent.

51.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the homework911 overview to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

52.     XU's intentional failure to disclose the prior art homework911 overview allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

## EIGHTH AFFIRMATIVE DEFENSE
(Inequitable Conduct VI: Intentional Non-Disclosure of
Known Material Prior Art References "XpertSHARE 2.0 Product Tour,"
"XpertSHARE User Manual" and Other Documents Describing XpertSHARE)

53.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

34

54.    Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability," 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

55.    On information and belief, the XpertSHARE 2.0 Product Tour was published prior to the filing of the '709 Patent or the '903 Patent. The XpertSHARE User Manual was published more than one year prior to the filing of the '709 Patent and the '903 Patent.

56.    The XpertSHARE 2.0 Product Tour, XpertSHARE User Manual and other documents describing XpertSHARE are material to patentability of one or more claims of the '709 Patent and the '903 Patent. In the recent Office Action (November 18, 2011 Office Action for U.S. Patent App. No. 11/200,520), the U.S.P.T.O. Examiner referred to these documents in rejecting claims claiming priority to the application that issued as the '709 Patent.

57.    On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, and knew or should have known of the XpertSHARE 2.0 Product Tour.

58.    On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent who was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, knew or should have known that the XpertSHARE 2.0 Product Tour was material to the patentability of the '709 Patent and the '903 Patent.

59.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the XpertSHARE 2.0 Product Tour to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

60.     XU's intentional failure to disclose the prior art XpertSHARE 2.0 Product Tour allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

## NINTH AFFIRMATIVE DEFENSE
(Inequitable Conduct VII: Intentional Non-Disclosure of
Known Material Prior Art References "U.S. Patent Publication No. 2002/0013836")

61.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

62.     Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability," 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

63.     U.S. Patent Publication No. 2002/0013836, entitled "Interactive Online Learning With Student-To-Tutor Matching," was published on January 31, 2002.  The named inventors on U.S. Patent Publication No. 2002/0013836 include Victor Friedman and James B. Nevin.

64.     James B. Nevin is a named inventor on the '709 Patent and the '903 Patent.

65.     On information and belief, Victor Friedman is XU's Chairman and/or Chief Executive Officer.

66.     XU personnel including at least Victor Friedman and James B. Nevin were aware of U.S. Patent Publication No. 2002/0013836 during the application process for the '709 Patent and the '903 Patent.

67.     U.S. Patent Publication No. 2002/0013836 discloses at least an interactive match-and-route system for matching a seeker with a best available expert, including at least one figure depicting an interactive screen from the "homework911" product.   As such, XU personnel including at least Victor Friedman or James B. Nevin knew or should have known that U.S. Patent Publication No. 2002/0013836 was material to the patentability of the '709 Patent and the '903 Patent.

68.     On information and belief, XU personnel including at least Victor Friedman and James B. Nevin intentionally failed to disclose U.S. Patent Publication No. 2002/0013836 to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

69.     XU's intentional failure to disclose the prior art U.S. Patent Publication No. 2002/0013836 allowed XU to fraudulently obtain issuance of the '709 Patent and the '903 Patent.

### TENTH AFFIRMATIVE DEFENSE
(Inequitable Conduct VIII: Intentional Non-Disclosure Of
Known Material Prior Art Identified To XU by ipCapital, Inc. ("ipCapital"))

70.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

71.     ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

72.    In March 2004, 

73.    Notwithstanding ▮▮▮▮▮▮▮▮▮▮▮▮▮ XU filed no Invention Disclosure Statement during the prosecution of the '709 Patent.  XU filed a single Invention Disclosure Statement, identifying a single prior art patent, during the prosecution of the '903 Patent.

74.    On information and belief, XU personnel including at least Victor Friedman and James B. Nevin intentionally failed to disclose the prior art ▮▮▮▮▮▮▮▮▮▮ in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

75.    XU's intentional failure to disclose the prior art ▮▮▮▮▮▮▮▮▮▮ allowed XU to fraudulently obtain issuance of the '709 Patent and the '903 Patent.

**ELEVENTH AFFIRMATIVE DEFENSE**
(Inequitable Conduct VIII: Intentional Omission of an Inventor)

76.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

77.    Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly omitted a contributing inventor to at least one claim limitation of each of the '709 Patent and the

'903 Patent, and continued to fail to correct the inventorship of the '709 Patent and the '903 Patent to include such inventor, with the intent to deceive the U.S.P.T.O..

78.     The European counterpart for the '709 Patent lists David Rutberg as a co-inventor.

79.     David Rutberg was included as a co-inventor on the original Application Data Sheet filed with the '967 Patent Application on March 31, 2005.

80.     On August 2, 2005, XU filed a substitute Application Data Sheet omitting to name David Rutberg as a co-inventor of the '967 Patent Application.

81.     XU failed to include David Rutberg as a co-inventor on the '014 Patent Application.

82.     On information and belief, XU knew, or should have known, that David Rutberg contributed to the conception of at least one claim limitation of the '709 Patent and the '903 Patent.

83.     On information and belief, XU knowingly and intentionally removed David Rutberg as a listed co-inventor of one or more claim limitations of the '709 Patent and, as such, the '709 Patent is unenforceable.

84.     XU knowingly and intentionally failed to name David Rutberg as a co-inventor of at least one claim limitation of the '903 Patent and, as such, the '903 Patent is unenforceable.

## TWELFTH AFFIRMATIVE DEFENSE
(Prosecution History Estoppel)

85.     XU is estopped from construing any claim of the '709 Patent and the '903 Patent to be infringed or have been infringed, either literally or under the doctrine of equivalents, by any method or product manufactured, used, imported, sold or offered for sale by Cisco in view of the

prior art and because of admissions and statements XU made to the U.S.P.T.O. during prosecution of the applications leading to the issuance of the '709 Patent and the '903 Patent.

**THIRTEENTH AFFIRMATIVE DEFENSE**
(35 U.S.C. § 287)

86.     XU's claims and/or recovery against Cisco are barred, in whole or in part, by 35 U.S.C. § 287.

**FOURTEENTH AFFIRMATIVE DEFENSE**
(No Willful Infringement)

87.     XU is not entitled to enhanced or increased damages for willful infringement because Cisco has not engaged in any conduct that meets the applicable standard for willful infringement, XU is not entitled to injunctive relief, and XU has not been irreparably harmed.

**FIFTEENTH AFFIRMATIVE DEFENSE**
(Laches/Estoppel)

88.     By reasons of XU's own conduct, statements, acts, and omissions, XU's claims are barred or limited by the doctrine of laches and/or equitable estoppel.

**SIXTEENTH AFFIRMATIVE DEFENSE**
(Failure to State a Claim)

89.     XU's claims fail to state a claim upon which relief can be granted.

**SEVENTEENTH AFFIRMATIVE DEFENSE**
(Fault of the Plaintiff)

90.     Cisco asserts that each claim is barred because any damages or losses that XU has alleged, if they exist at all, were proximately caused or contributed to by the conduct of XU.

**EIGHTEENTH AFFIRMATIVE DEFENSE**
(Adequate Remedy at Law)

91.     XU's claims for equitable relief are barred in light of the fact that XU has an adequate remedy at law.

## NINETEENTH AFFIRMATIVE DEFENSE
(Privilege/Justification)

92.    XU's claims are barred in whole or in part because Cisco was privileged and justified in acting as it did.

## TWENTIETH AFFIRMATIVE DEFENSE
(Lack of Standing)

93.    XU's claims are barred or limited because XU lacks standing to bring the claims against Cisco.

## TWENTY FIRST AFFIRMATIVE DEFENSE
(Unjust Enrichment)

94.    XU's claims are barred or limited because XU would be unjustly enriched if allowed to recover the relief sought.

## TWENTY SECOND AFFIRMATIVE DEFENSE
(Waiver)

95.    XU's claims are barred or limited because XU knowingly and voluntarily waived any purported causes of action that it may have had against Cisco.

## TWENTY THIRD AFFIRMATIVE DEFENSE
(Unclean Hands)

96.    XU's claims are barred or limited by the unclean hands of XU with respect to the matters alleged in the FAC.

## TWENTY FOURTH AFFIRMATIVE DEFENSE
(Excuse)

97.    Cisco asserts that at all times and places alleged in the FAC, Cisco performed and discharged each and every obligation owed to XU, if any, except such obligations as Cisco was excused from performing as a result of XU's conduct and failure to perform properly its obligations.

### TWENTY FIFTH AFFIRMATIVE DEFENSE
(Full Performance of Obligations)

98.    XU's claims are barred in whole or part because XU duly performed, satisfied and/or discharged all duties and obligations it may have owed to XU arising out of any contract between XU and Cisco.

### TWENTY SIXTH AFFIRMATIVE DEFENSE
(Discharge)

99.    XU's claims are barred in whole or in part because any alleged obligations owed by Cisco to XU were discharged.

### TWENTY SEVENTH AFFIRMATIVE DEFENSE
(Consent)

100.    XU's claims are barred in whole or in part because XU acquiesced in, ratified, participated in, and/or consented to the alleged acts and/or omissions about which XU complains.

### TWENTY EIGHTH AFFIRMATIVE DEFENSE
(Failure to Mitigate)

101.    XU's claims are barred in whole or in part because XU failed and neglected to exercise reasonable care and diligence to minimize and mitigate the alleged damages claimed.

### TWENTY NINTH AFFIRMATIVE DEFENSE
(No Actual Confusion or Likelihood of Confusion)

102.    On information and belief, Cisco alleges that XU has not alleged and cannot prove that XU has encountered any actual consumer confusion as a result of Cisco's alleged actions and, XU cannot demonstrate any likelihood of confusion.

## THIRTIETH AFFIRMATIVE DEFENSE
(Fair Use)

103.    Use by Cisco of the wording at issue constitutes classic fair use, inasmuch as such wording is used other than as an identifier of source, fairly and in good faith in its ordinary commonplace meaning, and is therefore a use permitted under federal, state and common law.

## THIRTY FIRST AFFIRMATIVE DEFENSE
(Descriptiveness Without Secondary Meaning)

104.    XU and third parties use the wording at issue descriptively and thus the wording at issue lacks the requisite distinctiveness to be able to act as an identifier of source exclusively for XU.  Accordingly, XU lacks any protectable or enforceable rights in the wording at issue, barring all trademark-based claims asserted.

## THIRTY SECOND AFFIRMATIVE DEFENSE
(Lack of Distinctiveness)

105.    XU has used and uses the alleged wording to convey the features, functions, and benefits of using XU's products and services and, as a result, the alleged wording does not function as an identifier of source and is not distinctive, barring all trademark-based claims asserted.

## THIRTY THIRD AFFIRMATIVE DEFENSE
(Genericness)

106.    The purported trademark on which XU bases its claims in the FAC should be found generic given the use of the same or nearly identical wording by third parties for similar or related goods and services to convey the wording's everyday, ordinary sense in connection with computer products, including computer software and related services, barring all trademark-based claims asserted.

## THIRTY FOURTH AFFIRMATIVE DEFENSE
(Abandonment)

107.    On information and belief, Cisco alleges that XU's trademark-based claims are barred because the wording at issue is widely used by third parties for similar or related goods and services without any apparent objection by XU.

## THIRTY FIFTH AFFIRMATIVE DEFENSE
(No Exclusive Rights)

108.    XU lacks any enforceable or protectable rights in the wording at issue because third parties use this same wording to describe related goods and services.

## THIRTY SIXTHAFFIRMATIVE DEFENSE
(First Amendment)

109.    Any use of the wording at issue is protected by the First Amendment.

## COUNTERCLAIMS

## INTRODUCTION

1.    XU is a failed company that, by its own admission, never sold a product to a customer. For five years prior to beginning discussions with Cisco, XU offered to sell its single product – called, at various times, homework911, KnowledgeSHARE and XpertSHARE – to scores of companies. No one wanted it. As XU's own former head of business development candidly admitted, ███████████████████████

2.    By the time XU began discussions with Cisco in July 2004, its product was called XpertSHARE. XpertSHARE was essentially an integration of various third-party products, including a Genesys routing engine for routing users to agents or "experts," as XU referred to them. Beginning in August 2004, XU and Cisco discussed the possibility of replacing the Genesys router at the heart of XpertSHARE with a Cisco router called ICM/IPCC. Cisco and Genesys are competitors in the call center technology market. At the time, Cisco thought that

XpertSHARE's taxonomy could "add some sizzle" to Cisco's ICM/IPCC product and help Cisco compete more effectively with Genesys and others.  XU promised and agreed to do the work necessary to replace the Genesys routing engine at the heart of XpertSHARE with Cisco's ICM/IPCC routing product.

3.      In order to perform the integration work it promised and agreed to do, XU needed to understand Cisco's ICM/IPCC and the proprietary and confidential interfaces Cisco had developed to allow third parties like XU to integrate its products with ICM/IPCC.  Under NDA, Cisco provided XU with extensive confidential and proprietary information regarding Cisco's ICM/IPCC, Media Routing and other interfaces.  Cisco engineers expended substantial efforts to educate and train XU regarding Cisco's call center technology and how XU could integrate with it.

4.      Contrary to the allegations of XU's FAC, XU provided Cisco with virtually no information regarding XpertSHARE.  XU did not provide Cisco with the source code for XpertSHARE, the functional specifications for XpertSHARE, the methods used by XU to develop the taxonomy or user interface for XpertSHARE, the algorithms or routing scripts used by XpertSHARE to match seekers with "experts," or any other confidential information regarding the technical aspects of XpertSHARE.  To Cisco, XpertSHARE essentially was just a black box.

5.      XU failed to perform the integration it promised and agreed to do.  Notwithstanding the lack of an integrated Cisco-XU product, Cisco promoted the anticipated future Cisco-XU product to its customer base and to others.  But, once again, the market rejected XpertSHARE.  None of the customers Cisco approached about a potential Cisco-XU integration wanted the product.  The business case for a Cisco-XU relationship diminished and, in January

2007, Cisco informed XU that it was no longer being considered for the "Solutions Plus" partner program that the parties had discussed up to that point.

6.     In July 2007, XU essentially shut down.  It laid off all remaining employees. Today it conducts no regular business operations.  Its only activity is its pursuit of this litigation against Cisco.

7.     As it had before beginning discussions with XU, Cisco's Customer Contact Business Unit ("CCBU") continued innovating and evolving its product offerings.  In June 2009, Cisco released a product called Expert Advisor, which allowed contact center agents to consult with "occasional agents" or "expert advisors" in the enterprise when necessary.  This product was independently developed by Cisco and was not based on any intellectual property developed or shared with Cisco by XU.

8.     Other Cisco business units have continued to evolve their product offerings as well.  In 2008, Cisco TelePresence Business Unit—a business unit that XU had no dealings with—began marketing a solution it called TelePresence Expert on Demand.   Using a TelePresence video conferencing terminal and an IP phone, a user of TelePresence Expert on Demand could conduct a videoconference with a remotely located agent with expertise of particular interest to the user.  This solution was independently conceived by Cisco and was not based on any intellectual property developed or shared with Cisco by XU.

9.     None of the other Cisco products that XU accuses of infringing or misusing its intellectual property do so.

10.     XU's entire lawsuit against Cisco is predicated on fraud and misrepresentation. XU has engaged in a pattern and practice of fraud and misrepresentation going all the way back to its days as an operating business, when it falsely told ████████████████████

███████████████████████████████████ and falsely told Cisco that

XpertSHARE was covered by patents long before XU had any issued patents (to try to induce

Cisco to acquire XU or enter into a business relationship with it).

11.     XU's baseless patent infringement claims against Cisco are predicated on invalid

patents obtained through fraud on the United States Patent and Trademark Office ("U.S.P.T.O.").

XU's Preliminary Infringement Contentions and other positions taken in this litigation

demonstrate that XU lacks any good faith basis to accuse any Cisco products of infringing any

XU patent.  Further, XU has knowingly accused Cisco products and solutions that are based on

technology that predate the filing of XU's patents-in-suit (by several years) of infringing its

after-acquired patents.  These and other positions taken by XU demonstrate this is an exceptional

case under 35 U.S.C. § 285.

12.     XU's trade secret misappropriation claim is based on knowing misrepresentations,

too.  XU falsely alleges in its complaint that it "disclosed every aspect of its intellectual property

to Cisco."  In truth, it was Cisco that disclosed its valuable intellectual property to XU.  XU

provided virtually no information about the operation of XpertSHARE to Cisco and its other

purported trade secrets either do not constitute "trade secrets" at all or have not been used by

Cisco.   XU's false allegations, its improper trade secret disclosure, and other conduct

demonstrate XU's misappropriation claim is brought in bad faith.  Under California Civil Code §

3426.4, Cisco is entitled to its attorney's fees, costs and interest, among other relief, for having to

defend against XU's bad faith claim for trade secret misappropriation.

13.     XU's Lanham Act and related claims for alleged trademark infringement are

equally baseless and brought in bad faith.   XU has no rights to the mark "Expert on Demand,"

which is descriptive, was not registered by XU, and has been used by others (besides Cisco) to

describe various software and other products.  These facts demonstrate that this is an exceptional case under 15 U.S.C. § 1117(a).

## THE PARTIES

14.     Cisco is a California corporation with a principal place of business at 170 West Tasman Drive, San Jose, California.

15.     On information and belief, Plaintiff and Counterdefendant XU is a Delaware corporation with a principal place of business located at 253 West 35th Street, New York, New York.

## JURISDICTION AND VENUE

16.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

17.     On information and belief, XU conducts business in this district and as a result of this business has continuous and systematic contacts with this district. Furthermore, XU has consented to jurisdiction in this district by filing suit against Defendant in this Court. Accordingly, XU is subject to personal jurisdiction in this district.

18.     On March 10, 2009 XU filed this lawsuit, which alleges that Cisco infringes the '709 Patent and the '903 patent.  There is an actual controversy between Cisco and Plaintiff regarding noninfringement, validity, and/or enforceability of the '709 Patent and the '903 Patent because Plaintiff has asserted that Cisco infringes the '709 Patent and the '903 Patent.

19.     Cisco's claims for Declaratory Relief are brought under 28 U.S.C. §§ 2201 and 2202.  This Court has jurisdiction over the subject matter of these counterclaims under 28 U.S.C. §§ 1331, 1338 and 1367.

20.     Venue for these counterclaims is proper in this Court under 28 U.S.C. §1391 and under the doctrine of pendent venue because these counterclaims are closely related to the claims set forth in the FAC.

## XU'S FRAUD ON THE U.S.P.T.O.

21.     A valid U.S. patent grants the owner the right to exclude others from making, using, selling, offering to sell, or importing the invention defined in the patent claims.

22.     In order to assist the U.S.P.T.O. in its effort to issue only valid patents, patent applicants have a duty of candor and good faith in dealing with the U.S.P.T.O.  Included in those duties is an obligation to disclose all known information that is material to the decision to issue the patent.  This includes a duty to disclose prior art, including offers to sell devices that fall within at least one claim of the patent application.  Under 35 U.S.C. § 102(b), the existence of such prior art may establish the lack of patentability.

23.     On April 2, 2004, XU applied for a patent entitled "System and Method for Managing Questions and Answers Using Subject Lists Styles."  The U.S.P.T.O. issued U.S. Patent No. 7,366,709 to XU on April 29, 2008.

24.     On January 24, 2005, XU applied for a patent entitled "Semantic to Non-Semantic Routing for Locating A Live Expert."  The U.S.P.T.O. issued U.S. Patent No. 7,499,903 to XU on March 3, 2009.

25.     During the application process for the '709 Patent and '903 Patent, XU failed to disclose to the U.S.P.T.O. material prior art of which XU was aware.  In doing so, XU violated its statutory duty of candor and good faith to the U.S.P.T.O.

26.     In fact, XU failed to disclose any prior art during prosecution of the '709 Patent. XU disclosed a single piece of patent prior art during prosecution of the '903 Patent.  XU failed

to disclose and concealed from the U.S.P.T.O. during prosecution of both the '709 Patent and the '903 Patent that XU had been offering for sale for years prior to filing of the applications products embodying the claims in the applications.

27.     In particular, XU, then doing business under the name of "Homework911.com, Inc." and "LearningIDEAS, Inc." sold or offered for sale a product referred to as "KnowledgeSHARE" by at least 2002.

28.     "KnowledgeSHARE" embodied every element of one or more claims of the '709 Patent.  For example, the figure shown on page 20 of the KnowledgeSHARE User Manual, and related text, depicts a user interface page that is substantively identical to the preferred embodiment shown in Figure 2 of the '709 Patent.

29.     "KnowledgeSHARE" embodied every element of one or more claims of the '903 Patent.  For example, pages 26-27 of the KnowledgeSHARE User Manual describe a skill-set database.

30.     Moreover, more than one year prior to the filing of either the '709 Patent or the '903 Patent, XU sold or offered for sale a product referred to as "homework911."  A copy of an overview of the "homework911" product published on the internet by XU is attached hereto as Exhibit F.

31.     "homework911" embodied every element of one or more claims of the '709 Patent.  For example, the "Tutor Session SC Overview" of Exhibit F, dated March 19, 2002, depicts a match-and-route system using an interactive page "Problem_Definition_L."

32.     "homework911" embodied every element of one or more claims of the '903 Patent.  For example, the "Tutor Session SC Overview" of Exhibit F, dated March 19, 2002, depicts a system to locate and establish real time communications with a live expert.

33.     Moreover, more than one year prior to the filing of either the '709 Patent or the '903 Patent, XU sold or offered for sale a product referred to as "XpertSHARE." XpertSHARE embodied every element of one or more claims of the '709 Patent and the '903 Patent.

34.     All of the above constitute relevant prior art, sales, and offers to sell that would have been and are material to the U.S.P.T.O.'s evaluation of the applications that gave rise to the '709 Patent and '903 Patent.   In fact, in a recent Office Action on a related application (November 18, 2011 Office Action for U.S. Patent App. No. 11/200,520), the U.S.P.T.O. patent examiner has identified KnowledgeSHARE and XpertSHARE as grounds for rejecting all claims in the application based on 35 U.S.C. §102(b).

35.     XU was aware of these products and of their relevance to the patentability of the inventions claimed in the '709 Patent and '903 Patent.

36.     XU was aware that it was required to disclose them to the U.S.P.T.O. and that this prior art, sales, and offers to sell would negatively impact its chances of its applications being granted.  In 2004,



37.

XU disclosed none of this prior art to the U.S.P.T.O. during prosecution of the patents-in-suit.

38.     Information on prior art such as an applicant's prior sales of covered technology is material to the U.S.P.T.O. in determining whether the grant a patent under 35 U.S.C. §§ 102 and 103.  The '709 Patent and '903 Patent as issued would not have been granted to XU had XU not omitted from its disclosures such known information on the prior art, including its own prior sales of covered technology.

### XU'S FRAUD ON CISCO

39.     In July 2004, XU approached Cisco about a potential business arrangement.  In August 2004 Cisco and XU entered into an NDA and ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████ XU agreed to perform the actual integration work.  To assist XU, Cisco provided XU with an extensive amount of confidential and proprietary information regarding Cisco's contact center routing product (ICM/IPCC) and related components, applications and proprietary interfaces.

40.     Cisco provided XU with this information in a number of ways including but not limited to the following.  First, Cisco provided XU with hardware components pre-loaded with Cisco's proprietary technology, including ICM/IPCC, simulation software, interfaces and other technology.  Second, Cisco provided XU with documents and diagrams that demonstrated the functionality of interfaces and potential integration designs.  Third, Cisco engineers taught and explained Cisco's technology to XU in detail, including by telephone, over email, and during in-person training sessions conducted specifically for XU by Cisco engineers.

41.     The information that Cisco provided to XU is independently valuable and not publicly available.  Cisco took reasonable efforts to maintain the secrecy of this information,

including entering into a non-disclosure agreement with XU, advising XU that such information was being provided pursuant to the non-disclosure agreement, and conspicuously marking documents as confidential.

42.    XU concealed and failed to disclose to Cisco that XU was simultaneously exploring a business relationship with one of Cisco's primary competitors in the call center space, Genesys.  In fact, **just three days** after XU entered into the NDA with Cisco, XU entered into an NDA with Genesys for purposes of exploring a potential business opportunity between XU and Genesys.  Contrary to the false statements in the FAC, XU continued to work with Genesys long after it began discussions with Cisco.  Indeed, XU and Gensys worked together to try to sell Genesys-based versions of XpertSHARE to actual and prospective Cisco customers.  If XU had disclosed its secret dealings with Genesys to Cisco, Cisco would not have continued to work with XU, would not have disclosed the proprietary and confidential information described herein to XU and would not have devoted all of the support and resources to the XU integration project that Cisco actually did.

## XU'S LITIGATION MISCONDUCT

43.    As set forth above, the '709 Patent and '903 Patent were obtained through knowing and willful fraud on the U.S.P.T.O. by XU and/or its agents, and are invalid and unenforceable for XU's failure to disclose material prior art references to the U.S.P.T.O., including its own activities in offering to sell products embodying the asserted claims of the asserted patents more than one year prior to the filing date of the patents-in-suit.  XU is knowingly asserting (and continuing to assert) invalid patents, to the detriment of Cisco and this Court.

44. Since the inception of this litigation, Cisco has apprised XU that Cisco's Expert Advisor and TelePresence Expert on Demand products do not implicate any of the inventions claimed in either the '709 Patent or the '903 Patent. Cisco has shown XU that its Expert Advisor product does not include any interface capable of being accused in good faith of infringing XU's '709 Patent and produced documents to XU demonstrating as much. XU knows that Expert Advisor relies on technology for performing matching and routing that predates (by many years) XU's '903 Patent. XU also knows that TelePresence Expert on Demand comprises no interface capable of being accused in good faith of infringing XU's '709 Patent, and that TelePresence Expert on Demand, like Expert Advisor, relies on routing technology that predates (again, by many years) XU's '903 Patent.

45. XU's initial complaint accused only Expert Advisor and TelePresence Expert On Demand of infringement. Rather than dismiss its baseless patent infringement claims in response to clear evidence of non-infringement and/or invalidity, XU has instead proposed objectively and subjectively baseless claim construction positions in an attempt to salvage its infringement claims against Expert Advisor and TelePresence Expert on Demand. XU also has amended its complaint to baselessly accuse other Cisco products of infringing its '709 Patent, and has proposed objectively and subjectively baseless claim constructions in an attempt to broaden the scope of the '709 Patent to cover these non-infringing products.

46. XU's Preliminary Infringement Contentions demonstrate that XU does not have a good faith basis for its patent infringement allegations. For example, XU's infringement contentions simply omit certain claim elements, and argue that it is "reasonable to infer" that certain elements are present in the accused Cisco products. XU is attempting to read the claimed "interactive problem definition page" on applications that do use web pages at all for submission

of a user's inquiry.  Elsewhere, XU attempts to read the complex taxonomies of information recited in the patents on simple search-bar functionality in Cisco products.  For other products, including TelePresence Expert on Demand and Quad, XU simply provided no infringement contentions at all.

47.    XU's trade secret disclosure evidences similarly improper litigation conduct.  By way of example, several of XU's purported trade secrets



Other of XU's purported trade secrets claim

Other of XU's purported trade secrets

XU's claim for trade secret misappropriation is both objectively baseless and objectively brought in bad faith.

48.    XU's FAC provides further evidence of XU's improper litigation tactics.  Among the many knowingly false allegations in XU's complaint are allegations that XU "disclosed every aspect of its intellectual property to Cisco," (¶ 10), that "Cisco and XpertUniverse were in regular contact for two and a half years," (¶ 11), that Cisco induced XU to cease business discussions with Genesys in favor of a new business relationship with Cisco and that "XpertUniverse changed its focus to devote substantially all its resources to building a platform specific to Cisco's needs," (¶ 35), that XU "disclosed to Cisco the proprietary and novel information that was the subject of its pending and confidential patent applications, the same applications that later matured into the '709 and '903 Patents," (¶ 41), among others.  XU knows these allegations are false and lacks probable cause to pursue them and claims based on them.

## COUNTERCLAIM I
### (Declaratory Judgment of Invalidity)

49.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

50.     The claims of the '709 Patent and the '903 Patent are invalid for failure to meet the requirements of one or more sections of 35 U.S.C. §§ 101 et seq. and/or one or more sections of 37 C.F.R including, but not limited to, C.F.R. § 1.56(a) [R-2].

## COUNTERCLAIM II
### (Declaratory Judgment of Non-Infringement)

51.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

52.     Cisco has not infringed and is not infringing, either directly or indirectly, any valid and enforceable claim of the '709 Patent or the '903 Patent.

## COUNTERCLAIM III
### (Unenforceability – Intentional Failure To Disclose Known Prior Art Sale Or Offer To Sell)

53.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

54.     On information and belief, XU has done business under the name "Homework911.com, Inc." and "LearningIDEAS, Inc."

55.     On information and belief, XU, doing business as LearningIDEAS, Inc., sold or offered for sale a product referred to as "KnowledgeSHARE" by at least 2002.   A copy of a "KnowledgeSHARE" User Manual is attached hereto as Exhibit A.

56.     On information and belief, the "KnowledgeSHARE" product embodied every element of one or more claims of the '709 Patent.  For example, the figure shown on page 20 of

the KnowledgeSHARE User Manual, and related text, depicts a user interface page that is substantively identical to the preferred embodiment shown in Figure 2 of the '709 Patent.

57.    On information and belief, the "KnowledgeSHARE" product embodied every element of one or more claims of the '903 Patent.   For example, pages 26-27 of the KnowledgeSHARE User Manual describe a skill-set database.

58.    On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent.

59.    On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent knew or should have known of the KnowledgeSHARE product during the application process for the '709 Patent and the '903 Patent.

60.    On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the sale or offer for sale of its KnowledgeSHARE product to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449 and did so with intent to deceive.

61.    XU's intentional failure to disclose the sale or offer for sale of its KnowledgeSHARE product allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

62.    On information and belief, more than one year prior to filing either the '709 Patent or the '903 Patent, XU sold or offered for sale a product referred to as "homework911."

A copy of an overview of the "homework911" product published on the internet by XU is attached hereto as Exhibit F.

63.     On information and belief, the "homework911" product embodied every element of one or more claims of the '709 Patent.  For example, the "Tutor Session SC Overview" of Exhibit B, dated March 19, 2002, depicts a match-and-route system using an interactive page "Problem_Definition_L."

64.     On information and belief, the "homework911" product embodied every element of one or more claims of the '903 Patent.  For example, the "Tutor Session SC Overview" of Exhibit F, dated March 19, 2002, depicts a system to locate and establish real time communications with a live expert.

65.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent knew or should have known of the "homework911" product during the application process for the '709 Patent and the '903 Patent.

66.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the sale or offer for sale of its homework911 product to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449 and did so with intent to deceive.

67.     XU's intentional failure to disclose the sale or offer for sale of its homework911 product allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

68.     XU sold or offered for sale a product referred to as "XpertSHARE 2.0" by at least January 26, 2004.  A copy of a press release announcing the release of the XpertSHARE 2.0

product is attached hereto as Exhibit G.  A copy of an XpertSHARE 2.0 Product Tour published by XU is attached hereto as Exhibit H.

69.     XU sold or offered for sale a product referred to as XpertSHARE version 1.3 prior to January 26, 2004.  On information and belief, XU sold or offered for sale earlier versions of XpertSHARE prior to XpertSHARE version 1.3.

70.     On information and belief, one or more versions of the "XpertSHARE" product embodied every element of one or more claims of the '709 Patent.  For example, the "Get Assistance" page shown on page 4 of the XpertSHARE 2.0 Product Tour depicts a user interface page that is substantively identical to the preferred embodiment shown in Figure 2 of the '709 Patent.

71.     On information and belief, one or more versions of the "XpertSHARE" product embodied every element of one or more claims of the '903 Patent.  For example, page 5 of the XpertSHARE 2.0 Product Tour depicts a slide titled "XpertSHARE Match & Route to the best available expert" showing a system to locate and establish real time communications with a live expert.

72.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent knew or should have known of the XpertSHARE 2.0 product or its preceding versions during the application process for the '709 Patent and the '903 Patent.

73.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the sale or offer for sale of its XpertSHARE 2.0 product, or any

prior version of XpertSHARE, to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449 and did so with intent to deceive.

74.     XU's intentional failure to disclose the sale or offer for sale of its XpertSHARE 2.0 product, or any prior version of XpertSHARE, allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

75.     Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability", 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

## COUNTERCLAIM IV
### (Unenforceability – Intentional Failure To Disclose Known Material Prior Art References)

76.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

77.     The KnowlegeSHARE User Manual was published prior to the filing of the '709 Patent or the '903 Patent.

78.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, and knew or should have known of the KnowledgeSHARE User Manual.

79.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent who was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, knew or

should have known that the KnowledgeSHARE User Manual was material to the patentability of the '709 Patent and the '903 Patent.

80.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the KnowledgeSHARE User Manual to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

81.     XU's intentional failure to disclose the prior art KnowledgeSHARE User Manual allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

82.     On information and belief, the homework911 overview was published prior to the filing of the '709 Patent or the '903 Patent.

83.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, and knew or should have known of the homework911 overview.

84.     On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent who was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, knew or should have known that the homework911 overview was material to the patentability of the '709 Patent and the '903 Patent.

85.     On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the homework911 overview to the U.S.P.T.O. as required by 37

C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

86.    XU's intentional failure to disclose the prior art homework911 overview allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

87.    On information and belief, the XpertSHARE 2.0 Product Tour was published prior to the filing of the '709 Patent or the '903 Patent.

88.    On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, and knew or should have known of the XpertSHARE 2.0 Product Tour.

89.    On information and belief, Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent who was an officer or employee of XU during prosecution of the '709 Patent and the '903 Patent, respectively, knew or should have known that the XpertSHARE 2.0 Product Tour was material to the patentability of the '709 Patent and the '903 Patent.

90.    On information and belief, XU personnel including at least Abraham Zelkin or one or more of the other individuals listed as an inventor on the '709 Patent and the '903 Patent intentionally failed to disclose the XpertSHARE 2.0 Product Tour to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

91.    XU's intentional failure to disclose the prior art XpertSHARE 2.0 Product Tour allowed XU to fraudulently obtain issuance of the '709 Patent or the '903 Patent.

92.    U.S. Patent Publication No. 2002/0013836, entitled "Interactive Online Learning With Student-To-Tutor Matching," was published on January 31, 2002.  The named inventors on U.S. Patent Publication No. 2002/0013836 include Victor Friedman and James B. Nevin.

93.    James B. Nevin is a named inventor on the '709 Patent and the '903 Patent.

94.    On information and belief, Victor Friedman is XU's Chairman and/or Chief Executive Officer.

95.    XU personnel including at least Victor Friedman and James B. Nevin knew or should have known of U.S. Patent Publication No. 2002/0013836 during the application process for the '709 Patent and the '903 Patent.

96.    U.S. Patent Publication No. 2002/0013836 discloses at least an interactive match-and-route system for matching a seeker with a best available expert, including at least one figure depicting an interactive screen from the "homework911" product.  As such, XU personnel including at least Victor Friedman or James B. Nevin knew or should have known that U.S. Patent Publication No. 2002/0013836 was material to the prosecution of the '709 Patent and the '903 Patent.

97.    On information and belief, XU personnel including at least Victor Friedman and James B. Nevin intentionally failed to disclose U.S. Patent Publication No. 2002/0013836 to the U.S.P.T.O. as required by 37 C.F.R. § 1.56(a) [R-2] in any Information Disclosure Statement U.S.P.T.O. form 1449, and did so with intent to deceive.

98.    XU's intentional failure to disclose the prior art U.S. Patent Publication No. 2002/0013836 allowed XU to fraudulently obtain issuance of the '709 Patent and the '903 Patent.

99.    Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly affirmatively misrepresented material information and/or violated the "duty to disclose all information known to be material to patentability", 37 C.F.R. § 1.56(a) [R-2], to the U.S.P.T.O., with the intent to deceive the U.S.P.T.O..

## COUNTERCLAIM V
### (Unenforceability – Omission Of A Co-Inventor)

100.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

101.    The European counterpart for the '709 Patent lists David Rutberg as a co-inventor.

102.    David Rutberg was included as a co-inventor on the original Application Data Sheet filed with the '967 Patent Application on March 31, 2005.

103.    On August 2, 2005, XU filed a substitute Application Data Sheet omitting to name David Rutberg as a co-inventor of the '967 Patent Application.

104.    XU failed to include David Rutberg as a co-inventor on the '014 Patent Application.

105.    On information and belief, XU knew, or should have known, that David Rutberg contributed to the conception of at least one claim limitation of the '709 Patent and the '903 Patent.

106.    On information and belief, XU knowingly and intentionally removed David Rutberg as a listed co-inventor of one or more claim limitations of the '709 Patent and, as such, the '709 Patent is unenforceable.

107.     On information and belief, XU knowingly and intentionally failed to name David Rutberg as a co-inventor of at least one claim limitation of the '903 Patent and, as such, the '903 Patent is unenforceable.

108.     Each claim of the '709 Patent and the '903 Patent is unenforceable because XU, at the time of prosecution of the '709 Patent and the '903 Patent, deliberately and knowingly omitted a contributing inventor to at least one claim limitation of each of the '709 Patent and the '903 Patent, and continued to fail to correct the inventorship of the '709 Patent and the '903 Patent to include such inventor, with the intent to deceive the U.S.P.T.O.

## COUNTERCLAIM VI
### (Trade Secret Misappropriation- California Civil Code Section 3426)

109.     Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

110.     Cisco provided XU with confidential and proprietary technical information regarding Cisco ICM/IPCC, MR and ARM interfaces, and other Cisco technology and business plans.  This information derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its use.

111.     By virtue of the conduct described above including, but not limited to, attempting to pass Cisco's trade secrets off as information that is proprietary and confidential to XU and continuing to use, without authorization, hardware and software that Cisco provided to XU containing Cisco's trade secrets, XU has misappropriated such trade secrets pursuant to California Civil Code Section 3426.

112.     Cisco took reasonable measures to protect the secrecy of these trade secrets by, among other things, entering into non-disclosure agreements with XU, labeling its trade secret

information as "confidential," and providing its trade secrets to XU in password-protected electronic files.

113.    XU's employees knew or had reason to know of the confidential and trade secret nature of this information.

114.    XU's acts have caused irreparable injury and damage to Cisco for which XU has no adequate remedy at law and, unless enjoined by this Court, Cisco will continue to suffer injury as a result of XU's misappropriation.

115.    XU has undertaken the above acts of misappropriation willfully and with malice, entitling Cisco to exemplary damages, attorneys' fees and costs.

## COUNTERCLAIM VII
### (Fraud)

116.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

117.    XU failed to disclose and concealed from Cisco that, within days of entering into the NDA with Cisco, it entered into an NDA with one of Cisco's primary competitors in the call center technology market, Genesys, and was pursuing business opportunities at Cisco customers together with Genesys.  XU failed to disclose and concealed these facts from Cisco with an intent to defraud Cisco because XU knew Cisco would not invest as it did in the potential relationship with XU if Cisco knew XU was working with one of Cisco's primary competitors contrary to Cisco's interests.

118.    Cisco was unaware of XU's surreptitious and ongoing relationship with Genesys.

119.    As a result of XU's concealment, Cisco has been damaged in an amount that will be proved at trial.

## COUNTERCLAIM VIII
### (Unfair Competition- California Business & Professions Code Section 17200, *et seq.*)

120.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

121.    The XU conduct alleged herein, including, but not limited to, XU's fraud on the U.S.P.T.O in obtaining the patents-in-suit, and its deception of Cisco regarding its parallel relationship with one of Cisco's primary competitors in the call center technology market, constitutes unlawful, unfair, or fraudulent business practices in violation of California Business and Professions Code Section 17200, *et seq.*

122.    As a result of XU's bad faith conduct in obtaining and asserting the '709 Patent and '903 Patent, Cisco has been deprived of benefits and money.  Cisco has suffered irreparable harm and injunctive relief is necessary to enjoin further wrongful acts by XU and remedy the consequences of XU's bad faith conduct.

## COUNTERCLAIM IX
### (Conversion)

123.    Cisco repeats and realleges the averments in all the Paragraphs above as though fully set forth herein.

124.    Cisco has an ownership right in the hardware and software containing Cisco's proprietary and confidential information that Cisco provided to XU.  XU was aware that the equipment was provided only for purposes of facilitating the integration work that XU agreed to perform.  At no time did Cisco convey to XU its ownership interest in the equipment.

125.    XU continues to possess the hardware and software containing Cisco's proprietary and confidential information and has not returned the equipment to Cisco, despite the fact that XU is no longer conducting the integration work for which the equipment was intended to be used.

126.    Accordingly, Cisco has been deprived of the possession and use of the equipment and has been damaged in an amount equal to the value of equipment.

**PRAYER FOR RELIEF**

WHEREFORE, Cisco prays for the entry of judgment as follows:

A.    that XU take nothing for relief;

B.    that XU's claims for patent infringement be dismissed with prejudice;

C.    judging the '709 Patent and its claims invalid;

D.    judging the '709 Patent and its claims unenforceable;

E.    judging the '903 Patent and its claims invalid;

F.    judging the '903 Patent and its claims unenforceable;

G.    judging that Cisco has not infringed and is not infringing, directly or indirectly, any valid and enforceable claim of the '709 Patent;

H.    judging that Cisco has not infringed and is not infringing, directly or indirectly, any valid and enforceable claim of the '903 Patent;

I.    that this case be adjudged and determined to be an exceptional case under 35 U.S.C. §285, and that Cisco be awarded its attorney fees, costs and interest;

J.    that this case be adjudged and determined to be a bad faith claim of misappropriation under California Civil Code Section 3426.4 and that Cisco be awarded its attorney fees, costs, and interest;

K.    actual damages, unjust enrichment caused by the misappropriation, and/or a reasonable royalty award under California Civil Code Section 3426.3;

L.    exemplary damages, attorneys' fees, costs, and interests under 3426.3-4;

M.     that this case be adjudged and determined to be exceptional under 15 U.S.C.

§1117(a) and that Cisco be awarded its attorneys' fees;

N.     for general and special damages in an amount to be proved at trial; and

O.     for such other and further relief as the Court deems just and equitable.

### JURY TRIAL DEMAND

Cisco demands a jury trial in this action on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant/Counterclaimant
Cisco Systems, Inc.*

OF COUNSEL:

Colm F. Connolly
MORGAN LEWIS & BOCKIUS LLP
1007 Orange Street, Suite 501
Wilmington, DE  19801
(302) 574-3000

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

February 3, 2012 - Original Filing Date
5228547.1
February 9, 2012 - Redacted Filing Date

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 3, 2012, upon the following in the manner indicated:

Philip A. Rovner, Esquire                    *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE  19801


Joseph Diamante, Esquire                     *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason Sobel, Esquire
Alex Solo, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038


Jack B. Blumenfeld (#1014)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 9, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 9, 2012, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                          *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE  19801

Joseph Diamante, Esquire                                       *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason Sobel, Esquire
Alex Solo, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY  10038

                                                    */s/ Jack B. Blumenfeld*

                                                    _____

                                                    Jack B. Blumenfeld (#1014)

# EXHIBIT C

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XPERTUNIVERSE, INC., | Civil Action No. 09-157-BMS |
| **Plaintiff** | |
| v. | |
| CISCO SYSTEMS, INC., | |
| **Defendant.** | |

## DEFENDANT CISCO SYSTEMS, INC.'S PRELIMINARY INVALIDITY CONTENTIONS

i

Pursuant to the Court's Scheduling Order, Defendant Cisco Systems, Inc. ("Cisco") hereby provides to Plaintiff XpertUniverse, Inc. ("XpertUniverse" or "XU") the following invalidity contentions for U.S. Patent No. 7,366,709 (the "'709 Patent")) and U.S. Patent No. 7,499,903 (the "'903 Patent").

Discovery in this matter is still ongoing. Cisco's investigation regarding these and other potential grounds for invalidity is ongoing. Cisco's disclosure is given without prejudice to Cisco's right to supplement or amend its invalidity contentions as additional facts are ascertained, analyses are made, research is completed, contentions are made, and claims are construed. Cisco reserves the right to amend these invalidity contentions as discovery progresses, agreed by the parties, or permitted by the Court.

In the absence of a claim-construction order, Cisco has based these Invalidity Contentions in part on consideration of XU's Preliminary Infringement Contentions as served on November 1, 2011. Cisco reserves the right to modify, amend or supplement its Preliminary Invalidity Contentions in the event that XU modifies, amends or supplements its Preliminary Infringement Contentions or takes a claim construction position different from or in addition to those embodied in its Preliminary Infringement Contentions. Cisco disagrees with what appear to be XU's claim constructions as advanced in its Preliminary Infringement Contentions. Cisco expressly reserves the right to propose alternative constructions.

Cisco also contends, based on XU's Preliminary Infringement Contentions, that XU appears to be taking an overly broad construction of the asserted claims of the Asserted Patents in an effort to piece together infringement claims where none exist and to accuse products that do not practice the claims as properly construed. At the same time, XU's Preliminary Infringement Contentions are in many places too general and vague to discern how XU contends that each

1

accused product practices each limitation of the asserted claims. For example, XU provided

charts for only two accused products – Cisco Pulse and Cisco Unified Expert Advisor. As such,

it is unknown how XU interprets the asserted claims in order to allegedly read on other

purportedly accused products. These and other deficiencies with XU's Preliminary Infringement

Contentions are explained more fully in a letter from Brett Schuman to Charles Cantine, dated

November 7, 2011, and incorporated herein by reference. In addition, by providing these

Preliminary Invalidity Contentions, Cisco does not intend to, and does not, admit that the

asserted claims are infringed by any of the accused Cisco products or technology, that any

particular feature or aspect of any of the accused products practices any limitations of the

asserted claims or that any of XU's proposed claim constructions are supportable or proper.

In its Preliminary Infringement Contentions, XU asserts that if the asserted claims are not

literally infringed, they are infringed under the doctrine of equivalents. XU, however, has failed

to provide any analysis or explanation regarding alleged infringement of the asserted claims

under the doctrine of equivalents. In its Preliminary Infringement Contentions, XU also

contends that Cisco indirectly infringes the asserted patents by contributing to and/or actively

inducing infringement of the Asserted Patents by providing customers with the instrumentalities

and promoting their use for at least the method claims of the asserted patents, and contends that

Cisco indirectly infringes by inducing its partners and/or customers to produce infringing

products and/or utilize them in an infringing manner. XU has failed to provide any analysis or

explanation regarding alleged indirect infringement, either under an inducement theory or a

contributory infringement theory, of the asserted claims. Cisco reserves the right to modify,

amend, and/or supplement its invalidity contentions as XU modifies, amends, and/or clarifies its

Preliminary Infringement Contentions (literal and/or under the doctrine of equivalents and indirect or direct infringement).

When the asserted claims of the asserted patents are properly construed, they do not read on Cisco's products or technology. Cisco will propose its claim construction positions in accordance with any applicable orders of this Court.  Nothing herein should be construed as setting forth or limiting Cisco's claim construction positions.  To the extent that any of the prior art references disclose the same functionality or feature of any of the accused products, Cisco reserves the right to argue that said feature or functionality does not meet any limitation of any of the asserted claims, and to argue, in the alternative, that if said feature or functionality is found to meet any limitation of any of the asserted claims of the asserted patents, then the prior art reference demonstrates that said limitation (and the claim as a whole) is not novel or is obvious, and thus that the alleged invention is not patentable.

Prior art not included in this disclosure, whether or not now known to Cisco, may become relevant depending on the claim constructions that XU asserts and/or the Court ultimately adopts and depending on the infringement positions taken by XU.  Cisco's continued investigation also may uncover additional prior art.  Accordingly, Cisco reserves the right to modify or supplement its Preliminary Invalidity Contentions after the Court issues its claim construction ruling. Further, XU has produced little or no prior art related documents in this action, nor has it responded to discovery on a wide variety of issues, including the conception and reduction to practice of the alleged inventions, whether XU products embodying the purported inventions were on sale or in public use more than one year prior to the date XU filed its patent applications, and whether XU published documents describing the purported inventions more than one year prior to the date XU filed its patent applications.  To the extent that XU supplements its

discovery responses bearing on issues of validity, Cisco reserves its right to modify or supplement its Invalidity Contentions in response.  Cisco also reserves the right to rely on applicants' admitted prior art and any admissions made during prosecution of the asserted patents, both alone and in combination with the disclosure contained in the prior art references disclosed herewith.

In addition, XU has not alleged, nor has it provided evidence to support, any priority dates prior to the filing dates of the asserted patents.  Cisco's Invalidity Contentions are based on the filing dates of the asserted patents, and should XU attempt to allege or provide evidence of an earlier priority date, Cisco reserves the right to oppose that attempt and/or amend or supplement its invalidity contentions.

The obviousness combinations of references identified below under 35 U.S.C. § 103 and in the claim charts attached at Appendices A1-14 and B1-13 are merely exemplary and are not intended to be exhaustive.  Additional obviousness combinations of the references identified below are possible, and Cisco reserves the right to use any such combinations in this litigation. In particular, Cisco is currently unaware of the extent, if any, to which XU will contend that limitations of the claims at issue are not disclosed in the art Cisco has identified as anticipatory. To the extent that an issue arises as to any such limitation, Cisco reserves the right to identify other references and/or combinations which would supply the alleged missing limitation.

## I.      INVALIDITY CONTENTIONS FOR THE '709 PATENT

### A.      Identification of Prior Art for the '709 Patent

Presently, Cisco intends to rely on at least the following prior art patents and references that anticipate one or more of the asserted claims of the '709 patent:

- U.S. Patent No. 7,120,647 to Venkatesh et al., "Web-Based Method and System For Providing Expert Information On Selected Matters," filed October 30, 2001, issued December 10, 2006 ("Venkatesh").

- U.S. Patent No. 7,155,430 to Sihvo et al., "Method for Providing Data Inquiry Service and Data Inquiry Service System," PCT filed December 13, 2001, issued December 26, 2006 ("Sivho")

- U.S. Patent No. 6,901,394 to Chauhan et al., "Method and System for Enhanced Knowledge Management," filed June 29, 2001, issued May 31, 2005 ("Chauhan")

- U.S. Patent No. 7,035,838 to Nelson et al., "Methods and Systems for Organizing Information Stored Within a Computer Network-Based System," filed December 6, 2002, issued April 25, 2006 ("Nelson")

- U.S. Patent Application No. 2005/0193055 to Angel et al., "Context Sensitive Dynamic User Interface for Customer Service Agent," filed February 26, 2004, published September 1, 2005 ("Angel")

- U.S. Patent Application No. 2002/0152279 to Sollenberger et al., "Personalized Internet Portal," filed April 21, 2001, published October 17, 2002 ("Sollenberger")

- U.S. Patent No. 6,195,696 to Baber et al., "Systems, Methods and Computer Program Products for Assigning, Generating and Delivering Content to Intranet Users," filed October 1, 1998, issued February 17, 2001 ("Baber")

- U.S. Patent No. 7,343,310 to Stender, "System and Method for Providing Web-Based User Interface to Legacy, Personal-Lines Insurance Applications," filed April 30, 2001, issued March 11, 2008 ("Stender")

- U.S. Patent Application No. 2002/0013846 to Friedman et al., "Interactive Online Learning With Student-to-Tutor Marching," filed July 18, 2001, published January 31, 2002 ("Friedman")

- U.S. Patent No. 6,510,431 to Eichstaedt et al., "Method and System for the Routing of Requests Using an Automated Classification and Profile Matching in a Networked Environment," filed June 28, 1999, issued January 21, 2003 ("Eichstaedt")

- U.S. Patent No. 6,240,420 to Lee, "Customer Support Search Engine System and Method of Searching Data Using the Search Engine System," filed August 31, 1998, issued May 29, 2001 ("Lee")

- RightNow Technologies Inc.'s eService Center 5.5 ("RightNow 5.5").

- XpertShare 2.0 product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0"), and prior versions of XpertShare.

- KnowledgeShare product, as described in the KnowledgeShare User Manual ("KnowledgeShare")

Cisco further reserves the right to rely on other prior art uncovered during the course of discovery. Additionally, Cisco reserves the right to rely on the earliest publication or priority dates to which each of the prior art references are entitled, including dates on which a claim of priority may be based for patent references that are any of a divisional, continuation, or continuation-in-part of an earlier filed patent application. Cisco reserves the right to rely on any prior versions of any products named in its invalidity contentions, as well as any additional documentation referring to any products named in its invalidity contentions.

## B. Invalidity Charts for the '709 Patent

XU has asserted claims 1-7 of the '709 Patent in its Preliminary Infringement Contentions, served on November 1, 2011. The charts attached hereto as Appendices A1-A14 identify where within each prior art reference are found each of the elements of the asserted claims of the '709 patent based on either Cisco's current understanding of the claim language of XU's asserted scope of the claims as reflected in XU's allegations and contentions made in this suit. Although Cisco disagrees with XU about the scope of the asserted claims, to the extent the claims are interpreted consistently, in whole or in part, with XU's contentions, this would render the claims invalid based on at least the prior art identified in Appendices A1-A14.

Although exemplary citations are provided, each particular prior art reference may contain additional disclosure of a given claim element at other locations. Thus, the following description is made in an effort to identify each claim element as being contained in the respective references and is not intended to be an exhaustive listing of all teachings of a

particular claim element within each prior art reference.

Cisco contends that each of the identified prior art references anticipates each of the asserted claims of the '709 patent.  Cisco further contends that each identified prior art reference, either alone or in combination with one or more of the other identified prior art references, invalidates each asserted claim as obvious under 35 U.S.C. § 103.

**C.**     **Exemplary Combinations that Render Obvious the Claims of the '709 Patent.**

In addition to the exemplary obviousness combinations disclosed in the claim charts at Appendix A1-14, one of ordinary skill in the art would be motivated to combine any of the references listed above in Section I.A with any of the other references listed therein.  In addition, one of ordinary skill in the art would be motivated to combine any of the following references listed below, with any of the references listed above in Section I.A:

- U.S. Patent No. 2004/0024739 to Copperman et al., filed July 1, 2003, published February 5, 2004.

- U.S. Patent No. 5,822,745 to Hekmatpour, filed December 27, 1996, issued October 13, 1998.

- Help SG Overview - homework911 ("homework911").

Furthermore, a person of ordinary skill in the art would have been motivated to combine any of these references for at least the following additional reasons: a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known

technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references.

For example, either of Copperman and Hekmatpour can be combined with any of Venkatesh, Sollenberger and Angel.  Copperman and Hekmatpour each describe methods of organizing and storing an enterprise's information in databases.  Venkatesh, Sollenberger, and Angel likewise teach methods of storing enterprise information, and displaying it to a user.  One of ordinary skill in the art would be motivated to combine any of Copperman and Hekmatpour with any of Venkatesh, Sollenberger, and Angel as they solve similar problems in the art, including problems relating to managing and accessing enterprise information in databases.

### D.    <u>Other Grounds of Invalidity of the '709 Patent Claims</u>

As indicated below, Cisco contends that various asserted claims are indefinite under 35 U.S.C. §112(2).  In Appendices A1-14 and B1-13, Cisco has provided citations to disclosures in the prior art based on what appears to be XU's constructions and infringement allegations concerning Cisco's products.  Cisco's citations of prior art shall not be construed as an admission that any of these terms or claims satisfy the requirements of § 112(2).

Claim 1 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry types," "values," "inquiry criteria," "designating a parameter that indicates a source from which inquiry criteria values are retrieved," and "interactive problem definition page" are ambiguous and fail to

define the metes and bounds of the claimed invention.

Claim 2 is indefinite under 35 U.S.C. § 112(2) because the limitation "inquiry criteria values" is ambiguous and fails to define the metes and bounds of the claimed invention.

Claim 3 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry criteria values" is ambiguous and fails to define the metes and bounds of the claimed invention.

Claim 5 is indefinite under 35 U.S.C. § 112(2) because the limitation "the processor being configured to extract unique combinations from the database and evaluate the combinations" is ambiguous and fails to define the metes and bounds of the claimed invention. Further, claim 5 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry criteria," "values" and "a parameter that indicates a source from which inquiry criteria and values are retrieved" are ambiguous and fail to define the metes and bounds of the claimed invention. Claim 5 is also indefinite  under 35 U.S.C. § 112(2) because the limitation "a plurality of monitors" is ambiguous and fails to define the metes and bounds of the claimed invention. Moreover, the claim limitation "a plurality of monitors" lacks adequate written description under 35 U.S.C. § 112(1), and was not described in the specification in a way to convey reasonably to one skilled in the art that the inventor had possession of the claimed invention at the time of filing.

Claim 6 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry criteria," "values" and "interactive problem definition page" are ambiguous and fail to define the metes and bounds of the claimed invention.

Claim 7 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry criteria," "values" and "plurality of monitors" are ambiguous and fail to define the metes and bounds of the claimed invention.  Moreover, the claim limitation "plurality of monitors" lacks adequate

written description under 35 U.S.C. § 112(1).  Cisco has provided invalidity contentions to the extent that a definition for these terms can be found.

## II.    INVALIDITY CONTENTIONS FOR THE '903 PATENT

### A.    Identification of Prior Art for the '903 Patent

Presently, Cisco intends to rely on at least the following prior art patents and references that anticipate one or more of the asserted claims of the '903 patent:

- U.S. Patent No. 6,453,038 to McFarlane et al., "System for Integrating Agent Database Access Skills In Call Center Agent Assignment Applications," filed March 12, 2002, issued May 6, 2003 ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al., "Method and System for Supporting a Decision Tree with Placeholder Capability," filed December 4, 1997, issued September 24, 2002 ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer, "Method and Apparatus to Connect Consumer to Expert," filed January 20, 2000, issued April 24, 2001 ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., "Skills Based Routing Method and System for Call Center," filed February 25, 2000, issued July 1, 2003 ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel, "Rules-Based Queuing of Calls to Call-Handling Resources," filed March 12, 2002, issued May 6, 2003 ("Gabriel")

- U.S. Patent No. 7,120,647 to Venkatesh et al., "Web-Based Method and System For Providing Expert Information On Selected Matters," filed October 30, 2001, issued December 10, 2006 ("Venkatesh").

- U.S. Patent No. 6,553,113 to Dhir et al., "System and Methods for Call Decisioning in a Virtual Call Center Integrating Telephony with Computers," filed July 9, 1999, issued April 23, 2003 ("Dhir").

- U.S. Patent Application No. 2002/0013846 to Friedman et al., "Interactive Online Learning With Student-to-Tutor Marching," filed July 18, 2001, published January 31, 2002 ("Friedman")

- U.S. Patent No. 6,510,431 to Eichstaedt et al., "Method and System for the Routing of Requests Using an Automated Classification and Profile Matching in a Networked Environment," filed June 28, 1999, issued January 21, 2003 ("Eichstaedt")

- XpertShare 2.0 product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0"), and prior versions of XpertShare.

- Siemens HiPath Pro Center Standard and Advanced Suites 4.0 ("HiPath")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7"), and prior versions of Genesys Suite.

- KnowledgeShare product, as described in the KnowledgeShare User Manual ("KnowledgeShare")

Cisco further reserves the right to rely on other prior art uncovered during the course of discovery. Additionally, Cisco reserves the right to rely on the earliest publication or priority dates to which each of the prior art references are entitled, including dates on which a claim of priority may be based for patent references that are any of a divisional, continuation, or continuation-in-part of an earlier filed patent application. Cisco reserves the right to rely on any prior versions of any products named in its invalidity contentions, as well as any additional documentation referring to any products named in its invalidity contentions.

**B.**     **Invalidity Charts for the '903 Patent**

Plaintiff has asserted claims 1-18 of the '903 Patent in its Preliminary Infringement Contentions, served on November 1, 2011. The charts attached hereto as Appendices B1-13 identify where within each prior art reference are found each of the elements of the asserted claims of the '903 patent. Although Cisco disagrees with XU about the scope of the asserted claims, to the extent the claims are interpreted consistently, in whole or in part, with XU's contentions, this would render the claims invalid based on at least the prior art identified in Appendices B1-B13.

Although exemplary citations are provided, each particular prior art reference may contain additional disclosure of a given claim element at other locations. Thus, the following

description is made in an effort to identify each claim element as being contained in the respective references and is not intended to be an exhaustive listing of all teachings of a particular claim element within each prior art reference.

Cisco contends that each of the identified prior art references anticipates each of the asserted claims of the '903 patent based on one or both of Cisco's understanding of the claims and XU's asserted scope of the claims.  Cisco further contends that each identified prior art reference, either alone or in combination with one or more of the other identified prior art references, invalidates each asserted claim as obvious under 35 U.S.C. § 103.

### C.      Exemplary Combinations that Render Obvious the Claims of the '903 Patent.

In addition to the exemplary combinations of prior art references disclosed in the charts at Exhibit B, one of ordinary skill in the art would be motivated to combine any of the references listed above in Section II.A with any of the other references listed therein.    In addition, one of ordinary skill in the art would be motivated to combine any of the following references listed below, with any of the references listed above in Section II.A:

- U.S. Patent No. 5,822,745 to Hekmatpour, filed December 27, 1996, issued October 13, 1998.  ("Hekmatpour")

- U.S. Patent No. 5,970,124 to Csaszar et al., filed June 5, 1997, issued October 19, 1999.  ("Csaszar")

- U.S. Patent No. 6,535,492 to Shtivelman, filed December 1, 1999, issued March 18, 2003.  ("Shtivelman")

- U.S. Patent No. 7,376,622 to Padalino et al., filed September 2, 1999, issued May 20, 2008.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al., filed August 17, 2000, issued July 25, 2006. ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al., filed December 20,

2002, issued June 24, 2004.  ("Creamer")

- U.S. Patent No. 7,783,475 to Neuberger et al., filed January 31, 2003, issued August 24, 2010. ("Neuberger")

- U.S. Patent No. 5,546,452 to Andrews et al., filed March 2, 1995, issued August 13, 1996.  ("Andrews")

- U.S. Patent No. 7,155,430 to Sihvo et al., PCT filed December 13, 2001, issued December 26, 2006 ("Sivho")

- Help SG Overview - homework911 ("homework911")

Furthermore, a person of ordinary skill in the art would have been motivated to combine any of these references for at least the following additional reasons: a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references.

For example, any of Padalino, Butler and Creamer can be combined with the Judkins reference.  Padalino, Butler and Creamer each describe using interactive voice response systems, and Judkins describes a system for skills-based routing in a call center, which can use an

interactive voice response system to obtain data from a customer or caller.  One of ordinary skill in the art would be motivated to combine any of Padalino, Butler, and Creamer with Judkins as they are in the same field, call center technology, and solve similar problems, including how to collect information from a customer and to most efficiently route customer inquiries.

Additionally, any of Sivho and Hekmatpour can be combined with any of McFarlane, Judkins, Venkatesh or Gabriel.  Sivho and Hekmatpour generally describe ways of organizing data in databases, while Judkins, Venkatesh and Gabriel describe using databases of user inquiries and expert skills to route queries to agents.  One of ordinary skill in the art would be motivated to combine any of Sivho and Hekmatpour with any of Judkins, Venkatesh or Gabriel as they each solve problems in database management and organizing information.  The above-listed combinations are listed as examples only.  As explained above, additional motivations to combine, as well as combinations of references, exist.

### D.     Other Grounds of Invalidity of the '903 Patent Claims

XU has asserted claims 1-7 of the '903 patent in its Preliminary Infringement Contentions, served November 1, 2011.  Claim 1 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry types," "criteria grouping(s)," "first layer of predetermined semantically expressed inquiry types," "one or more other layers of inquiry types" and "predetermined semantically-expressed inquiry types and its corresponding layers" fail to define the metes and bounds of the claimed invention.  Cisco has provided invalidity contentions for this claim to the extent that definitions for these terms can be found.

Claims 6-9 are indefinite under 35 U.S.C. §112(2) because the limitations "criteria groupings" and "layer of inquiry type" fail to define the metes and bounds of the claimed invention.  Defendant has provided invalidity contentions for these claims to the extent that

definitions for these terms can be found.

Claim 10 is indefinite under 35 U.S.C. §112(2) because the limitations "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" and "the response triggering the presentation of further members of the underlying criteria grouping" fail to define the metes and bounds of the claimed invention.  Defendant has provided invalidity contentions for these claims to the extent that definitions for these terms can be found.

Claim 12 is indefinite under 35 U.S.C. § 112(2) because the limitations "inquiry types," "criteria groupings," and "layers of inquiry types" fail to define the metes and bounds of the claimed invention.  Defendant has provided invalidity contentions for these claims to the extent that definitions for these terms can be found.

DATED:  December 1, 2011          /s/ Brett M. Schuman_____
                                 Brett M. Schuman

                                 Jack B. Blumenfeld (#1014)
                                 1201 North Market Street
                                 P.O. Box 1347
                                 Wilmington, DE 19899
                                 (302) 658-9200
                                 jblumenfeld@mnat.com
                                 *Attorneys for Defendant Cisco Systems, Inc.*

                                 OF COUNSEL:
                                 John V. Gorman
                                 MORGAN LEWIS & BOCKIUS LLP
                                 1701 Market Street
                                 Philadelphia, PA 19103
                                 (215) 963-5000

                                 Franklin Brockway Gowdy
                                 Brett M. Schuman
                                 MORGAN LEWIS & BOCKIUS LLP
                                 One Market Street, Spear Street Tower
                                 San Francisco, CA 94105
                                 (415) 442-1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2011, copies of the foregoing were caused to be

served on the following in the manner indicated:

Philip A. Rovner, Esq.                                    VIA ELECTRONIC MAIL
Jonathan Choa, Esq.
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801


Joseph Diamante, Esq.                                   VIA ELECTRONIC MAIL
Charles E. Cantine, Esq.
Stroock, Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038


                                                        /s/ Brett M. Schuman_____
                                                        Brett M. Schuman

Appendix B

**Appendix B-1**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent No. 6,453,038 to McFarlane et al., "System For Integrating Agent Database Access Skills In Call Center Agent Assignment Applications"**

U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane") was filed on June 1, 2000, and issued September 17, 2002.  McFarlane is prior art under at least 35 U.S.C. 102(a), (b) and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, McFarlane anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine McFarlane with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that McFarlane is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine McFarlane with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in McFarlane.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Finisar hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with McFarlane to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,535,492 to Shtivelman ("Shtivelman")

- U.S. Patent No. 7,783,475 to Neuberger et al. ("Neuberger")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| **1.**  A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, McFarlane teaches a method of semantic to non-semantic routing to locate a live expert, for example, a system of skills-based routing for a call center.  *See, e.g.*, Fig. 1, col. 4:13-28. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| |  |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | McFarlane teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, inquiry types in a database in an interactive voice response system. *See, e.g.*, col. 8:44-9:10.<br><br>Further, this claim element was well-known in the art, and McFarlane could be combined with any of the following:<br><br>Venkatesh: *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| | Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023.<br><br>Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | McFarlane teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, layers of inquiry types within an IVR system.  *See, e.g.*, col. 8:44-9:10.<br><br>Further, this claim element was well-known in the art, and McFarlane could be combined with any of the following:<br><br>Venkatesh:   *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined | McFarlane teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | the underlying criteria grouping for the associated inquiry type, for example, a database containing information on an agent's skills. *See, e.g.*, Fig. 6, col. 11:24-12:8; claim 1 ("means for maintaining data comprising a mapping of agent experience and agent ability to use, on an unassisted and unsupervised basis, said at least one automated resource to data indicative of an augmented agent skill level for said plurality of agents"); claim 9. |

*FIG. 6*

| AGENT EXPERIENCE LEVEL | KNOWLEDGE TOOL SKILL LEVEL | AUGMENTED SKILL IN TASK 1 | AUGMENTED SKILL IN TASK 2 | AUGMENTED SKILL IN TASK 3 |
|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 |
| 0 | 1 | 0 | 0 | 0 |
| 0 | 2 | 1 | 1 | 0 |
| 0 | 3 | 1 | 2 | 1 |
| 0 | 4 | 2 | 2 | 1 |

| AGENT EXPERIENCE LEVEL | KNOWLEDGE TOOL SKILL LEVEL | AUGMENTED SKILL IN TASK 1 | AUGMENTED SKILL IN TASK 2 | AUGMENTED SKILL IN TASK 3 |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 | 1 |
| 1 | 2 | 2 | 1 | 1 |
| 1 | 3 | 2 | 2 | 1 |
| 1 | 4 | 3 | 2 | 2 |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | McFarlane teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, an extension number associated with an agent. *See, e.g.*, col. 10:54-11:9; claim 1 ("means for automatically selecting said one agent as a function of an experience level of said agent with respect to said service need and said agent's augmented skill level in using a one of an augmented agent skill level for said plurality of agents"). <br><br> This element was well-known in the art, and further, McFarlane can be combined with any of the following: |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| | Venkatesh: *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman: *See, e.g.*, ¶¶ 0024.<br><br>Sassin: *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir: *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel: *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins: *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath: *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | McFarlane teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, collecting a user's request through an IVR system and connecting them to an agent with appropriate skill level. *See, e.g.*, col. 9:12-40; col. 9:55-10:12; col. 10:54-11:9. |
| **2.** The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>McFarlane teaches establishing a real time communicate path between the user and the expert, for example, a telephone call. *See, e.g.*, col. 4:13-28; col. 5:11-36; col. 6:7-18; col. 6:61-7:8. |
| **3.** The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>McFarlane teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephony connection or a VoIP connection. *See, e.g.*, col. 4:13-28; col. 5:11-36; col. 6:7-18; col. 6:61-7:8. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| **4.**   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>McFarlane teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, using agent skill sets and rankings. *See, e.g.*, col. 11:55-12:7. |
| **5.**   The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>McFarlane teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, based on a ranking of the expert's knowledge, or based on the service level to which a customer is entitled. *See, e.g.*, col. 10:15-53; col. 11:55-12:7. |
| **6.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>McFarlane teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, inquiry types in English and Spanish. *See, e.g.*, col. 12:8-19.<br><br>Further, this claim element was well-known in the art, and McFarlane can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| within a field of interest. | art, and McFarlane can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>McFarlane teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms, for example, in an interactive voice response system.  *See, e.g.*, col. 5:37-48.<br><br>The claim element was well-known in the art, and McFarlane can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based | *See* Claim 1.<br><br>McFarlane teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, based on user |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| on a predetermined user profile. | profile information.  *See, e.g.*, col. 7:9-19; col. 10:15-37.<br><br>Further, this element was well-known in the art, and McFarlane can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Col. 6:35-51; col. 7:1-13.<br><br>Csaszar:  *See, e.g.*, col. 8:55-9:9.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>KnowledgeShare:  *See, e.g.*, pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 3.<br><br>Sassin:  *See, e.g.*, col. 5:55-6:11. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>McFarlane teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, a user entering in a selection using an IVR system.  *See, e.g.*, col. 8:45-9:10; col. 9:12-40. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | McFarlane teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, an IVR system presenting an additional level of choices.  *See, e.g.*, col. 8:45-9:10; col. 9:12-40. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>McFarlane teaches that the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement, for example, a hierarchical arrangement.  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is held to be limiting, McFarlane teaches a match and route system operable to locate a live expert, for example, a system of skills-based routing for a call center. *See, e.g.*, Fig. 1, col. 4:13-28. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | McFarlane teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, a user's computer. *See, e.g.*, Fig. 2, col. 6:19-40; col. 7:20-67. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | McFarlane teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, call routing controller and engine. *See, e.g.*, Fig. 1, 2, col. 5:49-6:6.<br><br><br>FIG. 1 |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| the host server communicably connected with an inquiry-type database and a skill-set database; | McFarlane teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, call center routing controller connected to an IVR system and a database containing information on agent's skills. *See, e.g.*, Fig. 1, *See, e.g.*, col. 8:44-9:10; col. 11:24-12:8. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | McFarlane teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, hierarchical layers of inquiry types within an IVR system. *See, e.g.*, col. 8:44-9:10. <br><br> Further, this claim element was well-known in the art, and McFarlane can be combined with any of the following: <br><br> Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. <br><br> Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9. <br><br> Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57. <br><br> Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045. <br><br> Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54. <br><br> Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | McFarlane teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, a database containing information on an agent's skills. *See, e.g.*, Fig. 6, col. 11:24-12:8; claim 1 ("means for maintaining data comprising a mapping of agent experience and agent ability to use, on an unassisted and unsupervised basis, said at least one automated resource to data indicative of an |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
|  | augmented agent skill level for said plurality of agents"); claim 9. |

FIG. 6

| AGENT EXPERIENCE LEVEL | KNOWLEDGE TOOL SKILL LEVEL | AUGMENTED SKILL IN TASK 1 | AUGMENTED SKILL IN TASK 2 | AUGMENTED SKILL IN TASK 3 |
|---|---|---|---|---|
| 0 | 0 | 0 | 0 | 0 |
| 0 | 1 | 0 | 0 | 0 |
| 0 | 2 | 1 | 1 | 0 |
| 0 | 3 | 1 | 2 | 1 |
| 0 | 4 | 2 | 2 | 1 |

| AGENT EXPERIENCE LEVEL | KNOWLEDGE TOOL SKILL LEVEL | AUGMENTED SKILL IN TASK 1 | AUGMENTED SKILL IN TASK 2 | AUGMENTED SKILL IN TASK 3 |
|---|---|---|---|---|
| 1 | 0 | 0 | 0 | 0 |
| 1 | 1 | 1 | 1 | 1 |
| 1 | 2 | 2 | 1 | 1 |
| 1 | 3 | 2 | 2 | 1 |
| 1 | 4 | 3 | 2 | 2 |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | McFarlane teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, an extension number associated with an agent.  *See, e.g.*, col. 10:54-11:9; claim 1 ("means for automatically selecting said one agent as a function of an experience level of said agent with respect to said service need and said agent's augmented skill level in using a one of an augmented agent skill level for said plurality of agents"). <br><br> This claim element was well-known in the art, and further, McFarlane can be combined with any of the following: <br><br> Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. <br><br> Friedman:  *See, e.g.*, ¶¶ 0024. <br><br> Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| | <u>Dhir</u>:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br><u>Gabriel</u>:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br><u>Judkins</u>:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br><u>HiPath</u>:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | McFarlane teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, collecting a user's request through an IVR system and connecting them to an agent with appropriate skill level.  *See, e.g.*, col. 9:12-40; col. 9:55-10:12; col. 10:54-11:9. |
| **13.**  The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art.  Further, McFarlane can be combined with any of the following:<br><br><u>Lauffer</u>:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br><u>XpertShare 2.0</u>:  *See, e.g.*, Slide 8.<br><br><u>KnowledgeShare</u>:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8.<br><br><u>Friedman</u>:  *See, e.g.*, ¶¶ 0047, 0048. |
| **14.**  The match and route system of claim 12, wherein the communication network is the | *See* Claim 12.<br><br>McFarlane teaches that the communication network is the Internet.  *See, e.g.*, col. 4:14-28; col. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| Internet. | 7:20-67. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>The claim element "wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing."   Further, McFarlane can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 2, 12, col. 3:10-25; col. 6:52-67; col. 8:54-67.<br><br>Shtivelman:  *See, e.g.*, col. 1:45-2:2; col. 5:15-30.<br><br>Friedman:  *See, e.g.*,  ¶¶ 0046, 0047.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, 62, Sect. 3.2, 4.2, 8, 12.<br><br>ExpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>Sassin:  *See, e.g.*, Claim 12, 17.<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>McFarlane teaches that the host server is communicably connected with the database by the Internet.  *See, e.g.*, col. 7:20-67.<br><br>Further, this claim limitation was well-known in the art, and McFarlane can be combined with any of the following:<br><br>Neuberger:  *See, e.g.*, Fig. 1, col. 3:12-23.<br><br>Andrews:  *See, e.g.*, col. 5:14-30.<br><br>Dhir:  *See, e.g.*, col. 5:6-19. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| | <u>Sassin</u>:  *See, e.g.*, Fig. 1, col. 2:66-67; col. 7:1-13; col. 9:20-40.<br><br><u>Lauffer</u>:  *See, e.g.*, col. 1:50-51; col. 5:66-6:7.<br><br><u>Judkins</u>:  *See, e.g.*, Fig. 1, col. 5:27-48.<br><br><u>Gabriel</u>:  *See, e.g.*, col. 3:20-30.<br><br><u>Venkatesh</u>:  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25.<br><br><u>Creamer</u>:  *See, e.g.*, ¶ 0021. |
| **17.**  The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>McFarlane teaches that the host server is communicably connected with the databases by a local area network, or a wide area network.  *See, e.g.*, col. 6:7-19.<br><br>Further, this claim element was well-known in the art, and McFarlane can be combined with any of the following:<br><br>Andrews '452:  See, e.g., col. 5:14-30.<br><br>Dhir:  See, e.g., col. 5:6-19.<br><br>Sassin:  See, e.g., col. 3:10-48.<br><br>Lauffer:  See, e.g., col. 1:50-51; col. 5:66-6:7.<br><br>Judkins:  See, e.g., Fig. 1, col. 6:27-41.<br><br>Gabriel:  See, e.g., col. 3:20-30.<br><br>Venkatesh:  See, e.g., Figs. 1, 2, col. 2:56-3:25. |

| Claim Language | U.S. Patent No. 6,453,038 to McFarlane et al. |
|---|---|
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>The claim element "wherein the host server is configured in a multi-server architecture" was well-known in the art, and McFarlane can be combined with any of the following:<br><br>Andrews:  *See, e.g.*, Fig. 5, col. 7:53-8:15.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42.<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2.<br><br>HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8.<br><br>Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-2**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent No. 6,456,619 to Sassin et al., "Method and System for Supporting a Decision Tree With Placeholder Capability."**

U.S. Patent No. 6,456,619 to Sassin et al. ("Sassin") was filed on December 4, 1997, and issued September 24, 2002.  Sassin is prior art under at least 35 U.S.C. 102(a), (b) and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Sassin anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Sassin with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Sassin is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Sassin with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Sassin.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Sassin to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,535,492 to Shtivelman ("Shtivelman")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent Application No. 6,510,431 to Eichstaedt et al. ("Eichstaedt")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, Sassin teaches a method of semantic to non-semantic routing to locate a live expert, for example, an interactive decision tree protocol. *See, e.g.*, Fig. 1, col. 3:10-48. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
|  | <br><br>FIG. 1 |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Sassin teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, options corresponding to root nodes stored within decision tree data memory. *See, e.g.*, Fig. 1, col. 3:10-48.<br><br>Further, this claim element was well-known in the art, and Sassin could be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | <u>Csaszar</u>:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65. <br><br> <u>Padalino</u>:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40. <br><br> <u>Butler</u>:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> <u>Creamer</u>:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023. <br><br> <u>Sivho</u>:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31. <br><br> <u>Hekmatpour</u>:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Sassin teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, user options that constitute root nodes with a decision tree.  *See, e.g.*, col. 4:1-15; col. 9:41-57. <br><br> Further, this claim element was well-known in the art, and Sassin could be combined with any of the following: <br><br> <u>Venkatesh</u>:  *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18. <br><br> <u>Csaszar</u>:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9. <br><br> <u>Padalino</u>:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57. <br><br> <u>Butler</u>:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> <u>Creamer</u>:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045. <br><br> <u>Sivho</u>:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert | Sassin teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, a service representative skill set stored in data memory 18. *See, e.g.*, Fig. 1, col. 6:39-67; col. 9:5-19. |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Sassin teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, a node identifier. *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>This claim element was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>Venkatesh: *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman: *See, e.g.*, ¶¶ 0024.<br><br>Dhir: *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel: *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins: *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath: *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Sassin teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, using a node identifier to route to an appropriate expert. *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>This claim element is well-known in the art, and further Sassin can be combined with any of the following: |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | Friedman:  *See, e.g.*, Fig. 3, ¶¶ 0024, 0046.<br><br>Dhir:  *See, e.g.*, col. 11:62-12:43.<br><br>McFarlane:  *See, e.g.*, col. 9:12-40; col. 9:55-10:12; col. 10:54-11:9.<br><br>Gabriel:  *See, e.g.*, col. 5:30-49.<br><br>Judkins:  *See, e.g.*, col. 5:9-27; col. 9:51-64; col. 11:47-56; col. 13:20-28.<br><br>Eichstaedt:  *See, e.g.*, col. 3:20-31; col. 4:3-12.<br><br>Lauffer:  *See, e.g.*, col. 2:1-7; col. 5:36-58; col. 6:8-16; col. 6:54-58; col. 9:25-55.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 4.2.1, Sect. 4.3.1, Sect. 4.4. |
| **2.**   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Sassin teaches establishing a real time communication path between the user and the expert, for example, a telephone call.  *See, e.g.*, col. 6:39-67; col. 10:29-50. |
| **3.**   The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Sassin teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephony connection or a VoIP connection.  *See, e.g.*, col. 6:39-67; col. 10:29-50. |
| **4.**   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>The claim element "meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user" was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 11:55-12:7. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
|  | KnowledgeShare:  *See, e.g.*, p. 10, 31, 56, Sect. 3.2, 7, 10.1.<br><br>Friedman:  *See, e.g.*, ¶¶ 0020, 0024.<br><br>Gabriel:  *See, e.g.*, col. 5:30-49.<br><br>McFarlane:  *See, e.g.*, col. 11:55-12:7.<br><br>Dhir:  *See, e.g.*, col. 10:19-34.<br><br>XpertShare 2.0:  *See, e.g.* Slide 5, 6.<br><br>Lauffer:  *See, e.g.*, col. 1:55-67; col. 7:41-67.<br><br>Judkins: *See, e.g.*, Figs. 39, 40, col. 13:20-28; col. 19:24-37; col. 22:23-51.<br><br>Venkatesh:  *See, e.g.*, Fig. 11, Col. 7:60-8:16.<br><br>Eichstaedt:  *See, e.g.*, Fig. 8, col. 5:1-34. |
| **5.**   The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>The claim element "wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member" was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>Csaszar:  See, e.g., col. 8:55-9:9.<br><br>Creamer:  See, e.g., ¶¶ 0009, 0011, 0033.<br><br>Friedman:  *See, e.g.*, ¶¶ 0018, 0020, 0024, 0041.<br><br>Gabriel:  *See, e.g.,* col. 3:52-62; col. 6:36-50. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | McFarlane:  *See, e.g.*, col. 10:15-53; col. 11:55-12:7.<br><br>KnowledgeShare:  *See, e.g.*, p. 10, 22, 31, 56, Sect. 3.2, 5.3, 7, 10.1.<br><br>Dhir:  *See, e.g.*, col. 10:19-34.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 3, 4.<br><br>Lauffer:  *See, e.g.*, col. 1:55-67; col. 7:41-67.<br><br>Venkatesh:  *See, e.g.*, Fig. 11, Col. 7:60-8:16. |
| **6.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>The claim element "each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, was well-known in the art, and Sassin can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and Sassin can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms" was well-known in the art, and Sassin can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>Sassin teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, based on user identification information stored in data memory.  *See, e.g.*, col. 5:55-6:11. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>Sassin teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, from a user selecting a decision node.  *See, e.g.*, col. 4:1-15; col. 7:41-67. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | Sassin teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, subsequent options for a decision tree node.  *See, e.g.*, col. 4:1-15; col. 7:41-67. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>Sassin teaches that the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement, for example, a hierarchical arrangement.  *See, e.g.*, col. 4:1-15.<br><br>Further, this claim element was well-known in the art, and Sassin can be combined with any of the following:<br><br>Venkatesh:  See, e.g., Fig. 4, col. 6:35-67.<br><br>Creamer:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040.<br><br>Sivho:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65.<br><br>McFarlane:   *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is considered a limitation, Sassin teaches a match and route system operable to locate a live expert, for example, an interactive decision tree protocol.  *See, e.g.*, Fig. 1, col. 3:10-48. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| |  FIG. 1 |
|   at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Sassin teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, user operated terminals 24.  *See, e.g.*, Fig. 1, col. 3:10-48; col. 7:1-13.<br><br>This claim element was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Fig. 1, col. 2:56-3:9.<br><br>Dhir:  *See, e.g.*, Fig. 3, col. 8:28-39.<br><br>McFarlane:  *See, e.g.*, Fig. 2, col. 6:19-40; col. 7:20-67. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | Gabriel:  *See, e.g.*, Fig. 1, col. 3:20-30.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:28-47; col. 8:12-23.<br><br>Eichstaedt:  *See, e.g.*, Fig. 1, col. 2:43-65.<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 9:5-14.<br><br>Hekmatpour:  *See, e.g.*, col. 20:22-33. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Sassin teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, decision tree server 12. *See, e.g.*, Fig. 1, col. 3:10-48; col. 4:1-15. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Sassin teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, decision tree program memory and decision tree data memory. *See, e.g.*, Fig. 1, col. 3:10-67; col. 6:39-67. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Sassin teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, user options that constitute root nodes with a decision tree.  *See, e.g.*, col. 4:1-15; col. 9:41-57.<br><br>Further, this claim element was well-known in the art, and Sassin can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | Butler: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer: *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho: *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour: *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Sassin teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, a service representative skill set stored in data memory 18. *See, e.g.*, Fig. 1, col. 6:39-67; col. 9:5-19. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Sassin teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, a node identifier. *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>This element was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>Venkatesh: *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman: *See, e.g.*, ¶¶ 0024.<br><br>Sassin: *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir: *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel: *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins: *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath: *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user | Sassin teaches that the host server, upon the receipt of a user request for assistance with at least |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, , using a node identifier to route to an appropriate expert. *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>This element was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>Friedman: *See, e.g.*, Fig. 3, ¶¶ 0024, 0046.<br><br>Dhir: *See, e.g.*, col. 11:62-12:43.<br><br>McFarlane: *See, e.g.*, col. 9:12-40; col. 9:55-10:12; col. 10:54-11:9.<br><br>Gabriel: *See, e.g.*, col. 5:30-49.<br><br>Judkins: *See, e.g.*, col. 5:9-27; col. 9:51-64; col. 11:47-56; col. 13:20-28.<br><br>Eichstaedt: *See, e.g.*, col. 3:20-31; col. 4:3-12.<br><br>Lauffer: *See, e.g.*, col. 2:1-7; col. 5:36-58; col. 6:8-16; col. 6:54-58; col. 9:25-55.<br><br>HiPath: *See, e.g.*, HiPath UG, Sect. 4.2.1, Sect. 4.3.1, Sect. 4.4. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art.   Further, Sassin can be combined with any of the following:<br><br>Lauffer: *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br>XpertShare 2.0: *See, e.g.*, Slide 8.<br><br>KnowledgeShare: *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8. |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| | Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>Sassin teaches that the communication network is the Internet.  *See, e.g.*, Fig. 1, col. 2:66-67; col. 7:1-13; col. 9:20-40. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>Sassin teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing.  *See, e.g.*, Sassin Claim 12, 17. Further, this claim element was well-known in the art, and Sassin can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 2, 12, col. 3:10-25; col. 6:52-67; col. 8:54-67.<br><br>Shtivelman:  *See, e.g.*, col. 1:45-2:2; col. 5:15-30.<br><br>Friedman:  *See, e.g.*,  ¶¶ 0046, 0047.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, 62, Sect. 3.2, 4.2, 8, 12.<br><br>ExpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>Sassin teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, Fig. 1, col. 2:66-67; col. 7:1-13; col. 9:20-40. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area | *See* Claim 12.<br><br>Sassin teaches that the host server is communicably connected with the databases by a local area |

| Claim Language | U.S. Patent No. 6,456,619 to Sassin et al. |
|---|---|
| network, or a wide area network. | network, or a wide area network, for example, a wide-area network. *See, e.g.*, col. 3:10-48. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>The claim element "wherein the host server is configured in a multi-server architecture" was well-known in the art, and further, Sassin can be combined with any of the following:<br><br>Andrews:  *See, e.g.*, Fig. 5, col. 7:53-8:15.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42.<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2.<br><br>HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8.<br><br>Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-3**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based On U.S. Patent No. 6,223,165 to Lauffer et al., "Method and Apparatus to Connect Consumer to Expert"**

U.S. Patent No. 6,223,165 to Lauffer et al. ("Lauffer") was filed on January 20, 2000, and issued on April 24, 2001.  Lauffer is prior art under at least 35 U.S.C. 102(a), (b) and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Lauffer anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Lauffer with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Lauffer is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Lauffer with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Lauffer.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Lauffer to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer")

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 7,783,475 to Neuberger et al. ("Neuberger")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is held to be limiting, Lauffer teaches a method of semantic to non-semantic routing to locate a live expert, for example, a method of facilitating the delivery of advice from diverse sources to customers.  *See, e.g.*, Fig. 1B, col. 4:27-38; col. 4:47-62; col. 5:36-65. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| |  Fig. 1b |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Lauffer teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, a server unit containing humanly understandable keywords.  *See, e.g.*, col. 1:50-51; col. 1:55-2:7; col. 5:3-5; col. 5:59-65; col. 9:26-54.<br><br>Further, this claim element was well-known in the art, and Lauffer could be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
|  | Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023.<br><br>Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Lauffer teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, matching keywords to additional layers of semantically-expressed inquiry types.  *See, e.g.*, col. 1:50-51; col. 1:55-67; col. 5:36-65.<br><br>Further, this claim element was well-known in the art, and Lauffer could be combined with any of the following:<br><br>Venkatesh:   *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having | Lauffer teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, a server unit storing names and characteristics of experts.  *See, e.g.*, col. 1:31-42; col. 1:50-51; col. 1:55-67; col. 4:63-5:10. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Lauffer teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, assigning numbers to the keyword matches to an expert. *See, e.g.*, col. 5:36-65. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Lauffer teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, displaying a matching expert to a user. *See, e.g.*, col. 2:1-7; col. 5:36-58; col. 6:8-16; col. 6:54-58; col. 9:25-55. |
| **2.**   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Lauffer teaches establishing a real time communication path between the user and the expert, for example, a telephone, internet telephony, audio and/or video connection. *See, e.g.*, col. 2:11-24; col. 8:60-9:14. |
| **3.**   The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Lauffer teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, an internet telephony connection or an audio/video connection. *See, e.g.*, col. 2:11-24; col. 8:60-9:14. |
| **4.**   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Lauffer teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, using a quality score or a relevance score. *See, e.g.*, col. 1:55-67; col. 7:41-67. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Lauffer teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, a quality score or a relevance score. *See, e.g.*, col. 1:55-67; col. 7:41-67. |
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>The claim element "wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages" was well-known in the art, and Lauffer can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and Lauffer can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| | <u>Hekmatpour</u>:  *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1. <br><br> Lauffer teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms, for example, keywords.  *See, e.g.*, col. 1:55-67. <br><br> Further, this element was well-known in the art, and Lauffer can be combined with any of the following: <br><br> <u>Venkatesh</u>:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18. <br><br> <u>Butler</u>:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> <u>Creamer</u>:  *See, e.g.*, ¶¶ 0045, 0048, 0049. <br><br> <u>Sivho</u>:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. <br><br> <u>Hekmatpour</u>:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1. <br><br> The claim element "selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile" was well-known in the art, and further Lauffer may be combined with any of the following: <br><br> <u>Venkatesh</u>:  *See, e.g.*, Col. 6:35-51; col. 7:1-13. <br><br> <u>Csaszar</u>:  *See, e.g.*, col. 8:55-9:9. <br><br> <u>Creamer</u>:  *See, e.g.*, ¶¶ 0045, 0048, 0049. <br><br> <u>Sivho</u>:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. <br><br> <u>KnowledgeShare</u>:  *See, e.g.,* pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| | XpertShare 2.0:  *See, e.g.*, Slide 3.<br><br>Sassin:  *See, e.g.*, col. 5:55-6:11. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>Lauffer teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, receiving a user's selection of a keyword.  *See, e.g.*, col. 5:36-65, claims 1 and 10.<br><br>This claim element was well-known in the art, and further Lauffer can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, pp. 20, 22-23, Sect. 5, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Judkins:  *See, e.g.*, col. 11:47-56.<br><br>Venkatesh:  *See, e.g.*, col. 6:35-67.<br><br>Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | Lauffer teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, presenting further members according to a predetermined order based on relevance.  *See, e.g.*, col. 7:40-67.<br><br>This claim element was well-known in the art, and further, Lauffer can be combined with any of the following: |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| | McFarlane: *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare: *See, e.g.*, p. 20, Sect. 5.<br><br>XpertShare 2.0: *See, e.g.*, Slide 4.<br><br>Sassin: *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Judkins: *See, e.g.*, col. 11:47-56.<br><br>Venkatesh: *See, e.g.*, Fig. 4, col. 6:35-67.<br><br>Creamer: *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>Lauffer teaches that the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement, for example, the relationship between an expert and a keyword can be hierarchical. *See, e.g.*, col. 5:36-65.<br><br>This claim element was well-known in the art, and further, Lauffer can be combined with any of the following:<br><br>Venkatesh:  See, e.g., Fig. 4, col. 6:35-67.<br><br>Creamer:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040.<br><br>Sivho:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br>Sassin:  *See, e.g.*, col. 4:1-15.<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.** A match and route system operable to locate a live expert comprising: | Lauffer teaches a match and route system operable to locate a live expert, for example, a system of facilitating the delivery of advice to customers. *See, e.g.*, Figs. 1A, 1B, col. 4:27-38; col. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| | 4:47-62; col. 5:36-65. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Lauffer teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, a user's multimedia computer and an expert's multimedia computer. *See, e.g.*, col. 2:11-24; col. 9:5-14. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Lauffer teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, a server unit that assists in connection a seeker and an expert. *See, e.g.*, col. 1:50-51; col. 4:46-5:10. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Lauffer teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, a server unit. *See, e.g.*, col. 1:50-51; col. 4:46-5:10. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Lauffer teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, for example, matching keywords to multiple layers of semantically-expressed inquiry types. *See, e.g.*, col. 1: 55-67; col. 5:36-65. <br><br> Further, this claim element was well-known in the art, and Lauffer can be combined with any of the following: <br><br> Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. <br><br> Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9. <br><br> Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57. <br><br> Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
|  | Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54. |
|  | Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Lauffer teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, a server unit storing names and characteristics of experts.  *See, e.g.*, col. 1:31-42; col. 1:55-67; col. 4:63-5:10. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Lauffer teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, assigning numbers to the keyword matches to an expert.  *See, e.g.*, col. 5:36-65. |
|  | This element was well-known in the art, and further, Lauffer can be combined with any of the following: |
|  | Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. |
|  | Friedman:  *See, e.g.*, ¶¶ 0024. |
|  | Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50. |
|  | Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43. |
|  | Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29. |
|  | Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29. |
|  | HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert | Lauffer teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, displaying a matching expert to a user.  *See,* |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | *e.g.*, col. 2:1-7; col. 5:36-58; col. 6:8-16; col. 6:54-58; col. 9:25-55. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12. <br><br> Lauffer teaches that the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet, for example, video or a webcam. *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12. <br><br> Lauffer teaches that the communication network is the Internet. *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12. <br><br> Lauffer teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, web conferencing. *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12. <br><br> Lauffer teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, col. 1:50-51; col. 5:66-6:7. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12. <br><br> Lauffer teaches that the host server is communicably connected with the databases by a local area network, or a wide area network. *See, e.g.*, col. 1:50-51; col. 5:66-6:7. <br><br> This element was well-known in the art, and further, Lauffer can be combined with any of the following: <br><br> Andrews: *See, e.g.*, col. 5:14-30. |

| Claim Language | U.S. Patent No. 6,223,165 to Lauffer |
|---|---|
| | Dhir:  *See, e.g.*, col. 5:6-19.<br><br>Sassin:  *See, e.g.*, col. 3:10-48.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 6:27-41.<br><br>Gabriel:  *See, e.g.*, col. 3:20-30.<br><br>Venkatesh:  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25.<br><br>Creamer:  *See, e.g.*, ¶ 0021. |
| **18.**  The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>The claim element "wherein the host server is configured in a multi-server architecture" was well-known in the art, and further, Lauffer can be combined with any of the following:<br><br>Andrews:  *See, e.g.*, Fig. 5, col. 7:53-8:15.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42.<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2.<br><br>HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8.<br><br>Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-4**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent No. 6, 587,556 to Judkins et al., "Skills Based Routing for Call Center" ("Judkins")**

U.S. Patent No. 6,587,556 to Judkins et al. was filed on Feb. 25, 2000, and issued on July 1, 2003.  Judkins is prior art under at least 35 U.S.C. 102(a), (b) and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Judkins anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Judkins with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Judkins is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Judkins with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Judkins.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Judkins to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,535,492 to Shtivelman ("Shtivelman")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, Judkins teaches a method of semantic to non-semantic routing to locate a live expert, for example, an intelligent routing or skills-based routing system in a call center environment. *See, e.g.*, Fig. 1, Abstract, col. 5:9-48. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| |  |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Judkins teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, an interactive voice response (or SQL) database within an IVR server containing options for a caller.  *See, e.g.*, Figs. 1, 2, col. 5:27-48; col. 6:3-26;  col. 11:47-56; col. 23:9-46.<br><br>Further, this claim element was well-known in the art, and Judkins could be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
|  | Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023. <br><br> Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31. <br><br> Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Judkins teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, setting up layers of inquiry types in an IVR system in different languages such as English and Spanish.  *See, e.g.*, Figs 13, 71. 55, col. 11:47-56; col. 23:9-25; col. 26:5-17; col. 31:7-49. <br><br> Further, this claim element was well-known in the art, and Judkins could be combined with any of the following: <br><br> Venkatesh:   *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18. <br><br> Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9. <br><br> Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57. <br><br> Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. <br><br> Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045. <br><br> Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and | Judkins teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, setting up agent skills in a |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | database table managed by ACD manager.  *See, e.g.*, Figs. 14, 31, 32, 39, col. 7:53-56; col. 19:24-37; col. 22:23-51.<br><br><br><br>FIG.31. |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Judkins teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, a circuit number or an extension number, or alternatively, a route number.  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
|  |  |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| |  **FIG. 25.** This element was well-known in the art, and further Judkins can be combined with any of the following: Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. Friedman:  *See, e.g.*, ¶¶ 0024. Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50. Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43. Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29. HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least | Judkins teaches upon a user's request for assistance with at least one of the predetermined |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, by connecting a user to an expert through using the expert's identifier. *See, e.g.*, col. 5:9-27; col. 9:51-64; col. 11:47-56; col. 13:20-28. |
| **2.**   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Judkins teaches establishing a real time communicate path between the user and the expert, for example, a telephone call.  *See, e.g.*, Figs. 1, 2, 3, col. 5:9-26; col. 8:49-9:3; col. 9:51-64; col. 11:47-56. |
| **3.**   The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Judkins teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephony connection.  *See, e.g.*, Figs. 1, 2, 3, col. 5:9-26; col. 8:49-9:3; col. 9:51-64; col. 11:47-56. |
| **4.**   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Judkins teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, routing calls to experts based on skill rankings.  *See, e.g.*, Figs. 39, 40, col. 13:20-28; col. 19:24-37; col. 22:23-51. ' |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| | <br><br>○ Setting Up Agent Skills<br>○ Available Skills<br>○ Selected Skills<br><br>FIG. 39. |
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Judkins teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, for example, the level of the expert's individualized knowledge. *See, e.g.*, Figs. 39, 40, col. 13:20-28; col. 19:24-37; col. 22:23-51. |
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>Judkins teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, inquiry types in English and Spanish. *See, e.g.*, Figs 13, 71. 55, col. 11:47-56; col. 23:9-25; col. 26:5-17; col. 31:7-49.<br><br>Further, this claim element was well-known in the art, and Judkins can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| | Butler: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. \ |
| | Creamer: *See, e.g.*, ¶¶ 0044, 0045. |
| | Sivho: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh: *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer: *See, e.g.*, ¶¶ 0045.<br><br>Sivho: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour: *See, e.g.*, col. 22:65-23:18. |
| **8.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh: *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer: *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| | Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>Judkins teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, information associated with a caller's phone number.  *See, e.g.*, col. 9:65-7:10.<br><br>Further, this claim element was well-known in the art, and any of the following can be combined with Judkins:<br><br>Venkatesh:  *See, e.g.*, Col. 6:35-51; col. 7:1-13.<br><br>Csaszar:  *See, e.g.*, col. 8:55-9:9.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>KnowledgeShare:  *See, e.g.,* pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 3.<br><br>Sassin:  *See, e.g.*, col. 5:55-6:11. |
| **10.**  The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>Judkins teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, a user entering selections into an IVR system.  *See, e.g.*, col. 11:47-56. |
| the response triggering the presentation of<br>    further members of the underlying criteria | Judkins teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, the IVR system presenting additional |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| grouping in a predetermined order. | selections to the user.  *See, e.g.*, col. 11:47-56. |
| **11.**  The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>The claim element "the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh:  See, e.g., Fig. 4, col. 6:35-67.<br><br>Creamer:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040.<br><br>Sivho:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br>Sassin:  *See, e.g.*, col. 4:1-15.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65.<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.**  A match and route system operable to locate a live expert comprising: | To the extent that the preamble is considered limiting:<br><br>Judkins teaches a match and route system operable to locate a live expert, for example, an intelligent routing or skills-based routing system in a call center environment.  *See, e.g.*, Fig. 1, Abstract, col. 5:9-48. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| |  |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Judkins teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, agent workstations 114. *See, e.g.*, Fig. 1, col. 5:28-47; col. 8:12-23. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| | <br><br>col. 8:12-23. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Judkins teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, an Automatic Call Distribution server. *See, e.g.*, Fig. 1, col. 5:27-47; col. 6:56-7:5; col. 7:35-56. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| |  |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Judkins teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, an IVR system database and an agent skill database table. *See, e.g.*, Fig. 1, col. 5:27-48; col. 6:62-7:5; col. 7:53-56; col. 21:43-56. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Judkins teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, an interactive voice response (or SQL) database within an IVR server containing options for a caller. *See, e.g.*, Figs. 1, 2, col. 5:27-48; col. 6:3-26;  col. 11:47-56; col. 23:9-46.  Multiple layers of inquiry types are, for example, inquiry types in an IVR system in different languages such as English and Spanish. *See, e.g.*, Figs 13, 71. 55, col. 11:47-56; col. 23:9-25; col. 26:5-17; col. 31:7-49.<br><br>Further, this claim element was well-known in the art, and Judkins can be combined with any of the following: |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| | Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*., Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Judkins teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, agent skills in a database table managed by ACD manager.  Figs. 14, 31, 32, 39, col. 7:53-56; col. 19:24-37; col. 22:23-51.<br><br> |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Judkins teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, a circuit number or an extension number, or alternatively, a route number. *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br><br><br>FIG.21. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
|  |  FIG.25. This claim element was well-known in the art, and further, Judkins can be combined with the following: Venkatesh: *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. Friedman: *See, e.g.*, ¶¶ 0024. Sassin: *See, e.g.*, col. 6:39-67; col. 10:29-50. Dhir: *See, e.g.*, col. 8:1-15; col. 11:62-12:43. Gabriel: *See, e.g.*, Fig. 2, col. 5:20-29. HiPath: *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user | Judkins teaches that the host server, upon the receipt of a user request for assistance with at least |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
| request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, by connecting a user to an expert through using the expert's identifier.  *See, e.g.*, col. 5:9-27; col. 9:51-64; col. 11:47-56; col. 13:20-28. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art.  Further, Judkins can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8.<br><br>Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>Judkins teaches that the communication network is the Internet, for example, a TCP/IP link connection.  *See, e.g.*, Fig. 1, col. 5:27-48. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>The claim element "the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 2, 12, col. 3:10-25; col. 6:52-67; col. 8:54-67. |

| Claim Language | U.S. Patent No. 6,587,556 to Judkins et al. |
|---|---|
|  | Shtivelman:  *See, e.g.*, col. 1:45-2:2; col. 5:15-30.<br><br>Friedman:  *See, e.g.*,  ¶¶ 0046, 0047.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, 62, Sect. 3.2, 4.2, 8, 12.<br><br>ExpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>Sassin:  *See, e.g.*, Claim 12, 17.<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **16.**  The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>Judkins teaches that the host server is communicably connected with the database by the Internet, for example, a TCP/IP link.  *See, e.g.*, Fig. 1, col. 5:27-48. |
| **17.**  The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>Judkins teaches that the host server is communicably connected with the databases by a local area network, or a wide area network.  *See, e.g.*, Fig. 1, col. 6:27-41. |
| **18.**  The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>Judkins teaches that the host server is configured in a multi-server architecture.  *See, e.g.*, Fig. 1, col. 5:27-47. |

**Appendix B-5**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent No. 6,560,330 to Gabriel, "Rules-Based Queuing of Calls to Call-Handling Resources"**

U.S. Patent No. 6,560,330 to Gabriel ("Gabriel") was filed on March 12, 2002, was published on July 11, 2002, and issued on May 6, 2003.  Gabriel is prior art under at least 35 U.S.C. 102(a), (b), and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Gabriel anticipates and renders obvious, alone, or in combination with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Gabriel with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Gabriel is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Gabriel with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Gabriel.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Gabriel to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,535,492 to Shtivelman ("Shtivelman")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
| --- | --- |
| 1. A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, Gabriel teaches a method of semantic to non-semantic routing to locate a live expert, for example, an automatic call distribution system based on agent attributes. *See, e.g.*, Figs. 1, 2, Abstract. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | <br><br>*FIG. 1* |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Gabriel teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, call attributes that are determined from a user's call and are stored in rules definitions. *See, e.g.*, col. 3:51-4:7.<br><br>Further, this claim element was well-known in the art, and Gabriel could be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
|  | Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023.<br><br>Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Gabriel teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, layers of call attributes, including those based on language.  *See, e.g.*, col. 3:51-4:7; col. 5:65-6:14; col. 6:36-50.<br><br>Further, this claim element was well-known in the art, and Gabriel could be combined with any of the following:<br><br>Venkatesh:   *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and | Gabriel teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, information on agent attributes |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | stored in resources definitions. *See, e.g.*, Fig. 1, col. 3:63-4:7; col. 5:20-29; col. 6:3-34.<br><br><br><br>*FIG. 1* |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Gabrial teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, resource entries. *See, e.g.*, Fig. 2, col. 5:20-29. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| |  |

*FIG. 2*

This element was well-known in the art, and further, Gabriel can be combined with any of the following;

Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.

Friedman:  *See, e.g.*, ¶¶ 0024.

Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.

Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.

Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.

HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17.

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Gabriel teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, using rules engine to locate an agent with the necessary call attributes. *See, e.g.*, col. 5:30-49. |
| **2.** The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Gabriel teaches establishing a real time communication path between the user and the expert, for example, a telephone call. *See, e.g.*, col. 3:19-30. |
| **3.** The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Gabriel teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephone call. *See, e.g.*, col. 3:19-30. |
| **4.** The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Gabriel teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, ranking experts based on their knowledge. *See, e.g.*, col. 5:30-49. |
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Gabriel teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, an agent's knowledge in a particular subject matter, or the priority assigned to a user's call based on a customer's business history. *See, e.g.,* col. 3:52-62; col. 6:36-50. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>Gabriel teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, languages such as Italian or French. *See, e.g.,* col. 5:65-6:14.<br><br>Further, this claim element was well-known in the art, and Gabriel can be combined with any of the following:<br><br>Padalino: *See, e.g.,* Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler: *See, e.g.,* Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer: *See, e.g.,* ¶¶ 0044, 0045.<br><br>Sivho: *See, e.g.,* Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh: *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler: *See, e.g.,* Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer: *See, e.g.,* ¶¶ 0045.<br><br>Sivho: *See, e.g.,* Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour: *See, e.g.,* col. 22:65-23:18. |
| **8.** The method of claim 1, wherein each layer of inquiry type is comprised of the | *See* Claim 1. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| underlying criteria groupings composed in user-centric terms. | The element "each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>Gabriel teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, a caller's business information.  *See, e.g.*, col. 3:51-62. |
| **10.**   The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>The claim element "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" was well known in the art, and Gabriel can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, pp. 20, 22-23, Sect. 5, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65, claims 1 and 10. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | Judkins:  *See, e.g.*, col. 11:47-56. <br><br> Venkatesh:  *See, e.g.*, col. 6:35-67. <br><br> Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | The claim element "the response triggering further members of the underlying criteria grouping in a predetermined order" was well-known in the art, and further, Gabriel can be combined with any of the following: <br><br> McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. <br><br> KnowledgeShare:  *See, e.g.*, p. 20, Sect. 5. <br><br> XpertShare 2.0:  *See, e.g.*, Slide 4. <br><br> Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67. <br><br> Lauffer:  *See, e.g.*, col. 7:40-67. <br><br> Judkins:  *See, e.g.*, col. 11:47-56. <br><br> Venkatesh:  *See, e.g.*, Fig. 4, col. 6:35-67. <br><br> Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10. <br><br> The claim element "wherein the predetermined order is one of a hierarchical arrangement, an independent arrangement, and a combination hierarchical/independent arrangement" was well-known in the art.  Further, Gabriel can be combined with any of the following: <br><br> Venkatesh:  See, e.g., Fig. 4, col. 6:35-67. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | <u>Creamer</u>:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040.<br><br><u>Sivho</u>:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br><u>Sassin</u>:  *See, e.g.*, col. 4:1-15.<br><br><u>Lauffer</u>:  *See, e.g.*, col. 5:36-65.<br><br><u>McFarlane</u>:   *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is held to be limiting, Gabriel teaches a match and route system operable to locate a live expert, for example, an automatic call distribution system based on agent attributes.  *See, e.g.*, Figs. 1, 2, Abstract. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Gabriel teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, agent voice-and-data terminals.  *See, e.g.*, Fig. 1, col. 3:20-30. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| |  FIG. 1 |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Gabriel teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, and ACD system. *See, e.g.*, Fig. 1, col. 3:31-50. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Gabriel teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, resources definitions and rules definitions. *See, e.g.*, Fig. 1, col. 3:51-4:7. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are | Gabriel teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, call attributes that are |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | determined from a user's call and are stored in rules definitions.  *See, e.g.*, col. 3:51-4:7.<br><br>Further, this claim element was well-known in the art, and Gabriel can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Gabriel teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, information on agent attributes stored in resources definitions.  *See, e.g.*, Fig. 1, col. 3:63-4:7; col. 5:20-29; col. 6:3-34. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| |  |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Gabriel teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, resource entries. *See, e.g.*, Fig. 2, col. 5:20-29. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | <br><br>*FIG. 2*<br><br>This claim element was well-known in the art, and further, Gabriel can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | Gabriel teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, using rules engine to locate an agent with the necessary call attributes. *See, e.g.*, col. 5:30-49. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12. <br><br> The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art at the time, and further Gabriel can be combined with any of the following: <br><br> Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. <br><br> XpertShare 2.0:  *See, e.g.*, Slide 8. <br><br> KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8. <br><br> Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12. <br><br> Gabriel teaches that the communication network is the Internet.  *See, e.g.*, col. 3:20-30. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12. <br><br> The element "wherein the interactive communication is instant messaging, web conferencing, or combination of instant messaging and web conferencing" was well-known in the art, and further, Gabriel can be combined with any of the following: <br><br> Venkatesh:  *See, e.g.*, Figs. 2, 12, col. 3:10-25; col. 6:52-67; col. 8:54-67. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | Shtivelman:  *See, e.g.*, col. 1:45-2:2; col. 5:15-30. <br><br> Friedman:  *See, e.g.*,  ¶¶ 0046, 0047. <br><br> KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, 62, Sect. 3.2, 4.2, 8, 12. <br><br> ExpertShare 2.0:  *See, e.g.*, Slide 8. <br><br> Sassin:  *See, e.g.*, Claim 12, 17. <br><br> Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **16.** The match and route system of claim 12, wherein the host server is communically connected with the databases by the Internet. | *See* Claim 12. <br><br> Gabriel teaches that the host server is communicably connected with the database by the Internet.  *See, e.g.*, col. 3:20-30. |
| **17.** The match and route system of claim 12, wherein the host server is communically connected with the databases by a local area network, or a wide area network. | *See* Claim 12. <br><br> Gabriel teaches that the host server is communicably connected with the databases by a local are network, or a wide area network.  *See, e.g.*, col. 3:20-30. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12. <br><br> The claim limitation "wherein the host server is configured in a multi-server architecture" was well-known in the art, and further, Gabriel can be combined with any of the following: <br><br> Andrews:  *See, e.g.*, Fig. 5, col. 7:53-8:15. <br><br> Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42. <br><br> Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2. <br><br> HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8. |

| Claim Language | U.S. Patent No. 6,560,330 to Gabriel |
|---|---|
| | Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-6**

**Prior Art Invalidity Chart for U.S. Patent No. 7,499,903 Based On U.S. Patent No. 7,120,647 to Venkatesh  et al., "Web-Based Method and System for Providing Expert Information On Selected Matters."**

U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh") was filed on October 30, 2001, was published on May 29, 2003, and issued October 10, 2006.  Venkatesh is prior art under at least 35 U.S.C. 102(a), (b), and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Venkatesh anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Venkatesh with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Venkatesh is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Venkatesh with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Venkatesh.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Venkatesh to render one or more of the claims obvious:

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer")

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent Application No. 6,510,431 to Eichstaedt et al. ("Eichstaedt")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath"), as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, Venkatesh teaches a method of semantic to non-semantic routing to locate a live expert, for example, a method of "cross referencing user information with expert information" and "contacting the expert based on user selected expert information inputted into the client system." *See, e.g.*, Fig. 4, Abstract, col. 1:54-2:3. |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Venkatesh teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, Database 20. *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
|  |  FIG. 3A |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Venkatesh teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, layers of inquiry types for functional communities such as "identification," "type," "location," and "business." *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18. |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
|  |  FIG. 3A |
|  | This claim element is well-known in the art, and further, Venkatesh can be combined with any of the following: |
|  | Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9. |
|  | Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57. |
|  | Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. |
|  | Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045. |
|  | Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an | Venkatesh teaches supplying a skill-set database that includes an entry that associates at least |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, database 20, which stores information on experts.  *See, e.g.*, Figs. 2, 3A, 3B, Abstract, col. 4:3-6:19.<br><br>This element was well-known in the art, and further, Venkatesh can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 1:31-42; col. 1:50-51; col. 1:55-67; col. 4:63-5:10.<br><br>Eichstaedt:  *See, e.g.*, Figs. 1, 4, col. 2:43-3:12; col. 4:3-12.<br><br>HiPath:  *See, e.g.*, Sect. 4.2.3, Sect. 4.3.3, Sect. 13.3.3, Sect. 13.6.<br><br>Judkins:  *See, e.g.*, Figs. 14, 31, 32, 39, col. 7:53-56; col. 19:24-37; col. 22:23-51.<br><br>Gabriel:  *See, e.g.*, Fig. 1, col. 3:63-4:7; col. 5:20-29; col. 6:3-34.<br><br>McFarlane:  *See, e.g.*, Fig. 6, col. 11:24-12:8; claim 1 ("means for maintaining data comprising a mapping of agent experience and agent ability to use, on an unassisted and unsupervised basis, said at least one automated resource to data indicative of an augmented agent skill level for said plurality of agents"); claim 9.<br><br>Dhir:  *See, e.g.*, Fig. 5; col. 1:25-37; col. 10:19-34; col. 11:5-11.<br><br>Sassin:  *See, e.g.*, Fig. 1, col. 6:39-67; col. 9:5-19.<br><br>Friedman:  *See, e.g.*, ¶¶ 0015, 0016.<br><br>Hekmatpour:  *See, e.g.*, col. 14:64-15:11. |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Venkatesh teaches, mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier, for example, a phone number associated with the expert.  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| | <br><br>FIG. 7<br><br>This element was well-known in the art, and further, Venkatesh can be combined with any of the following:<br><br>Friedman: *See, e.g.*, ¶¶ 0024.<br><br>Sassin: *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir: *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel: *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins: *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath: *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least | Venkatesh teaches that upon a user's request for assistance with at least one of the |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | predetermined semantically-expressed inquiry types, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type identified by the user, for example, in response to a user's request, the expert is identified by the phone number. *See, e.g.*, Figs. 4, 7, 10-14, col. 6:52-67; col. 7:25-32; col. 7:45-8:16; col. 8:43-9:21. |
| **2.**  The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Venkatesh teaches establishing a real time communication path between the user and the expert, for example, a chat room or a telephone call. *See, e.g.*, Figs. 12, 13; col. 6:64-67. |
| **3.**  The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 2.<br><br>Venkatesh teaches that the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection, for example, an internet chat connection or a telephony connection. *See, e.g.*, Figs. 12, 13; col. 6:64-67. |
| **4.**  The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Venkatesh teaches the step of meritoriously ranking an expert, wherein a most meritorious available expert is placed in communication with the user. *See, e.g.*, Fig. 11, Col. 7:60-8:16. |
| **5.**  The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Venkatesh teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. *See, e.g.*, Fig. 11, Col. 7:60-8:16. |
| **6.**  The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in | *See* Claim 1.<br><br>The claim element "wherein each layer of inquiry type is comprised of the underlying criteria |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| different languages. | groupings composed in different languages" was well-known in the art, and further, Venkatesh can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>Venkatesh teaches each layer of inquiry types is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest, for example, layers of inquiry types for functional communities such as "identification," "type," "location," and "business."  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18. |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| | <br><br>FIG. 3A<br><br>This element was well-known in the art, and further, Venkatesh can be combined with any of the following:<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in | *See* Claim 1.<br><br>Venkatesh teaches that each layer of inquiry type is comprised of underlying criteria groupings |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| user-centric terms. | composed in user-centric terms, for example, layers of inquiry types for functional communities such as "identification," "type," "location," and "business."  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br><br><br>This claim element is well-known in the art, and further, Venkatesh can be combined with any of the following:<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| **9.** The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>Venkatesh teaches selecting one of the layers of inquiry types for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, the interface can be customized based on a user's profile and login. *See, e.g.*, Col. 6:35-51; col. 7:1-13. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>Venkatesh teaches receiving from the user a response to the presentation of first member of the underlying criteria grouping. *See, e.g.*, col. 6:35-67. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | Venkatesh teaches that the response triggers the presentation of further members of the underlying criteria groupings in a predetermined order. *See, e.g.*, col. 6:35-67. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>Venkatesh teaches that the predetermined order is one of a hierarchical arrangement; an independent, and a combination hierarchical/independent arrangement. *See, e.g.*, Fig. 4, col. 6:35-67. |
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is held to be limiting, Venkatesh teaches a match and route system operable to locate a live expert, for example, for example a method of "cross referencing user information with expert information" and "contacting the expert based on user selected expert information inputted into the client system." *See, e.g.*, Fig. 4, Abstract, col. 1:54-2:3. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Venkatesh teaches at least first and second multimedia computers connected to a communnication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, a web-based phone. *See, e.g.*, Fig. 1, col. 2:56-3:9. |
| a host server connected to the communication network and operable to support interactive | Venkatesh teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, server 12 and database server 16. *See, e.g.*, Figs. 1, 2, col. 2:56-3:24. |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| communication between a seeker and an expert; | |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Venkatesh teaches a host server communicably connected with an inquiry-type database and a skill-set database, for example, server system 12 is communicably connected with database 20, which contains an inquiry-type database and a skill-set database.  *See, e.g.*, Figs. 1, 2, 3A, 3B, col. 2:56-3:51; col. 4:3-6:18. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Venkatesh teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, layers of inquiry types for functional communities such as "identification," "type," "location," and "business."  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br><br><br>This claim element was well-known in the art, and further, Venkatesh can be combined with any |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| | of the following:<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*., Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Venkatesh teaches the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, database 20, which stores information on experts.  *See, e.g.*, Figs. 2, 3A, 3B, Abstract, col. 4:3-6:19.<br><br>This claim element was well-known in the art, and further, Venkatesh can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 1:31-42; col. 1:50-51; col. 1:55-67; col. 4:63-5:10.<br><br>Eichstaedt:  *See, e.g.*, Figs. 1, 4, col. 2:43-3:12; col. 4:3-12.<br><br>HiPath:  *See, e.g.*, Sect. 4.2.3, Sect. 4.3.3, Sect. 13.3.3, Sect. 13.6.<br><br>Judkins:  *See, e.g.*, Figs. 14, 31, 32, 39, col. 7:53-56; col. 19:24-37; col. 22:23-51.<br><br>Gabriel:  *See, e.g.*, Fig. 1, col. 3:63-4:7; col. 5:20-29; col. 6:3-34.<br><br>McFarlane:  *See, e.g.*, Fig. 6, col. 11:24-12:8; claim 1 ("means for maintaining data comprising a mapping of agent experience and agent ability to use, on an unassisted and unsupervised basis, said at least one automated resource to data indicative of an augmented agent skill level for said |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
|  | plurality of agents"); claim 9. |
|  | <u>Dhir</u>:  *See, e.g.*, Fig. 5; col. 1:25-37; col. 10:19-34; col. 11:5-11. |
|  | <u>Sassin</u>:  *See, e.g.*, Fig. 1, col. 6:39-67; col. 9:5-19. |
|  | <u>Friedman</u>:  *See, e.g.*, ¶¶ 0015, 0016. |
|  | <u>Hekmatpour</u>:  *See, e.g.*, col. 14:64-15:11. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Venkatesh teaches a unique routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, a phone number associated with the expert.  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. <br><br><br><br>FIG. 7<br><br>This claim element was well-known in the art, and further, Venkatesh can be combined with any of the following: |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| | <u>Friedman</u>:  *See, e.g.*, ¶¶ 0024.<br><br><u>Sassin</u>:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br><u>Dhir</u>:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br><u>Gabriel</u>:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br><u>Judkins</u>:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br><u>HiPath</u>:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | Venkatesh teaches the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry types, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, in response to a user's request, the expert is identified by the phone number.  *See, e.g.*, Figs. 4, 7, 10-14, col. 6:52-67; col. 7:25-32; col. 7:45-8:16; col. 8:43-9:21. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>Venkatesh teaches that the bi-directional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet.  *See, e.g.*, Fig. 1, col. 2:56-3:9. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>Venkatesh teaches that the communication network is the Internet.  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, of a combination of instant messaging and web | *See* Claim 12.<br><br>Venkatesh teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing.  *See, e.g.*, Figs. 2, 12, col. 3:10-25; |

| Claim Language | U.S. Patent No. 7,120,647 to Venkatesh et al. |
|---|---|
| conferencing. | col. 6:52-67; col. 8:54-67. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>Venkatesh teaches that the host server is communicably connected with the database by the Internet.  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>Venkatesh teaches that the host server is communicably connected with the databases by a local area network or a wide area network.  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>Venkatesh teaches that the host server is configured in a multi-server architecture.  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2. |

**Appendix B-7**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent No. 6,553,113 to Dhir et al., "System and Methods For Call Decisioning in a Virtual Call Center Integrating Telephony with Computers.**

U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir") was filed on July 9, 1999, and issued April 22, 2003.  It is prior art under at least 35 U.S.C. 102(a), (b), and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Dhir anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Dhir with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Dhir is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Dhir with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Dhir.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Dhir to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer")

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,535,492 to Shtivelman ("Shtivelman")

- U.S. Patent No. 7,783,475 to Neuberger et al. ("Neuberger")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| **1.**  A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent the preamble is considered limiting, Dhir teaches a method of semantic to non-semantic routing to locate a live expert, for example, a virtual call center. *See, e.g.*, Fig. 1, Abstract, col. 3:12-31. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| |  FIG. 1 |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are | Dhir teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, inquiry types in an IVR system, stored in IVR transaction module. *See, e.g.*, Figs. 2, 4, col. 5:51-6:3; col. 7:52-67. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| humanly understandable descriptors; | 

FIG. 2

Further, this claim element was well-known in the art, and Dhir could be combined with any of the following:

<u>Venkatesh</u>:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
|  | Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65. |
|  | Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40. |
|  | Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. |
|  | Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023. |
|  | Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31. |
|  | Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Dhir teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, inquiry types in an additional IVR module, or inquiry types in languages other than English, stored in IVR transaction module.  *See, e.g.*, Figs. 4, 10 col. 5:51-6:2; col. 9:15-35, col. 13:35-61. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
|  | <br><br>FIG. 4<br><br>Further, this claim element was well-known in the art, and Dhir could be combined with any of the following:<br><br>Venkatesh:  *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | Dhir teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, data reflecting the queues that agents can support, stored in call center administrative system.  *See, e.g.*, Fig. 5; col. 1:25-37; col. 10:19-34; col. 11:5-11.<br><br><br>FIG. 5 |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Dhir teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, using a routing code and route return address.  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>This claim element was well-known in the art, and further, Dhir can be combined with any of the following: |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
|  | Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Dhir teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, identifying an expert through a using a routing code and route return address.  *See, e.g.*, col. 11:62-12:43. |
| 2.   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Dhir teaches establishing a real time communicate path between the user and the expert, for example, a telephone call.  *See, e.g.*, col. 2:57-61; col. 13:18-31. |
| 3.   The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Dhir teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephone call.  *See, e.g.*, col. 2:57-61; col. 13:18-31. |
| 4.   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious | *See* Claim 1.<br><br>Dhir teaches meritoriously ranking the expert, wherein a most meritorious available expert is |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| available expert is placed in communication with the user. | place in communication with the user, for example, ranking experts by skill level.  *See, e.g.*, col. 10:19-34. |
| **5.**   The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Dhir teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, ranking experts by skill level.  *See, e.g.*, col. 10:19-34. |
| **6.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>Dhir teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, English and Spanish.  *See, e.g.*, Fig. 10, col. 13:35-61. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | <br><br>Further, this claim element was well-known in the art, and Dhir can be combined with any of the |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and Dhir can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms" was well-known in the art, and Judkins can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
|  | Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**  The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>Dhir teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, based on user account information.  *See, e.g.*, col. 7:15-51; col. 11:43-61; col. 13:47-61. |
| **10.**  The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>The claim element "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" was well-known in the art, and further, Dhir can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, pp. 20, 22-23, Sect. 5, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65, claims 1 and 10.<br><br>Judkins:  *See, e.g.*, col. 11:47-56.<br><br>Venkatesh:  *See, e.g.*, col. 6:35-67.<br><br>Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | The claim element "the response triggering the presentation of further member of the underlying criteria grouping in a predetermined order" was well-known in the art, and further Dhir can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, p. 20, Sect. 5.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Lauffer:  *See, e.g.*, col. 7:40-67.<br><br>Judkins:  *See, e.g.*, col. 11:47-56.<br><br>Venkatesh:  *See, e.g.*, Fig. 4, col. 6:35-67.<br><br>Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| **11.**  The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>The claim element "wherein the predetermined order is one of a hierarchical arrangement, and independent arrangement, and combination hierarchical/independent arrangement" was well-known in the art, and further, Dhir can be combined with any of the following:<br><br>Venkatesh:  See, e.g., Fig. 4, col. 6:35-67.<br><br>Creamer:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040.<br><br>Sivho:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br>Sassin:  *See, e.g.*, col. 4:1-15.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | <u>McFarlane</u>:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.**  A match and route system operable to locate a live expert comprising: | To the extent that the preamble is considered limiting, Dhir teaches a match and route system operable to locate a live expert, for example, a virtual call center.  *See, e.g.*, Fig. 1, Abstract, col. 3:12-31. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| |  FIG. 1 |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Dhir teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, agent workstations. *See, e.g.*, Fig. 3, col. 8:28-39. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | <br><br>FIG. 3 |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Dhir teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, central server system. *See, e.g.*, Fig. 1, col. 4:48-65; col. 5:6-18. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | FIG. 1 |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Dhir teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, IVR transaction module and call center administrative system. *See, e.g.*, Fig. 2, col. 5:6-18; col. 7:52-67; col. 11:5-11. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Dhir teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, inquiry types in an IVR system, and inquiry types in additional languages such as Spanish, stored in IVR transaction module. *See, e.g.*, Figs. 2, 4, 10, col. 5:51-6:3; col. 7:52-67; col. 9:15-35, col. 13:35-61.  |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| |  |

FIG. 4

Further, this claim element was well-known in the art, and Dhir can be combined with any of the following:

Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.

Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.

Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.

Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.

Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.

Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Dhir teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, data reflecting the queues that agents can support, stored in call center administrative system.  *See, e.g.*, Fig. 5; col. 1:25-37; col. 10:19-34; col. 11:5-11.  |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Dhir teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, using a routing code and route return address.  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.

This limitation was well-known in the art, and further, Dhir can be combined with any of the following: |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | Dhir teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, identifying an expert through a using a routing code and route return address.  *See, e.g.*, col. 11:62-12:43. |
| **13.**  The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art, and further, Dhir can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8.<br><br>Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| | |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>Dhir teaches that the communication network is the Internet.  *See, e.g.*, col. 5:6-19; col. 8:40-52. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>The claim element "wherein the interactive communication is instant messaging, web conferencing, or a combination of instant message and web conferencing" was well-known in the art, and further, Dhir can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 2, 12, col. 3:10-25; col. 6:52-67; col. 8:54-67.<br><br>Shtivelman:  *See, e.g.*, col. 1:45-2:2; col. 5:15-30.<br><br>Friedman:  *See, e.g.*,  ¶¶ 0046, 0047.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, 62, Sect. 3.2, 4.2, 8, 12.<br><br>ExpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>Sassin:  *See, e.g.*, Claim 12, 17.<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>Dhir teaches that the host server is communicably connected with the database by the Internet, for example.  *See, e.g.*, col. 5:6-19. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>Dhir teaches that the host server is communicably connected with the databases by a local area network, or a wide area network.  *See, e.g.*, col. 5:6-19. |

| Claim Language | U.S. Patent No. 6,553,113 to Dhir et al. |
|---|---|
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>The claim element "wherein the host server is configured in a multi-server architecture" was well-known in the art, and further Dhir can be combined with any of the following:<br><br>Andrews:  *See, e.g.*, Fig. 5, col. 7:53-8:15.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42.<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2.<br><br>HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8.<br><br>Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-8**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent Application No. 2002/0013836 to Friedman et al., "Interactive Online Learning With Student-To-Tutor Matching".**

U.S. Patent Application No. 2002/0013836 to Friedman et al. ("Friedman") was filed on July 18, 2001, and was published on January 31, 2002.  Friedman is prior art under at least 35 U.S.C. 102(a), (b) and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Friedman anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Friedman with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Friedman is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of

ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Friedman with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Friedman.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Friedman to render one or more of the claims obvious:

- Help SG Overview – homework911 ("homework911")

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered, Friedman teaches a method of semantic to non-semantic routing to locate a live expert, for example, a system for matching a student and a tutor. *See, e.g.*, Fig. 1, ¶ 0011. <br><br>  <br><br> Figure 1 <br><br> *See also* homework911, p. 3. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| |  |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Friedman teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, selection criteria. *See, e.g.*, ¶ 0016.<br><br>Further, this claim element was well-known in the art, and Friedman could be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| | <u>Butler</u>: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br><u>Creamer</u>: *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023.<br><br><u>Sivho</u>: *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31.<br><br><u>Hekmatpour</u>: *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Friedman teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, request criteria. *See, e.g.*, ¶ 0026.<br><br>Further, this claim element was well-known in the art, and Friedman could be combined with any of the following:<br><br><u>Venkatesh</u>: *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br><u>Csaszar</u>: *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br><u>Padalino</u>: *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br><u>Butler</u>: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br><u>Creamer</u>: *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br><u>Sivho</u>: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria | Friedman teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, information regarding tutors stored in database 18. *See, e.g.*, ¶¶ 0015, 0016. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| grouping for the associated inquiry type; | |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Friedman teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, a qualifier. *See, e.g.*, ¶¶ 0024. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Friedman teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, using the match-and-route system to identify a tutor. *See, e.g.*, Fig. 3, ¶¶ 0024, 0046. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| |  *See also*, homework911, p. 3 |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| |  |
| **2.** The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Friedman teaches establishing a real time communicate path between the user and the expert, for example, an internet connection, or a telephone call.  *See, e.g.*, ¶¶ 0046, 0047.<br><br>*See also*, homework911, p. 3. |
| **3.** The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Friedman teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephony connection or a voice over internet protocol connection. *See, e.g.*, ¶¶ 0046, 0047.<br><br>*See also*, homework911, p. 3. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| **4.** The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Friedman teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, based on a tutor's proficiency values. *See, e.g.*, ¶¶ 0020, 0024. |
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Friedman teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, based on a tutor's proficiency values, or based on a user's profile. *See, e.g.*, ¶¶ 0018, 0020, 0024, 0041. |
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>Friedman teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, English or Spanish. *See, e.g.*, ¶¶ 0026, 0049.<br><br>Further, this claim element was well-known in the art, and Friedman can be combined with any of the following:<br><br>Padalino:  See, e.g., Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  See, e.g., Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.  \\<br><br>Creamer:  See, e.g., ¶¶ 0044, 0045.<br><br>Sivho:  See, e.g., Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>Friedman teaches each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest, for example, "mathematics," "elementary level arithmetic," "third grade math," etc. *See, e.g.*, ¶ 0016. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| | This element was well-known in the art, and further, Friedman can be combined with any of the following:

Venkatesh: *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.

Butler: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.

Creamer: *See, e.g.*, ¶¶ 0045.

Sivho: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.

Hekmatpour: *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.

Friedman teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms, for example, "mathematics," "elementary level arithmetic," "third grade math," etc. depending on the students needs and capabilities. *See, e.g.*, ¶ 0016.

This claim element is well-known in the art, and further, Friedman can be combined with any of the following:

Venkatesh: *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.

Butler: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.

Creamer: *See, e.g.*, ¶¶ 0045, 0048, 0049.

Sivho: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.

Hekmatpour: *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further | *See* Claim 1. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | Friedman teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, using a student's login and password.  *See also*, homework911, p. 5.<br><br>This claim element is well-known in the art, and further, Friedman can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Col. 6:35-51; col. 7:1-13.<br><br>Csaszar:  *See, e.g.*, col. 8:55-9:9.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*., Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>KnowledgeShare:  *See, e.g.,* pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 3.<br><br>Sassin:  *See, e.g.*, col. 5:55-6:11. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>Friedman teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, a student entering in information in a student profile. *See, e.g.*, ¶ 0017. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | Friedman teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, presenting additional, narrowing options to the user.  *See, e.g.*, ¶ 0017. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and | *See* Claim 10.<br><br>Friedman teaches that the predetermined order is one of a hierarchical arrangement, an |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| combination hierarchal/independent arrangement. | independent arrangement, and combination hierarchical/independent arrangement, for example, an independent arrangement between a student's language requirements and school level. *See, e.g.*, ¶ 0017. |
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is held to be limiting, Friedman teaches a match and route system operable to locate a live expert, for example, a system for matching a student and a tutor. *See, e.g.*, Fig. 1, ¶ 0011.<br><br><br><br>Figure 1<br><br>*See also* homework911, p. 3. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Friedman teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, a tutor and a student's computers. *See, e.g.*, Fig. 1, ¶ 0014. |
| a host server connected to the communication | Friedman teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, hosting server |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| network and operable to support interactive communication between a seeker and an expert; | 14.  *See, e.g.*, Fig. 1, ¶¶ 0014, 0046. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Friedman teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, database 18, which holds information on tutors and students. *See, e.g.*, Fig. 1, ¶ 0015.<br><br><br><br>Figure 1 |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Friedman teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically expressed inquiry types, for example, request criteria and selection criteria.  *See, e.g.*, ¶¶ 0016, 0026.<br><br>Further, this claim element was well-known in the art, and Friedman can be combined with any of the following: |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| | Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.

Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.

Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.

Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.

Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.

Sivho:  *See, e.g.*., Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.

Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Friedman teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, information regarding tutors stored in database 18.  *See, e.g.*, ¶¶ 0015, 0016. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; | Friedman teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, a qualifier.  *See, e.g.*, ¶¶ 0024. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | Friedman teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, using the match-and-route system to identify a tutor.  *See, e.g.*, Fig. 3, ¶¶ 0024, 0046. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| | <br><br>*See also*, homework911, p. 3. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>Friedman teaches that the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet, for example, an electronic whiteboard or a webcam.  *See, e.g.*, |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| | ¶¶ 0047, 0048. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>Friedman teaches that the communication network is the Internet. *See, e.g.*, ¶¶ 0014, 0046. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>Friedman teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, text chat or web conferencing. *See, e.g.*, ¶¶ 0046, 0047.<br><br>*See also,* homework911, p. 3. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>Friedman teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, Fig. 1, ¶ 0014. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>Friedman teaches that the host server is communicably connected with the databases by a local area network, or a wide area network. *See, e.g.*, ¶ 0014.<br><br>This element was well-known in the art, and further, Friedman can be combined with any of the following:<br><br>Andrews: *See, e.g.*, col. 5:14-30.<br><br>Dhir: *See, e.g.*, col. 5:6-19.<br><br>Sassin: *See, e.g.*, col. 3:10-48.<br><br>Lauffer: *See, e.g.*, col. 1:50-51; col. 5:66-6:7.<br><br>Judkins: *See, e.g.*, Fig. 1, col. 6:27-41. |

| Claim Language | U.S. Patent Application No. 2002/0013846 to Friedman et al. |
|---|---|
| | Gabriel: *See, e.g.*, col. 3:20-30. |
| | Venkatesh: *See, e.g.*, Figs. 1, 2, col. 2:56-3:25. |
| | Creamer: *See, e.g.*, ¶ 0021. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12. |
| | Friedman teaches that the host server is configured in a multi-server architecture, for example, using a web server and an automatic call distribution server. *See, e.g.*, Fig. 1, ¶ 0014. |
| |  |
| | Figure 1 |

**Appendix B-9**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on U.S. Patent No. 6,510,431 to Eichstaedt et al., "Method and System For The Routing Of Requests Using An Automated Classification And Profile Matching In A Networked Environment."**

U.S. Patent No. 6,510,431 to Eichstaedt et al. ("Eichstaedt") was filed on June 28, 1999, and issued on January 21, 2003.  It is prior art under at least 35 U.S.C. § 102(a), (b) and (e).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Eichstaedt anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Eichstaedt with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Eichstaedt is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of

ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Eichstaedt with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Eichstaedt.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Eichstaedt to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer")

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath"), as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
| --- | --- |
| **1.**  A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is held to be limiting, Eichstaedt teaches a method of semantic to non-semantic routing to locate a live expert, for example, a system for routing customer requests for advisors.  *See, e.g.*, Figs. 1, 7, col. 1:52-65; col. 2:30-42. |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Eichstaedt teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, an automatic classifier and problem pool.  *See, e.g.*, Figs. 1, 4, col. 2:43-3:13; col. 3:47-4:2; col. 4:14-40. This claim element was well-known in the art, and further, Eichstaedt can be combined with any of the following: Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65. Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
|  | Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023.<br><br>Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Eichstaedt teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, categories within the problem pool.  *See, e.g.*, Figs. 1, 4, col. 2:43-3:13; col. 3:47-4:2; col. 4:14-40.<br><br>This claim element was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Venkatesh:   *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having | Eichstaedt teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, a database of expert profiles stored in the profile engine.  *See, e.g.*, Figs. 1, 4, col. 2:43-3:12; col. 4:3-12. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Eichstaedt teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, the mapping function between classified requests and associated profiles.  *See, e.g.*, col. 3:20-31; col. 4:3-12.<br><br>This claim element was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Eichstaedt teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, the profile engine comparing a user's request to associated profiles, then the advisor process server creating a connection between a customer and an advisor.  *See, e.g.*, col. 3:20-31; col. 4:3-12. |
| **2.**   The method of claim 1, further comprising the step of establishing a real time | *See* Claim 1.<br><br>Eichstaedt teaches establishing a real time communicate path between the user and the expert, |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| communication path between the user and the expert. | for example, a chat session or telephone call. *See, e.g.*, col. 2:43-65; col. 4:33-47. |
| **3.** The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Eichstaedt teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, an email connection or a telephone call. *See, e.g.*, col. 2:43-65; col. 4:33-47. |
| **4.** The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Eichstaedt teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, identifying a high-priority advisor. *See, e.g.*, Fig. 8, col. 4:54-67; col. 5:1-34. |
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>Eichstaedt teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, identfying a high-priority advisor based on the expert's individualized knowledge. *See, e.g.*, Fig. 8, col. 5:1-34. |
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>The claim element "each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages," and further, Eichstaedt can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The claim element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest," and further Eichstaedt can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>The claim element "wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms" was well-known in the art and further Eichstaedt can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the | *See* Claim 1. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | Eichstaedt teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, based on a user's login and registration.  *See, e.g.*, Fig. 7, col. 4:13-28.<br><br>This claim element was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Col. 6:35-51; col. 7:1-13.<br><br>Csaszar:  *See, e.g.*, col. 8:55-9:9.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*., Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>KnowledgeShare:  *See, e.g.,* pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 3.<br><br>Sassin:  *See, e.g.*, col. 5:55-6:11. |
| **10.**  The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>The claim element "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" was well-known in the art, and further Eichstaedt can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, pp. 20, 22-23, Sect. 5, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| | Lauffer:  *See, e.g.*, col. 5:36-65, claims 1 and 10.<br><br>Judkins:  *See, e.g.*, col. 11:47-56.<br><br>Venkatesh:  *See, e.g.*, col. 6:35-67.<br><br>Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | The claim element "the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order" was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, p. 20, Sect. 5.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Lauffer:  *See, e.g.*, col. 7:40-67.<br><br>Judkins:  *See, e.g.*, col. 11:47-56.<br><br>Venkatesh:  *See, e.g.*, Fig. 4, col. 6:35-67.<br><br>Creamer:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>The claim element "wherein the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement" was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Venkatesh:  See, e.g., Fig. 4, col. 6:35-67. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| | Creamer:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040.<br><br>Sivho:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br>Sassin:  *See, e.g.*, col. 4:1-15.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65.<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.**  A match and route system operable to locate a live expert comprising: | To the extent that the preamble is considered a limitation, Eichstaedt teaches a match and route system operable to locate a live expert, for example, a system for routing customer requests to advisors.  *See, e.g.*, Figs. 1, 7, col. 1:52-65; col. 2:30-42. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Eichstaedt teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, a customer's computer and an advisor's computer.  *See, e.g.*, Fig. 1, col. 2:43-65. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Eichstaedt teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, the customer server process and the advisor server process.  *See, e.g.*, Figs. 3, 8, col. 3:36-54; col. 5:1-19. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Eichstaedt teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, an automatic classifier and problem pool, and a database of expert profiles stored in the profile engine.  *See, e.g.*, Figs. 1, 4, col. 2:43-3:13; col. 3:47-4:12. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically- | Eichstaedt teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, categories within the problem pool.  *See, e.g.*, Figs. 1, 4, col. 2:43-3:13; col. 3:47-4:2.<br><br>This claim element was well-known in the art, and further, Eichstaedt can be combined with any |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| expressed inquiry types; | of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Eichstaedt teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, a database of expert profiles stored in the profile engine.  *See, e.g.*, Figs. 1, 4, col. 2:43-3:12; col. 4:3-12. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Eichstaedt teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, the mapping function between classified requests and associated profiles.  *See, e.g.*, col. 3:20-31; col. 4:3-12.<br><br>This claim element was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
|  | Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | Eichstaedt teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, the profile engine comparing a user's request to associated profiles, then the advisor process server creating a connection between a customer and an advisor.  *See, e.g.*, col. 3:20-31; col. 4:3-12. |
| **13.**  The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>Eichstaedt teaches that the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet.  *See, e.g.*, Fig. 1, col. 2:30-42; col. 5:41-48.<br><br>This claim element was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8.<br><br>Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |
| **14.**  The match and route system of claim 12, wherein the communication network is the | *See* Claim 12.<br><br>Eichstaedt teaches that the communication network is the Internet.  *See, e.g.*, col. 2:43-65. |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| Internet. | |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>Eichstaedt teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, a chat session. *See, e.g.*, col. 2:43-65; col. 4:30-41. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>Eichstaedt teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, col. 2:43-65. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>The claim element "wherein the host server is communicably connected with the databases by a local area network, or a wide area network" was well-known in the art, and further, Eichstaedt can be combined with any of the following:<br><br>Andrews: *See, e.g.*, col. 5:14-30.<br><br>Dhir: *See, e.g.*, col. 5:6-19.<br><br>Sassin: *See, e.g.*, col. 3:10-48.<br><br>Lauffer: *See, e.g.*, col. 1:50-51; col. 5:66-6:7.<br><br>Judkins: *See, e.g.*, Fig. 1, col. 6:27-41.<br><br>Gabriel: *See, e.g.*, col. 3:20-30.<br><br>Venkatesh: *See, e.g.*, Figs. 1, 2, col. 2:56-3:25.<br><br>Creamer: *See, e.g.*, ¶ 0021. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a | *See* Claim 12.<br><br>Eichstaedt teaches that the host server is configured in a multi-server architecture. *See, e.g.*, |

| Claim Language | U.S. Patent No. 6,510,431 to Eichstaedt et al. |
|---|---|
| multi-server architecture. | Figs. 3, 8, col. 3:36-54; col. 5:1-19. |

**Appendix B-10**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on XpertShare 2.0 (and prior versions of XpertShare)**

The product XpertShare 2.0 was sold or offered for sale by at least January 21, 2004.  XpertShare 2.0 is described in the document "XpertShare 2.0 Product Tour" ("XpertShare 2.0"), which was published by XpertUniverse.  Prior versions of XpertShare were on sale and described in publications prior to January 21, 2004.  XpertShare 2.0 is prior art under at least 35 U.S.C. 102(a) and (b).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, XpertShare 2.0 anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine XpertShare 2.0 with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that XpertShare 2.0 is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person

of ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine XpertShare with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in XpertShare 2.0.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Finisar hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with XpertShare 2.0 to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | XpertShare 2.0 |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, XpertShare 2.0 teaches a method of semantic to non-semantic routing to locate a live expert, for example, the XpertShare Match & Route system. *See, e.g.*, Slide 4, 5.<br><br> |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | XpertShare 2.0 teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, a database storing inquiry types displayed on the "Get Assistance" page.  *See, e.g.*, Slide 4. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of | XpertShare 2.0 teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, layers of inquiry types as shown on the "Get Assistance" page. |

| Claim Language | XpertShare 2.0 |
|---|---|
| inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | XpertShare 2.0 teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, information stored regarding experts connected through XpertShare 2.0.  *See, e.g.*, Slide 5.<br><br> |
| mapping each skill-set database entry to | XpertShare 2.0 teaches mapping each skill-set database entry to the associated inquiry type in the |

| Claim Language | XpertShare 2.0 |
| --- | --- |
| the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | inquiry type database through a unique numerical routing identifier.  *See, e.g.*, Slide 5. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | XpertShare 2.0 teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, a user entering in a query on the "Get Assistance" page.  *See, e.g.*, Slide 4, 5.<br><br> |
| **2.**   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>XpertShare 2.0 teaches establishing a real time communication path between the user and the expert, for example, a video or chat session.  *See, e.g.*, Slide 8. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| **3.** The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>XpertShare 2.0 teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a video connection or a VoIP connection. *See, e.g.*, *See, e.g.*, Slide 8. |
| **4.** The method of claim 1, further comprising the step of meritoriously | *See* Claim 1. |

| Claim Language | XpertShare 2.0 |
|---|---|
| ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | XpertShare 2.0 teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example,  |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>XpertShare 2.0 teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, based on a user's prior selections stored in a profile, or routing to the best expert.  *See, e.g.*, Slide 3, 4. |
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different | *See* Claim 1.<br><br>XpertShare 2.0 teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, a seeker can set a preferred language.  *See, e.g.*, Slide. 4. |

| Claim Language | XpertShare 2.0 |
|---|---|
| languages. |  |
| **7.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>XpertShare 2. 0 teaches each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest, for example, underlying groupings such as "Area of interest" "systems," and "Aircraft." *See, e.g.*, Slide 4. |
| **8.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>XpertShare 2.0 teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms, for example, underlying groupings such as "Area of interest" "systems," and "Aircraft." *See, e.g.*, Slide 4. |
| **9.** The method of claim 1, further comprising the step of selecting one of | *See* Claim 1.<br><br>XpertShare 2.0 teaches selecting one of the layers of inquiry type for presentation of the underlying |

| Claim Language | XpertShare 2.0 |
|---|---|
| the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | criteria grouping to the user based on a predetermined user profile, for example, a user's login.  *See, e.g.*, Slide 3.<br><br> |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>XpertShare 2.0 teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, using hierarchical pull-down menus on the "Get Assistance" page. *See, e.g.*, Slide 4. |

| Claim Language | XpertShare 2.0 |
|---|---|
| | <br><br>XpertShare 2.0:  See, e.g., Slide 4 – "Get Assistance" – "Define the problem, challenge or opportunity using hierarchical pull-down menus supplemented by free text."<br><br>See also Slide 4 – "Get Assistance" – "Request an expert from a prior session, if desired."  Prior expert data is obtained based on previous sessions. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | XpertShare 2.0 teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, additional selections.  *See, e.g.*, Slide 4. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent | *See* Claim 10.<br><br>XperShare 2.0 teaches that the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement, for example, a hierarchical relationship.  *See, e.g.*, Slide 4. |

| Claim Language | XpertShare 2.0 |
|---|---|
| arrangement. | |
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is considered limiting, XpertShare 2.0 teaches a match and route system operable to locate a live expert, for example, the XpertShare Match & Route system. *See, e.g.*, Slide 4, 5.<br><br> |

| Claim Language | XpertShare 2.0 |
|---|---|
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | XpertShare 2.0 teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, seekers' and experts' computers. *See, e.g.*, Slide 5.<br><br> |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | XpertShare 2.0 teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, match and route engine. *See, e.g.*, Slide 5. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | XpertShare 2.0 teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, a database for inquiry types shown on the "Get Assistance" page, and a database containing information on experts. *See, e.g.* Slides 4, 6. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | XpertShare 2.0 teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, layers of inquiry types as shown on the "Get Assistance" page. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | XpertShare 2.0 teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, information stored regarding experts connected through XpertShare 2.0. *See, e.g.*, Slide 5. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | XpertShare 2.0 teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, . *See, e.g.*, Slide 5. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined | XpertShare 2.0 teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, a user entering in a query on the "Get Assistance" page. *See, e.g.*, Slide 4, 5. |

| Claim Language | XpertShare 2.0 |
|---|---|
| semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. |  |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>XpertShare 2.0 teaches that the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. *See, e.g.*, Slide 8. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>XpertShare 2.0 teaches that the communication network is the Internet.  *See, e.g.*, Slides 8, 9, 10. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>XpertShare 2.0 teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, a web conference.  *See, e.g.*, Slide 8. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>XpertShare 2.0 teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, Slide 5. |

| Claim Language | XpertShare 2.0 |
|---|---|
| |  |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>XpertShare 2.0 teaches that the host server is communicably connected with the databases by a local area network, or a wide area network.  *See, e.g.*, Slide 5.<br><br>This claim element was well-known in the art, and further, XpertShare 2.0 can be combined with any of the following:<br><br>Andrews:  *See, e.g.*, col. 5:14-30.<br><br>Dhir:  *See, e.g.*, col. 5:6-19.<br><br>Sassin:  *See, e.g.*, col. 3:10-48. |

| Claim Language | XpertShare 2.0 |
|---|---|
| | Lauffer:  *See, e.g.*, col. 1:50-51; col. 5:66-6:7.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 6:27-41.<br><br>Gabriel:  *See, e.g.*, col. 3:20-30.<br><br>Venkatesh:  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25.<br><br>Creamer:  *See, e.g.*, ¶ 0021. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>XpertShare 2.0 teaches that the host server is configured in a multi-server architecture.  *See, e.g.*, Slide 5.<br><br>This element was well-known in the art, and further, XpertShare 2.0 can be combined with any of the following:<br><br>Andrews '452:  *See, e.g.*, Fig. 5, col. 7:53-8:15.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42.<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2.<br><br>HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8.<br><br>Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-11**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on Siemens HiPath Pro Center Standard and Advanced Suites**

Siemens HiPath Pro Center Standard and Advanced Suites 4.0 ("HiPath") was on sale at least as of 2001 and was described in a printed publication at least as of 2001.  HiPath is prior art under at least 35 U.S.C. 102(a), (b), (e) and (g).

The following documents describe the function and operation of HiPath:

- Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Siemens HiPath Pro Center Standard and Advanced Suites 4.0 Desktop User Guide ("HiPath DUG")

- Siemens HiPath Pro Center Suite Version 4.0 Overview ("HiPath Overview")

- Siemens HiPath Pro Center Standard and Advanced Suites 4.0 Programming Guide ("HiPath PG")

Cisco reserves the right to rely on prior releases of HiPath, as well as other documentation describing its operation.

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, HiPath anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine HiPath with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a

predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that HiPath is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine HiPath with the additional listed prior art.  Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in HiPath.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with HiPath to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

- U.S. Patent No. 6,456,619 to Sassin et al. ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

- U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

- XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

- KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

| Claim Language | HiPath |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is considered limiting, HiPath teaches a method of semantic to non-semantic routing to locate a live expert, for example, call center applications that use skills-based routing. *See, e.g.*, HiPath UG, Sect. 1, 2.1, 2.2, 2.3.2, 4.2. |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | HiPath teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, inquiry types in an IVR system stored in a design database. *See, e.g.*, HiPath UG, Sect. 10.2.3, Sect. 18.3, *see also,* HiPath overview, p. X-16; HiPath PG, Sect. 2.3, 2.3.1, 2.3.2, 3.1.<br><br>Further, this claim element was well-known in the art, and HiPath can be combined with any of the following:<br><br>Venkatesh: *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24. |

| Claim Language | HiPath |
|---|---|
| | Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 4:52-65.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023.<br><br>Sivho:  *See, e.g.*, Fig. 6, col. 3:47-39; col. 5:65-6:31.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | HiPath teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one corresponding with the first layer of predetermined semantically-expressed inquiry types, for example, inquiry types in a different language.  *See, e.g.*, HiPath UG, Sect. 4.3.2, Sect. 18.<br><br>This element was well-known in the art, and HiPath can be combined with any of the following:<br><br>Venkatesh:   *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*., col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*., col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined | HiPath teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping |

| Claim Language | HiPath |
|---|---|
| semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | for the associated inquiry type, for example, skills in agent resumes stored in the administration database. *See, e.g.,* Sect. 4.2.3, Sect. 4.3.3, Sect. 13.3.3, Sect. 13.6. |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | HiPath teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, a skill score or a route control group number. *See, e.g.,* HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17.<br><br>This claim element was well-known in the art, and further, HiPath can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | HiPath teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, through the call matching process in ResumeRouting or Resume Routing Advanced. *See, e.g.,* HiPath UG, Sect. 4.2.1, Sect. 4.3.1, Sect. 4.4 |

| Claim Language | HiPath |
|---|---|
| **2.** The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>HiPath teaches establishing a real time communication  path between the user and the expert, for example, a telephone call.  *See, e.g.*, HiPath DUG, Sect. 4.1 |
| **3.** The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>HiPath teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephone call.  *See, e.g.*, HiPath DUG, Sect. 4.1. |
| **4.** The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>HiPath teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, based on an expert's skill score.  *See, e.g.*, HiPath UG, Sect. Sect. 4.4, 4.4.2, 4.4.3. |
| **5.** The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>HiPath teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, based on an agent's skill score.  *See, e.g.*, HiPath UG, Sect. Sect. 4.4, 4.4.2, 4.4.3.  Additionally and alternatively, an expert can be assigned to a call based on a user's preference.  *See, e.g.*, HiPath UG, Sect. 3.5.1. |
| **6.** The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>HiPath teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, English and Spanish.  *See, e.g.*, HiPath UG, Sect. 4.3.2, Sect. 18.<br><br>This element was well-known in the art, and further, HiPath can be combined with any of the |

| Claim Language | HiPath |
|---|---|
|  | following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| 7.   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The claim element "wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and further, HiPath can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| 8.   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>The claim element "wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms" was well-known in the art, and further, HiPath can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61. |

| Claim Language | HiPath |
|---|---|
|  | Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>HiPath teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, based on account information.  *See, e.g.*, HiPath UG, Sect. 3.1, 3.5.1.<br><br>Further, this claim element was well-known in the art, and any of the following can be combined with HiPath:<br><br>Venkatesh:  *See, e.g.*, Col. 6:35-51; col. 7:1-13.<br><br>Csaszar:  *See, e.g.*, col. 8:55-9:9.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>KnowledgeShare:  *See, e.g.,* pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 3.<br><br>Sassin:  *See, e.g.*, col. 5:55-6:11. |
| **10.**  The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>HiPath teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, collecting a user's selections in an IVR system.  *See, e.g.*, HiPath UG, Sect 2.4, pp. 3-19. |

| Claim Language | HiPath |
|---|---|
| | |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | HiPath teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, additional options in an IVR sub-menu. *See, e.g.*, Sect. 10.2.3. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>HiPath teaches that the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement, for example, hierarchical options in a submenu. *See, e.g.*, Sect. 10.2.3. |
| **12.** A match and route system operable to locate a live expert comprising: | To the extent that the preamble is held to be limiting, HiPath teaches a match and route system operable to locate a live expert, for example, all center applications that use skills-based routing. *See, e.g.*, HiPath UG, Sect. 1, 2.1, 2.2, 2.3.2, 4.2. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | HiPath teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, agent workstations. *See, e.g.*, HiPath DUG, Sect. 2, 2.1, 4.1, 4.1.1. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | HiPath teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, ProCenter servers. *See, e.g.*, Fig. 3-3, 3-4, |

| Claim Language | HiPath |
|---|---|
|  | <br>Figure 3-3   Single-Site Call Center: Call Flow in the Basic Configuration with Phonemail, IVR, or Call Director Call Processing |

| Claim Language | HiPath |
|---|---|
| | Figure 3-4      Single-Site Call Center: Call Flow in the IVR Hold Configuration |
| the host server communicably connected with an inquiry-type database and a skill-set database; | HiPath teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, the ProCenter server is communicably connected to the design and administration databases.  *See, e.g.*, Sect. 2.1.1. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at | HiPath teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, levels of inquiry types in different languages in an IVR system stored in a design database.  *See, e.g.*, HiPath UG, Sect. 4.3.2, Sect. 10.2.3, Sect. 18, Sect. 18.3, *see also,* HiPath overview, p. X-16; HiPath PG, Sect. 2.3, 2.3.1, 2.3.2, 3.1. |

| Claim Language | HiPath |
|---|---|
| least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | Further, this claim element was well-known in the art, and HiPath can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | HiPath teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, skills in agent resumes stored in the administration database.  *See, e.g.*, Sect. 4.2.3, Sect. 4.3.3, Sect. 13.3.3, Sect. 13.6. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | HiPath teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, a skill score or a route control group number.  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17.<br><br>This claim element was well-known in the art, and further, HiPath can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>Friedman:  *See, e.g.*, ¶¶ 0024. |

| Claim Language | HiPath |
|---|---|
| | Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | HiPath teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, through the call matching process in ResumeRouting or Resume Routing Advanced.  *See, e.g.*, HiPath UG, Sect. 4.2.1, Sect. 4.3.1, Sect. 4.4 |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art, and further, HiPath can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8.<br><br>Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>HiPath teaches that the communication network is the Internet, for example, using the Internet integration feature.  *See, e.g.*, HiPath UG, Sect. 2.3.8. |

| Claim Language | HiPath |
|---|---|
| | |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>HiPath teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, a chat session.  *See, e.g.*, HiPath UG, Sect. 2.3.8. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>HiPath teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, Sect. 8.5. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>HiPath teaches that the host server is communicably connected with the databases by a local area network, or a wide area network, for example, a local area network.  *See, e.g.*, HiPath IG, Sect. 2.3, *see also* HiPath UG, Sect. 8.4. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>HiPath teaches that the host server is configured in a multi-server architecture, for example, in a networked call center configuration. *See, e.g.*, Fig. 3-8. |

| Claim Language | HiPath |
| --- | --- |
| | Figure 3-8    Networked Call Center. Call Flow in the Basic Configuration with PhoneMail or IVR Call Processing, in which Call is Distributed |

**Appendix B-12**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on Genesys Suite 7, Including Genesys Universal Routing 7 and Genesys Expert Contact 7**

Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7, were products sold at least as early as January 24, 2004, and were described in printed publications at least as early as January 24, 2004.

Genesys Suite 7 is described in the following documents:

- Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

- Genesys Universal Routing 7 Reference Manual ("UR7 RM")

- Genesys Expert Contact 7 User's Guide ("EC7 UG")

- Genesys Universal Routing 7 Strategy Samples ("UR7 Strategy")

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, Genesys Suite 7 anticipates and renders obvious, alone, or in combination with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine Genesys Suite 7 the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar way; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill

in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that Genesys Suite 7 is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine Genesys Suite 7 with the additional listed prior art. Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in Genesys Suite 7.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with Genesys Suite 7 to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent No. 5,970,124 to Csaszar et al.  ("Csaszar")

- U.S. Patent No. 7,376,622 to Padalino et al.  ("Padalino")

- U.S. Patent No. 7,082,392 to Butler et al.  ("Butler")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer").

- U.S. Patent No. 7,155,430 to Sivho et al., ("Sivho")

  - U.S. Patent No. 7,783,475 to Neuberger et al. ("Neuberger")

  - U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

  - U.S. Patent No. 6,453,038 to McFarlane et al. ("McFarlane")

  - U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

  - U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

  - U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

  - U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

  - U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

  - U.S. Patent Application No. 2002/0013846 to Friedman et al. ("Friedman")

  - U.S. Patent Application No. 6,510,431 to Eichstaedt et al. ("Eichstaedt")

  - U.S. Patent No. 5,822,745 to Hekmatpour et al. ("Hekmatpour")

  - XpertShare 2.0 Product, as described in XpertShare 2.0 Product Tour ("XpertShare 2.0")

  - KnowledgeShare Product, as described in KnowledgeShare User Manual ("KnowledgeShare")

  - Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

| Claim Language | Genesys Suite 7 |
|---|---|
| **1.** A method of semantic to non-semantic routing to locate a live expert comprising the | To the extent that the preamble is considered limiting, Genesys Suite 7 teaches a method of semantic to non-semantic routing to locate a live expert, for example, using skills-based routing in a call center application. *See, e.g.*, UR7 GSG, pp. 17-18; EC7 UG, pp. 11-16, 25-27. |

| Claim Language | Genesys Suite 7 |
|---|---|
| steps of: | |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | Genesys Suite 7 teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, user options in a routing strategy stored in a configuration database.  *See, e.g.*, UR7 GSG, pp. 14-15; UR7 RM, p. 23; UR 7 Strategy, pp. 48-54.<br><br>Further, this claim element was well-known in the art, and Genesys Suite 7 could be combined with any of the following:<br><br>Venkatesh:   *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18.<br><br>Csaszar:  *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | Genesys Suite 7 teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, user options in a routing strategy in different languages.  *See, e.g.*, UR7 GSG, pp. 14-15, 40; UR 7 Strategy, pp. 48-54.<br><br>Further, this claim element was well-known in the art, and Genesys Suite 7 could be combined with any of the following:<br><br>Venkatesh:   *See, e.g.,* Figs. 3A, 3B, col. 4:25-6:18. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | *Csaszar*: *See, e.g.*, col. 6:28-51; col. 7:13-24; col. 8:55-9:9.<br><br>*Padalino*: *See, e.g.*, col. 7:18-40; col. 7:61-8:20; col. 17:49-57.<br><br>*Butler*: *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>*Creamer*: *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>*Sivho*: *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type; | Genesys Suite 7 teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, agent skills stored in a Workforce database. *See, e.g.*, UR7 RM, pp. 111-112; UR7 GSG, p. 18. |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | Genesys Suite 7 teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, target specification DN. *See, e.g.*, UR 7 GSG, p. 38.<br><br>This claim element was well-known in the art, and further, Genesys Suite 7 can be combined with any of the following:<br><br>*Venkatesh*: *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32.<br><br>*Friedman*: *See, e.g.*, ¶¶ 0024.<br><br>*Sassin*: *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>*Dhir*: *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>*Gabriel*: *See, e.g.*, Fig. 2, col. 5:20-29. |

| Claim Language | Genesys Suite 7 |
|---|---|
|  | <u>Judkins</u>:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br><u>HiPath</u>:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | Genesys Suite 7 teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, indentifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, routing to an agent based on a customer's query. *See, e.g.*, UR 7 GSG, p. 38. |
| **2.**   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.<br><br>Genesys Suite 7 teaches establishing a real time communicate path between the user and the expert, for example, a telephone call.  *See, e.g.*, UR 7 GSG, pp. 14, 38. |
| **3.**   The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>Genesys Suite 7 teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a telephony connection or a voice over internet protocol connection. *See, e.g.*, UR 7 GSG, pp. 14, 38. |
| **4.**   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>Genesys Suite 7 teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, based on agent skill level.  *See, e.g.*, UR 7 RM, pp. 88, 102-106; UR 7 GSG, p. 18. |
| **5.**   The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the | *See* Claim 4.<br><br>Genesys Suite 7 teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, |

| Claim Language | Genesys Suite 7 |
|---|---|
| user, and indicators within a predetermined profile associated with an organization to which the user is a member. | for example, based on an expert's skill level, or based on customer profile information. *See, e.g.*, UR 7 RM, pp. 88, 102-106; UR 7 GSG, pp. 17, 18. |
| **6.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>Genesys Suite 7 teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, user options in a routing strategy in different languages. *See, e.g.*, UR7 GSG, pp. 14-15, 40.<br><br>Further, this claim element was well-known in the art, and Genesys Suite 7 can be combined with any of the following:<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0044, 0045.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge within a field of interest. | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest" was well-known in the art, and Genesys Suite 7 can be combined with any of the following:<br><br>Venkatesh:  See, e.g., Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  See, e.g., Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  See, e.g., ¶¶ 0045.<br><br>Sivho:  See, e.g., Fig. 2, col. 3:47-4:7; col. 4:20-54. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in | *See* Claim 1.<br><br>The element "each layer of inquiry type is comprised of the underlying criteria groupings |

| Claim Language | Genesys Suite 7 |
|---|---|
| user-centric terms. | composed in user-centric terms" was well-known in the art, and Genesys Suite 7 can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 4:25-6:18.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, ¶¶ 0045, 0048, 0049.<br><br>Sivho:  *See, e.g.*, Fig. 2, col. 3:47-4:7; col. 4:20-54.<br><br>Hekmatpour:  *See, e.g.*, col. 22:65-23:18. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>Genesys Suite 7 teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, based on customer profile information.  *See, e.g.*, UR 7 GSG, p. 17. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>The claim element "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" was well-known in the art, and further, Genesys Suite 7 can be combined with any of the following:<br><br>McFarlane:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br>KnowledgeShare:  *See, e.g.*, pp. 20, 22-23, Sect. 5, 5.3.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 4.<br><br>Sassin:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br>Lauffer:  *See, e.g.*, col. 5:36-65, claims 1 and 10. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | <u>Judkins</u>:  *See, e.g.*, col. 11:47-56.<br><br><u>Venkatesh</u>:  *See, e.g.*, col. 6:35-67.<br><br><u>Creamer</u>:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | The claim element "the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order" was well-known in the art, and further, Genesys Suite 7 can be combined with any of the following:<br><br><u>McFarlane</u>:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40.<br><br><u>KnowledgeShare</u>:  *See, e.g.*, p. 20, Sect. 5.<br><br><u>XpertShare 2.0</u>:  *See, e.g.*, Slide 4.<br><br><u>Sassin</u>:  *See, e.g.*, col. 4:1-15; col. 7:41-67.<br><br><u>Lauffer</u>:  *See, e.g.*, col. 7:40-67.<br><br><u>Judkins</u>:  *See, e.g.*, col. 11:47-56.<br><br><u>Venkatesh</u>:  *See, e.g.*, Fig. 4, col. 6:35-67.<br><br><u>Creamer</u>:  *See, e.g.*, ¶¶ 0038, 0039, 0040. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>The claim element "wherein the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement" is well-known in the art, and further Genesys Suite 7 can be combined with any of the following:<br><br><u>Venkatesh</u>:  See, e.g., Fig. 4, col. 6:35-67.<br><br><u>Creamer</u>:  See, e.g., Fig. 3, ¶¶ 0038, 0039, 0040. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | <u>Sivho</u>:  See, e.g., Figs. 2, 3, col. 4:41-5:6.<br><br><u>Sassin</u>:  *See, e.g.*, col. 4:1-15.<br><br><u>Lauffer</u>:  *See, e.g.*, col. 5:36-65.<br><br><u>McFarlane</u>:  *See, e.g.*, col. 8:45-9:10, col. 9:12-40. |
| **12.**  A match and route system operable to locate a live expert comprising: | To the extent that the preamble is considered limiting, Genesys Suite 7 teaches a match and route system operable to locate a live expert, for example, using skills-based routing in a call center application.  *See, e.g.*, UR7 GSG, pp. 17-18; EC7 UG, pp. 11-16, 25-27. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | Genesys Suite 7 teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, agent desktops.  *See, e.g.*, UR 7 GSG, p. 38. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | Genesys Suite 7 teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, the Universal Routing Server.  *See, e.g.*, UR 7 GSG, pp. 40-41. |
| the host server communicably connected with an inquiry-type database and a skill-set database; | Genesys Suite 7 teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, a workforce database and a configuration database.  *See, e.g.*, UR 7 GSG, p. 42. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | <br><br>**Figure 6: Network Routing Architecture** |
| the inquiry-type database containing at least two layers of inquiry types, the layers of | Genesys Suite 7 teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings |

| Claim Language | Genesys Suite 7 |
|---|---|
| inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, user options in a routing strategy in different languages. *See, e.g.*, UR7 GSG, pp. 14-15, 40; UR 7 Strategy, pp. 48-54.<br><br>Further, this claim element was well-known in the art, and Genesys Suite 7 can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-51; col. 4:3-24.<br><br>Csaszar:  *See, e.g.*, Fig. 1, col. 1:51-61; col. 3:22-36; col. 4:52-65; col. 6:28-51; col. 7:12-24; col. 8:55-9:9.<br><br>Padalino:  *See, e.g.*, Fig. 1, col. 6:9-26; col. 7:18-40, col. 7:61-8:20; col. 17:49-57.<br><br>Butler:  *See, e.g.*, Fig. 1, col. 2:34-58; col. 4:58-5:15; col. 5:31-52; col. 8:31-61.<br><br>Creamer:  *See, e.g.*, Fig. 1, ¶¶ 0009, 0011, 0021, 0023, 0031, 0033, 0044, 0045.<br><br>Sivho:  *See, e.g.*, Figs. 2, 6, col. 3:47-4:7; col. 4:20-54; col. 6:46-54.<br><br>Hekmatpour:  *See, e.g.*, col. 15:34-52. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | Genesys Suite 7 teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, agent skills stored in a Workforce database.  *See, e.g.*, UR7 RM, pp. 111-112; UR7 GSG, p. 18. |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | Genesys Suite 7 teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, target specification DN.  *See, e.g.*, UR 7 GSG, p. 38.<br><br>This claim element was well-known in the art, and further, Genesys Suite 7 can be combined with any of the following:<br><br>Venkatesh:  *See, e.g.*, Figs. 7, col. 4:4-6:18; col. 7:25-32. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | Friedman:  *See, e.g.*, ¶¶ 0024.<br><br>Sassin:  *See, e.g.*, col. 6:39-67; col. 10:29-50.<br><br>Dhir:  *See, e.g.*, col. 8:1-15; col. 11:62-12:43.<br><br>Gabriel:  *See, e.g.*, Fig. 2, col. 5:20-29.<br><br>Judkins:  *See, e.g.*, Figs. 21, 25, 31, col. 18:5-18; col. 18:49-58; col. 19:24-29.<br><br>HiPath:  *See, e.g.*, HiPath UG, Sect. 2.3.2, Sect. 4.2.2, Sect. 4.2.3, Sect. 9.3.1, Sect. 9.3.2, Sect. 10.4.2.1, pp. X-35, Table 7-3, pp. 14-16, 14-17. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | Genesys Suite 7 teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, routing to an agent based on a customer's query.  *See, e.g.*, UR 7 GSG, p. 38. |
| **13.** The match and route system of claim 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | *See* Claim 12.<br><br>The claim element "wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet" was well-known in the art, and further, Genesys Suite 7 can be combined with any of the following:<br><br>Lauffer:  *See, e.g.*, col. 2:11-24; col. 5:66-6:7; col. 9:5-14.<br><br>XpertShare 2.0:  *See, e.g.*, Slide 8.<br><br>KnowledgeShare:  *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8.<br><br>Friedman:  *See, e.g.*, ¶¶ 0047, 0048. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12. Genesys Suite 7 teaches that the communication network is the Internet, for example, an Ethernet connection.  *See, e.g.*, UR 7 GSG, Fig. 6, p. 47. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12. Genesys Suite 7 teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, a chat session. *See, e.g.*, UR 7 GSG, p. 74; UR 7 RM, p. 101. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12. The claim element "wherein the host server is communicably connected with the database by the Internet" was well-known in the art, and further, Genesys Suite 7 can be combined with any of the following:  Neuberger:  *See, e.g.*, Fig. 1, col. 3:12-23.  Andrews:  *See, e.g.*, col. 5:14-30.  Dhir:  *See, e.g.*, col. 5:6-19.  Sassin:  *See, e.g.*, Fig. 1, col. 2:66-67; col. 7:1-13; col. 9:20-40.  Lauffer:  *See, e.g.*, col. 1:50-51; col. 5:66-6:7.  Judkins:  *See, e.g.*, Fig. 1, col. 5:27-48.  Gabriel:  *See, e.g.*, col. 3:20-30.  Venkatesh:  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25.  Creamer:  *See, e.g.*, ¶ 0021. |

| Claim Language | Genesys Suite 7 |
|---|---|
| | |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>Genesys Suite 7 teaches that the host server is communicably connected with the databases by a local area network, or a wide area network.  *See, e.g.*, UR 7 GSG, p. 39. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>Genesys Suite 7 teaches that the host server is configured in a multi-server architecture, for example, an enterprise routing architecture.  *See, e.g.*, UR 7 GSG, p. 39. |

**Appendix B-13**

**Prior Art Invalidity Chart For U.S. Patent No. 7,499,903 Based on KnowledgeShare Product and "KnowledgeShare User Manual"**

The product KnowledgeShare was sold or offered for sale by at least 2002.  The document "KnowledgeShare User Manual" was published by XpertUniverse and/or its predecessors-in-interest. It is prior art under at least 35 U.S.C. 102(a) and (b).

Based on the claim construction positions XpertUniverse appears to be asserting and the application of those claim constructions to Cisco's products in XpertUniverse's infringement contentions, KnowledgeShare anticipates and renders obvious, alone, or in combination with with other prior art identified by Cisco's Invalidity Contentions, the asserted claims as described below.  These invalidity contentions are not an admission by Defendant that the accused products, including any current or past version of these products, are covered by, or infringe these claims, particularly when the claims are properly construed. Any references to documents made herein should be understood to identify both the document itself and any products, prototypes, public uses, associated knowledge, and other actual embodiments of the devices and method described therein.

A person of ordinary skill in the art would have been motivated to combine KnowledgeShare with the other references set forth in this chart, for at least the following reasons: a person of skill in the art would be motivated to combine the prior art because it addresses similar problems in a similar prior; a person of skill in the art would be motivated to combine the prior art because it is in the same field of art; a person of skill in the art would have combined the prior art elements according to known methods in order to yield predictable results; a person of skill in the art would have known to substitute one prior art element for another to obtain a predictable result; a person of skill in the art would have known to apply the same improvement technique in the same way to the base devices in order to achieve predictable results; a person of skill in the art would have known that applying a known technique would have yielded a predictable result and an improved system, method, or product; there was a recognized need or problem in the art and a person of skill in the art would have pursued the known potential solution with a reasonable expectation of success; a person of skill in the art, in view of design incentives or other market forces, could have implemented a known variation that would have been predictable to one of ordinary skill in the art; and the prior art contains some teaching, suggestion, or motivation that would have led one of ordinary skill in the art to modify and/or combine the prior art references. The above-identified examples are given merely to illustrate various motivations to combine and are not intended to provide an exhaustive list of every possible motivation which may apply. Nor is such a list required by under any applicable law or rules.

To the extent that KnowledgeShare is deemed not to disclose, explicitly or inherently, any limitation of an asserted claim, Cisco reserves the right to argue that any differences between the reference and the corresponding claim limitations would have been obvious to one of ordinary skill in the art even if it has not been specifically noted that the reference is to be combined with the knowledge of a person of ordinary skill in the art.  Any reference to other prior art within a claim limitation should be understood to mean that a person of ordinary skill in the art would be motivated to combine KnowledgeShare with the additional listed prior art. Moreover, when other prior art is listed within a claim limitation, it should be understood that a person of ordinary skill in the art would be motivated to combine those references with the other invalidity charts for this patent in the same manner.

To the extent a citation is further explained by reference to a Figure in a prior art reference, such a Figure shall be considered to be included in the citation.  Cisco incorporates, in full, all prior art references cited in KnowledgeShare.  Discovery and investigation is ongoing, and Cisco reserves the right to supplement these contentions.  To the extent XpertUniverse asserts that any claim is infringed, but did not explicitly identify that claim in its Disclosure of Asserted Claims, Cisco hereby reserves the right to amend these invalidity contentions to consider the newly added claims and/or argue that XpertUniverse is precluded from adding any claims not so identified.

The following prior art references are cited in the table below as references that may be combined with KnowledgeShare to render one or more of the claims obvious:

- U.S. Patent No. 7,120,647 to Venkatesh et al. ("Venkatesh")

- U.S. Patent Application No. 2004/0122941 to Creamer et al. ("Creamer")

- U.S. Patent No. 5,546,452 to Andrews et al. ("Andrews")

- U.S. Patent No. 6,456,619 to Sassin et al.  ("Sassin")

- U.S. Patent No. 6,223,165 to Lauffer ("Lauffer")

- U.S. Patent No. 6,587,556 to Judkins et al., ("Judkins")

- U.S. Patent No. 6,560,330 to Gabriel ("Gabriel")

- U.S. Patent No. 6,553,113 to Dhir et al. ("Dhir")

- Siemens HiPath ProCenter Standard and Advanced Suites ("HiPath") as described in Siemens HiPath Pro Center Standard and Advanced Suites 4.0 User Guide ("HiPath UG")

- Genesys Suite 7, including Genesys Universal Routing 7 and Genesys Expert Contact 7 ("Genesys Suite 7") as described in Genesys Universal Routing 7 Getting Started Guide ("UR7 GSG")

| Claim Language | KnowledgeShare |
|---|---|
| **1.**   A method of semantic to non-semantic routing to locate a live expert comprising the steps of: | To the extent that the preamble is held to be limiting, KnowledgeShare teaches a method of semantic to non-semantic routing to locate a live expert, for example, the KnowledgeShare platform.  *See, e.g.,*  pp. 10, 19, 26-27, 31, 56, Sect. 3.2, 5, 6.1.1, 7, 10.1. |
| providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors; | KnowledgeShare teaches providing an inquiry-type computer database populated with a first layer of predetermined semantically-expressed inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, for example, inquiry types displayed on a Get Assistance page.  *See, e.g.,* pp. 19, 20, Sect. 5, 5.1. |

| Claim Language | KnowledgeShare |
|---|---|
| | <br>Get Assistance page |
| associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types; | KnowledgeShare teaches associating in the database one or more other layers of inquiry types with the underlying criteria groupings, the one or more other layers of inquiry types having a one-to-one correspondence with the first layer of predetermined semantically-expressed inquiry types, for example, additional layers of inquiry types on a Get Assistance Page. *See, e.g.*, p. 20, Sect. 5.1. |

| Claim Language | KnowledgeShare |
|---|---|
| | <br><br>Get Assistance page |
| supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one | KnowledgeShare teaches supplying a skill-set database that includes an entry that associates at least one expert with one of the predetermined semantically-expressed inquiry types and its corresponding layers, the expert having individualized knowledge of at least one criteria from the underlying criteria grouping for the associated inquiry type, for example, using the "View Skillset" function.  *See, e.g.*, pp. 25-26, 56, Sect. 6.1.1, 10.1. |

| Claim Language | KnowledgeShare |
|---|---|
| criteria from the underlying criteria grouping for the associated inquiry type; |   **View Skill Set Window** |
| mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier; and | KnowledgeShare teaches mapping each skill-set database entry to the associated inquiry type in the inquiry type database through a unique numerical routing identifier, for example, mapping a skillset to inquiry types.  *See, e.g.*, pp. 26-27, 56, Sect. 6.1.1, 10.1. |
| upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user. | KnowledgeShare teaches upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type, identifying the expert through the numeric routing identifier associated with the predetermined semantically-expressed inquiry type requested by the user, for example, a user enters in a request on the Get Assistance page, and uses KnowledgeShare's match and route function.  *See, e.g.*, p. 10, 20, Sect. 3.2, 5.1. |
| **2.**   The method of claim 1, further comprising the step of establishing a real time communication path between the user and the expert. | *See* Claim 1.  KnowledgeShare teaches establishing a real time communicate path between the user and the expert, for example, a VoIP connection or a video connection.  *See, e.g.*, pp. 10, 11, 18, 32-34, |

| Claim Language | KnowledgeShare |
|---|---|
| | 35-37, 39-47, 64-68; Sect. 3.2, 3.3, 4.2, 7.1, 7.2, 8, Appx. A. |
| **3.**   The method of claim 2, wherein the communication path is at least one of an internet connection, a telephony connection, a video telephony connection, and a voice over internet protocol connection. | *See* Claim 1.<br><br>KnowledgeShare teaches the communication path is at least one of an internet connection, a telephony connection, a video telephone connection, and voice over internet protocol connection, for example, a VoIP connection or a video connection.  *See, e.g.*, pp. 10, 11, 18, 32-34, 35-37, 39-47, 64-68; Sect. 3.2, 3.3, 4.2, 7.1, 7.2, 8, Appx. A. |
| **4.**   The method of claim 1, further comprising the step of meritoriously ranking the expert, wherein a most meritorious available expert is placed in communication with the user. | *See* Claim 1.<br><br>KnowledgeShare teaches meritoriously ranking the expert, wherein a most meritorious available expert is place in communication with the user, for example, for example, using expert skill levels.  *See, e.g.*, p. 10, 31, 56, Sect. 3.2, 7, 10.1. |
| **5.**   The method of claim 4, wherein the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member. | *See* Claim 4.<br><br>KnowledgeShare teaches that the expert's rank includes at least one of the level of the expert's individualized knowledge, indicators within a predetermined profile of the user, and indicators within a predetermined profile associated with an organization to which the user is a member, for example, based on the expert's skill level, or according to information in a user profile.  *See, e.g.*, p. 10, 22, 31, 56, Sect. 3.2, 5.3, 7, 10.1. |
| **6.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages. | *See* Claim 1.<br><br>KnowledgeShare teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in different languages, for example, by a user's preferred language.  *See, e.g.*, p. 20, 54, Sect. 5. |
| **7.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in jargon specific to differing levels of knowledge | *See* Claim 1.<br><br>KnowledgeShare teaches each layer of inquiry type is comprised of the underlying groupings composed in jargon specific to differing levels of knowledge within a field of interest, for |

| Claim Language | KnowledgeShare |
|---|---|
| within a field of interest. | example, by allowing a user to select a "level" of knowledge.  *See, e.g.*, p. 9, 20, Sect. 3.2, 5. |
| **8.**   The method of claim 1, wherein each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms. | *See* Claim 1.<br><br>KnowledgeShare teaches each layer of inquiry type is comprised of the underlying criteria groupings composed in user-centric terms, for example, using "intuitive" terms to the user.  *See, e.g.*, p. 9, Sect. 3.2. |
| **9.**   The method of claim 1, further comprising the step of selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile. | *See* Claim 1.<br><br>KnowledgeShare teaches selecting one of the layers of inquiry type for presentation of the underlying criteria grouping to the user based on a predetermined user profile, for example, a user's role or profile information.  *See, e.g.*, pp. 18, 22-23, 53-54, Sect. 4.3, 10.1, 5.3. |
| **10.** The method of claim 9, further comprising the step of receiving from the user a response to the presentation of a first member of the underlying criteria grouping; and | *See* Claim 9.<br><br>KnowledgeShare teaches receiving from the user a response to the presentation of a first member of the underlying criteria grouping, for example, using a Get Assistance Page.  *See, e.g.*, p. 20, 22-23, Sect. 5, 5.3. |
| the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order. | KnowledgeShare teaches the response triggering the presentation of further members of the underlying criteria grouping in a predetermined order, for example, additional selections in a drop-down menu, or a list of preferred experts.  *See, e.g.*, p. 20, Sect. 5. |
| **11.** The method of claim 10, wherein the predetermined order is one of a hierarchal arrangement, an independent arrangement, and combination hierarchal/independent arrangement. | *See* Claim 10.<br><br>KnowledgeShare teaches that the predetermined order is one of a hierarchical arrangement, an independent arrangement, and combination hierarchical/independent arrangement, for example, a hierarchical drop-down menu.  *See, e.g.*, p. 20, Sect. 5. |
| **12.** A match and route system operable to | To the extent that the preamble is considered limiting: |

| Claim Language | KnowledgeShare |
|---|---|
| locate a live expert comprising: | KnowledgeShare teaches a match and route system operable to locate a live expert, for example, the KnowledgeShare platform.  *See, e.g.*,  pp. 10, 19, 26-27, 31, 56, Sect. 3.2, 5, 6.1.1, 7, 10.1. |
| at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device; | KnowledgeShare teaches at least first and second multimedia computers connected to a communication network, each multimedia computer including a bidirectional audio or audio/visual device, for example, computers of seekers and experts.  See, e.g., pp. 15-18, 64-68, Sect. 4.2, 13.1. |
| a host server connected to the communication network and operable to support interactive communication between a seeker and an expert; | KnowledgeShare teaches a host server connected to the communication network and operable to support interactive communication between a seeker and an expert, for example, a match and route engine.  *See, e.g.*, pp. 9-10, Sect. 3.2. |
| the host server communically connected with an inquiry-type database and a skill-set database; | KnowledgeShare teaches the host server communicably connected with an inquiry-type database and a skill-set database, for example, match and route engine accessing inquiry types and expert skill sets.  *See, e.g.*, pp. 9-10, 19, 20, 26-27, 56, Sect. 3.2, 5, 6.1.1, 10.1. |
| the inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types; | KnowledgeShare teaches that the inquiry-type database contains at least two layers of inquiry types, the layers of inquiry types are organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types, for example, additional layers of inquiry types on a Get Assistance Page.  *See, e.g.*, p. 20, Sect. 5.1. |
| the skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping; | KnowledgeShare teaches that the skill-set database contains at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping, for example, using the "View Skillset" function.  *See, e.g.*, pp. 25-26, 56, Sect. 6.1.1, 10.1. |

| Claim Language | KnowledgeShare |
|---|---|
| | <br><br>**View Skill Set Window** |
| a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database; and | KnowledgeShare teaches a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database, for example, mapping a skillset to inquiry types. *See, e.g.*, pp. 26-27, 56, Sect. 6.1.1, 10.1. |
| the host sever, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier. | KnowledgeShare teaches that the host server, upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type, operable to identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user by use of the numeric routing identifier, for example, a user enters in a request on the Get Assistance page, and uses KnowledgeShare's match and route function. *See, e.g.*, p. 10, 20, Sect. 3.2, 5.1. |
| **13.** The match and route system of claim | *See* Claim 12. |

| Claim Language | KnowledgeShare |
|---|---|
| 12, wherein the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet. | KnowledgeShare teaches that the bidirectional audio/visual device is at least one of a webcam, an electronic whiteboard, or a tablet, for example, an electronic whiteboard or video. *See, e.g.*, pp. 10, 18, 32-37, 39-47, Sect. 3.2, 4.2, 8. |
| **14.** The match and route system of claim 12, wherein the communication network is the Internet. | *See* Claim 12.<br><br>KnowledgeShare teaches that the communication network is the Internet. *See, e.g.*, pp. 10, 17, 64-68, Sect. 3.2, 4.2, 13.1. |
| **15.** The match and route system of claim 12, wherein the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing. | *See* Claim 12.<br><br>KnowledgeShare teaches that the interactive communication is instant messaging, web conferencing, or a combination of instant messaging and web conferencing, for example, a chat or video chat session. *See, e.g.*, pp. 10, 18, 32-37, 39-47, 62, Sect. 3.2, 4.2, 8, 12. |
| **16.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by the Internet. | *See* Claim 12.<br><br>KnowledgeShare teaches that the host server is communicably connected with the database by the Internet. *See, e.g.*, p. 11, Sect. 3.3. |
| **17.** The match and route system of claim 12, wherein the host server is communicably connected with the databases by a local area network, or a wide area network. | *See* Claim 12.<br><br>KnowledgeShare teaches that the host server is communicably connected with the databases by a local area network, or a wide area network. *See, e.g.*, pp. 9-10, Sect. 3.2.<br><br>This element was well-known in the art, and further, KnowledgeShare can be combined with any of the following:<br><br>*Andrews*: *See, e.g.*, col. 5:14-30. |

| Claim Language | KnowledgeShare |
|---|---|
| | Dhir:  *See, e.g.*, col. 5:6-19.<br><br>Sassin:  *See, e.g.*, col. 3:10-48.<br><br>Lauffer:  *See, e.g.*, col. 1:50-51; col. 5:66-6:7.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 6:27-41.<br><br>Gabriel:  *See, e.g.*, col. 3:20-30.<br><br>Venkatesh:  *See, e.g.*, Figs. 1, 2, col. 2:56-3:25.<br><br>Creamer:  *See, e.g.*, ¶ 0021. |
| **18.** The match and route system of claim 12, wherein the host server is configured in a multi-server architecture. | *See* Claim 12.<br><br>KnowledgeShare teaches that the host server is configured in a multi-server architecture.  *See, e.g.*, pp. 9-10, Sect. 3.2.<br><br>This element was well-known in the art, and further KnowledgeShare can be combined with any of the following:<br><br>Andrews '452:  *See, e.g.*, Fig. 5, col. 7:53-8:15.<br><br>Judkins:  *See, e.g.*, Fig. 1, col. 5:27-42.<br><br>Venkatesh:  *See, e.g.*, Figs. 3A, 3B, col. 3:26-4:2.<br><br>HiPath:  *See, e.g.*, HiPath UG, Fig. 3-8.<br><br>Genesys Suite 7:  *See, e.g.*, UR 7 GSG, p. 39. |

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | |
| Plaintiff and Counterdefendant, | ) | |
| | ) | C.A. No. 09-157 (RGA) |
| v. | ) | |
| | ) | REDACTED - PUBLIC VERSION |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant and Counterplaintiff. | ) | |

**DEFENDANT AND COUNTERPLAINTIFF CISCO SYSTEMS, INC.'S
OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT NO. 2 FOR INVALIDITY OF U.S. PATENT NOS. 7,366,709 AND 7,499,903
BASED ON 35 U.S.C. § 102(B) (COUNTS I & II)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant/Counterplaintiff Cisco
Systems, Inc.*

OF COUNSEL:

MORGAN, LEWIS & BOCKIUS LLP

Kell M. Damsgaard
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

October 31, 2012 - Original Filing Date
November 7, 2012 - Redacted Filing Date

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................................ ii

I.     NATURE AND STAGE OF THE PROCEEDINGS ........................................ 1

II.    SUMMARY OF ARGUMENT ...................................................................... 1

III.   STATEMENT OF RELEVANT FACTS ........................................................ 2

       A.     XpertUniverse Was Founded As Homework911, Selling Niche-Market
              Educational Software .......................................................................... 2

       B.     XU's Extensive – And Unsuccessful – Attempts To Sell XpertSHARE ............... 3

       C.     XU's Efforts To Protect Its Purported Intellectual Property ................................ 5

              1.     ██████████████████████ ........................................... 5

              2.     XU's Patent Prosecution Strategy .......................................... 6

       D.     ██████████████████████████ .................................................. 6

       E.     XU Sues Cisco in 2009 .................................................................... 6

IV.    THE '709 AND '903 PATENTS ARE INVALID .......................................... 7

       A.     Relevant Legal Principles ................................................................ 7

       B.     XpertSHARE Embodied The Claims Of The '709 Patent Before The
              Patent's Critical Date. ...................................................................... 8

       C.     ██████████████████████████████
              ██████. ...................................................................... 12

       D.     ██████████████████████████████
              ████████. ................................................................... 13

V.     CONCLUSION .......................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**C** **A** SES
**P** AGE (S )

*Adenta GmbH v. Orthoarm, Inc.*,
  501 F.3d 1364 (Fed. Cir. 2007)................................................................................8, 14

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
  560 F.3d 1317 (Fed. Cir. 2009)................................................................................8, 14

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
  527 F.3d 1318 (Fed. Cir. 2008)........................................................................................8

*Microsoft Corp. v. i4i Ltd. P'ship.*,
  131 S. Ct. 2238 (2011) ....................................................................................................8

*Minton v. Nat'l Assoc. of Secur. Dealers*,
  336 F.3d 1373 (Fed. Cir. 2003)........................................................................................7

*Paragon Podiatry Lab. Inc. v. KLM Labs. Inc.*,
  984 F.2d 1182 (Fed. Cir. 1993)........................................................................................7

*Pfaff v. Wells Electronics, Inc.*,
  525 U.S. 55 (1999) ...........................................................................................................7

**S** TATUTES

35 U.S.C. § 102(b) .................................................................................................*passim*

## I.     NATURE AND STAGE OF THE PROCEEDINGS

On March 10, 2009, Plaintiff XpertUniverse, Inc. ("XU") sued Cisco Systems, Inc. ("Cisco") for, among other things, alleged patent infringement.  *See* D.I. 2.  XU's Fourth Amended Complaint, the operative complaint, asserts claims against Cisco for infringement of U.S. Patent No. 7,366,709 ("'709 Patent") and U.S. Patent No. 7,499,903 ("'903 Patent").  *See* D.I. 82.  Cisco has moved for summary judgment of the invalidity of those patents under 35 U.S.C. § 102(b).  This is Cisco's opening brief in support of that motion.

## II.     SUMMARY OF ARGUMENT

The asserted patents are invalid under 35 U.S.C. § 102(b).[1]  More than a year before filing its patent applications, ███████████████████████████████████████ ███████████████████████████████.  Notwithstanding XU's litigation-inspired denials, there is overwhelming evidence that ████████████████████████████████ including, but not limited to, the following:

- ███████████████████████████████████████████
  ███████████████████████████████████████████
  █████████████████████████████████

- ███████████████████████████████████████████
  ███████████████████████████████████████████
  ██████████████████████

- ███████████████████████████████████████████
  ██████████████████████████████████

---

[1] As Cisco has alleged and as its expert has opined, there are numerous other bases for invalidity of the asserted XU patents.  However, for purposes of this motion, Cisco focuses only on invalidity based on § 102(b).



*See* Ex. 15.[2]

Indeed, XU entered into a fully executed license agreement for XpertSHARE with Allstate Insurance Company more than a year before filing the patent applications.[3]

## III.     STATEMENT OF RELEVANT FACTS

### A.     XpertUniverse Was Founded As Homework911, Selling Niche-Market Educational Software

XU, initially called Homework911.com, was founded in 1999.  D.I. 82 (FAC) ¶ 24. Homework911.com developed an educational software platform named homework911 that enabled students to locate and work with suitable tutors on the internet.  Ex. 16 at 5.

---

[2] Unless otherwise noted, all exhibits cited herein are attached to the Omnibus Declaration of Brett M. Schuman in Support of Cisco's Motions for Partial Summary Judgment Nos. 1-11 and Motions to Exclude Expert Reports of Walter Bratic and Illah Nourbakhsh ("Omnibus Decl."), filed concurrently herewith.

[3] XU did not to produce this license agreement in response to Cisco's discovery requests.  Cisco obtained it only in response to a third-party subpoena to Allstate.  Declaration of Ryan L. Scher in Support of Cisco's Opening Brief in Support of its Motion for Partial Summary Judgment For Invalidity of U.S. Patent Nos. 7,366,709 and 7,499,903 ("Scher Declaration") ¶ 2.

Homework911.com subsequently changed its name to LearningIDEAS, and changed the product name to KnowledgeSHARE. *Id.* The company name was subsequently changed to XpertUniverse ("XU"), and the product name was changed to XpertSHARE. *Id.* at 6. Notwithstanding all the name changes, according to XU, homework911, KnowledgeSHARE and XpertSHARE are essentially the same product.[4] *Id.*

According to XU, XpertSHARE is a software platform that allows seekers to locate and collaborate with experts who can address the seeker's inquiry. Ex. 4 at 8. XpertSHARE consists of largely off-the-shelf, third-party software – a Genesys routing engine (for routing a "seeker's" inquiry to an "expert"), IBM's Sametime product (for collaboration between the user and the expert), and a configurable user interface (called "Get Assistance") created by Exigen. Scher Decl. Ex. 1 at 19:7-18. To this combination, XU allegedly added ████████████████████. Scher Decl. Ex. 2 at 8:16-10:5, 13:22-14:4. ████████████████████████████████ ████████████████████████. *See* Scher Decl. Ex. 5 at 60:6-9.

### B. XU's Extensive – And Unsuccessful – Attempts To Sell XpertSHARE

████████████████████████████████████[5] ████████████████
████████████████████████████████. *See* Scher Decl. Exs. 1 at 68:4-10; 6 at 71:25-110:22. XU gave numerous live demonstrations of XpertSHARE to potential customers. *See* Scher Decl. Exs. 1 at 85:20-86:2; 6 at 71:25-110:22.

---

[4] For convenience, Cisco will refer to the company as XU and the product as "XpertSHARE" throughout this motion.

[5] Around the same time, an established call center company named Genesys Telecommunications Laboratories, Inc. began marketing and selling a product called Genesys Expert Contact. According to Genesys, ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████ Ex. 17 at 5.

███████████████████████████████████████████████████████████

████████████████████. *See* Scher Decl. Ex. 6 at 112:14-23, 165:5-12, 183:2-9.

In December 2002, Allstate Insurance Company paid XU ████████ for a license to its technology for a "pilot." *See* Exs. 19-21; Scher Decl. Ex. 6 at 179:17-181:8. After the pilot, Allstate decided not to continue with XU. Other documents reflect ███████████████████████ ████████████████████████████████████, for example:

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 22.

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 23; *see also* Ex. 24.

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 25.[6]

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[6] XU did not produce the ██████ it refers to here.



Ex. 26.

*See* Exs. 27-30.

XU created user manuals for KnowledgeSHARE and XpertSHARE in support of these efforts. *See* Exs. 4-5. The KnowledgeSHARE User Manual has a 2002 copyright date. *See* Ex. 5. XU also created documents summarizing its ███████████████████████████████████████████████████████████████████████████████. *See, e.g.*, Exs. 31-37.

XU's efforts to sell XpertSHARE ultimately failed – the market rejected the product. Scher Decl. Ex. 1 at 21:20-22:14. According to XU, ██████████████████. Scher Decl. Ex. 6 at 9:10-12.

C.    **XU's Efforts To Protect Its Purported Intellectual Property**

1.    ████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* Scher Decl. Ex. 6 at 244:3-245:4. ███████████████████████████████████████████████████.[7] *See* Ex. 9 at 3. ████████████████████████████████████████████████████████████. *See generally*, Scher Decl. Exs. 2-4. ████████████████████████████████████████████

---

[7] These recordings were produced by ipCapital and have since been transcribed. *See* Scher Decl. Exs. 2-4.



t ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Scher Decl. Ex. 2 at 23:8-24:3; *see generally*, Ex. 9 at 158 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 9 at 3, 9-15 ▮▮▮▮▮▮▮▮▮▮▮▮, 16-20 ▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮ Ex. 10.

**2.    XU's Patent Prosecution Strategy**

On April 2, 2004, XU filed a provisional patent application which comprised a PowerPoint presentation describing XpertSHARE. Ex. 3. On March 31, 2005, XU filed a utility application claiming priority to this provisional application, which issued as the '709 Patent, entitled "System and Method For Managing Questions and Answers Using Subject Lists Styles." *See* Ex. 1, D.I. 82 (Count I). XU filed another patent application on January 24, 2005, which issued as the '903 Patent – the other patent XU is asserting against Cisco. *See* D.I. 82 (Count II); Ex. 2.

**D.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Scher Decl. Exs. 6 at 50:2-13; 7 at 32:9-21. XU continued prosecuting its patents, however. The '709 Patent issued April 29, 2008, and the '903 Patent issued March 3, 2009. *See* Exs. 1, 2.

**E.    <u>XU Sues Cisco in 2009</u>**

In March 2009, XU sued Cisco claiming, among other things, infringement of the '709 and '903 Patents by two Cisco products: Expert Advisor and TelePresence Expert on Demand. *See* D.I. 2 (Complaint). In October 2011, XU filed the operative complaint, its Fourth Amended

Complaint, purporting to accuse additional Cisco products of infringing the '709 and '903 Patents. *See* D.I. 82 (FAC).

As set forth in Cisco's Motion for Terminating Sanctions (D.I. 293), ███████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████.

Even without those documents, however, the evidence of invalidity of the '709 and '903 Patents is compelling.

## IV.     <u>THE '709 AND '903 PATENTS ARE INVALID</u>

### A.     <u>Relevant Legal Principles</u>

Section 102(b) of the Patent Act contains a number of "statutory bars" to patentability. *See* 35 U.S.C. §102(b). These statutory bars preclude patentability if certain activities occur more than one year before the filing of a patent application, *i.e.*, the so-called "critical date."

<u>The "on-sale" bar</u>. This statutory bar "applies when two conditions are satisfied before the critical date. First, the product [embodying the patented invention] must be the subject of a commercial offer for sale . . . . Second, the invention must be ready for patenting." *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1999). A single sale or offer to sell a product embodying the invention prior to the critical date is enough to bar patentability. *Paragon Podiatry Lab. Inc. v. KLM Labs. Inc.*, 984 F.2d 1182, 1188 (Fed. Cir. 1993). For method claims, an offer for sale occurs when a patentee conveys that which would enable a buyer to practice each step of the method, *e.g.*, software embodying the claimed method. *See Minton v. Nat'l Assoc. of Secur. Dealers*, 336 F.3d 1373, 1378 (Fed. Cir. 2003) (holding that providing a computer program embodying the claimed method constituted an offer to sell).

<u>The "public use" bar</u>. For invalidity based on public use, the record must demonstrate that an embodiment of the patented invention was in public use as defined by the statute before

the critical date. *Adenta GmbH v. Orthoarm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007). "A public use includes any public use of the claimed invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy or confidentiality" prior to the critical date. *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009).

Summary judgment under 35 U.S.C. § 102(b) is appropriate if the record reveals no genuine dispute of material fact. *Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318, 1321 (Fed. Cir. 2008); *Clock Spring*, 560 F.3d at 1326. Patent invalidity must be proved by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship.*, 131 S. Ct. 2238, 2242 (2011).

**B.      XpertSHARE Embodied The Claims Of The '709 Patent Before The Patent's Critical Date**

The '709 Patent covers a method and system to "categorize a user's inquiry and to define the scope of the assistance sought by creating a *subject style list*." Ex. 1, col. 1, ll. 40-42 (emphasis added). The patent claims a method for creating a catalog of "inquiry types," organized from "underlying criteria," to be presented to a user in a configured "interactive problem definition page." The earliest possible priority date for the '709 Patent is April 2, 2004[8] and, thus, the critical date for the '709 Patent is April 2, 2003. *See id.* It is beyond genuine dispute that the invention claimed in the '709 Patent was embodied in XpertSHARE prior to the critical date.

*First*, the provisional application that ultimately issued as the '709 Patent consists of a PowerPoint presentation describing the product itself, XpertSHARE. *See* Ex. 3. The '709 Patent claims priority to this XpertSHARE document. In effect, XU told the U.S.P.T.O. that XpertSHARE discloses the invention claimed in the '709 Patent. There is perhaps no clearer

---

[8] For purposes of this motion, Cisco determined the critical date based on the filing of the provisional application from which the '709 Patent issued. By doing so, Cisco does not concede that the '709 Patent is entitled to claim priority to the '097 provisional application (Ex. 3) and reserves the right to contest that in this litigation.

evidence of the fact that XpertSHARE embodies the invention claimed in the '709 Patent than what XU told the U.S.P.T.O.

*Second*,  Scher Decl. Ex. 3 at 42:18-47:5. . *See id.* at 47:1-4 ( ); Scher Decl. Ex. 4 at 33:2-34:10 ( ). *See* Ex. 9 at 17-20 . XpertSHARE was XU's only product. . Ex. 38.

*Third*, at their depositions, the named inventors (former XU employees Nevin and Mason) . Scher Decl. Exs. 8 at 118:14-18 ( ); 9 at 185:20-24, 186:18-23.[9] XU's former vice-president of operations, David Rutberg, also admitted that

_____

[9] . Scher Decl. Ex. 9 at 11:10-12:5.

XpertSHARE embodied the technology described in the asserted patents.  Scher Decl. Ex. 1 at 21:15-19.

> *Fourth*, a comparison of the patent specification with ███████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ Figure 2 of the '709 Patent

depicts the interactive problem definition page (referred to in the patent as the "Get Assistance"

page) that is the result of the claimed method:



Ex. 1 at Fig. 2.  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████



Ex. 5 at 20 (███████).



Ex. 39.

*Fifth,* ████████████████████████████████████

████████████████████████████████████

███████. ████████████████████████████████

 . Ex. 40. ███████████

███████████ *See* Ex. 41.

**C.** 

The '903 Patent claims a method for matching and routing a seeker to a live expert who has the skills to address the seeker's inquiry. The method comprises creating a multi-layered database populated with inquiry types (a so-called "inquiry type database"), a database populated with live expert profiles (a so-called "skill-set database"), and a methodology for mapping between entries in the skill-set database and the inquiry-type database using a unique numerical routing identifier. *See* Ex. 2, col. 1, ll. 50-66. The critical date for the '903 Patent is January 24, 2004. *See* 35 U.S.C. § 102(b). As evidenced below, t███████████

███████████.



███████████. Scher Decl. Exs. 2 at 22:23-24:3; 3 at 15:4-20:3 ███

███████████. I███████████ Scher Decl. Ex. 2 at 22:23-24:3. ███████████

███████████ Ex. 38. ███████████

███████████ ██

███████████. Ex. 9 at 9-15 ███████████.

12

█████████████████████████████████████████████████

████████████████████████████. Scher Decl. Exs. 8 at 118:14-18; 9 at

185:20-24, 186:18-23.  So did Mr. Rutberg, XU's former vice president.  Scher Decl. Ex. 1 at

21:15-19.

    *Third*, ███████████████████████████████████████████

███████████:

- ███████████████████████████████████████████████

- ███████████████████████████████████████████████

- ███████████████████████████████████████████████

**D.** ███████████████████████████████████████████

    Again, the critical date for the '709 Patent is April 2, 2003; the critical date for the '903

Patent is January 24, 2004.  ███████████████████████████████████

███████████████████████████████

█████████████████████████████████████████████:

---

[10] As noted above and in Cisco's Motion for Terminating Sanctions (D.I. 292, 293),

██████████████████████████████████████████████████

██████████████████████

.  *See* D.I. 293 at 8.  ████████████

██████████████████████████████████████████████████

- XU piloted XpertSHARE at Allstate Insurance in December 2002. Ex. 42 at 14; *see also* Ex. 43 at 1 

  Scher Decl. Ex. 6 at 179:17-181:8.

  *Id.* at 185:6-186:9; *see also* Scher Decl. Ex. 7 at 68:3-69:10.

- . Ex. 23; *see also* Ex. 24.[11]

- . *See* Exs. 44 at 4; 45 (launched third quarter of 2002).

- Ex. 45.

- *See, e.g.*, Exs. 22, 25, 26.

  . *See, e.g.*, Exs. 44, 159, 160.

.

. *See, e.g.*, Exs. 27-30.

*See, e.g.*, Exs. 161-164.

---

[11] As detailed in Cisco's Motion for Terminating Sanctions (D.I. 292, 293),

. *See* D.I. 293 at § IV.A.1.

██████████. *See Clock Spring*, 560 F.3d at 1325 (citing *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007)).

## V.    CONCLUSION

For the foregoing reasons, Cisco requests that the Court grant partial summary judgment and rule that the '709 and '903 Patents are invalid pursuant to 35 U.S.C. § 102(b).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant/Counterclaimant*
*Cisco Systems, Inc.*

OF COUNSEL:

MORGAN, LEWIS & BOCKIUS LLP

Kell M. Damsgaard
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

October 31, 2012 - Original Filing Date
6624625
November 7, 2012 - Redacted Filing Date

15

## CERTIFICATE OF SERVICE

   I hereby certify that on October 31, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

   I further certify that I caused copies of the foregoing document to be served on October 31, 2012, upon the following in the manner indicated:

Philip A. Rovner, Esquire         *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Joseph Diamante, Esquire         *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason Sobel, Esquire
Alex Solo, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038

                */s/ Jack B. Blumenfeld*

                Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on November 7, 2012, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Joseph Diamante, Esquire                                     *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason M. Sobel, Esquire
Barry Clayton McCraw, Esquire
Kenneth L. Stein, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038

*/s/ Jennifer Ying*
_____
Jennifer Ying (#5550)

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XPERTUNIVERSE, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 09-157-RGA |
| | : |
| CISCO SYSTEMS, INC., | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION

Philip A. Rovner, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Charles E. Cantine, Esq. (argued), Jason M. Sobel, Esq. (argued), Stroock & Stroock & Lavan LLP, New York, NY, Attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Jennifer Ying, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Kell M. Damsgaard, Esq. (argued), Philadelphia, PA, Brett M. Schuman, Esq. (argued), Ryan Scher, Esq. (argued), San Francisco, CA, Morgan, Lewis & Bockius LLP, Attorneys for Defendant.

March $\theta$, 2013

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are Defendant's Motions for Partial Summary Judgment (D.I. 297, 300, 303, 306, 311, 315, 318, 320, 327, and 328) and associated briefing (D.I. 495, 521, 537, 570) and declarations.[1] The Court had the benefit of oral argument on February 27, 2013. (D.I. 611). Over the course of briefing these Motions, the issues for partial summary judgment appear to have shifted from the accused product framework outlined in the Motions to the following issues: 1) XU's trade secret misappropriation claim; 2) XU's breach of contract claims; 3) XU's rescission and fraud-based claims; 4) XU's claims for patent infringement; 5) XU's claims relating to the phrase "expert on demand"; and 6) the preemptive or supersessive effect of XU's California Unfair Trade Secrets Act claim.[2] For the reasons set forth herein, partial summary judgment is **GRANTED** on Issue 1; **GRANTED IN PART** on Issue 2; **GRANTED IN PART** on Issue 3; **GRANTED IN PART** on Issue 4; **GRANTED** on Issue 5; and **GRANTED IN PART** on Issue 6.

---

[1] Citations herein to Defendant's Schuman Declaration (Schuman Decl.) refer to the numbered exhibits found consecutively at D.I. 498-505, and citations to Defendant's Scher Declaration (Scher Decl.) refer to the numbered exhibits found at D.I. 538. Citations herein to Plaintiff's McCraw Declaration (McCraw Decl.) refer to the numbered exhibits found consecutively at D.I. 523 and 527-532.

[2] For example, Cisco's Motion at D.I. 328 is directed toward all of XU's claims targeting Cisco's Telepresence Expert On Demand product, whereas its brief is directed toward XU's attempt to claim intellectual property in XU's "expert on demand" phrase and notes that XU has dropped several of its other claims against Telepresence Expert On Demand. (D.I. 495 at 36 n.24). The Court asks Cisco to submit a proposed order deciding its motions consistently with the rulings herein, and asks XU to advise the Court and Cisco which claims they plan to proceed upon.

1

## DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the nonmoving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." FED.R.CIV.P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable

2

inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49; *see Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

## B. Decision

The parties agree that XU's state law claims are governed by California law. (Schuman Decl. Ex. 6, §10.0; Ex. 7, §12.5; Ex. 8, §9.5). In light of the looming trial date and to expedite a decision on these issues, the Court presumes familiarity with the background of the case and the parties' arguments, and will only recite them here as necessary to explain the Court's rulings.

### 1) *XU's trade secret misappropriation claim (Count V)*

Upon consideration of Cisco's Motions for partial summary judgment (D.I. 303, 306, 311, 315, 320, 327), all of which relate in part to Count V of the Fourth Amended Complaint (D.I. 82) ("Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act"), the Court will grant the Motions to the extent they relate to Count V. Although a host of grounds are raised by Cisco in support of its motions, the basis for decision is that the identification of the trade secrets is insufficient to create a triable factual issue, and even if any trade secrets were sufficiently described, XU has failed to create a genuine issue of material fact to show Cisco misappropriated any sufficiently described trade secret.

3

California law sets forth the definition of a trade secret:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).[3] It further sets forth the definition of trade secret misappropriation:

3

The definition of "trade secret" contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be "continuously used in one's business." The broader definition in the Act extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use. The definition includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor.

*Cf. Telex Corp. v. IBM Corp.*, 510 F.2d 894 (CA10, 1975) per curiam, cert. dismissed 423 U.S. 802 (1975) (liability imposed for developmental cost savings with respect to product not marketed). Because a trade secret need not be exclusive to confer a competitive advantage, different independent developers can acquire rights in the same trade secret.

The words "method, technique" are intended to include the concept of "know-how."

The language "not being generally known to the public or to other persons" does not require that information be generally known to the public for trade secret rights to be lost. If the principal person who can obtain economic benefit from information is aware of it, there is no trade secret. A method of casting metal, for example, may be unknown to the general public but readily known within the foundry industry.

The phrase "and not being readily ascertainable by proper means by" was included in this section as originally proposed by the National Conference of Commissioners on Uniform State Laws. It was removed from the section in favor of the phrase "the public or to." This change was made because the original

4

"Misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or

---

language was viewed as ambiguous in the definition of a trade secret. However, the assertion that a matter is readily ascertainable by proper means remains available as a defense to a claim of misappropriation.

Information is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market. On the other hand, if reverse engineering is lengthy and expensive, a person who discovers the trade secret through reverse engineering can have a trade secret in the information obtained from reverse engineering.

Finally, reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on "need to know basis," and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.

The efforts required to maintain secrecy are those "reasonable under the circumstances." The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. *See E.I. du Pont de Nemours & Co., Inc. v. Christopher*, supra. It follows that reasonable use of a trade secret including controlled disclosure to employees and licensees is consistent with the requirement of relative secrecy.

Cal. Civ. Code § 3426.1 Legislative History, [84 S.J. 13883].

limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b). "Improper means" includes "theft, bribery, misrepresentation,

breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic

or other means. Reverse engineering or independent derivation alone shall not be considered

improper means." *Id.* § 3426.1(a).

(a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

(b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b).

*Id.* § 3426.3.

"It is critical to any CUTSA cause of action . . . that the information claimed to have been

misappropriated be clearly identified. Accordingly, a California trade secrets plaintiff must . . .

identify the trade secret with reasonable particularity." *Silvaco Data Sys. v. Intel Corp.*, 184 Cal.

App. 4th 210, 221 (Cal. Ct. App. 2010) (citing Code Civ. Proc. § 2019.210). Although the

parties disagree about the gloss put on this by California cases, the cases cited by the parties in

their briefs are generally consistent. The cases provide that a trade secret consists of information,

6

not ideas; a trade secret is actual, not theoretical; a trade secret is specific, not general.[4] For example, a description of a software methodology implementing "features, functions, and characteristics of the design and operation" characterizes the "underlying design" and not the information therein or related source code, and fails to describe a trade secret with sufficient particularity. *Silvaco Data Sys.*, 184 Cal. App. 4th at 221-22. Descriptions must clearly refer to tangible trade secret material, not an overall system that potentially qualifies for trade secret protection. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998). Narratives that explain the nature of the information in very general terms are insufficient. *Agency Solutions.com, LLC v. Trizetto Group*, 819 F.Supp.2d 1001, 1012 (E.D. Cal. 2011). Cases from other jurisdictions are also helpful: descriptions that "effectively assert[] that all information or about [the plaintiff's] software is a trade secret," by describing the "methods and processes underlying and the inter-relationships among various features making up [the plaintiff's] software package," are too broad. *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002).

Against this backdrop, XU has strained to describe its supposed trade secrets in a manner that makes a plausible case that it had trade secrets. Cisco complained about XU's earlier identifications. (Schuman Decl. Ex. 70; D.I. 183). The Court ordered that XU supplement its identifications. (Schuman Decl. Ex. 205). XU did so on or about June 4, 2012, in its Supplemental Response to Interrogatory No. 12. (Schuman Decl. Ex. 71). Cisco objected that

---

[4] XU's citation of *Mattel, Inc. v. MGA Entertainment, Inc.*, 782 F.Supp.2d 911 (C.D. Ca. 2011), for the proposition that a "concept" can constitute a trade secret does not dilute the requirement that the concept be described with sufficient particularity. (D.I. 521 at 21 n.16); *see Mattel*, 782 F.Supp.2d at 960 (addressing a trade secret "concept" including the group name, doll names, "doll designs, fashions, themes, and marketing slogans").

7

these responses were insufficient. (D.I. 215). XU stated that it could not improve upon these responses. (Schuman Decl. Ex. 12). The Court indicated that it had doubts about the sufficiency of the responses, but did not think a discovery dispute was the appropriate place to resolve those doubts. (Schuman Decl. Ex. 12).

The Court resolves those doubts here. All but two of XU's 46 asserted trade secrets mirror the methodology implementing certain features discarded in *Silvaco*, and the narratives discarded in *Agency Solutions.com*. None of XU's descriptions designate any information or identify any source code; they are very general recitations of processes implementing equally general features, structures, design considerations, and platforms.[4] The fact that Dr. Forys found public examples he thought fell within XU's broad descriptions does not make those descriptions sufficiently particular. The only descriptions with sufficient specificity are numbers 18 and 33, which refer to specific architecture diagrams and system and logic diagrams that contain the information underlying the narratives.[5]

Trade secret numbers 18 and 33 clear Cisco's first hurdle, but not the second. XU has provided no evidence to show Cisco misappropriated those trade secrets. "It is the plaintiff's

---

[4] The breadth and generality of the trade secret descriptions was exemplified during a discovery dispute when XU's counsel claimed that video conferencing between two bank branches would be covered by its trade secrets. (D.I. 598 at 5-6). As another example, at oral argument, XU's counsel could not explain how trade secret 40 differed from a typical phone call to an insurance company. (D.I. 611 at 84-90).

[5] This is not to say that reference to such a diagram is necessary to describe a trade secret with sufficient particularity. Rather, the diagrams rescue XU's prose descriptions, which would otherwise be insufficient.

The video and documents XU introduced at argument to show embodiments of trade secret descriptions 36 and 37, but did not reference in its opposition, do not make up for the deficiencies in XU's trade secret descriptions. (D.I. 161 at 94-95, 114-19).

8

burden to show improper use as part of its prima facie case." *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1669 (Cal. Ct. App. 2003). XU has provided no evidence that Cisco used any purported trade secret, much less numbers 18 and 33. XU's expert, Dr. Nourbakhsh, broadly states that he finds functions of trade secrets 18 and 33 "embodied" in Cisco projects, but does not identify any of the information in XU's cited diagrams "embodied" in any Cisco project. (D.I. 521 at 26-27); (McCraw Decl. Ex. 97, ¶¶ 124, 157, 224). Such "embodiment" falls short of evidence that Cisco misappropriated trade secrets 18 and 33 under the CUTSA's definition in § 3426.1, particularly in light of Cisco's otherwise undisputed evidence that it developed Pulse, Quad, VEM/Remote Expert, SOAR, and Expert Advisor without the use of any XU trade secrets. (D.I. 495 at 15-17).[6]

In sum, XU has failed to adequately describe all but two trade secrets, and failed to create a genuine issue of material fact that it had any trade secrets that Cisco misappropriated.

2) *XU's breach of contract claims (Counts IX, X, XI).*

Upon consideration of Cisco's motion for partial summary judgment with respect to Counts IX, X, XI, and VI, (D.I. 318), the Court will grant the motion in part.[7]

The parties agree on the law governing the breach of contract claims. *See Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal. App. 4th 1171, 1178 (Cal. Ct. App. 2008). The three governing agreements each provided explicit direction to XU as to what type of information would be shared and how to designate documents and information confidential. The 2004

---

[6] As set forth at D.I. 604, the Declaration of Leni Selvaggio cited in this section of Cisco's brief has been stricken. It has not been considered here.

[7] This decision is independent of the Court's decision on XU's claim to rescind these same contracts.

9

Nondisclosure Agreement provided XU would share "Product Information," mark written documents containing confidential information, and identify any orally conveyed confidential information as confidential at the time of disclosure with confirmation in writing. (Schuman Decl. Ex. 6, §§1.0, 2.0). XU employees understood this requirement. (Schuman Decl. Ex. 67). The NDA provided it could only be modified by a writing signed by both parties. (Schuman Decl. Ex. 6). The 2005 Technology Developer Program Partner Agreement ("CTDPA") provided XU would share a subset of technical and business information related to XU's products and services and provide any confidential information only in written form, designated as Confidential Information (unless XU sought and obtained written approval to deviate from these requirements). (Schuman Decl. Ex. 7, § 11.2). The 2006 CTDPA provided XU would share technical and business information related to its products and business information, with the same designation and approval requirements as the 2005 CTDPA. (Schuman Decl. Ex. 8, §5.1.1).

The parties agree that Cisco showed some XU documents to a third party consultant, SBT Advisors. *See* (Schuman Decl. Ex. 142-44, Ex. 182 at 271:9-25). The parties agree XU did not mark these documents as confidential.[8] *See* (Schuman Decl. Ex. 142-44). XU fails to create a genuine issue of material fact that Cisco "knew or should have known these documents to be proprietary" based on a "course of conduct" between the parties, such that Cisco showing those unmarked XU documents would breach one or more of the contracts.[9] XU relies on its Eiss

---

[8] The documents appear to be general marketing pieces.

[9] It is not clear from the record which contract(s) XU presently asserts Cisco breached by showing XU documents to SBT Advisors. This interaction is alleged in all three breach of contract counts of the Fourth Amended Complaint. (D.I. 82).

Declaration and Mason Declaration to generally describe "an intention of confidentiality" and Cisco's reassurance that "confidentiality of all sensitive information exchanged was being maintained," but the Mason Declaration also states that "[a]t no point in time" "throughout 2005 and 2006" "did anyone at Cisco or XU explicitly state or suggest that the terms of the confidentiality agreement had changed in any way." (D.I. 524, ¶¶ 9-10; D.I. 522, ¶¶ 14-18). XU also relies on a May 2005 email from Cisco's Ken Jordan asking XU for technical documents and noting, "All documents are covered under NDA." (McCraw Decl. Ex. 36).

This meager and unspecific record does not show any course of dealing deviating from the requirements of the NDA (which required a signed writing to change) or the CTDPAs to positively identify confidential information. The Mason Declaration indicates the parties adhered to the agreements' terms; the Declarations and Jordan email show the parties' intentions to protect XU's confidentiality, but do not change the mechanism for doing so provided in the agreements. Cisco has demonstrated that there is no genuine issue of material fact that it breached any contract by showing the three XU documents to the third party consultant.

The parties agree that XU gave Cisco nine documents designated as confidential under these agreements.[10] (Schuman Decl. Ex. 23, 26, 27, 31, 32, 35, 36, 39, 106). XU first argues that Cisco used XU confidential information in two patent applications, relying on Dr. Nourbakhsh's opinion. (D.I. 521) (citing McCraw Decl. Ex. 97, ¶¶ 263-72; D.I. 528, ¶ 92). XU also relies on Dr. Nourbakhsh's opinion to argue that Cisco used information from marked XU documents in its products. (D.I. 521 at 16) (citing D.I. 528, ¶¶ 58-82). The majority of Dr. Nourbakhsh's

---

[10] The briefing does not provide which agreement covers which document(s), and XU's claim for rescission seems to invoke a dispute on that point. *See* Section 3, *infra*.

11

opinion addresses "trade secrets;" as explained *supra*, XU's trade secret claims fail, and Dr. Nourbakhsh's trade secret opinion does not support any breach of contract.[11] Dr. Nourbakhsh opines only that Cisco used two of the nine documents XU designated as confidential, identified as CISCO3996 (Schuman Decl. Ex. 23) and CISCO13900 (Schuman Decl. Ex. 35), in one patent application, No. 11/772,318 (Schuman Decl. 150). (D.I. 528, ¶ 92). Dr. Nourbakhsh opines that the "basic mechanism" in Cisco's patent application No. 11/772,318 "is exactly the information XU provided" in those two confidential documents. *Id.*

As far as Cisco's use of any of the nine documents in any of its patents or products, XU demonstrates a genuine issue of material fact only with regard to whether Cisco used CISCO3996 and CISCO13900 in application no. 11/772,318 in breach of contract. Otherwise, Cisco has demonstrated the absence of any genuine issue of material fact, particularly with regard to the breach element of XU's breach of contract claims, and its motion is accordingly granted in part.

---

[11] In paragraph 92 of his Declaration, Dr. Nourbakhsh first opines that Cisco application 11/772,318 uses 17 XU trade secrets. "Secondly," he opines, "there is considerable evidence that XU's confidential information is also disclosed by Cisco in this patent application. Specifically, XU transmitted confidential and proprietary information . . . in confidential documents CISCO3996 and CISCO13900." Dr. Nourbakhsh went on to quote parts of the application, then concluded "the basic mechanism disclosed in the present application . . . is exactly the information XU provided, confidentially to Cisco in CISCO3996 and CISCO13900." (D.I. 528, ¶ 92). Dr. Nourbakhsh's analysis of the two documents is confined to XU's breach of contract claim. Dr. Nourbakhsh does not opine that the two documents conveyed any XU trade secrets to Cisco.

12

*3) XU's rescission and fraud-based claims (Counts III, IV, XII)*

Cisco moved for partial summary judgment on Counts III (common law fraud), IV (deceit under California Civil Code §§ 1709, 1710),[12] and XII (rescission). (D.I. 297, D.I. 495 at 20-21). XU's theories appear to be: 1) Cisco fraudulently induced XU to enter into the CTDPAs by misrepresenting each of them as a mere formality, and by tying the CTDPAs to participation in Solutions Plus; 2) Cisco concealed from XU that it was denied entry into Solutions Plus; and 3) the CDTPAs are unconscionable.[13] (D.I. 521 at 9-13).

Cisco's Motion is granted with regard to XU's theory of fraudulent inducement based on the CTDPAs being formalities. This theory requires XU to prove, *inter alia*, actual and justifiable reliance by a preponderance of the evidence. *Liodas v. Sahadi*, 19 Cal.3d 278, 291 (1977); *Orient Handel v. United States Fid. & Guar. Co.*, 192 Cal. App. 3d 684, 693 (Cal. App. 1987). XU has submitted no evidence that it was reasonable for Eiss and Zelkin to rely on a characterization of the CTDPAs as formalities. *See* (McCraw Decl. Ex. 7 at 275-76, Ex. 9 at 182-86). To the contrary, the terms of the CTDPAs themselves make it unreasonable to rely on a characterization as a formality. They are multiple pages long, and explain they are to permit

---

[12] The parties appear to regard Counts III and IV as being redundant of each other, as they submitted the same jury instructions for both counts. (D.I. 579, pp. 115-36).

[13] At oral argument, XU explained the Court need only reach the rescission claim if the Court determines that the CTDPAs, with their limitations of liability, "are somehow operable contracts and govern the proceedings of what happened." (D.I. 611 at 13-17). The briefing on Cisco's Motion provides no basis for the Court to determine whether the CTDPAs are "operable" and govern the exchanges of information at issue here. *See id.* at 13 (providing XU stated this argument in the pretrial order). The Court evaluates XU's rescission claim only in the context of Cisco's Motion.

XU's participation in the Cisco Technology Developer Program and that they supersede the parties' prior agreements. (Schuman Decl. Exs. 7, 8).

Cisco's Motion is also granted with regard to XU's theory that XU was fraudulently induced to enter into the CTDPAs via a misrepresentation that XU would be able to participate in Cisco's Solutions Plus program. XU's only evidence underlying this theory is an internal Cisco email dated March 24, 2005, evaluating a draft term sheet with XU without mentioning either CDTPA or Solutions Plus. (McCraw Decl. Ex. 30). This falls far short of creating any genuine issue of material fact that Cisco was misrepresenting anything about Solutions Plus to XU in order to ensnare XU in a CDTPA. To the contrary, the evidence shows the CTDPA progressed the parties' relationship beyond a mere NDA and toward integration of XU's work with Cisco's. (Schuman Decl. Ex. 8 at CISCO00227789, CISCO002277893; Ex. 199 at 10).

While XU has failed to create a genuine issue of material fact that any misrepresentation about Solutions Plus was used to fraudulently induce XU to enter into the CDTPAs, XU has shown a genuine issue of material fact with regard to whether Cisco concealed XU's status in the Solutions Plus program, generally. XU's theory is that Cisco rejected XU from Solutions Plus on April 19, 2006, based on an internal Cisco Solutions Plus Governance Council email dated April 25, 2006, subject line "4/19 GS+ Governance Council Meeting Notes," providing:

Topic: Xpert Universe . . .
Outcome: Denied; appeared as niche product. Governance Council did not see horizontal revenue pull through, suggested BU should OEM or acquire

(McCraw Decl., Ex. 40, at CISCO00038318). Cisco points to internal Cisco emails showing efforts to try to get XU into the program in May 2006 and October 2006. (Schuman Decl. Exs.

14

220, 221; McCraw Decl. Ex. 43). XU asserts Cisco did not tell XU about this decision, while Cisco asserts it told XU about the denial as evidenced by XU efforts to overcome the "objections" to its participation as of July 12, 2006. (Scher Decl. Ex. 10). XU points to contemporaneous Cisco documents referring to XU as a competitor; Cisco argues that collaboration between different companies does not mean they are not still competitors. (McCraw Decl. Exs. 61, 62; DTX 108). XU asserts Cisco finally told XU that it could not participate in Solutions Plus in January 2007. (D.I. 521 at 11) (citing McCraw Decl. Ex. 1 at 50, Ex. 74).

This record presents a few genuine issues of material fact regarding whether Cisco concealed XU's status with regard to Solutions Plus. Did Cisco deny XU from Solutions Plus with finality in April 2006, and conceal the finality of that decision from XU for a period of months, or were there only objections in April 2006 that XU could overcome? What did Cisco communicate to XU about Solutions Plus, and when? Cisco's motion is denied with regard to concealment of XU's status in Solutions Plus.

Finally, Cisco's motion is granted as to XU's theory that the CDTPAs are unconscionable.[14] "Under California law, courts may refuse to enforce any contract found 'to have been unconscionable at the time it was made,' or may 'limit the application of any unconscionable clause.' Cal. Civ.Code Ann. § 1670.5(a). A finding of unconscionability requires a procedural and a substantive element, the former focusing on oppression or surprise

---

[14] The Court permitted XU to amend its pleadings to include this theory. (D.I. 612 at 151). The parties agree that rescission based on unconscionability is a matter for the Court to determine on the merits based on the summary judgment briefing, if summary judgment itself is denied. (D.I. 611 at 5-6; D.I. 612 at 151-52).

15

due to unequal bargaining power, the latter on overly harsh or one-sided results." *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1746 (2011) (internal quotation and citation omitted).[15] XU's only evidence of procedural unconscionability is Eiss's testimony of "how things frequently were with Cisco, we would get an invitation to participate in something, and you need to do this, this, this, and this to make it happen, and we are in a short time frame, so just get it done" and her speculation as to how that would have informed Zelkin's decision to commit XU to the 2006 CDTPA. (McCraw Decl. Ex. 9 at 197). This fails to show XU was oppressed or surprised by unequal bargaining power. The CDTPAs fall far short of the traditional concept of a contract of adhesion: the agreements are between commercial entities, and XU has not shown that Cisco's bargaining power vastly outweighs XU's or that XU could not negotiate any terms of the CDTPA. *See Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1004-5 (9th Cir. 2010).

As for substantive unconscionability, XU argues, without relying on any record evidence, that the CTDPAs allow Cisco to develop competing products, limited liability to $3 million, and narrowed the definition of confidential information from the NDA. (D.I. 521 at 13). In fact, these rights and limitations were all mutual. (Schuman Decl. Ex. 7, §§ 9.0, 11.1-11.4, 11.8; Ex. 8, §§ 5.1, 5.5, 7.0).

In sum, Cisco's motion is granted as to XU's rescission claim (Count XII) and granted as to XU's fraudulent inducement theory of fraud and deceit (Counts III and IV), but denied as to XU's theory of concealment regarding Solutions Plus underlying Counts III and IV.

---

[15] XU argues for rescission based on unconscionability, but the remedy for unconscionability is the Court's refusal to enforce the contract. *See* Cal. Civ. Code §§ 1670.5, 1689.

16

4) *XU's claims for patent infringement (Counts I and II)*

Cisco's Motion for Partial Summary Judgment No. 2 for Invalidity of U.S. Patent Nos. 7,366,709 and 7,499,903 Based On 35 U.S.C. § 102(b) (Counts I & II) (D.I. 300) is denied. Cisco has not shown the absence of a genuine issue of material fact with regard to, *inter alia*, whether the specific versions of the XU products that were demonstrated or offered for sale embodied the patented inventions at the time they were demonstrated or offered for sale.

Cisco's Motion for Partial Summary Judgment No. 4 Relating to Cisco's Expert Advisor Product (D.I. 306), No. 5 Relating to Cisco's Pulse Product (D.I. 311), and No. 8 Relating to Cisco's Virtual Management / Remote Expert Product ("Virtual Expert") (D.I. 327) are granted in part, as to XU's claims of indirect infringement under Counts I and II. XU's only basis for demonstrating indirect infringement is Dr. Nourbakhsh's opinion that "any Cisco customer" "will" use "the methodology recited by the [asserted] method claims." (D.I. 521 at 30 (citing Nourbkhsh Report, ¶¶ 96, 111, 146, 197, 208)). The Court has deemed that exact opinion unreliable; it cannot serve to maintain XU's claims of indirect infringement on summary judgment. (D.I. 632 at 5).

The remainder of Cisco's Motions (D.I. 306, 311, 327) regarding Counts I and II are denied. Cisco has not shown the absence of a genuine issue of material fact.

5) *XU's claims relating to the phrase "expert on demand"*

Cisco's Motion (D.I. 328) is granted to the extent any XU claim relies on XU's claim of a protectable interest in the phrase "expert on demand." XU has not shown that Expert on Demand is a protectable phrase under either the Lanham Act or California state law.

17

It is undisputed that XU has not registered "expert on demand" as a trademark. XU bears the burden of proof as to validity and protectability of the unregistered phrase for which it claims trademark protection. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 926 (9th Cir. 2005) (addressing both Lanham Act and California state law claims); *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) (addressing a Lanham Act claim).

The first step in the analysis here is to determine, as a question of fact, whether the potential trademark is inherently distinctive, or whether it is descriptive and therefore secondary meaning must be shown. *See Yellow Cab*, 419 F.3d at 927; *Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010); *cf. E.T. Browne*, 538 F.3d at 191-92. XU is pursuing the theories that "expert on demand" is protectable as both inherently distinctive and as descriptive with secondary meaning. (D.I. 611 at 133). XU has not submitted any evidence that creates a genuine issue of material fact that "expert on demand" is inherently distinctive. XU relies on testimony by its own CEO (Friedman) and President (Eiss) describing their motivations and intentions for the phrase. (McCraw Decl. Ex. 103 at 167-68; Ex. 9 at 136). Such self-serving testimony by the trademark holder does not meet XU's burden on summary judgment. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995); *Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.*, 198 F.3d 1143, 1152 (9th Cir. 1999); *cf. Citizens Financial Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 122 (3d Cir. 2004). XU relies on an abandoned trademark application by a different entity to argue the phrase is distinctive. (McCraw Decl. Ex. 102).

18

This falls far short of actual registration and does not show the USPTO's opinion on the phrase as filed by any entity, much less XU.

The next step in the analysis is to determine, as a question of fact, whether "expert on demand" is a descriptive mark that can receive trademark protection because it has acquired distinctiveness by establishing secondary meaning in the marketplace. *Yellow Cab Co.*, 419 F.3d at 926; *E.T. Browne*, 538 F.3d at 191-92. The test to determine whether "expert on demand" has secondary meaning as required for XU's Lanham Act claim includes:

(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

*See E.T. Browne*, 538 F.3d at 199. XU submits evidence that it argues shows Cisco copied XU's use of the phrase. (McCraw Decl. Ex. 65 at XU-0082626, Ex. 109, 110, 115); (D.I. 524, ¶ 13). XU's evidence shows only that Cisco saw XU materials with the phrase. Cisco's evidence shows Cisco came up with the phrase independently. (Schuman Decl. Ex. 193 at 59-61, 92-94; Ex. 166).

As for the other ten factors, XU used "expert on demand" to describe a version of XpertSHARE from 2004-2007. (Schuman Decl. Ex. 169, Ex. 182 at 188; D.I. 525, ¶ 24; McCraw Decl. 103 at 165, 167-68). Because XU had no customers and never sold a product, it has no evidence of sales or advertising leading to buyer association, customer surveys, customer testimony, number of sales, or number of customers. (Schuman Decl. Ex. 182 at 185, 212). Other companies were using the same phrase to describe similar products. (Schuman Decl. Exs. 173, 213). On balance, XU has only shown evidence of nonexclusive use of the phrase for three

19

years, without ever having a product or customers. In other words, XU has no evidence that it ever used the term in the public marketplace or in front of consumers, while other companies did use it. XU has failed to produce sufficient evidence to create a genuine issue of material fact with regard to secondary meaning, and therefore that "expert on demand" is a protectible descriptive phrase, for its Lanham Act claim. Cisco's motion is granted on that claim.

To evaluate the phrase's secondary meaning in XU's California state law claims, the finder of fact considers: (1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive. *See Yellow Cab Co.*, 419 F.3d at 930. As explained, there are no actual purchasers, XU used the phrase for three years without a product, and XU's use was not exclusive. XU has failed to produce sufficient evidence to create a genuine issue of material fact with regard to secondary meaning for its California claims asserting "expert on demand"; Cisco's motion is granted on those claims.

With regard to Count XVI (Conversion), Cisco points out that "intangible intellectual property cannot be subject to conversion as a matter of law." *See Innospan Corp. v. Intuit, Inc.*, 2011 WL 856265, *3 (N.D. Cal. 2011). Cisco's motion is granted with regard to Count XVI.

*6) The preemptive or supersessive effect of XU's California Unfair Trade Secrets Act claim*

Cisco argues in its brief for partial summary judgment on Counts III (common law fraud), IV (deceit), VI (breach of confidence), XV (common law quasi contract unjust enrichment), XIII (common law unfair competition), XIV (unfair competition under the

20

California Civil Code), and XVI (conversion) to the extent they are based on the same nucleus of facts as XU's California Uniform Trade Secrets Act claim (Count V). (D.I. 495 at 38-39, in support of D.I. 303, 318); *see Silvaco Data Systems v. Intel Corp.*, 184 Cal.App.4th 210, 232-36 (Cal. App. 2010) (interpreting Cal. Civil Code § 3426.7, subds. (a) and (b), and holding "CUTSA provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies based upon misappropriation of a trade secret").

XU does not contest that CUTSA preempts other claims based on trade secret misappropriation. Instead, XU identifies bases for these counts other than trade secret misappropriation: alleged concealment of Solutions Plus status (Counts III and IV), "hiding XU's 'competitor' status from XU, falsely preventing XU from working with other partners, and presenting XU's technology to potential customers without including XU" (Counts XIII and XIV), unjust enrichment with a "head start" after alleged concealment of Solutions Plus status (Count XV), and misappropriation of business opportunities as opposed to confidential information (Count XVI). (D.I. 521 at 38-39).

These asserted grounds for relief are not what XU originally pled. *See* (D.I. 82). The Court granted XU's request to amend its pleadings of Counts III and IV to include XU's concealment theory, and that theory is not preempted. (D.I. 612 at 151). XU did not request to amend its pleadings for Counts XIII, XIV, XV, or XVI. In fact, a month after XU proffered these new theories in opposition to summary judgment, XU repeated its original misappropriation theories in the pretrial order. *See* (D.I. 580, Ex. 2 at 38-43; Ex. 6 at 17-24; Ex. 7 at 18-21). XU's new theories in opposition to summary judgment are untimely and not supported by any record evidence; it is unclear what "business opportunities" XU is even

21

alleging. One reasonable conclusion is that XU proposed these new theories to survive

summary judgment, as opposed to in response to the natural course of litigation and discovery.

They will not serve to save Counts XIII, XIV, XV, or XVI from being superseded by XU's

CUTSA claim (Count V).[16]  Cisco's motion is granted on Counts XIII, XIV, XV, and XVI.

XU argues that its breach of confidence claim (Count VI), "expressly based on theft of

non-trade secret, but otherwise protectable, confidential and proprietary information," is not

preempted under CUTSA.  (D.I. 521 at 40).  The argument that CUTSA "was not intended to

preempt common law ... claims based on the taking of information that, though not a trade

secret, was nonetheless of value to the claimant" was "emphatically reject[ed]" in *Silvaco Data

Systems*. 184 Cal. App. 4th at 239 n.22.

> On the contrary, a prime purpose of the law was to sweep away the adopting
> states' bewildering web of rules and rationales and replace it with a uniform set of
> principles for determining when one is—and is not—liable for acquiring,
> disclosing, or using "information ... of value." (*See* [Cal. Civ. Code] § 3426.8.)
> Central to the effort was the act's definition of a trade secret. (*See* [Cal. Civ. Code]
> § 3426.1, subd. (d).) Information that does not fit this definition, and is not
> otherwise made property by some provision of positive law, belongs to no one,
> and cannot be converted or stolen. ... Permitting the ... claim to proceed on a
> contrary rationale . . . [would] create[]a new category of intellectual property far
> beyond the contemplation of the Act, subsuming its definition of "trade secret"
> and effectively obliterating the uniform system it seeks to generate.

---

[16] The practical effect of this decision is nearly imperceptible.  XU's claims that Cisco
misappropriated its trade secrets, confidential information, and "expert on demand" phrase are
disposed of herein (with the exception of a breach of contract claim based on two documents
marked confidential), so the preempted portions of these claims fail on their merits anyway. XU
has the opportunity to prove its Solutions Plus theories in Counts III and IV; it is difficult to see
what advantage XU would gain by repackaging those theories as unfair competition claims in
Counts XIII (common law unfair competition) and XIV (unfair competition under the California
Civil Code), particularly where Count XIV is an equitable claim to be determined by the Court in
any case. *See Openwave Sys., Inc. v. Myriad France S.A.S.*, 2011 WL 2580991, *2 (N.D. Cal.
Jun. 29, 2011); (D.I. 580 at 14-15).

*Id.*

Cisco's Motions (D.I. 303, 318) are granted for Counts VI, XIII, XIV, XV, and XVI, and granted in part for Counts III and IV to the extent they depend on misappropriation or theft of any trade secrets or other information of value.[17]

## CONCLUSION

For the reasons stated herein, Cisco's motions for partial summary judgment are granted in part for the following Counts: Counts I and II in part, because XU has no admissible evidence of indirect infringement; Counts III and IV in part, as XU has shown a genuine issue of material fact only with regard to whether Cisco concealed XU's status in the Solutions Plus program; Count V, because XU has failed to adequately describe all but two of its trade secrets with particularity and to create a genuine issue of material fact to show Cisco misappropriated any trade secrets; Count VI, because it is mutually exclusive with a breach of contract claim and because and because it is superseded by XU's CUTSA claim; Counts VII and VIII because XU has failed to create a genuine issue of material fact to show "expert on demand" is a protectable phrase; Counts IX, X, and XI in part, as XU has shown a genuine issue of material fact only with regard to whether Cisco used two specific XU documents in one Cisco patent application; Count XII, because XU has not shown fraudulent inducement or

---

[17] Cisco also argues for partial summary judgment on Count VI on the basis that there cannot be a valid, express contract and an implied contract existing at the same time. *See Wal-Noon Corp. v. Hill*, 45 Cal. App. 3d 605, 613 (Cal. Ct. App. 1975). XU argues its breach of confidence claim is "mutually exclusive with a claim for breach of contract," citing *Berkla v. Corel Corp.*, but appears to misapprehend what the Ninth Circuit meant by "mutually exclusive:" "California courts have made clear that these two causes of action are mutually exclusive: There cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time." 302 F.3d 909, 918 (9th Cir. 2002) (citing *Wal-Noon Corp.*). Cisco's motion is granted for Count VI on this basis as well.

23

unconscionability; Counts XIII, XIV, XV, and XVI because they are superseded by XU's CUTSA claim (Count V), and Count XVI because intangible intellectual property cannot be subject to conversion.

An appropriate order will follow.

24

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

XpertUniverse, INC.,          ) Trial Volume 7
                              )
            Plaintiff,        )
                              ) C.A. No. 09-157 (RGA)
v.                            )
                              )
                              )
CISCO SYSTEMS, INC.,          )
                              )
            Defendant.        )

Wednesday, March 20, 2013
9:08 a.m.

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE RICHARD G. ANDREWS
         United States District Court Judge

APPEARANCES:

POTTER ANDERSON & CORROON, LLP
BY:  PHILIP A. ROVNER, ESQ.

-and-

STROOCK & STROOCK & LAVAN
BY:  CHARLES E. CANTINE, ESQ.
BY:  JASON SOBEL, ESQ.
BY:  CLAYTON McCRAW, ESQ.

Counsel for the Plaintiffs

APPEARANCES CONTINUED:


MORRIS NICHOLS ARSHT & TUNNELL, LLP
BY:  JACK B. BLUMENFELD, ESQ.

5              -and-

MORGAN LEWIS & BOCKIUS, LLP
BY:  BRETT M. SCHUMAN, ESQ.
 BY:  KELL M. DAMSGAARD, ESQ.

          Counsel for the Plaintiffs


10


15


20

21

22

23

24

products actually use XpertUniverse's IP.  We

don't think that's right, but if it is right,

those products didn't do any better.  All the

accused products are either discounted, dead, or

5    the one product, Remote Expert, that is not dead,

was projected to do this much in revenue

(indicating) and as you heard for the last couple

of days, it had one pilot at Home Depot.

And the market, nobody knows the

10   market better than John Hernandez, and John

Hernandez told you that there had been many

companies trying to do what XpertUniverse was

trying to do here, get expert, subject matter

experts, people outside the Contact Center

15   Enterprise involved in helping solve customer

problems and nobody has been able to do it.

The reason Cisco was interested in

XpertUniverse was because they claimed they could

do it, but they couldn't and all they had was a

20   demo, and they failed.

21   I want to turn to the patent case

22   quickly.  We're almost out of time here.

23   A general comment about the patent

24   case.  I know it's hard to follow.  It's hard for

patent lawyers to follow sometimes.  But these

accused products you've heard about, Expert

Advisor, Remote Expert, Pulse, I would submit to

you that these are square pegs that do not fit in

5     the round holes of these patents.     Dr.

Nourbakhsh and XpertUniverse are trying to

squeeze products that have nothing to do with

these products into the claims.

The first patent, the '709 patent.

10    Can you put up CL6, please.

The '709 patent, remember, we showed

you all those graphical user interfaces.  The

'709 patent is about the look and feel of the

platform, a web page.  Remember Mr. Lepore came

15    down from Massachusetts to tell you about this

product.  He designed this product.  He created

it.  Nobody knows better how this product works.

Expert Advisor is a telephone call

only.  There's no graphical user interface.  It's

20    a telephone call.  It cannot possibly infringe

21    the '709 patent.  I don't need to show you the

22    hurdles.  You can knock them all down.  A

23    telephone call cannot infringe a patent that

24    requires a graphical user interface or the

presentation of something graphically to a

user.

Pulse.  You heard from Mr. Gannu,

the engineer who designed Pulse.  Cisco has no

5   burden to show you these products do not

infringe.  The Court gave you the instruction.

XpertUniverse must prove to you these products

infringe.  But we brought the engineers who

designed the accused products to explain to you

10   very clearly how they work.

Pulse is a search engine.  That's

it.  It's like Google.  You heard Mr. Gannu.

That's a search bar at the top that's like

Google.  You type in anything you want.

15   Dr. Nourbakhsh mentioned this thing

called a tag cloud.  You click on a tag.  It runs

a search.  There's nothing more to it than that.

There's not enough stuff on the interface to

infringe the patent.

20   The other patent, the '903 patent --

21   can we put up CL7, please.  Remember this,

22   complicated diagram?  I'm not going to go through

23   it now.  I don't have time.  Mr. Lepore walked

24   you through the whole thing.  This is the '903

patent applied to this.

Dr. Nourakhsh's theory is that these things over here, assignments, queues, are organized from these things over here, call

5    types.  Mr. Lepore built the product.  He explained to you, carefully demonstrated to you, there's no connection between the two whatsoever.

These things are not organized from these things, noninfringement with respect to

10    Expert Advisor on the '903 patent.

Remote Expert, we bought you Bill Dry.  It's a button that you push at Home Depot and it makes a phone call to a group of agents.

Dr. Nourbakhsh, I would submit to

15    you, when he talked up there on the witness stand about why he thinks it infringes, he did not tie anything in Remote Expert to any of the elements of claim 12 of the '903 patent.

Push the decorator button, calls a

20    phone number, gets you a group of agents.  That

21    does not infringe the patent.

22        I want to talk about invalidity very

23    briefly.  We have the burden of proof there and I

24    would submit to you that we carried that burden.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Remember Dr. Chatterjee, he was in here. He

looked at all that code. You might have been

wondering, why did he do that? Because he found

in the code that these patents were in the code

5    prior to the critical date. XpertUniverse had

embedded these patents in their software prior to

the critical date.

And I have to connect the dots for

you here because we didn't show them to you, but

10    the patents are invalid if prior to the critical

date, XpertUniverse was offering for sale a

product that embodied these patents.

And I would just quickly put up on

the screen, please, Rick, Defendant's 110.

15    Defendant's 110, March 3rd, 2003.

That's before April 2nd, 2003, the critical date.

And if we go to the second page --

third page, please, next page. XpertUniverse,

prior to the critical date, when their inventions

20    are in their code is offering Allstate

21    KnowledgeSHARE. That's the product that Dr.

22    Chatterjee examined. KnowledgeSHARE embodied the

23    inventions. KnowledgeSHARE was being offered to

24    Allstate.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

Remember what Dr. Chatterjee said?
It's black and white.  It's either in the code or
it's not.  He found it in the code.  They offered
it for sale.  It does not matter that they didn't

5   actually succeed in selling it to Allstate.  We
know they didn't succeed in selling it to
anybody.  It also does not matter that it wasn't
a finished product.  The law is that if they
offer the invention in the patents for sale prior

10  to the critical date, those patents are invalid.
And I would submit to you that we have proven the
patents are invalid.

In closing, Cisco did nothing wrong
here.  It did nothing to hurt XpertUniverse.

15  XpertUniverse is just one of many failed
startups.

Cisco wanted, wanted this
relationship to work.  Why else would John
Hernandez have done all the things that he did?

20  Those are not alleged things.  Those really

21  happened.

22  Those e-mails to Carl Wiese, Senior

23  Vice President at Cisco, John put his credibility

24  on the line for XpertUniverse.  He was

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801

```
State of Delaware)
                 )
New Castle County)


            CERTIFICATE OF REPORTER


5               I, Heather M. Triozzi, Certified
        Professional Reporter, Registered Professional
        Reporter, and Notary Public in the State of
        Delaware, do hereby certify that the foregoing
        record, Pages 2005 to 2354 inclusive, is a true
        and accurate record of the above-captioned
        proceedings held on March 20, 2013, in
        Wilmington.
                In witness whereof, this 20th day of
        March, 2013, at Wilmington.
10


                        Heather M. Triozzi, CSR, RPR
                        Cert. No:  184-PS
                        Exp:  Permanent




15
        DATED:  March 20, 2013




20


21

22

23

24
```

Case 3:17-cv-02848-RS   Document 59-2   Filed 02/15/18   Page 405 of 509

  5




 10




 15




 20


 21

 22

 23

 24

# EXHIBIT G

*Filed this 22nd Day of March, 2012 In Open Court*
*— KSM*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,                    )
                                         )
                    Plaintiff            )
                                         )
v.                                       )
                                         )        Civil Action No.  09-157 (RGA)
                                         )
CISCO SYSTEMS, INC.,                    )
                                         )
                    Defendant.           )

## JURY VERDICT FORM

You, the jury, are to answer the following questions based on the evidence admitted at trial and according to all of the instructions I have given you.

## A.    FRAUDULENT CONCEALMENT

1.    Did XpertUniverse prove, by a preponderance of the evidence, that Cisco committed fraud by concealment?

**Answer "Yes" or "No":** ___Yes___

*If you answered "Yes" to Question 1 then answer Question 2.*

2.    What damages do you find XpertUniverse has proven by a preponderance of the evidence it should recover for its loss that was caused by Cisco's fraud by concealment?

**Answer: $** ___70 million___

## B.    <u>INFRINGEMENT OF XPERTUNIVERSE'S PATENTS</u>

1.    Did XpertUniverse prove, by a preponderance of the evidence, that Cisco infringed Claim 5 of U.S. Patent No. 7,366,709?

Expert Advisor: **Answer "Yes" or "No":** ___Yes___

Pulse: **Answer "Yes" or "No":** ___No___

**A45**

2.      Did XpertUniverse prove, by a preponderance of the evidence, that

Cisco infringed claim 12 of U.S. Patent No. 7,499,903? *(Please answer Yes or No*

*for each accused product)*

Expert Advisor: **Answer "Yes" or "No"** : __Yes__

Remote Expert: **Answer "Yes" or "No"** : __Yes__


## C.      **VALIDITY OF XPERTUNIVERSE'S PATENTS**

1.      Did Cisco prove, by clear and convincing evidence, that claim 5 of

U.S. Patent No. 7,366,709 is invalid due to anticipation?

**Answer "Yes" or "No"** : __No__

2.      Did Cisco prove, by clear and convincing evidence, that claim 5 of

U.S. Patent No. 7,366,709 is invalid due to obviousness?

**Answer "Yes" or "No":** __No__

3.      Did Cisco prove, by clear and convincing evidence, that claim 12 of

U.S. Patent No. 7,499,903 is invalid due to anticipation?

**Answer "Yes" or "No":** __No__

4.      Did Cisco prove, by clear and convincing evidence, that claim 12 of

U.S. Patent No. 7,499,903 is invalid due to obviousness?

**Answer "Yes" or "No":** __No__

**A46**

2

**D.    DAMAGES FOR CISCO'S PATENT INFRINGEMENT**

*Answer the question posed in this Section only if you (i) found, in Section B that XpertUniverse proved that Cisco infringed U.S. Patent No. 7,366,709 or 7,499,903, and (ii) found that Cisco did not prove that a claim for which you answered "Yes" in Section B was invalid.*

1.    What damages do you find XpertUniverse has proven by a preponderance of the evidence it should recover for Cisco's infringement of XpertUniverse's patents?

| Products | Amount |
|---|---|
| Expert Advisor | $ 15,463. |
| Pulse | $ 0 |
| Remote Expert | $ 18,920. |

Signed this _22_ day of March, 2013:

_____

**JURY FOREPERSON**

**A47**

3

_____

**JUROR**

_____

**JUROR**

_____

**JUROR**

_____

**JUROR**

_____

**JUROR**

_____

**JUROR**

_____

**JUROR**

_____

**JUROR**

**A48**

# EXHIBIT H

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | |
| Plaintiff and Counterdefendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-157 (RGA) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant and Counterclaimant. | ) | |

**DEFENDANT AND COUNTERCLAIMANT CISCO SYSTEMS, INC.'S
OPENING BRIEF IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW UNDER RULE 50(b) AND, IN THE ALTERNATIVE,
FOR REMITTITUR OR NEW TRIAL UNDER RULE 59 (a)(1)**

OF COUNSEL:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen M. Sullivan
Cleland B. Welton II
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Daniel H. Bromberg
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

MORGAN, LEWIS & BOCKIUS LLP
Brett M. Schuman
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

Kell M. Damsgaard
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

May 6, 2013

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant-Counterclaimant
Cisco Systems, Inc.*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.      INTRODUCTION ................................................................................................... 1

II.     LEGAL STANDARDS ......................................................................................... 3

III.    CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON LIABILITY FOR
FRAUDULENT CONCEALMENT ..................................................................... 5

        A.     No Rational Jury Could Have Found That The Fact Purportedly Concealed
By Cisco Was Material ............................................................................... 5

        B.     Alternatively, Cisco Is Entitled To A New Trial On Fraudulent
Concealment ............................................................................................... 8

IV.    CISCO IS ENTITLED TO JMOL, OR TO REMITTITUR AND/OR NEW
TRIAL, ON THE DAMAGES AWARDED FOR FRAUDULENT
CONCEALMENT ................................................................................................ 8

        A.     Cisco Is Entitled To JMOL That XU Did Not Cause XU To Suffer $70
Million In Lost Value Damages ................................................................. 8

               1.     No Reasonable Jury Could Find With Reasonable Certainty That
XU Lost Value ............................................................................... 10

               2.     No Reasonable Jury Could Find With Reasonable Certainty That
The Amount Of XU's Lost Value Was $70 Million ...................... 14

               3.     No Reasonable Jury Could Find That Cisco's Delay In Disclosing
The Denial Of XU's SolutionsPlus Application Caused Any Loss
In XU's Value ............................................................................... 19

        B.     Alternatively, The Court Should Grant Remittitur And/Or A New Trial On
Damages For Fraudulent Concealment .................................................... 22

               1.     Any Damages Awarded For Fraudulent Concealment Should Be
Remitted To $2.66 Million Or At Most $4 Million ...................... 22

               2.     Cisco Is Entitled To A New Trial On Damages For Fraudulent
Concealment ................................................................................. 24

V.     CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON THE PATENT
INFRINGEMENT CLAIMS ............................................................................. 27

## TABLE OF CONTENTS (cont'd)

**Page**

A.      Cisco Is Entitled To JMOL On The Remote Expert Infringement Claim ............27

B.      Cisco Is Entitled to JMOL On The Expert Advisor Infringement Claims............30

C.      Cisco Is Entitled To JMOL Based On The On-Sale Bar .....................................32

D.      Alternatively, Cisco Is Entitled To A New Trial On The Patent
        Infringement Claims ...........................................................................................33

VI.     CONCLUSION ............................................................................................................34

# TABLE OF AUTHORITIES

**Page**

**Cases**

*AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*,
432 F. Supp. 2d 1319 (S.D. Fla. 2006),
*aff'd*, 294 F. App'x 501 (11th Cir. 2008) .............................................. 17, 18, 19

*Bank of Am. Corp. v. Superior Court*,
198 Cal. App. 4th 862 (2011) ................................................................5

*Beck v. City of Pittsburgh*,
89 F.3d 966 (3d Cir. 1996) ....................................................................3

*Becton, Dickinson & Co v. Tyco Healthcare Grp., L.P.*,
616 F.3d 1249 (Fed. Cir. 2010)...........................................................27

*Blakey v. Cont'l Airlines, Inc.*,
992 F. Supp. 731 (D.N.J. 1998) .............................................................4

*Bullen v. Chaffinch*,
336 F. Supp. 2d 342 (D. Del. Sept. 17, 2004)....................................3, 4

*Cargill, Inc. v. Canbra Foods, Ltd.*,
476 F.3d 1359 (Fed. Cir. 2007)........................................................32, 33

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
350 F. Supp. 2d 582 (D. Del. 2004) ......................................................26

*Cornell Univ. v. Hewlett-Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009)
*cross-appeals dismissed*, 455 F. App'x 954 (Fed. Cir. 2010) .................3

*Cortez v. Trans Union, LLC*,
617 F.3d 688 (3d Cir. 2010) ............................................................4, 22

*Donald M. Durkin Contracting, Inc. v. City of Newark*,
2008 WL 952984 (D. Del. Apr. 9, 2008) ...............................................4

*Donlin v. Philips Lighting N. Am. Corp.*,
581 F.3d 73 (3d Cir. 2009) ..................................................................27

*Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ...............................................................26

*Engalla v. Permanente Med. Grp., Inc.*,
15 Cal. 4th 951 (1997).........................................................................6

*Eshelman v. Agere Sys., Inc.*,
554 F.3d 426 (3d Cir. 2009) ..................................................................3

# TABLE OF AUTHORITIES (cont'd)

**Page**

Evans v. Port Auth. of N.Y. & N.J.,
   273 F.3d 346 (3d Cir. 2001) ............................................................5

Fladeboe v. Am. Isuzu Motors, Inc.,
   150 Cal. App. 4th 42 (2007) .........................................................23

Galena v. Leone,
   638 F.3d 186 (3d Cir. 2011) ...........................................................3

Gasperini v. Ctr. for Humanities, Inc.,
   518 U.S. 415 (1996) .....................................................................24

Gen. Elec. Co. v. Joiner,
   522 U.S. 136 (1997) .....................................................................27

Goehring v. Chapman Univ.,
   121 Cal. App. 4th 353 (2004) ................................................. 15, 20

Gray v. Don Miller & Assocs., Inc.,
   35 Cal. 3d 498 (1984) ...................................................................20

Grupe v. Glick,
   26 Cal. 2d 680 (1945) ................................................................8, 9

Hirst v. Inverness Hotel Corp.,
   544 F.3d 221 (3d Cir. 2008) .........................................................27

IPPV Enters., LLC v. Echostar Commc'ns. Corp.,
   191 F. Supp. 2d 530 (D. Del. 2002) ..........................................5, 22

In re James Wilson Assocs.,
   965 F.2d 160 (7th Cir. 1992) ........................................................26

Kenly v. Ukegawa,
   16 Cal. App. 4th 49 (1993) ...........................................................23

Kids' Universe v. In2Labs,
   95 Cal. App. 4th 870 (Cal. Ct. App. 2002) ....................... 9, 10, 13, 14

Kruse v. Bank of Am.,
   202 Cal. App. 3d 38 (1998) ..........................................................20

Legendary Art, LLC v. Godard,
   2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) .................................26

Lifescan, Inc. v. Home Diagnostics, Inc.,
   103 F. Supp. 2d 345 (D. Del. 2000),
   aff'd, 13 Fed. App'x 940 (Fed. Cir. 2001) ........................................3

# TABLE OF AUTHORITIES (cont'd)

**Page**

*McMillan v. Weeks Marine, Inc.*,
    478 F. Supp. 2d 651 (D. Del. 2007) ...................................................................25

*Meteorlogic, Inc. v. KLT, Inc.*,
    368 F.3d 1017 (8th Cir. 2004) .......................................................................26

*Mindgames, Inc. v. W. Publ'g Co.*,
    218 F.3d 652 (7th Cir. 2000) .........................................................................14

*Minn. Mut. Life Ins. Co. v. Ensley*,
    174 F.3d 977 (9th Cir. 1999) .........................................................................20

*Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*,
    833 F.2d 491 (3d Cir. 1987) ..........................................................................12

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996)...................................................................5, 22

*Paradox Sec. Sys. v. ADT Sec. Servs.*,
    388 F. App'x 976 (Fed. Cir. 2010)................................................................28

*Parlour Enters., Inc. v. Kirin Grp., Inc.*,
    152 Cal. App. 4th 281 (2007) ..........................................................9, 12, 17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013)......................................................................4

*Pryer v. C.O. 3 Slavic*,
    251 F.3d 448 (3d Cir. 2001) ...........................................................................4

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) ........................................................................................3

*Rohm & Haas Co. v. Brotech Corp.*,
    1995 WL 17878613 (D. Del. Jun. 30, 1995),
    *aff'd*, 48 F.3d 1089 (Fed. Cir. 1997) ...........................................................28

*Sargon Enters., Inc. v. Univ. of S. Cal.*,
    55 Cal. 4th 747 (2012)...................................................................2, 8, 9, 14

*Serv. Emps. Int'l Union, Local 250 v. Colcord*,
    160 Cal. App. 4th 362 (2008) .......................................................................20

*Shum v. Intel Corp.*,
    630 F. Supp. 2d 1063 (N.D. Cal. 2009).........................................................20

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
    453 F. App'x 977 (Fed. Cir. 2011).................................................................30

## TABLE OF AUTHORITIES (cont'd)

*Sole Energy Co. v. Petrominerals Corp.*,
128 Cal. App. 4th 212 (2005) ........................................................................................12

*Spence v. Bd. of Educ. of Christina Sch. Dist.*,
806 F.2d 1998 (3d Cir. 1986)........................................................................................22

*Starceski v. Westinghouse Elec. Corp.*,
54 F.3d 1089 (3d Cir.1995) ............................................................................................4

*Sterling v. Redevelopment Auth. of the City of Phila.*,
836 F. Supp. 2d 251 (E.D. Pa. 2011)............................................................................26

*Stevens v. Parke, Davis & Co.*,
9 Cal. 3d 51 (1973)........................................................................................................24

*Syngenta Seeds, Inc. v. Monsanto Co.*,
404 F. Supp. 2d 594 (D. Del. 2005),
*aff'd*, 231 F. App'x 954 (Fed. Cir. 2007) ......................................................................4

*TK-7 Corp. v. Estate of Barbouti*,
993 F.2d 722 (10th Cir. 1993) ....................................................................... 17, 18, 19, 26

*Tunis Bros. Co. v. Ford Motor Co.*,
952 F.2d 715 (3d Cir. 1991) .........................................................................................18

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ............................................................................... 4, 8, 24

*Williams v. Wraxall*,
33 Cal. App. 4th 120 (1995) .........................................................................................20

*Woodson v. Scott Paper Co.*,
109 F.3d 913 (3d Cir. 1997) ................................................................................... 4, 24

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
609 F.3d 1308 (Fed. Cir. 2010)............................................................................. 4, 8, 24

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012) .........................................................................................26

## Statutes and Rules

35 U.S.C. § 102(b) .................................................................................................................32

Cal. Civ. Proc. Code § 657 ....................................................................................................24

Fed. R. Civ. P. 50(a)................................................................................................................1

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

<u>**Page**</u>

Fed. R. Civ. P. 50(b) ........................................................................... 1, 3, 34

Fed. R. Civ. P. 59 ...................................................................................... 34

Fed. R. Civ. P. 59(a)(1) ........................................................................... 1, 4

Fed. R. Evid. 702(d) .................................................................................... 27

Fed. R. Evid. 703, advisory committee's note ............................................. 26

<u>**Other Authorities**</u>

1 Witkin, Summary of California Law *Contracts* § 882 (10th ed. 2005) ............................. 9

Restatement (Second) of Torts § 538 (1977) ......................................................... 6

# I.     INTRODUCTION

Defendant Cisco Systems, Inc. ("Cisco") respectfully files this opening brief in support of its motion for judgment as a matter of law (JMOL) under Fed. R. Civ. P. 50(b) and alternatively for new trial and/or remittitur under Fed. R. Civ. P. 59(a)(1).    Cisco hereby renews and incorporates by reference its previous submissions under Fed. R. Civ. P. 50(a) (D.I. 663).

The evidence at trial was legally insufficient to show that Cisco concealed *any material fact* about the denial of the application by Plaintiff XpertUniverse, Inc. (XU) to the SolutionsPlus Program, much less that XU—a new business with a new technology that had no customers, no sales, and no finished products—suffered a jaw-dropping ***$70 million*** in lost value damages from such concealment.    This Court therefore should grant JMOL for Cisco as to either liability or damages, or both.    Alternatively, the damages should be remitted from $70 million to no more than $4 million or the case set for new trial.

*First*, XU failed to provide legally sufficient evidence that Cisco fraudulently concealed any material fact.    At trial, XU's former president Elizabeth Eiss testified that Cisco made XU aware of virtually everything that happened to XU's application for the SolutionsPlus Program: that Cisco's Governance Council considered the application in late April, that the Council did not approve the application based on several objections, and that John Hernandez (the product manager for Cisco's Customer Contact Business Unit (CCBU)) and others at Cisco were working to overcome those objections.    The only thing that XU did not learn was that the Council had termed XU's application "denied."    XU failed to show that knowing that its application had been "denied" as opposed to "not granted" would have made any difference to XU, much less the material difference that is legally required for a judgment of fraudulent concealment.

*Second*, even if XU had proved fraudulent concealment (which it did not), it failed to provide legally sufficient evidence at trial that it sustained $70 million in damages for lost value as a result. Under California law, which governs XU's fraudulent concealment claim, both the occurrence and the extent of lost profits or lost value must be proved with reasonable certainty. This is an especially exacting standard for a new business, as the California Supreme Court recently reaffirmed unanimously in *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747 (2012). *Sargon* held impermissibly speculative expert opinion testimony that a small dental implant start-up that had never earned more than $100,000 a year within ten years would have captured up to 20% of the global dental implant market and made profits of up to $1.2 billion—if only USC had completed a small clinical study. XU's damages expert Walter Bratic offered similarly speculative testimony that XU would have captured 15-30% of the market for expert location software and thus been worth $70 million—but for Cisco's supposed concealment of the fact that XU's application had "denied." Bratic's testimony fell far short of showing with reasonable certainty the occurrence, extent or causation of *any* lost value to XU, much less $70 million in lost value, and XU provided no other evidence on which a rational jury could have based such damages.

*Alternatively*, should the Court deny Cisco JMOL on fraudulent concealment liability and/or damages, the Court should remit XU's damages from $70 million to $2.66 million or at most $4 million, and/or order a new trial. The only non-speculative evidence of damages in the record was that XU spent up to $4 million on integrating its product with Cisco routers in 2006 (including approximately $2.66 million after the denial of the SolutionsPlus application) in the hope of partnering with Cisco. That evidence should place an upper boundary on the damages this Court allows to stand. In the event that XU declines remittitur to that amount, the Court

should grant new trial on the grounds that the jury's verdict was against the weight of the evidence, the damages were excessive, and the damages were tainted by Bratic's speculative and unreliable expert testimony.

*Finally*, JMOL or new trial should be granted on XU's patent infringement claims. The conclusory testimony of its patent expert failed to establish that Cisco's products practiced all the limitations of the '903 and the '709 patents. Moreover, the evidence showed that XU offered both inventions for sale more than a year before applying for the patents.

## II.  LEGAL STANDARDS

Under Fed. R. Civ. P. 50(b), this Court should grant a motion for JMOL if, "viewing the evidence in the light most favorable to the nonmoving party, there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law." *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). JMOL is thus warranted if "there is no legally sufficient evidentiary basis for a reasonable jury to find" for the non-moving party on a determinative issue. *Bullen v. Chaffinch*, 336 F. Supp. 2d 342, 346 (D. Del. Sept. 17, 2004) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)). "The question is not whether there is literally no evidence supporting the . . . party [against whom the motion is directed], but whether there is evidence upon which a reasonable jury could properly have found its verdict." *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 433 (3d Cir. 2009) (citation omitted). A court therefore may enter JMOL as to liability if the plaintiff failed to prove a necessary element of its claim, *see, e.g.*, *Galena*, 638 F.3d at 208, 213; *Lifescan, Inc. v. Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 362 (D. Del. 2000), *aff'd*, 13 Fed. App'x 940 (Fed. Cir. 2001), or as to the amount of damages if the plaintiff failed to present sufficient evidence to sustain the amount, *see, e.g.*, *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 292-93 (N.D.N.Y. 2009) (Rader, J.,

by designation), *cross-appeals dismissed*, 455 F. App'x 954 (Fed. Cir. 2010); *Donald M. Durkin Contracting, Inc. v. City of Newark*, 2008 WL 952984, at *3-7 (D. Del. Apr. 9, 2008).

This Court may grant a new trial under Fed. R. Civ. P. 59(a)(1), even where the verdict is supported by substantial evidence, if the verdict is "against the clear weight of the evidence" and thus a new trial is needed "to prevent a miscarriage of justice," *Bullen*, 336 F. Supp. 2d at 347*; see also Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001), including with respect to the amount of damages, *see Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 26 (Fed. Cir. 2012); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010). In determining whether a verdict is against the weight of the evidence, "the court need not view the evidence in the light most favorable to the verdict winner," *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F. Supp. 2d 594, 600 (D. Del. 2005), *aff'd*, 231 F. App'x 954 (Fed. Cir. 2007), and is permitted to "consider the credibility of witnesses and to weigh the evidence," *Blakey v. Cont'l Airlines, Inc.*, 992 F. Supp. 731, 734 (D.N.J. 1998).

New trial also may be granted under Fed. R. Civ. P. 59(a)(1) if the Court finds that the "(1) damages are excessive, [or] (2) substantial trial errors were made." *Bullen*, 336 F. Supp. 2d at 347 (citing, *e.g.*, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 936 (3d Cir. 1997)).

A remittitur may be offered as an alternative to a new trial "when a trial judge concludes that a jury verdict is 'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff whole." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1356 (Fed. Cir. 2013) (applying Third Circuit law and quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir.1995)); *see also Cortez v. Trans Union, LLC*, 617 F.3d 688, 715-16 (3d Cir. 2010) (remittitur is appropriate where the damages awarded by the jury are "clearly unsupported and/or excessive") (citation omitted). A remittitur should be

set at "the highest amount the jury could 'properly have awarded based on the relevant evidence.'" *IPPV Enters., LLC v. Echostar Commc'ns. Corp*., 191 F. Supp. 2d 530, 573 (D. Del. 2002) (quoting *Oiness v. Walgreen Co*., 88 F.3d 1025, 1030 (Fed. Cir. 1996)); *accord Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354-55 (3d Cir. 2001).

## III. CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON LIABILITY FOR FRAUDULENT CONCEALMENT

### A. No Rational Jury Could Have Found That The Fact Purportedly Concealed By Cisco Was Material

This Court should grant JMOL that Cisco is not liable for fraudulent concealment of any material fact. On summary judgment, the Court dismissed most of XU's fraud claims because XU failed to offer evidence sufficient to raise a genuine issue. D.I. 634 at 13-15. The Court found genuine issues of fact concerning only XU's fraudulent concealment claim, which XU raised after discovery in opposition to Cisco's summary judgment motion. *See* D.I. 521 at 9-11. At trial, however, it became clear that Cisco had informed XU about the denial of its application for the SolutionsPlus Program in every respect except using the term "denied." XU's former president Ms. Eiss admitted on cross-examination that XU knew that its application for the Program had been presented to Cisco's Governance Council, that the Council had not accepted the application based on certain objections, and that Mr. Hernandez and others at Cisco were working to overcome those objections. Thus, the only thing concealed from XU was that Cisco's Governance Council had termed the application "denied." *See* PTX 37 at 4. XU did not, and could not, show that this fact was material, and therefore its fraudulent concealment claim failed as a matter of law.

To prove fraudulent concealment under California law, which governs XU's fraudulent concealment claim, *see* D.I. 634 at 3, a plaintiff must prove, *inter alia*, that the defendant "concealed or suppressed a *material* fact." *Bank of Am. Corp. v. Superior Court*, 198 Cal. App.

4th 862, 870 (2011) (emphasis added). A fact is "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997) (quoting RESTATEMENT (SECOND) OF TORTS § 538(2)(a) (1977)). Thus, to prevail on its fraudulent concealment claim, XU had to prove that Cisco concealed a fact that "would influence a reasonable person's judgment or conduct." 7 Tr. 2164:5-21, 2165:10-12.

Ms. Eiss testified at trial that, by June 2006, she was aware of what had happened to XU's application to the SolutionsPlus Program, admitting that she "knew our application had been submitted to the Council . . . ," 3 Tr. 633:17-18, and that (1) XU "didn't have an approval," 3 Tr. 635:16-17; (2) the Council had raised concerns about "getting clients on board and getting market traction," 3 Tr. 635:19-20, and "training and education issues," 3 Tr. 630:19; and (3) CCBU's product manager Mr. Hernandez was seeking to overcome those objections and get XU admitted to the program, 3 Tr. 634:4-11 ("John was absolutely working with us."). Indeed, in the months following the Governance Council's decision, Ms. Eiss worked with Mr. Hernandez "to counter the objections we've encountered from the Sales VPs and Channels team" in the Council. DX 433, 435, 456; 6 Tr. 1768:9-1771:4, 1771:12-1772:11, 1774:21-1775:11.

This effort to overcome the initial rejection of XU's application had a realistic chance of success and in fact came close to succeeding. Most applications for the SolutionsPlus Program go through multiple reviews, and many applications are accepted after being initially rejected. 6 Tr. 1712:14-1715:4. To help XU succeed in this fashion, Hernandez assumed personal responsibility for XU's SolutionsPlus application after the Council denied it, so that he could champion the application to the executives on the Council who had objected to the application. 6 Tr. 1765:4-18. Among other things, he lobbied Carl Weise, the sales executive on the Council,

and in October 2006 convinced Mr. Wiese to support XU's application. DX 455, 579; 6 Tr. 1783:7-1791:7, 1795:9-20. But, to overcome the Council's objections, Mr. Hernandez had to show that XU had customer support and, in particular, a "lighthouse account." 6 Tr. 1752:16-1753:8, 1754:8-1756:2. Mr. Hernandez believed that Citibank, which signed a statement of work for an XU pilot project, would be that "lighthouse account." *Id.*; 4 Tr. 1003:3-12. But Citibank encountered financial difficulties and canceled the pilot project. 4 Tr. 1003:16-1004:6, 1009:17-20. Because of this cancellation and the failure of another potential project with FedEx, Mr. Hernandez concluded that the Governance Council's objections to XU's application could not be overcome and decided not to continue to pursue the application. 6 Tr. 1797:24-1798:18.

XU asserted at trial that there is a difference between a "denial" and what it was told happened in the Governance Council, 3 Tr. 636:9-14, but failed to provide legally sufficient evidence to convince a rational jury that this difference was material. XU did not dispute Mr. Hernandez's testimony that many companies initially denied admittance into the SolutionsPlus program are later admitted, *see* 6 Tr. 1712:14-1715:4, nor that Mr. Hernandez believed that the Council's objections to XU's application could be overcome, PTX 45; 6 Tr. 1751:3-1752:15. XU also failed to present any evidence that, had it known that the Governance Council termed its application "denied," it would have pursued other partnering options rather than support Mr. Hernandez's efforts to have the application reconsidered. Nor did XU present evidence that *any* company that knew that its application had been considered but not granted pending efforts to overcome objections would have acted differently upon learning that its application had been termed "denied" while those efforts continued to take place. Accordingly, XU failed to present legally sufficient evidence that the fact supposedly concealed by Cisco was material, and therefore Cisco is entitled to JMOL on fraudulent concealment.

### B. Alternatively, Cisco Is Entitled To A New Trial On Fraudulent Concealment

For all the reasons set forth in Part III.B, *supra*, the jury's implied finding that XU concealed a material fact is against the great weight of the evidence. As a consequence, if JMOL is not granted on XU's fraudulent concealment claim, a new trial on that claim is warranted. *See Whitserve*, 694 F.3d at 26-34; *Wordtech*, 609 F.3d at 1319-22.

## IV. CISCO IS ENTITLED TO JMOL, OR TO REMITTITUR AND/OR NEW TRIAL, ON THE DAMAGES AWARDED FOR FRAUDULENT CONCEALMENT

### A. Cisco Is Entitled To JMOL That XU Did Not Cause XU To Suffer $70 Million In Lost Value Damages

Even if the verdict on fraudulent concealment liability is allowed to stand (which it should not be), this Court should grant JMOL on the $70 million awarded by the jury on the fraudulent concealment claim. California law requires that both the occurrence and the amount of any lost profits or lost value be proven with reasonable certainty, and this standard is especially stringent with respect to a new or unestablished business like XU. The testimony of XU's damages expert Mr. Bratic was legally insufficient under that standard. Mr. Bratic failed to establish that XU had lost any value as a result of Cisco's supposed eight-month concealment of the fact that XU's application for the SolutionsPlus Program had been "denied"—much less that XU's capital value would have been $70 million if only Cisco had added that one word to all the other disclosures it made to XU about the status of its application. Nor did XU provide any other evidence sufficient to satisfy California law on lost profits/lost value damages.

California law has long held that "damages for the loss of prospective profits" are recoverable only "where the evidence makes reasonably certain their occurrence and extent." *Grupe v. Glick*, 26 Cal. 2d 680, 692-93 (1945). This rule is especially stringent as applied to new or unestablished businesses such as XU, as the California Supreme Court recently reaffirmed in *Sargon*, 55 Cal. 4th at 774. As *Sargon* noted, when an established business claims

8

lost profits, the occurrence and extent of that loss "may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales." *Id.* (quotation omitted). In contrast, when start-ups and other *unestablished* businesses are prevented from operating, there is no such evidence.

Thus, as a general matter, "'where the operation of an *unestablished* business is prevented or interrupted, damages for prospective profits that might otherwise have been made from its operation are not recoverable for the reason that their occurrence is uncertain, contingent and speculative.'" *Id.* (quoting *Grupe*, 26 Cal. 2d at 692-93) (emphasis added); *see also* 1 WITKIN, SUMMARY OF CALIFORNIA LAW *Contracts* § 882 at 969 (10th ed. 2005) ("If the anticipated profits were not to come from an established business or profession, . . . the difficulty of estimating them has generally led the courts to classify the damages as uncertain and speculative, and to deny recovery."). This is especially true where, as here, a new business is in a market that itself was unestablished. *See Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870, 887 (Cal. Ct. App. 2002). This general bar to recovery of lost profits by a new or unestablished business may be overcome only in those cases "'where their nature and occurrence can be shown by evidence of reasonable reliability,'" *Sargon*, 55 Cal. 4th at 774 (quoting *Grupe*, 26 Cal. 2d at 693), and such certainty may be established "with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like," *Parlour Enters., Inc. v. Kirin Grp., Inc.*, 152 Cal. App. 4th 281, 288 (2007) (quoting *Kids' Universe*, 95 Cal. App. 4th at 884).

These precedents apply fully here. While *Grupe* and *Sargon* involved breach of contract rather than fraud claims, "the rule regarding proof of lost profits from an unestablished business applies in tort as well as contract cases," *Kids' Universe*, 95 Cal. App. 4th at 883. Moreover, lost

9

*value* damages (as XU claims here) are subject to the same new business rule as lost profits. *See id.* at 887-88 (rejecting evidence of lost value damages as insufficient to show with reasonable certainty that a toy retailer's unlaunched website would have led it to make future profits warranting a capital valuation of $50 million).

**1.      No Reasonable Jury Could Find With Reasonable Certainty That XU Lost Value**

At trial, XU presented testimony from its damages expert Mr. Bratic concerning its lost value, but that testimony failed to establish the occurrence of that loss with the reasonable certainty required by the new business rule.  Bratic adopted his valuation numbers without analysis from two reports, *see* 5 Tr. 1282:3-20, 1316:8-1317:1, that had valued XU based on projected revenues.  *See* PTX 312 at 27 (estimating XU's value based on multiples of revenue projections); PTX 314 at 22, 25-26 (estimating XU's value based on multiple of revenue projections and discounted cash flow analysis).  Although this Court excluded as based on "inherently speculative" projections the reports on which Mr. Bratic relied, *see* D.I. 608 at 4, Mr. Bratic pointedly declined to make any independent valuation of XU and instead relied upon the excluded reports, 5 Tr. 1282:18-1283:20.  And while this Court precluded Mr. Bratic from opining that Cisco's alleged concealment of the denial of the SolutionsPlus application caused any decrease in XU's value, *see* D.I. 647 at 3, 10, XU presented none of the evidence normally required to prove an unestablished business' lost profits or lost value with reasonable certainty: no business records of similar enterprises, no surveys of potential customers or market analyses, and no market or financial data independent of Mr. Bratic's testimony.

XU sought to prove that it would have generated sales and revenues by contending that it had the "option" of partnering with Genesys or IBM instead of Cisco.  7 Tr. 2218:24-2219:11.  But the evidence nowhere established that these options were anything more than mere

10

possibilities.  XU failed to present any testimony from Genesys or IBM that they likely would have entered into partnering arrangements with XU.  Instead, XU's former CEO Victor Friedman and former president and COO Ms. Eiss simply offered conclusory assertions that IBM and Genesys were available partnering "options."  2 Tr. 337:12-338:6; 3 Tr. 567:7-568:16.  For example, Mr. Friedman stated, without explanation, that he was "sure" Genesys "would have been delighted to walk into the Citibank opportunity," 2 Tr. 338:1-3—an opportunity that failed to materialize because of the financial difficulties and layoffs at Citibank in late 2006, *see supra* p. 7.  Ms. Eiss' testimony was similarly conclusory: she stated that she was "convinced" XU could have gone back to Genesys because XU already had built a solution with a Genesys component.  3 Tr. 568:10-12.  *But see* 3 Tr. 754:12-17 (stating that XU never had a finished product) (John Steinhoff).

The evidence that XU presented of its supposed IBM option was similarly insufficient to establish lost value with reasonable certainty.  Mr. Friedman asserted without explanation that IBM was "very, very interested in working with us" and did not care about whose router XU's platform ran on.  2 Tr. 337:17-23.  Ms. Eiss testified that XU "could have gone back to IBM" because it had grown its relationship with IBM while working with Cisco and "a lot of people behind IBM were big fans of what we were doing," 3 Tr. 567:10-568:5.  But neither Mr. Friedman nor Ms. Eiss testified that IBM was *likely* to partner with it, and evidence showed that IBM never purchased anything from XU, was less supportive of XU than Cisco, and talked about but did not offer a standstill agreement in early 2006.  2 Tr. 347:15-348:22; 3 Tr. 673:24-675:4.

This evidence fails as a matter of law to establish that XU would have partnered with IBM or Genesys with the reasonable certainty required by the new business rule.  To establish lost value with reasonable certainty based on an agreement that it was prevented from making, a

11

new or unestablished business must prove that "an agreement was likely." *Parlour Enters.*, 152 Cal. App. 4th at 292; *cf. Sole Energy Co. v. Petrominerals Corp.*, 128 Cal. App. 4th 212, 243 (2005) (requiring more than a "speculative expectation that a potentially beneficial relationship will arise" to establish tortious interference with prospective advantage) (citation omitted). A mere expression of interest in making a purchase and even a discussion of a possible purchase does not establish lost profits or lost value with reasonable certainty. *See, e.g.*, *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 498 (3d Cir. 1987) (oral expressions of interest and inquiries about capacity insufficient); *Sole Energy*, 128 Cal. App. 4th at 243 (discussions about possible purchases insufficient). *A fortiori*, the fact that XU had good relations and mutual interests with IBM and Genesys does not establish with reasonable certainty that either IBM or Genesys would have taken the greater step of partnering with XU.

Even if XU had shown with reasonable certainty that it would have entered into some partnership with IBM or Genesys (which it did not), it still would have had to prove with reasonable certainty that the arrangement would have resulted in sales before it could establish lost value. But XU had no sales, no customers, and no finished product, 2 Tr. 351:16-352:7; 3 Tr. 571:5-573:2, 754:15-755:1, and it presented no evidence that it would have gained traction and had sales or customers if it had partnered with IBM or Genesys.[1] XU's technology was admittedly new and "parad[igm] shift[ing]." 2 Tr. 262:21; *see also* 3 Tr. 511:21-23 ("we were offering a technology that didn't really exist before"). As a consequence, XU had to persuade

---

[1]  Mr. Friedman testified at trial that Citibank was a customer of XU, *see* 2 Tr. 352:8-15, and XU presented testimony from Harvey Koeppel, the former chief information officer of Citibank's global consumer group, that Citibank was interested in XU's technology and signed a statement of work for a pilot project with XU. 4 Tr. 982-1018; *see also* 2 Tr. 328:18-329:22, 352:8-13. But, as previously noted, Citibank did not go forward with the project for financial reasons, 4 Tr. 1003:16-1004:6, 1009:11-1012:8, which doomed XU's Citibank prospects whether partnered with Cisco, IBM or Genesys.

would-be customers to "imagine how to transform their business processes so that the world could be different," 3 Tr. 511:19-512:9, *see also* 3 Tr. 595:20-596:11 ("we had to get the mind share around what XpertShare could do to change business processes and then they had to buy on to that"); 3 Tr. 610:10-12 (XU's product "involved rethinking business process"). XU failed to present any evidence that, if it had partnered with IBM or Genesys, customers would not only have imagined this transformation but also invested in it by purchasing XU's product. In short, based on the record at trial, no reasonable jury could find with reasonable certainty that XU would have had any sales if it had partnered with IBM or Genesys, much less lost any value derived from those sales. In short, XU's valuation of itself was based on sheer speculation.

The California Court of Appeal has held that far more extensive and persuasive evidence was legally insufficient to satisfy the new business rule. In *Kids' Universe*, 95 Cal. App. 870, a toy company claimed that the negligent flooding of its retail store prevented it from starting an online business in late 1997 when toy retailers first appeared on the Internet. *Id.* at 876-77. The company presented evidence that it had developed a sophisticated website, made preparations to respond to online orders, and negotiated favorable placement on a fast-growing Internet portal. *Id.* at 886-87. It also presented evidence that, by the time it recovered from the flood, placement on an Internet portal was no longer affordable, but that eToys, an on-line toy retailer that began using the same Internet portal at the same time that the company would have, enjoyed great success. *Id.* at 876, 887-88 Although acknowledging that this evidence suggested that the company's website would have been successful absent the flood, the California Court of Appeal nonetheless held that the evidence "would not allow a reasonable trier of fact to find with reasonable certainty lost net *profits* from the unlaunched Web site" because (1) the online market for toys was unestablished at the time; (2) the company had not previously made any profit on its

website and presented no evidence that the website would have been profitable with the portal; and (3) the website's success was contingent upon customers actually making purchases and doing so in sufficient quantity to make the website successful. *Id.* at 887-88.

The evidence presented by XU at trial is similarly insufficient to show lost sales, lost profits, or lost value with reasonable certainty. Like the toy company in *Kids' Universe*, XU was an unestablished business operating in an unestablished area; it had no record of sales, much less profitability; and its success was contingent upon customer acceptance and purchase of its products. Indeed, XU's evidence is much weaker. In contrast to the toy company in *Kids' Universe*, XU had no finished product; there was no established market for its new and untested technology; and it was unable to point to any similarly situated business that succeeded in selling the product. Thus, under *Kids' Universe* and California's new business rule, XU failed to establish with the requisite reasonable certainty the occurrence of any lost revenue and, by extension, any lost value.

**2. No Reasonable Jury Could Find With Reasonable Certainty That The Amount Of XU's Lost Value Was $70 Million**

In addition to failing to prove with reasonable certainty the occurrence of any lost value, XU also failed to prove with reasonable certainty the amount of that supposed loss. Although the calculation of lost profits or lost value is "always speculative to some degree" and thus cannot be calculated with "absolute certainty," *Sargon*, 55 Cal. 4th at 775, California law requires the extent or amount of lost profits or value to be proven to a reasonable certainty, which means that there must be "some reasonable basis of computation," *id.* at 774 (quotation omitted); *see also Mindgames, Inc. v. W. Publ'g Co.*, 218 F.3d 652, 658 (7th Cir. 2000) (Posner, J.) ("a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate . . . capitalizing fantasized

14

earnings into a huge present value sought as damages").  XU failed to offer any such basis for the $70 million in lost value that the jury found in awarding damages, and its evidence of the amount of lost value was thus legally insufficient for several reasons:

*First*, XU's lost value evidence used the wrong measure of lost value.  Damages for fraud are recoverable only if the plaintiff proves a "causal connection with the reliance" on the omission or misrepresentation, *Goehring v. Chapman Univ.*, 121 Cal. App. 4th 353, 364 (2004), which in this case means a causal connection with XU's reliance on its supposed belief that its SolutionsPlus application had not been denied.  Thus, the proper measure of XU's lost value damages was the difference between what the company would have been worth if the "denial" had been disclosed in late April 2006, when the purported reliance began, and its value after the "denial" was disclosed in January 2007.  XU's expert, however, incorrectly determined XU's value as the difference between its value with and without a partnership with Cisco.

Mr. Bratic took his valuation of XU from two reports, neither of which considered the impact on XU's value of the timing of Cisco's disclosure that the SolutionsPlus application had been denied.  The Standard & Poor's report, which was issued in February 2005, PTX 312 at 1, more than a year before the denial of XU's SolutionsPlus application, estimated XU's value "*based upon a potential partnership with Cisco*."  D.I. 498, Ex. 46 ¶ 72 (emphasis added).  And the Duff & Phelps report, which was issued in October 2006, PTX 314 at 1, three months before the denial of the application supposedly was disclosed, assumed that XU would "implement[] a partnering model" through which "potential sales relationships . . . may be fostered,"  PTX 314 at 12 n.4, 17, and its valuation of XU's financial sector operations was "very close" to the Standard & Poor's valuation, 5 Tr. 1297:8-19.  Accordingly, Mr. Bratic recognized at trial that

the valuations he took from the Standard & Poor's and Duff & Phelps reports assumed that XU

would partner with Cisco in the SolutionsPlus Program or at least had the prospect of doing so:

> Q.     Please explain [your damage model] to us.
>
> A.     . . . [T]he measure of damages is to look at what the value of [XU] was *at the time it was part of the SolutionsPlus program, working towards that*, comparing what happened after it was no longer part of the SolutionsPlus program.

5 Tr. 1275:24-1276:22 (emphasis added).  Thus Mr. Bratic incorrectly measured the damages to

XU *from not being in SolutionsPlus*, not the damages from Cisco's supposed disclosure that XU

had been denied admittance to the program in January 2007 rather than in April 2006.[2]

Elsewhere, Mr. Bratic asserted that his $70 million valuation assumed only that XU

would "partner or collaborate with companies, either Cisco or other companies."  5 Tr. 1255:9-

18; *see also* 5 Tr. 1276:10-14 (assuming that XU "was going forward with partners . . . whether

they be Cisco, whether they be IBM or Genesys").  But XU failed to prove with reasonable

certainty that XU would have partnered with IBM or Genesys.  *See supra* pp. 10-14.  In addition,

XU failed to present any evidence that IBM or Genesys had a partnering program similar to

Solutions Plus or that XU's revenues in a sales partnership with IBM or Genesys would have

been the same as it was projected to have in the SolutionsPlus Program.  To the contrary, the

evidence showed that Cisco was XU's preferred partner and that, even after the SolutionsPlus

application was denied, Cisco supported XU more vigorously than IBM.  DX 428; 3 Tr. 673:16-

675:4.  Thus, Mr. Bratic's assumption that XU had the same value whether it partnered with

Cisco, IBM or Genesys is based on speculation and thus fails to establish XU's value with the

reasonable certainty required by the new business rule.

---

[2]    Mr. Bratic used this measure in his expert report, because, when he submitted the report, XU was claiming that it was promised admittance to SolutionsPlus.  D.I. 82 ¶¶ 76, 145(b).  This claim was rejected at the summary judgment stage.  *See* D.I. 634, at 14.

*Second*, even if the valuations that Mr. Bratic drew from the Standard & Poor's and Duff & Phelps reports had used the right measure of damages, they were based on revenue projections that are, as this Court recognized, "inherently speculative." D.I. 608 at 4. Both reports estimated the value of XU based on its anticipated revenues, which in turn were "based on projections provided by XUI management." PTX 314 at 3, 12, 15; *see also* PTX 312 at 9 nn. 3-4 (noting that projections were "[b]ased on discussions with XpertUniverse Management"). Neither Standard & Poor's nor Duff & Phelps purported to have verified the projections from XU's management. To the contrary, Standard & Poor's itself described XU management's projections as "guesstimates." PTX 312 at 4. The Duff & Phelps report stated that it would "assume no responsibility and make no representations with respect to the[ir] accuracy," and that its valuation was "dependent on the achievability of management's projections." PTX 314 at 3. Moreover, neither the reports, Mr. Bratic nor XU explained how XU's management had generated the projections used in the reports.

A valuation based on such unexplained projections cannot establish a new business's loss with reasonable certainty. *See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 733-34 (10th Cir. 1993) (holding lost profit calculations based on unexplained sales projections were speculative and failed to show lost profits with reasonable certainty); *AlphaMed Pharms. Corp. v. Arriva Pharms., Inc*., 432 F. Supp. 2d 1319, 1350-51 (S.D. Fla. 2006) (holding lost profits calculations by the same damages expert Mr. Bratic speculative because based on unproven assumptions in the plaintiff's business plan), *aff'd*, 294 F. App'x 501 (11th Cir. 2008); *Parlour Enters.*, 152 Cal. App. 4th at 289-90 (holding impermissibly speculative a lost profits calculation that a small ice cream restaurant would grow on a par with the national Friendly's chain, noting that the plaintiff had failed to show "how the projections were actually calculated or upon what facts they were

17

based"); *see also Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 738-39 (3d Cir. 1991) ("[A] growth percentage rate determined only by the plaintiffs' speculation about the number of tractors they could sell within a given year requires the jury to speculate and thus cannot support a compensatory damages award.").

For example, in *TK-7 Corp.*, 993 F.2d 722, the plaintiff asserted that the defendant had prevented it from entering into a joint venture in Britain, and its financial expert had calculated the lost profits from that venture based on market share projections in a market survey report. *Id.* at 730-31. The expert, however, failed to explain how the market share projections in the report were generated. *Id.* at 733. Thus, applying Oklahoma's "new business rule," the Tenth Circuit held that, even though the expert attempted to corroborate the projections, his calculations were speculative and failed to prove lost profits with reasonable certainty. *Id.* at 726, 733. "In order to establish future lost profits damages with reasonable certainty, the plaintiffs at a minimum were required to present testimony fully explaining how the projection of future sales was calculated and the factors upon which it was based." *Id.* at 733

Applying the *TK-7 Corp.* decision, *AlphaMed* held the testimony of Mr. Bratic, XU's damages expert here, deficient as a matter of law. In *AlphaMed*, Mr. Bratic opined that, due to the defendant's misconduct, AlphaMed, a start-up, missed a "window of opportunity" to attract capital and went out of business. 432 F. Supp. 2d at 1330. Mr. Bratic in that case, much as here, calculated AlphaMed's lost profits based on assumptions in AlphaMed's business plan and representations of its owners. *Id.* at 1350. After trial, the district court granted JMOL, reasoning that, to satisfy its burden of proof, AlphaMed had "to prove the factual bases on which [Bratic's] assumptions rested." *Id.* at 1351. Because AlphaMed failed to do so, the court ruled that it had failed to prove lost profits with reasonable certainty and entered JMOL for defendant Arriva. *Id.*

at 1351-52. The Eleventh Circuit unanimously affirmed, based on the district court's "well-reasoned opinion." 294 F. App'x 501.

Mr. Bratic's testimony here, as in *AlphaMed*, failed to prove with reasonable certainty lost value from a supposed lost window of opportunity. Much as in *AlphaMed*, Mr. Bratic relied on client revenue projections, here filtered through the Standard & Poor's and Duff & Phelps reports. But Mr. Bratic failed to explain the basis for these projections, and XU presented no other evidence explaining them. And like the expert in *TK-7 Corp.*, Mr. Bratic attempted to corroborate some of the projections based on Cisco's projections for XU sales while partnered with Cisco, but failed to explain how these projections were generated, much less how they suggested what XU's sales would have been if XU had partnered with IBM or Genesys rather than Cisco. *See* 5 Tr. 1300:15-1305:4; PTX 469 at 16. Thus, XU failed to prove the reliability of the projections on which Mr. Bratic's valuation was predicated, and therefore failed to establish the amount of XU's loss with reasonable certainty.

### 3. No Reasonable Jury Could Find That Cisco's Delay In Disclosing The Denial Of XU's SolutionsPlus Application Caused Any Loss In XU's Value

In addition to failing to show either the occurrence or the amount of lost value with reasonable certainty and therefore failing to satisfy California's new business rule, XU failed to prove the required element of causation with respect to the lost value damages the jury awarded. This Court warned XU before and during trial that it could not rely upon Mr. Bratic to establish such causation, but instead would have to do so through fact testimony. *See* D.I. 647 at 3 ("Causation is a factual issue on which Bratic has not offered any helpful expert testimony. XU must prove causation through fact testimony."); *see also* 5 Tr. 1315:2-18, 1315:20-1316:5, 1320:3-11 (sustaining objections to testimony by Bratic concerning causation). XU did not heed these warnings, and failed to present any fact testimony establishing that Cisco's supposed delay

in disclosing the denial of the SolutionsPlus application, as distinguished from the denial itself, caused XU to suffer $70 million in damages.

Under California law, "[d]eception without resulting loss is not actionable fraud," and therefore "[t]o recover for fraud, a plaintiff must 'prove detriment proximately caused by the defendant's tortious conduct.'" *Geohring*, 121 Cal. App. 4th at 364 (quotation omitted); *see also Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 60 (1998) ("It is axiomatic that to obtain recovery for fraud, a claimant must prove, *inter alia*, that damages were sustained as a proximate [result] of the fraudulent conduct.") (citation omitted). Accordingly, even apart from the new business rule, courts applying California law have granted JMOL when a plaintiff claiming fraud has not proved causation. *See, e.g.*, *Shum v. Intel Corp.*, 630 F. Supp. 2d 1063, 1075 (N.D. Cal. 2009); *Kruse*, 202 Cal. App. 3d at 60-62; *Williams v. Wraxall*, 33 Cal. App. 4th 120, 132, 137 (1995); *see also Minn. Mut. Life Ins. Co. v. Ensley*, 174 F.3d 977, 982 (9th Cir. 1999) (granting summary judgment); *Gray v. Don Miller & Assocs., Inc.*, 35 Cal. 3d 498, 503-04 (1984) (reversing fraud damages award where plaintiff's claimed damages were not caused by reliance on the fraud but by other non-actionable events); *Serv. Emps. Int'l Union, Local 250 v. Colcord*, 160 Cal. App. 4th 362, 375 (2008) (reversing trial court's award of damages for fraud and breach of fiduciary duty after bench trial because there was "no substantial evidence" of causation); *Goehring*, 121 Cal. App. 4th at 365 (granting summary adjudication).

XU's theory of causation was that concealment of the "denial" of its SolutionsPlus application from late April 2006 until January 2007 caused it to fail and go out of business. But XU did not present evidence of such a causal connection. Far from presenting evidence that Cisco's concealment of the denial of its application caused it to go out of business, XU presented testimony that the ***denial*** itself "killed" its business. For example, Mr. Friedman testified that,

20

when he told investors that XU would not participate in the SolutionsPlus Program, they were angered and that "funding dried up very quickly. The investors that used to be there for us were all done. . . . And we slowly but surely started to wind down the company . . . ." 2 Tr. 336:1-5. Ms. Eiss similarly testified that the SolutionsPlus Program was important to XU's investors and that denial of XU's application "pretty much killed the company because we were counting on SolutionsPlus to drive revenue." 3 Tr. 532:7-23, 566:8-567:6.

Moreover, XU failed to prove that disclosure of the denial of its application had any different impact in January 2007 than it would have had in April or May 2006, shortly after the Governance Council made its decision. Mr. Friedman and Ms. Eiss testified that XU had other "options" in April 2006, 2 Tr. 337:12-338:6; 3 Tr. 567:7-568:16, but XU failed to show that these options would have led to a partnering relationship, much less that such a relationship would have saved XU from failure and enabled XU to achieve the projected revenues that formed the basis for the $70 million valuation. *See supra* pp. 10-14, 16. In addition, XU failed to offer any reason why these options were available in late April 2006 but not in January 2007, thus failing to show that the supposed concealment of the denial until January 2007 affected the availability of the options.

Indeed, the evidence showed that, by April 2006, XU already had one foot in the grave. By that time, XU had been operating for seven years and had expended at least $24 million. DX 521 at 2; 2 Tr. 351:16-18. Nevertheless, it had not sold a single product and did not even have a finished product available for sale. 2 Tr. 351:22-352:7; 3 Tr. 571:5-573:8. XU also could not identify any customer other than Citibank, which pursued a pilot project but in the end did not go forward with even that project. *See supra* pp. 7, 12 n.1 Questions were being raised about XU's senior executives, product, and business model. DX 502, 505, 507, 513, 521. And XU was

strapped for cash and had no ability to support any clients other than Citibank. DX 425 at 4; 3 Tr. 619:5-620:3.

In light of this record, no reasonable jury could have found that XU's demise was caused by Cisco's delay in disclosing the fact that in late April 2006 the Governance Council had termed XU's SolutionsPlus application "denied."

**B.      Alternatively, The Court Should Grant Remittitur And/Or A New Trial On Damages For Fraudulent Concealment**

If the Court does not grant JMOL on the damages awarded XU on its fraudulent concealment claim, it should remit those damages or grant a new trial on damages.

**1.      Any Damages Awarded For Fraudulent Concealment Should Be Remitted To $2.66 Million Or At Most $4 Million**

"The remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Cortez*, 617 F.3d at 715 (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1998, 1201 (3d Cir. 1986); brackets omitted). As shown in Section IV.A *supra*, the $70 million in damages awarded by the jury for fraudulent concealment is both clearly unsupported and excessive: the evidence failed to show that XU was a $70 million company or that Cisco's supposed failure to earlier disclose its "denial" of XU's application for the SolutionsPlus Program caused XU to fail, much less to lose $70 million in value. If the Court does not grant JMOL on damages for fraudulent concealment, it should remit those damages to the "highest amount the jury could properly have awarded based on the relevant evidence." *IPPV Enters.*, 191 F. Supp. 2d at 573 (quoting *Oiness*, 88 F.3d at 1030).

While Mr. Bratic's $70 million valuation for XU is unsupportable, and XU failed to offer any alternative method by which the jury could reasonably have calculated the company's purported lost value, the record might support up to $2.66 million or at most $4 million in

damages to which this Court could order remittitur.  As the Court recognized, D.I. 647 at 3-4, XU could have sought to recover reliance damages,[3] and the jury might have concluded that XU would have halted its efforts at integration upon hearing of the denial of the SolutionsPlus application despite Mr. Hernandez's nearly successful efforts at revisiting the issue.  The jury thus conceivably might have awarded XU the amounts its expended working on integrating its software with Cisco routers after late April 2006.  *See, e.g.*, *Fladeboe v. Am. Isuzu Motors, Inc.*, 150 Cal. App. 4th 42, 66 (2007) (noting that defrauded parties are entitled to recover "out-of-pocket damages"); *Kenly v. Ukegawa*, 16 Cal. App. 4th 49, 54-55 (1993) ("Cases involving fraud where property was not acquired have limited damages to out-of-pocket losses.").  Mr. Bratic testified that XU raised $4 million in 2006, which it spent on the integration.  5 Tr. 1311:14-22. XU cannot claim reliance damages for any expenses incurred before the supposed concealment of the denial of the SolutionsPlus application in late April 2006, *see* D.I. 647 at 3-4, and there is no evidence of how much of the work on integrating XU's products with Cisco routers was done before April 2006.  As a result, the highest out-of-pocket damages the record might support would assume that the expenditures were evenly distributed throughout the year and attribute to the eight months from May to December two-thirds of the 2006 expenses, which is approximately $2.66 million.  In no event could the jury award reliance damages of more than

---

[3]  The Court also addressed this measure of damages with Bratic at the *Daubert* hearing. D.I. 646 at 115:24-119:12. There, Mr. Bratic confirmed that he reviewed XU's financial records to determine the amount XU spent working on the integration during the concealment period. *Id.* at 118:1-4 ("THE COURT:  So the part about how they spent money between April and October or April and January, is that based on a review of the financial records?  THE WITNESS: Yes.").

the $4 million expended in 2006. Thus, the damages for fraudulent concealment should be remitted to $2.66 million or at most to $4 million.[4]

## 2. Cisco Is Entitled To A New Trial On Damages For Fraudulent Concealment

If the Court grants remittitur, it should grant a new trial on the damages awarded on XU's fraudulent concealment claim contingent on XU's rejection of the remittitur.

*First*, for all the reasons set forth in Part IV.A *supra*, the jury's findings that XU lost value, that this lost value amounted to $70 million, and that XU's failure and consequent loss in value was caused by the supposed concealment of the "denial" of the SolutionsPlus application were against the great weight of the evidence. As shown above, XU never was a $70 million company; the evidence presented by XU of its alleged loss was speculative and failed to establish either the occurrence or the amount of the loss with reasonable certainty; and XU did not go out of business or lose any value it might otherwise have had because Cisco failed to disclose that the Governance Council "denied" XU's application from late April 2006 through January 2007. *See supra* pp. 8-22. As a consequence, if JMOL is not granted, a new trial is warranted. *See Whitserve*, 694 F.3d at 26-34; *Wordtech*, 609 F.3d at 1319-22.

*Second*, a new trial is warranted for the related reason that the jury's $70 million award is excessive. *See, e.g.*, *Woodson*, 109 F.3d at 936. A verdict is excessive if it is so large that the jury "clearly should have reached a different verdict," Cal. Civ. Proc. Code § 657, or, put another way, "the evidence does not justify the amount of the award," *Stevens v. Parke, Davis & Co.*, 9 Cal. 3d 51, 61 (1973). *See also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 419 (1996)

---

[4]    In addition, as explained in Cisco's brief concerning the limitation-of-liability clause in the parties' Technology Developer Program Agreements, XU's damages are subject to a $3 million cumulative cap. The total damages on the patent infringement and fraudulent concealment claims therefore cannot exceed $3 million.

(holding that state law governs whether an award is excessive). As just shown, that is the case here.

*Third*, a new trial is warranted because the jury's damages award was tainted by unreliable expert testimony from Mr. Bratic. *See McMillan v. Weeks Marine, Inc.,* 478 F. Supp. 2d 651, 656-60 (D. Del. 2007) (granting a new trial on damages after concluding that the testimony and expert reports of plaintiff's damages expert should not have been admitted at trial); *see also* D.I. 389-1 (listing nine published decisions excluding or striking testimony from Bratic).

After the *Daubert* hearing, this Court expressed doubts about the reliability of Mr. Bratic's opinion concerning XU's value and in particular his use of the valuations in the Standard & Poor's and Duff & Phelps reports, *see* D.I. 647 at 3 n.1, which were excluded in part because of the speculative nature of the projections on which those valuations were predicated. *See* D.I. 608 at 4. Nonetheless, the Court allowed Mr. Bratic to offer his opinion concerning XU's value based on his representation that it was reasonable to rely upon the reports because he had done his "own independent work and investigation on those valuation reports." D.I. 646 at 56-60. At trial, however, Mr. Bratic revealed just how deficient that "independent work and investigation" had been. Although he checked most of the sources identified in the reports, 5 Tr. 1297:20-1298:16, he sought to verify the revenue projections upon which the valuations in the reports were predicated merely by comparing them to *Cisco*'s projections of XU's sales had XU been partnered with Cisco—without attempting to explain why XU's sales partnered with someone else would have been similar. *See supra* p. 16. These "Cisco" projections in turn were merely *XU's own projections*, provided by XU to Cisco and circulated within Cisco. 6 Tr. 1739:20-1749:3. In addition, despite the Court's observation that these "guesstimates" were

"inherently speculative" and generated by parties with a "substantial motive to paint a rosy picture," D.I. 608 at 4, Mr. Bratic made no attempt to explain how the projections were generated, much less determine if they were made in a reliable fashion, which is itself grounds for rejecting his opinion as unreliable. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290-93 (3d Cir. 2012) (upholding exclusion of expert opinion based upon financial projections because the expert was unfamiliar with the assumptions and methodology underlying the projections); *Meteorlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004) (excluding an opinion based on uncritical acceptance of a report prepared for a party as an investment-planning tool); *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004) (excluding damages estimates based on projections in a marketing presentation when the expert failed to investigate the methodology used to generate the projections); *Sterling v. Redevelopment Auth. of the City of Phila.*, 836 F. Supp. 2d 251, 273 (E.D. Pa. 2011) (excluding expert opinion concerning lost profits because it was based on revenue projections from the plaintiff that the expert failed to investigate).

Mr. Bratic's failure to investigate the basis for the projections in the Duff & Phelps and Standard & Poor's reports also improperly foreclosed any critical examination of them at trial. Although experts may rely on hearsay, they may not act simply as a mouthpiece or conduit for hearsay. *See, e.g.*, *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (Posner, J.); *see also TK-7 Corp.*, 993 F.2d at 732-33; *In re James Wilson Assocs.*, 965 F.2d 160, 172-73 (7th Cir. 1992) (Posner, J.); *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *4-5 (E.D. Pa. Aug. 17, 2012). Experts are permitted to rely on hearsay "because the expert's 'validation, expertly performed and subject to cross-examination'" substitutes for cross-examination of the original declarant. *TK-7 Corp.*, 993 F.2d at 732 (quoting Fed. R. Evid. 703,

26

advisory committee's notes). Mr. Bratic short-circuited such scrutiny by relying on projections in documents excluded from the record without determining how they were generated.

Finally, Mr. Bratic's testimony was unreliable and inadmissible because his valuation of XU does not "fit" this case. *See* Fed. R. Evid. 702(d) (an expert must have "reliably applied the principles and methods to the facts of the case"); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). As shown in Section IV.A.2 *supra,* Bratic did not calculate XU's value in light of the "denial" of the SolutionsPlus application; instead, he used valuations of XU that assumed XU was partnering or at least had the prospect of partnering with Cisco. Thus, his opinion that XU lost $70 million in value is based on the fact that XU was denied admittance to SolutionsPlus, not on any harm from the eight-month concealment of that denial.

As the jury adopted Mr. Bratic's testimony valuing XU at $70 million in awarding XU damages in that amount, the admission of his unreliable testimony was obviously prejudicial, and a new trial is warranted on this ground alone. *See, e.g*., *Donlin v. Philips Lighting N. Am. Corp*., 581 F.3d 73, 83 (3d Cir. 2009); *Hirst v. Inverness Hotel Corp*., 544 F.3d 221, 228 (3d Cir. 2008).

## V. CISCO IS ENTITLED TO JMOL OR NEW TRIAL ON THE PATENT INFRINGEMENT CLAIMS

### A. Cisco Is Entitled To JMOL On The Remote Expert Infringement Claim

To prove direct infringement, XU had to prove that each and every limitation of the asserted claims was actually present in Cisco's accused products. *See, e.g.*, *Becton, Dickinson & Co v. Tyco Healthcare Grp., L.P*., 616 F.3d 1249, 1253 (Fed. Cir. 2010) ("If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law.") (citation and alteration omitted); *see also* D.I. 648 ¶¶ 4-5, 8, 10 (granting summary judgment on XU's indirect infringement claims). XU claimed that Cisco's Remote Expert product infringed claim

12 of the '903 patent.  At trial, however, the only evidence of infringement that XU presented was the testimony of an expert, Dr. Illah Nourbakhsh, and Dr. Nourbahksh's conclusory testimony failed to establish that Remote Expert practices three of the '903 patent's limitations. *See Paradox Sec. Sys. v. ADT Sec. Servs.*, 388 F. App'x 976, 982 (Fed. Cir. 2010) (affirming grant of JMOL where patentee's expert made only conclusory statements and failed to point to any structure in accused product that satisfied the claim limitation); *Rohm & Haas Co. v. Brotech Corp.*, 1995 WL 17878613, at *10 (D. Del. Jun. 30, 1995) ("blanket statement that certain accused products infringe[d] . . . is of little value absent some underlying support specific" to the claim limitation), *aff'd*, 48 F.3d 1089 (Fed. Cir. 1997).

*First*, Dr. Nourbakhsh failed to present any probative evidence that Remote Expert practices the "inquiry-type database" limitation.  One of claim 12's limitations is an "inquiry-type database containing at least two layers of inquiry types, the layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors, wherein at least one layer of inquiry types comprises predetermined semantically-expressed inquiry types."  PTX 6, col. 7:52-56.  Dr. Nourbakhsh identified the expert table in Remote Expert as an inquiry-type database, 4 Tr. 1049:24-1050:5, and asserted that the table practiced the limitations for such a database, 4 Tr. 1050:11-1051:23.  But with respect to the requirement that the database have "layers of inquiry types organized from an underlying plurality of criteria groupings that are humanly understandable descriptors," all that Dr. Nourbakhsh said was that Remote Expert contains "expert types" that operate as layers of inquiry types and "expert skills" that operate as criteria groupings.[5]  He did not suggest that the

---

[5] *See* 4 Tr. 1051:10-15 ("And studying Remote Expert, I find that it has multiple layers of inquiry types, these things that I mentioned called expert types, and it has underlying set of criteria groupings which in this case expressed as something called expert skills.").

expert types supposedly acting as layers of inquiry in Remote Expert are "organized from" the expert skills acting as criteria groupings, as the limitation requires. Nor could he. Undisputed testimony from William Dry, the Cisco engineer who designed Remote Expert, established that Remote Expert does not organize the expert table database: to the contrary, the database is "empty when the customer receives it" and "they must populate it." 6 Tr. 1905:1-6; *see also* 6 Tr. 1905:7-17 (describing process).

In addition to failing to show that Remote Expert has layers of inquiry organized by criteria groupings, Dr. Nourbakhsh failed to present any probative evidence that Remote Expert has multiple layers of inquiry types. This Court construed the term "inquiry types" to mean "terms that organize and identify categories of assistance requested, created prior to use and expressed using language that is humanly understandable," and the term "layer of inquiry types" to mean "a defined set of predetermined semantically expressed inquiry types." D.I. 168 at 4-5. Dr. Nourbakhsh asserted that Remote Expert's expert table "has multiple layers of inquiry types," 4 Tr. 1051:10-11, but he offered no justification for this assertion other than a vague allusion to the use of multiple languages, 4 Tr. 1050:19-1051:5. It is undisputed, however, that Remote Expert can use multiple languages by creating buttons or icons using different languages, hard-coded changes that do not practice claim 12. 4 Tr. 1169:6-1172:24; 6 Tr. 1911:11-1912:1.

*Second*, Dr. Nourbakhsh failed to offer any probative evidence that Remote Expert practices the "skill-set database" limitation. Claim 12 requires a "skill-set database containing at least one entry that associates the expert with one of the inquiry types and its underlying criteria grouping." PTX 6, col. 7:58-60. Here again, Dr. Nourbakhsh offered only a conclusory assertion. He testified that Remote Expert "has a skill set database" which contains "IDs that

relate right back to the kinds of questions people can ask in the other database table." 4 Tr. 1052:11-16. Dr. Nourbakhsh failed, however, to identify any structure in Remote Expert that constitutes the claimed "skill-set database" and, thus, failed to offer any probative evidence that Remote Expert practices the "skill-set database" limitation. *See, e.g.*, *Smith & Nephew, Inc. v. Arthrex, Inc.*, 453 F. App'x 977, 981 (Fed. Cir. 2011).

*Third*, Dr. Nourbakhsh failed to offer any probative evidence that Remote Expert practices a "unique numeric routing identifier." Claim 12 requires a "unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database." PTX 6, col. 7:61-63. At trial, Dr. Nourbakhsh pointed to two types of numbers used by Remote Expert: the IVR PN and an ID number. 4 Tr. 1052:20-1053:8; 7 Tr. 2129:19-2130:12. The IVR PN, however, is the telephone number of a group of agents able to receive calls, 6 Tr. 1907:16-1909:7, and thus does not link entries in the skill-set database and the inquiry-type database. The ID number identifies "touch interface" or button "that the customer sees," 6 Tr. 1909:23-1910:23, and thus also does not link entries in the skill-set database and the inquiry-type database either.

In short, far from proving that Remote Expert practices each and every limitation in claim 12, XU failed to present probative evidence that it practices three separate limitations.

### B. Cisco Is Entitled to JMOL On The Expert Advisor Infringement Claims

XU claims that another Cisco product, Expert Advisor, infringes claim 12 of the '903 patent as well as claim 5 of the '709 patent. The evidence that XU presented through Dr. Nourbakhsh falls short on these infringement claims as well.

As with Remote Expert, XU failed to present probative evidence that Expert Advisor practices the "inquiry-type database," "skill-set database," and "unique numeric routing identifier" limitations of the '903 patent. Dr. Nourbakhsh identified Expert Advisor's

assignment queue system as its "inquiry types," and its call type lists as its "criteria groupings." 4 Tr. 1060:18-1061:1, 1173:24-1175:18. But Dr. Nourbakhsh did not, and could not, testify that Expert Advisor practiced claim 12's "layers of inquiry types organized from an underlying plurality of criteria groupings" (PTX 6, col. 7:52-53) because Expert Advisor's call-type lists do not organize layers of assignment queues. 5 Tr. 1518:4-6. Indeed, Mike Lepore, the Cisco engineer who led the team that built Expert Advisor, testified that there was no relationship at all between the assignment queues and the call-type lists. 5 Tr. 1493:10-1494:1, 1517:16-1518:3. In addition, although Dr. Nourbakhsh asserted that expert advisor "has skill-set databases," he once again failed to identify any structure containing such a database. 4 Tr. 1062:7-22. Dr. Nourbakhsh also asserted that Expert Advisor had a "unique numeric routing identifier" because there was a "unique connection between the skill groups and the assignment queues," but failed to identify any numeric identifier used for routing. 4 Tr. 1062:23-1063:7.

Dr. Nourbakhsh's testimony concerning the '709 patent suffered from a different shortcoming. Claim 5 of that patent requires, among other things, a "database connected to a plurality of monitors presenting the quantity of inquiry criteria and values to the second member in an interactive manner." PTX 2, col. 10:8-10. Expert Advisor users, however, do not interact through monitors presenting inquiry criteria and values: "With Expert Advisor, the only way that you could get into the system, was via a phone call." 5 Tr. 1498:3-5; *see also* 5 Tr. 1498:5-1499:21, 1518:18-21; PTX 18 at 12-13. Dr. Nourbakhsh pointed out that Cisco's Virtual Expert Management uses a graphical user interface and asserted that Virtual Expert Management is "at its core Expert Advisor," 4 Tr. 1145:21-1146:19, but XU failed to present any evidence substantiating this assertion, and Cisco presented evidence showing that it was incorrect. PTX 18 at 12-13; 5 Tr. 1497:13-1498:15, 1499:19-21.

31

Thus, Cisco is entitled to judgment as matter of law on all of XU's patent infringement claims.

### C.     Cisco Is Entitled To JMOL Based On The On-Sale Bar

Cisco is also entitled to judgment as a matter based on the "on-sale" bar.  Under Section 102(b) of the Patent Act, an invention may not be patented if it has been "on sale" more than one year before a patent application for it was filed.  *See* 35 U.S.C. § 102(b).  An invention is considered to be "on sale" if two conditions are satisfied: "first, the claimed invention must be the subject of a commercial sale or offer for sale, and, second, it must be ready for patenting."  *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1368 (Fed. Cir. 2007).  Cisco showed that both these conditions were satisfied for the inventions described in the '903 and the '709 patents more than a year before an application to patent the inventions was filed.

Specifically, Cisco showed that the application for the '903 patent was filed on January 24, 2005, and the application for the '709 patent was first filed on April 2, 2004.  3 Tr. 767:24-768:9; PTX 2 at 2; PTX 6 at 2.  Cisco also showed that in 2002 and 2003, XU (then named LearningIdeas) offered its platform to Allstate.  *See* DX 110, 538, 541.  Finally, Cisco's software expert, Dr. Sandeep Chatterjee, analyzed XU's source code, and based upon the comments and conventions in that code, determined that both claim 12 of the '903 patent and claim 5 of the '709 patent were embodied in XU's platform before April 2, 2003.  6 Tr. 1645:17-1667:1.  Thus, the inventions described in claims 12 of the '903 patent and claim 5 of the '709 patent were embodied in XU's platform and offered to Allstate for sale more than a year before the applications for those patents were filed, and the on-sale bar renders both claims invalid.

XU failed to rebut this evidence.  XU presented testimony from John Steinhoff, a former director of technology and one of the inventors named on both the '903 patent and the '709 patent, that XU did not have any finished products and that the invention was not embodied in

the demonstrations of its product that XU presented.  *See*  3 Tr. 714:2-5, 718:20-23, 754:18-755:5; 7 Tr. 2093:18-21, 2094:10-22.  But the on-sale bar does not require that a patent be included in a finished product or embodied in a demonstration shown to potential customers.  As noted above, it requires only that the claimed invention be "ready for patenting" and be the subject of an "offer for sale."  *Cargill*, 476 F.3d at 1368.

XU also presented testimony from Dr. Nourbakhsh disputing whether the inventions in question were embodied in XU's source code.  But two of the named inventors, Richard Mason and James Nevin, admitted that their inventions were embodied in XU's source code, *see* 5 Tr. 1576:2-15 (Richard Mason); 5 Tr. 1577:7-11 (James Nevin), and while Dr. Nourbakhsh denied that the limitations of the patents in suit were included in the portions of the source code identified by Dr. Chatterjee, his testimony was once again conclusory in nature, and he failed to explain when the elements of the inventions that the inventors had testified were included in XU's source code were added to it.  7 Tr. 2101:14-2109:18.  Thus, XU failed to raise a genuine issue concerning the application of the on-sale bar, and Cisco is entitled to JMOL under the bar on XU's patent infringement claims.

### D. Alternatively, Cisco Is Entitled To A New Trial On The Patent Infringement Claims

For substantially the same reasons that Cisco is entitled to JMOL on the patent infringement claims and on the on-sale bar, a new trial is the minimum relief to which Cisco is entitled.  Even if the conclusory testimony of Dr. Nourbakhsh was somehow sufficient to support the jury's verdicts, those verdicts are against the great weight of the evidence, and a new trial is warranted.

33

## VI.    CONCLUSION

For the foregoing reasons, pursuant to Fed. R. Civ. P. 50(b), Cisco is entitled to judgment as a matter of law on XU's fraudulent concealment and patent infringement claims and as to the $70 million in damages awarded for fraudulent concealment.  In the alternative, pursuant to Fed. R. Civ. P. 59, any judgment on the fraudulent concealment claim should be remitted to $2.66 million and/or a new trial should be granted on the fraudulent concealment and patent infringement claims.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

OF COUNSEL:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Kathleen M. Sullivan
Cleland B. Welton II
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Defendant/Counterclaimant
Cisco Systems, Inc.*

Daniel H. Bromberg
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

MORGAN, LEWIS & BOCKIUS LLP
Brett M. Schuman
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

Kell M. Damsgaard
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

May 6, 2013

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2013, I caused the foregoing to be electronically

filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all

registered participants.

I further certify that I caused copies of the foregoing document to be served on

May 6, 2013, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                          *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Stephen D. Susman, Esquire                                  *VIA ELECTRONIC MAIL*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002

Joseph Diamante, Esquire                                      *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason M. Sobel, Esquire
Barry Clayton McCraw, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038

*/s/ Jack B. Blumenfeld*
_____
Jack B. Blumenfeld (#1014)

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| XPERTUNIVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 09-157-RGA |
| | : | |
| CISCO SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Philip A. Rovner, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Charles E. Cantine, Esq., Jason M. Sobel, Esq., Stroock & Stroock & Lavan LLP, New York, NY, Attorneys for Plaintiff.

Jack B. Blumenfeld, Esq., Jennifer Ying, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Kathleen M. Sullivan, Esq., Cleland B. Welton II, Esq., New York, NY, Daniel H. Bromberg, Esq., Redwood Shores, CA, Quinn Emanuel Urquhart & Sullivan, LLP; Kell M. Damsgaard, Esq., Philadelphia, PA, Brett M. Schuman, Esq., Ryan Scher, Esq., San Francisco, CA, Morgan, Lewis & Bockius LLP, Attorneys for Defendant.

November 20, 2013

*Richard G. Andrews*
ANDREWS, U.S. DISTRICT JUDGE:

Pending before the Court are the parties' post-trial motions. Plaintiff XpertUniverse, Inc. ("XU") filed a Motion to Alter or Amend the Judgment Pursuant to Federal Rule of Civil Procedure 59(e) and Motion for Attorneys' Fees Pursuant to 35 U.S.C. § 285 (D.I. 702). Defendant and Counterclaimant Cisco Systems, Inc. ("Cisco") filed a Motion for Judgment as a Matter of Law under Rule 50(b) and, in the Alternative, for Remittitur or New Trial Under Rule 59(a)(1) (D.I. 699); a Motion for Enforcement of the Parties' Agreement to Limit Liability (D.I. 697); and for an order holding the patents in suit unenforceable due to inequitable conduct (D.I. 706).

XU brings this action against Cisco alleging that Cisco infringed its patents and fraudulently concealed information from XU during the course of a relationship between the parties, as set forth most recently in XU's Fourth Amended Complaint. (D.I. 82). Cisco responded with numerous counterclaims and affirmative defenses, alleging that XU obtained its patents via fraud on the United States Patent and Trademark Office. (D.I. 127). After a nine-day jury trial, the jury returned the following verdict: Cisco committed fraud by concealment and caused damages of $70 million; Cisco's Expert Advisor product infringed XU's U.S. Patent No. 7,366,709; Cisco's Expert Advisor and Remote Expert products infringed XU's U.S. Patent No. 7,499,903; XU should recover $15,463 for Cisco's infringement through Expert Advisor; and XU should recover $18,920 for Cisco's infringement through Remote Expert.

The parties completed their post-trial briefing on June 27, 2013.

2

## DISCUSSION

### I. Cisco's Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. FED.R.CIV.P. 50(a)(1). "Entry of judgment as a matter of law is a sparingly invoked remedy," one "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (internal quotation marks omitted).

"To prevail on a renewed motion for [judgment as a matter of law] following a jury trial, the [moving] party 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v. Iolab Co)rp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citation omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The court may not determine the credibility of the witnesses nor

3

"substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.*, 732 F.2d at 893. Rather, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.,* 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B WRIGHT & MILLER, Federal Practice & Procedure § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

Federal Rule of Civil Procedure 59(a) provides, in pertinent part: "The court may . . . grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." While new trials are infrequently granted, the "most common reasons" for granting such motions are: "(1) when the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) when newly-discovered evidence would be likely to alter the outcome of the trial; (3) when improper conduct by an attorney or the court unfairly influenced the verdict; or (4) when the jury verdict was facially inconsistent. " *Zarow–Smith v. N.J. Transit Rail Operations*, 953 F.Supp. 581, 584 (D.N.J. 1997) (citations omitted).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard). However, where the

4

ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993). Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law—in that the court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352–53.

### A. Fraudulent Concealment

XU claims that Cisco concealed that Cisco denied XU entry into a partnership program called Solutions Plus in April 2006, and did not disclose that denial until January 2007. XU claims, and the jury found, that this concealment of XU's denial from April 2006 to January 2007 was fraudulent concealment that led to XU's demise and $70 million in damages.

The parties agree that California law governs XU's fraudulent concealment claim. (D.I. 580 at 4). The elements of a cause of action for fraud based on concealment are:

(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Bank of Am. Corp. v. Superior Court*, 130 Cal. Rptr. 3d 504, 509-10 (Cal. Ct. App. 2011) (citations and internal quotation marks omitted). Cisco asserts that the fact concealed – XU's denial from Solutions Plus – was not material. A fact is material if "a reasonable man would

5

attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Engalla v. Permanente Medical Group, Inc.*, 938 P.2d 903, 919 (Cal. 1997); (*see* D.I. 679 at 142). As such, materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.[1] *Id.*

The evidence at trial shows that after XU's application for Solutions Plus was presented to Cisco's Governance Council, the Council described the application as "denied" on April 25, 2006. (PTX 37 at CISCO38318). XU's former President and Chief Operating Officer at the time, Elizabeth Eiss, was the point person at XU for the Cisco relationship. (D.I. 675, Trial Tr. vol. 3, 474, 505-07, 564-65). By June 2006, Eiss knew XU's application had been submitted to the Council, that Council members had concerns regarding "getting clients on board and getting market traction" and "training and education issues," and that XU "didn't have an approval." (D.I. 675, Trial Tr. vol. 3, 629, 632, 633-37). XU witnesses testified that Cisco never told them that their application had been "denied," and Cisco emails show this to be the case. (D.I. 674, Trial Tr. vol. 2, 338-39; D.I. 675, Trial Tr. vol. 3, 561-62, 564, 567-68; PTX 38, PTX 47, PTX 46). The Cisco flowchart depicting the formal Solutions Plus approval process does not indicate any opportunity for lobbying or additional review after a rejection by the Governance Council, but Cisco employee John Hernandez testified that in practice, many Solutions Plus applications are accepted after being initially rejected. (DX 826 at XU68616; D.I. 676, Trial Tr. vol. 4, 975; D.I. 678, Trial Tr. vol. 6, 1712-15). In XU's case, after the April 2006 "denial," Eiss worked with Hernandez, her "champion" at Cisco, to address the Council members' concerns and get XU

---

[1] Cisco has not asserted that materiality is a question of law.

6

admitted to the program. (D.I. 675, Trial Tr. vol. 3, 636; D.I. 678, Trial Tr. vol. 6, 1767-91; DX 433, 435, 456.) Hernandez went on to convince Council member Carl Weise to support XU's application. (D.I. 678, Trial Tr. vol. 6, 1783-91; DX 455, DX 457 at 1, DX 579). But when a potential XU account canceled an XU pilot, Hernandez concluded that the Council's objections could not be overcome, and informed XU that Solutions Plus would not be available. (D.I. 678, Trial Tr. vol. 6, 1797-1800; PTX 41).

The evidence shows Cisco informed XU about the status of its application in every respect except for Cisco's use of the term "denied." The issue here is whether there is sufficient evidence from which a jury reasonably could find that there is a material difference between not being approved, and being denied. Generally, XU asserts materiality based on the testimony of Cisco employees that if Cisco's employees had been in XU's position, they would have wanted to know that the application had been denied. (D.I. 676, Trial Tr. vol. 4, 958-59; *id.* at 982). XU also asserts that the concealment of the denial itself speaks to the materiality of the information concealed.

More specifically, XU argues that knowing about the denial would have influenced XU's conduct. Eiss testified, "to characterize that we knew it hadn't been approved as equal to you knew it was denied, those are two totally different things." (D.I. 675, Trial Tr. vol. 3, 637-38). Cisco's expert characterized short periods of time, which would include the nine months from April 2006 to January 2007, as a lifetime and testified that XU had other opportunities in April 2006. (D.I. 679, Trial Tr. vol. 7, 2055-56, 2076-77). Eiss and Friedman testified that had XU known about the denial, XU could have abandoned its relationship and instead sought a partnership with a competitor, such as Genesys or IBM. (D.I. 675, Trial Tr. vol. 3, 569-70; D.I.

7

674, Trial Tr. vol. 2, 339-40). XU points to evidence that Cisco wanted to keep Genesys and XU from partnering. (*E.g.*, PTX 428, PTX 44). A former Citigroup Senior Vice President testified that Citigroup was considering an XU pilot and that Citigroup was not concerned whether XU was partnered with Cisco or IBM for that pilot. (D.I. 676, Trial Tr. vol. 4, 1003-04). XU argues that "the jury was entitled to infer that since the process went no further, had XU known of the denial[, it] would have pursued other opportunities." (D.I. 725 at 7).

The evidence does not support the conclusion that the process "went no further" after the April 2006 Governance Council meeting. Eiss and Hernandez continued to work towards approval through December 2006, and obtained Carl Weise's support. The evidence also does not support that XU would have pursued other opportunities if it had known of the "denial." Eiss and Friedman testified only that XU "could have" (*e.g.*, D.I. 675, Trial Tr. vol. 3, 532, 569-70) pursued relationships with other companies if they had learned about the denial - not that the information would have changed their own conduct, much less that of a reasonable person. For XU to prove the materiality of the concealment of the "denial" for nine months, the factfinder must infer that, had XU been told it was denied in April 2006, XU would have withdrawn from the active relationship with Cisco, and would have sought to resuscitate defunct relationships with IBM and Genesys. There is no evidence that XU would have done so.

More generally, there is no evidence that there is any material difference between "denied" and "not approved." While Eiss testified that to her there was a vague difference, she did not provide any evidence as to why her conduct would have been influenced by any such difference, or to allow the jury to infer what a reasonable person's conduct would have been. While the evidence shows that XU was "denied," it was also undisputed that Hernandez

8

continued to work, both internally and with Eiss, towards approval. XU's supposed status as terminally denied (as opposed to not approved with a chance of overcoming that lack of approval) is not supported by Cisco's internal emails after the "denial." (*See* PTX 38 (showing Hernandez continuing to "move this forward"); PTX 46 (leaving open the possibility of "pushing solution[] + if there is a large customer opportunity requiring it"); PTX 48 (noting Carl Weise's approval)). There is no evidence that the Governance Council's use of the word "denied" introduced any material difference from "not approved."

There is insufficient evidence for a jury to find that a reasonable person would attach importance to the knowledge that XU was "denied," as opposed to not approved, in determining his choice of action in the transaction in question. *See Engalla*, 938 P.2d at 919. Cisco's motion for judgment as a matter of law on the fraudulent concealment claim is granted. The Court need not reach Cisco's request for a new trial.

### B. Damages for Fraudulent Concealment

Because the Court has already found there was insufficient evidence for a jury to find Cisco concealed or suppressed a material fact, the Court need not reach Cisco's requests for judgment as a matter of law, new trial, and/or remittitur on the damages awarded for fraudulent concealment. However, as there are additional related deficiencies in the evidence underlying the fraudulent concealment verdict, the Court will briefly set forth its reasons why it would grant Cisco's request for a judgment as a matter of law on the $70 million concealment damages the jury awarded.

The inquiry is whether, as a result of the concealment or suppression of the fact, the plaintiff sustained damage. *Bank of America*, 130 Cal. Rptr. 3d at 511. An expert's opinion on

9

the measure of damages requires sufficient proof that the plaintiff's injury was caused by the defendant's conduct. *See Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F.Supp.2d 1319, 1352 (S.D. Fla. 2006).

Cisco frames its request for judgment as a matter of law on concealment damages under what it calls the "new business rule." Cisco claims that California law requires more stringent proof of lost profits for new businesses, like XU, than for established ones; that because XU's theory of lost value is based on partnering with larger companies to obtain customers and sales, that XU's "lost value" is essentially lost profits; and that XU has failed to meet the "new business" standard for showing those lost profits. (D.I. 700 at 8-14) (citing *Sargon Enterprises, Inc. v. University of Southern California*, 288 P.2d 1237 (Cal. 2012); *Kids' Universe v. In2Labs*, 95 Cal. App. 4th 870 (Cal. Ct. App. 2002)).

The deficiency in the evidence of causation is broader than Cisco's proposed "new business rule." At trial, XU's theory of causation was that the concealment of the "denial," as opposed to "not approved," from April 2006 to January 2007 destroyed XU. XU asserts it had numerous opportunities in April 2006 to derive value by partnering with larger companies like Cisco, IBM, or Genesys, or perhaps on a pilot program with Citibank. XU asserted, through its expert Walter Bratic, these partnership opportunities supported valuing XU at $70 million in April 2006. By January 2007, XU's theory goes, XU had spent all its resources on the Cisco integration, news of the denial from Solutions Plus caused its investors to pull out, and none of the partnership opportunities were available, making XU worth nothing.

A necessary corollary underlying this theory is that, had XU known it was "denied" in April 2006, not only would XU not have gone out of business and lost its entire $70 million in

10

value, it would have lost no value at all.[2] Because XU's $70 million valuation was based on partnering with another company (D.I. 677, Trial Tr. vol. 5, 1277), XU's causation theory requires showing that had XU known about the "denial" in April 2006, XU could have kept its value by partnering with a different company. This in turn depends on the assumptions that 1) had Cisco informed XU of its "denied" status in April 2006, XU would have separated from Cisco; and 2) had XU pursued a partnership with a different company in April 2006, it could have developed that partnership in a manner that kept XU in business and valued at $70 million. XU's causation theory also requires showing that the concealment through January 2007 destroyed the opportunities for those partnerships.

Only after proving causation, complete with these corollaries and assumptions, could XU reach Bratic's opinion. Bratic only assumed that Cisco's alleged concealment caused XU to lose its entire value, and he was precluded from opining on causation. (D.I. 647 at 2-3). XU was required to prove causation through fact testimony. *Id.* at 3. Bratic described his damages model as "but for" – comparing XU's value before and after the fraudulent concealment. Bratic's damages model was predicated on XU deriving value from partnering with somebody – Cisco, IBM, or Genesys. (D.I. 677, Trial Tr. vol. 5, 1277; *id.* at 1255). "For Bratic's opinions to be of any use, [XU] was required to offer sufficient proof of the assumptions that Bratic accepted as the foundation for his opinion, most importantly — that [XU]'s injury was caused by [Cisco]'s conduct. Only upon such a showing could [XU] proceed to the next prong of its [damages]

---

[2] In other words, XU's theory was that news of the "denial" in April 2006 would have had no effect, whereas the same news nine months later caused XU to go out of business.

11

analysis and offer Bratic's opinion to provide the jury with a non-speculative estimation of the amount of [XU] 's injury." *Alphamed*, 432 F.Supp.2d at 1352.

XU failed to prove that had it known about the "denial" in April 2006, things would have ended differently. First, there is no evidence that concealing news of the denial from April 2006 to January 2007 destroyed any potential partnership opportunities. XU argues that the Genesys partnership no longer existed "as a result" of XU spending all its resources, but cites no evidence of such causation. Acquisition by Genesys is unsupported by anything more than a Cisco email noting a "risk" of that acquisition; there is no evidence that XU was ever up for sale or that Genesys had ever made a bid. (*See* PTX 45 at CISCO33722). The Citibank opportunity, which XU pursued with Cisco, disappeared because of factors internal to Citibank. (D.I. 676, Trial Tr. vol. 4, 1005-06). IBM declined to purchase an XU license because XU's product was not ready. (D.I. 674, Trial Tr. vol. 2, 349-50).

Second, there is no evidence that had XU known about the "denial" in April 2006, it would have done anything differently, *i.e.*, that it would have left Cisco and that it could have monetized a different partnership. As noted in concluding XU failed to show the concealed information was material, there is no evidence that XU would have left Cisco to pursue any other partnership if it had known about the Governance Council's use of the term "denied." Nor is there any evidence that XU could have monetized any partnership if it had pursued one: as just noted, the Citibank opportunity disappeared because of factors unique to Citibank, and there is no evidence of any potential Genesys or IBM partnership to add value to XU, in April 2006 or at any other relevant time.

12

Third, there is no evidence that the effects of finding out about the "denial" in January

2007 were any different, or any more detrimental to XU, than finding out about the "denial" in

April, 2006. In other words, if disclosure of Cisco's "denial" in January 2007 destroyed XU, it is

reasonable to wonder why disclosure of the "denial" in April 2006 would not have had the same

effect. XU offered, at most, only speculation that an April 2006 disclosure would have turned

out any differently. Eiss and Friedman testified that the *denial* of Solutions Plus caused XU to

lose revenue and investment – but said nothing about the impact of the nine-month *concealment*

of the denial on investors or on any third party partnership. (*See* D.I. 674, Trial Tr. vol. 2, 338-

40; D.I. 675, Trial Tr. vol. 3, 569-70). XU notes testimony that by January 2007, XU had spent

all of its resources integrating the Cisco routing component into its solution. (D.I. 677, Trial Tr.

vol. 5, 1262, 1265, 1272-75). But, again, there is no evidence that XU could have capitalized on

anything else if it had not spent all its money on the Cisco integration, or if it had not been

abandoned by its investors.

The evidence presented by XU at trial is insufficient to show XU lost value because of

the concealment of its application being "denied," as opposed to being "not approved," from

April 2006 to January 2007. Without evidence of any causation, XU could not proceed to the

next prong - Bratic's opinion that XU was worth $70 million before the concealment, and had no

value after. There is no substantial evidence from which the jury could have found that

concealment of the "denial" for nine months caused XU to forego, or lose, other valuable

partnerships, and thereby lose its entire value. Thus, were the Court not granting judgment as a

matter of law on "materiality," the Court would grant it on "damages."

13

## *C. Patent Infringement*

Cisco asks for judgment as a matter of law, or in the alternative a new trial, on XU's direct infringement claims. XU's infringement expert, Dr. Illah Nourbakhsh, provided XU's only evidence of infringement. Cisco claims Dr. Nourbakhsh's testimony regarding five particular limitations ("inquiry-type database," "multiple layers of inquiry types," "skill-set database," "numeric routing identifier," and "monitors presenting inquiry criteria and values") is conclusory, unsupported by any probative evidence, and in some cases in conflict with testimony from lay witnesses. (D.I. 700 at 27-32). XU points out that for the most part, Cisco did not cross-examine Dr. Nourbakhsh on these limitations, and notes the jury's ability to reconcile any conflicts between different witnesses' testimony. (D.I. 725 at 33-38). Dr. Nourbakhsh testified specifically, albeit quickly, as to how each Cisco product met each limitation at issue, surpassing the level of testimony in Cisco's cited cases. *See Paradox Sec. Sys. v. ADT Sec. Servs.*, 388 F. App'x 976, 982 (Fed. Cir. 2010); *Rohm & Haas Co. v. Brotech Corp.*, 1995 WL 17878613, *10 (D. Del. June 30, 1995). Cisco has not shown there is insufficient evidence from which a jury reasonably could find liability, nor that the verdict is against the great weight of the evidence.

Cisco also asks for judgment as a matter of law that the '903 and '709 patents are invalid because they were on sale more than one year before their applications were filed, under 35 U.S.C. § 102(b); in the alternative, Cisco requests a new trial. Cisco asserts it proved XU offered the inventions described in those patents for sale to Allstate in 2002 and 2003, based on XU offering its platform for sale, on Dr. Sandeep Chatterjee's opinion that XU's software embodied the claims at issue before April 2, 2003, and on two XU inventors testifying the XU software embodied the claims at issue. (DX 110, 538, 540; D.I. 678, Trial Tr. vol. 6 1645-67; D.I. 677,

14

Trial Tr. vol. 5, 1576-80). Cisco claims this evidence entitles it to judgment as a matter of law, or a new trial, over testimony by XU's John Steinhoff, that the invention was not embodied in the demonstrations XU showed Allstate, and by Dr. Nourbakhsh, that the software did not embody the claims at issue. (*See* D.I. 695, Trial Tr. vol. 3 720, 728; D.I. 679, Trial Tr. vol. 7, 2095-96; *id.* at 2102-2110). Cisco argues that what is shown or demonstrated to prospective customers need not actually embody a patent, so long as the claimed invention is ready for patenting and is the subject of an offer for sale. (D.I. 700 at 32-33, *citing Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1368 (Fed. Cir. 2007)).

In response, XU notes Steinhoff's testimony that the Allstate demonstration environment did not embody the claims at issue, as it did not contain any code at all; that the jury was able to credit either Dr. Chatterjee's testimony that XU's source code at the time[3] embodied the claims at issue, or Dr. Nourbakhsh's testimony that it did not; and that the two named inventors testified only that XU's code embodied the claims at issue, without saying when. XU argues that Cisco did not meet its burden of establishing by clear and convincing evidence that the inventions were the subject of a commercial offer for sale and ready for patenting before the critical dates.

The evidence reasonably supports the verdict that the patents were not invalid due to the on-sale bar. The jury was entitled to weigh the testimony by Drs. Chatterjee and Nourbakhsh, and rely on Dr. Nourbakhsh's testimony if it so chose. Similarly, the jury could conclude that the inventors' testimony that the source code embodied the claims at issue did not prove the code did

---

[3] Dr. Chatterjee was precluded from testifying that the code he analyzed was executed or implemented in a product XU demonstrated, offered for sale, or sold. (D.I. 599 at 1-2).

15

so before the critical date. It was within the jury's province to find Cisco did not prove § 102(b)
"on sale bar" invalidity by clear and convincing evidence.

## II. Cisco's Motion for Enforcement of the Parties' Agreement to Limit Liability

In the alternative to Cisco's motions for judgment as a matter of law or a new trial, Cisco

asserts that limitations of liability in 2005 and 2006 agreements between Cisco and XU capped

liability at $3 million. Because the Court has granted Cisco's motion on the fraud verdict, and

because Cisco's asserted $3 million cap does not affect the remaining damages for patent

infringement, the Court need not reach Cisco's motion for enforcement of those limitations of

liability against that verdict. The motion is moot.

## III. Cisco's Request for an Order Holding the Patents Unenforceable

Cisco requests this Court find the patents in suit unenforceable because of the inventor(s)'

inequitable conduct in intentionally not disclosing pre-filing marketing and sales activities that

Cisco claims would have prevented XU from obtaining the patents in suit.

To prevail on an inequitable conduct claim, a defendant must establish both the

materiality of the withheld reference and the applicant's intent to deceive the PTO. *Therasense,*

*Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). In *Therasense*,

the Federal Circuit rejected the "sliding scale" approach to proving inequitable conduct, "where a

weak showing of intent may be found sufficient based on a strong showing of materiality, and

vice versa." *Id*. Instead, *Therasense* made clear that "[i]ntent and materiality are separate

requirements." *Id*. Moreover, a district court may not infer intent solely from materiality, and

thus "[p]roving that the applicant knew of a reference, should have known of its materiality, and

decided not to submit it to the PTO does not prove specific intent to deceive." *Id*.

16

With respect to materiality, the standard is but-for materiality unless there is affirmative egregious misconduct (which is not alleged here). *Id.* at 1291–92. A prior art reference "is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* at 1291. In the inequitable conduct context, but-for materiality must be shown by a preponderance of the evidence, "giv[ing] claims their broadest reasonable construction." *Id.* at 1291–92; *see also Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1334 (Fed. Cir. 2012). "Often the patentability of a claim will be congruent with the validity determination—if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO." *Therasense*, 649 F.3d at 1292.

To satisfy the intent requirement, "the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290; *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1374–75 (Fed.Cir. 2012) ("Knowledge of the reference and knowledge of materiality alone are insufficient after *Therasense* to show an intent to deceive .... To sustain a charge of inequitable conduct, 'clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.' "). Thus, inequitable conduct requires clear and convincing evidence of a specific intent to deceive the PTO. *Therasense*, 649 F.3d at 1290. Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence. *Id.* However, "the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Id.* at 1290 (quoting

17

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)).

"Indeed, the evidence must be sufficient to require a finding of deceitful intent in light of all of the circumstances." *Id.* (internal quotation marks and citation omitted). "Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290–91.

Cisco points to the development of XU's technology platform through several iterations, including earlier versions called KnowledgeSHARE and XpertSHARE, and XU's attempts to sell or license those versions and develop support documents for them. The underlying facts are not in dispute.[4] Named inventors Richard Mason and James Nevin, as well as XU's former vice president David Rutberg, testified that the inventions claimed in the '709 Patent and the '903 Patent were embodied in XpertSHARE. (D.I. 677, Trial Tr. vol. 5, 1574-80). Cisco's expert, Dr. Sandeep Chatterjee, opined that the claimed inventions were present in XU's source code by April 3, 2003, more than a year before the applications for the patents were filed. (D.I. 678, Trial Tr. vol. 6, 1645-67). Cisco points to XU's efforts to sell or license its platform to Allstate Insurance Company in December 2002 (*e.g.*, DX 538, 540, 541, 110)); to Dell Computer Corp. in July 2002 (D.I. 708-1, DX 537); and to Computer Associates in July 2002 (D.I. 708-1, DX 536 at 3-4). The named inventors were involved in the effort to sell to Allstate. (*E.g.*, DX 110). In connection with these efforts, XU created user manuals and other documentation for its platform bearing copyright dates of 2002. (DX 97, 33).

---

[4] The parties agreed to submit the issue of inequitable conduct to the Court for decision after the jury trial. (D.I. 580 at 15, ¶4). The parties have treated the issue as one to be decided without any further hearing, as evidenced in the briefing. (*See* D.I. 706, 726, 752). Therefore, some of the record on this issue was not admitted at trial and is found only as appendices to the briefing.

18

In 2004, XU hired an intellectual property consulting firm called ipCapital Group, Inc. to evaluate whether XU had any protectable intellectual property, through an "ipScan."[5] (D.I. 708, Ex. D, Tr. 244-45). Friedman and the named inventors were involved in the ipScan. (*Id.* Ex. D, Tr. 244-45; *id.* Ex. E, 25, 204; *id.* Ex. F, 55, 195; *id.* Ex. G, 183-84; *id.* Ex. H, 299).

XU filed a provisional patent application, No. 60/559907, on April 2, 2004, which listed Nevin, Steinhoff, Mason, Zelkin, and Rutberg as inventors. (D.I. 707, DX 204). On March 31, 2005, XU filed a patent application claiming priority therefrom, which issued on April 29, 2008, as the '709 Patent, listing Nevin, Steinhoff, Mason, and Zelkin as inventors.[6] (D.I. 707, DX 39). On January 24, 2005, XU filed another patent application, naming Nevin, Steinhoff, Mason, and Zelkin as inventors, which issued on March 3, 2009, as the '903 Patent. (D.I. 707, DX 40). For both patents, each inventor certified they were not aware of any publications, offers for sale, or uses more than a year before, and XU did not submit any prior art offers for sale. (D.I. 707, DX 77 at CISCO377026-29; DX 39; DX 76 at CISCO377189-92; DX 40).

On August 8, 2005, XU filed a third patent application claiming priority to the application that issued as the '709 Patent, U.S. Application Serial No. 11/200,520 ("the '520 Application"). (D.I. 707, DX 38). During the period when the applications that became the '903 and '709 Patents were pending, the PTO rejected claims in the '520 Application over Xpertshare 2.0 three times. (DX 38 [November 2, 2006; July 12, 2007; February 26, 2008]). After the patents in

---

[5] Cisco relies on the ipScan report (PTX 61) and transcripts of tape recordings of the ipScan meeting (D.I. 708, Ex. I) to assert that ipCapital flagged potential on sale bar issues to the inventors of the patents in suit. The Court excluded this report as hearsay, and excluded ipCapital's statements in the recordings as lacking sufficient foundation even if they were probative. (*See* D.I. 601 at 37-49; D.I. 608). The Court will not consider them now.

[6] Rutberg was originally named as an inventor too. (D.I. 707, DX 39).

19

suit had issued, the PTO rejected the claims in the '520 Application over

KnowledgeSHARE/XpertSHARE at least another four times. (DX 38). After further

amendments and multiple interviews with the Examiner, the claims were allowed with almost no

explanation on January 7, 2013. (D.I. 707, DX 38).

Cisco asserts that XU's offers to sell its platform to Allstate and Computer Associates

were material to the on-sale bar, and that Friedman and the inventors intentionally withheld

evidence that XU offered to sell the KnowledgeSHARE/XpertSHARE platform during

prosecution of the '903 and '709 Patents. XU disputes both but-for materiality and intent. The

Court begins with intent.

Cisco asserts it has shown specific intent to defraud by showing: 1) Friedman and the

named inventors had actual knowledge of XU's offers to sell; 2) XU, including Friedman and

Steinhoff as evidenced by their declarations in the '520 Application prosecution history, knew

from the rejections in the copending '520 Application that the PTO had patentability concerns

regarding XU's xpertshare 2.0; and 3) ipCapital put Friedman and the inventors on notice

regarding the prior offers for sale. Cisco argues that Friedman and the inventors were thus aware

of the prior offers for sale and their materiality, such that intent to deceive is the single most

reasonable inference able to be drawn from this evidence. *Id.* (citing *Therasense*, 649 F.3d at

1290). In response, XU does not dispute that Friedman and the inventors knew of the prior offers

for sale or of their significance to the PTO or to ipScan. XU argues that Cisco has shown no

20

evidence of any intent to deceive, and that Cisco's argument inferring intent from alleged materiality is improper.[7]

Cisco has not shown clear and convincing evidence of a specific intent to deceive the PTO - specifically, that XU's applicants made a deliberate decision to withhold the information. *See Therasense*, 649 F.3d at 1290. Assuming for purposes of discussing intent that the prior sale activities satisfy the but-for materiality standard and that Friedman and the inventors were aware of this materiality, there is zero evidence of intent other than their knowledge of the prior sale activities and their presumed materiality. The law is clear: this is insufficient. *1st Media, LLC*, 694 F.3d at 1375 ("An applicant's knowledge of a reference's materiality, however, cannot by itself prove, let alone clearly and convincingly prove, that any subsequent non-disclosure was based on a deliberate decision."). Cisco argues that intent to deceive is the single most reasonable inference, but provides no evidence of any deliberate decision to deceive. Without showing intent, Cisco cannot show inequitable conduct. Its motion is denied.[8]

## IV. XU's Motion to Alter or Amend the Judgment

XU moved to alter or amend the judgment pursuant to FED. R. CIV. P. 59(e), to grant XU the following with regard to the patent infringement verdict: 1) supplemental damages based on

---

[7] XU also notes it was represented by counsel in prosecuting the '520 Application and patents in suit. Cisco correctly counters that XU had never before asserted an advice of counsel defense, such that it would be improper to rely on such a defense to find there was no inequitable conduct.

[8] Because Cisco did not prove intent, the Court need not reach the element of materiality. However, the Court notes that the jury did not find Cisco proved an on-sale bar. As explained *supra*, the Court denied Cisco's request for a judgment as a matter of law on the issue. The Court would be hard pressed to find a basis for ruling the same activities meet the standard of but-for materiality in this context, even acknowledging that Cisco only has to meet the preponderance of the evidence standard to find materiality for inequitable conduct.

21

pre-verdict infringing sales and for any accounting that may be necessary; 2) prejudgment interest on the awarded damages under 35 U.S.C. § 284; 3) post-judgment interest under 28 U.S.C. § 1961; and 4) ongoing royalties for continued infringement after entry of the Judgment or, in the alternative, a permanent injunction.

### A. Pre-Verdict Infringing Sales

XU seeks sales information, and supplemental damages thereon, updated from the last information Cisco provided: for Expert Advisor, from January 29, 2012 through trial (March 22, 2013), and for Remote Expert, from April 12, 2012 through trial. Cisco responds that Expert Advisor has not been sold since January 29, 2012, and the only additional sales of Remote Expert in the version the jury found to infringe have been outside the United States, as Cisco changed the configuration. (D.I. 720 at 3-4). Cisco therefore concludes that there are no sales after the close of discovery of products the jury found infringe.

Regarding Expert Advisor, XU's somewhat strained interpretation of Cisco documentation to argue the product may still be sold or implemented (D.I. 703 at 11, D.I. 747 at 2-3) does not controvert Cisco's express representations, supported by employee testimony and a declaration, that it has not made any additional sales of Expert Advisor.[9] (*See* D.I. 677, Trial Tr. vol. 5, 1520; D.I. 722, Decl. of Tod Famous, ¶ 4, Ex. A). Any Cisco response to XU's request for updated sales information would be, "none." The Court will not order this exercise in redundancy.

---

[9] During a discovery dispute over Expert Advisor, counsel for XU conceded Cisco was no longer selling that product. (D.I. 598 at 30). The Court precluded further pretrial discovery into Expert Advisor. *Id.* at 31-32.

22

Regarding Remote Expert, as an initial matter, the parties do not appear to dispute that sales outside the United States do not infringe. Cisco represented to the Court before trial that if Remote Expert were found to infringe, Cisco would update its sales figures for Remote Expert versions 1.5 and 1.8. (D.I. 704-1 at 8, Hrg. Tr. at 24-25). Now, after trial, Cisco asserts there have been no additional U.S. sales of Remote Expert 1.5 or 1.8 with the matching and routing capabilities presented in XU's infringement case and evaluated by the jury. Cisco points to Dr. Nourbakhsh's testimony that Remote Expert practices the '903 Patent's limitation of "at least two layers of inquiry types" because of the way in which it supports implementations using multiple languages. (D.I. 676, Trial Tr. vol. 4, 1169-75). Dr. Nourbakhsh testified that using an independent translation file, such as Google Translate, does not use the invention of the '903 Patent. *Id.* at 1173-75. Cisco asserts, through an employee declaration, that it has modified Remote Expert so that it now uses Google Translate to convert the interface to another language. (D.I. 721, Decl. of William Dry, ¶ 13).

In reply, XU asserts that Remote Expert's "multi-lingual support was just one example that proved Remote Expert satisfied this limitation." (D.I. 747 at 6, citing D.I. 676 at 1052-53). Dr. Nourbakhsh stated in a declaration that Remote Expert 1.8's "locales" still denote multiple layers of inquiry types, even if the multiple languages do not. (D.I. 749, ¶¶ 7-8). XU asserts that the modified version of Remote Expert still contains infringing multiple layers (*i.e.*, the "locales"), making the change "no more than a colorable variation" that still infringes, as in *Creative Internet Advertising Corp. v. Yahoo! Inc.*, 674 F.Supp.2d 847, 856-59 (E.D. Tex. 2009).

XU bases its argument for preverdict sales information for the new version of Remote Expert on law addressing enforcement of an ongoing royalty against a new, post-verdict version

23

of a product. (D.I. 747 at 3 n.1; *id.* at 6-7 (citing *Creative Internet Advertising Corp.*, 674 F.Supp.2d at 856-59)). A party seeking to include a new product version in post-verdict relief must prove that the new version is not more than colorably different from the product found to infringe, and that the newly accused product actually infringes. *nCube Corp. v. Seachange Int'l Inc.*, 2012 WL 4863049, *2 (D. Del. Oct. 9, 2012) (quoting *TiVo Inc. v. Echostar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en banc)); *see also Creative Internet Advertising Corp.*, 674 F.Supp.2d at 855. The Court "'must focus initially on the differences between the features relied upon to establish infringement and the modified features of the newly accused products.'" *nCube,* 2012 WL 4863049 at *4 (quoting *TiVo*, 646 F.3d at 882). In *nCube*, the plaintiff accused a component called the Client1D of satisfying a specific limitation. After a verdict of infringement and the award of an injunction, the defendant redesigned the Client1D component. The plaintiff then claimed a second component in the new version, the SessionID, satisfied that limitation. The SessionID was not changed or modified as part of the redesign effort. Accordingly, the Court did not find in the SessionID allegations a basis for finding a lack of colorable differences. *Id.* at *4-5. The plaintiff also failed to prove by clear and convincing evidence that the modified system infringed. *Id.* at *5.

While this inquiry relates to preverdict sales information, and *nCube* addresses the scope of post-verdict relief, factually, this case is very similar to *nCube*, but has even less of an evidentiary basis to find a lack of colorable differences between the versions of Remote Expert or to find that the new version infringes. The multilingual feature relied upon to establish infringement of a specific limitation at trial is no longer present in Remote Expert; XU's expert admitted the new method for achieving multiple languages does not infringe that limitation; and

the "locale" feature relied upon to establish infringement by the new version was not addressed at trial or even in XU's opening brief. (*See* D.I. 676; D.I. 703). Dr. Nourbakhsh's use of the word "example" at trial, his new two-paragraph "locales" opinion, and Cisco's employee's short declaration fail to prove that the new version of Remote Expert is not colorably different from the old version, or that the new version infringes. Further, based on the briefing, it is not clear what standard and burden of proof the Court should apply in the context of pre-verdict sales, whether Dr. Nourbakhsh's "locales" opinion is properly introduced at this juncture, or if the opinion was in Dr. Nourbaksh's expert report.

The Court notes Cisco's request for an evidentiary hearing. (D.I. 720, at 4). This approach has been adopted in the context of determining whether a new version fell within the scope of an ongoing royalty. *See Creative Internet Advertising Corp.*, 674 F.Supp.2d at 849. Another approach appears to be denying the request to include the unadjudicated version of Remote Expert without prejudice to the plaintiff filing a separate action involving that product. *See Fractus, S.A. v. Samsung Electronics Co., Ltd.*, 2013 WL 1136964, *2 (E.D. Tex. Mar. 15, 2013). Given the submissions' many substantive and procedural shortcomings and the indications that, under *nCube*, the new version of Remote Expert appears to be colorably different than the version found to infringe, this second approach is the most prudent.

The Court denies XU's request for pre-verdict sales information for both Expert Advisor and Remote Expert, without prejudice to XU filing for patent infringement by Remote Expert as configured after the verdict.[10]

---

[10] XU's ability to file a separate action without prejudice is noted only with regard to this particular issue of damages. The Court makes no ruling as to any other bar or defense, such as statute of limitations or waiver.

25

## B. Prejudgment and Post-Judgment Interest

XU moves to amend the judgment to provide for prejudgment and post-judgment interest based on the average prime rate, compounded quarterly. (D.I. 703 at 3-4). XU asserts the prime rate best compensates a plaintiff for lost revenues during infringement, as that rate represents the cost of borrowing money. *Id.* (citing *IMX, Inc. v. LendingTree, LLC*, 469 F.Supp.2d 203, 227-28 (D. Del. 2007). Cisco responds that prejudgment interest should be set at the T-Bill rate, compounded annually, and that XU has provided no justification for the higher prime rate such as borrowing money pending judgment or any risk of Cisco defaulting. (D.I. 720 at 4-6) (citing *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming a trial court's exercise of its discretion in setting the rate), and cases from other Districts).

The Court has broad discretion to select the pre-judgment interest rate to be applied, and the Federal Circuit has held that application of the prime rate is appropriate even if there is no evidence that the patent holder borrowed at the prime rate. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991). Because the prime rate provides a better measure of the risk of nonpayment that XU bore, and thus, a better measure of the harm XU suffered by not receiving a reasonable royalty during the period of the hypothetical negotiation rate, the Court will award XU prejudgment and post-judgment interest at the prime rate, compounded quarterly. *See IMX*, 469 F.Supp.2d at 227-28 (citing *Mars, Inc. v. Conlux USA Corp.*, 818 F.Supp. 707, 720-21 (D. Del. 1993), *aff'd*, 16 F.3d 421 (Fed. Cir. 1993)).

The Court will also award post-judgment interest at the rate provided by statute. *See* 28 U.S.C. § 1961(a).

26

### C. *Permanent Injunction*

XU seeks a permanent injunction against Cisco's infringing products. XU has the burden of showing that (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Each factor will be taken in turn; in brief, XU has not shown any of the four factors, and a permanent injunction is thus not warranted here.

#### i. Irreparable Harm

For the first factor, XU argues it has suffered irreparable injury because XU lost the opportunity to license its technology to competitors, while Cisco was able to corner the market for the technology, to obtain an exclusive license through its infringement, and to take advantage of the head start that infringement afforded. In response, Cisco first asserts XU must be at risk of irreparable harm from *future* infringement. Cisco asserts there is no such risk because it has stopped selling Expert Advisor and the redesigned version of Remote Expert does not infringe. *See* Section IV(1), *supra*. In reply, XU describes the new version of Remote Expert as unadjudicated and irrelevant and claims that whether the new version is colorably different is "an issue for another day." (D.I. 747 at 5).[11]

The Court takes XU to be conceding that the new version of Remote Expert does not threaten XU with any future harm, or, at least, is not relevant to the analysis. Contrary to Cisco's

---

[11] This contrasts with XU's request for preverdict sales information for Remote Expert, based on the argument that the new version is not colorably different than the older version and infringes.

27

assertion, the absence of any future harm does not end the irreparable harm inquiry; the Court still must sift through XU's assertions of past harm. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861-62 (Fed. Cir. 2010) ("It [is] proper for the district court to consider evidence of past harm to [plaintiff]. Past harm to a patentee's market share, revenues, and brand recognition is relevant for determining whether the patentee 'has suffered an irreparable injury.' Although injunctions are tools for prospective relief designed to alleviate future harm, by its terms the first *eBay* factor looks, in part, at what has already occurred." (internal citations omitted)).

XU claims irreparable injury from losing the opportunity to license its technology to competitors, because Cisco has cornered the market for the technology and essentially obtained an exclusive license through its infringement and the head start that infringement afforded. Cisco responds with several piecemeal attacks based on XU's willingness to license and the extent to which XU has proven that Cisco meaningfully cornered any market with a nexus to the patents in suit.

The shortcomings in XU's case for irreparable injury are more fundamental than Cisco's arguments. While, as the Court just noted, the *eBay* standard establishes that past harm is relevant to the irreparable harm analysis, an injunction is by definition a prospective remedy. *See, e.g., i4i*, 598 F.3d at 861–62. "In this case, the irreparable harm factor weighs against granting a permanent injunction because the 'irreparable' component of the injury that [XU] alleges stems from [Cisco]'s past conduct, which allegedly 'shaped the market' and resulted in long-term" loss of licensing. *See LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 798 F.Supp.2d 541, 563 (D. Del. 2011); *see also Edwards LifeSciences AG v. Corevalve, Inc.*, 2011 WL 446203, *14-15 (D. Del. Feb. 7, 2011) ("At its core, the irreparable injury that [XU] asserts

stems from the fact that [Cisco] was the first to enter the market for the technology in question.").
"This harm would continue even if a permanent injunction were issued, and [XU] makes no allegations of prospective lost customers or harms that are truly irreparable unless the court issues a permanent injunction. On the contrary, the court concludes that [XU] would not benefit substantially from an injunction being issued at this stage, several years after" Cisco allegedly cornered the market. *See LG Electronics*, 798 F.Supp.2d at 563; *see also Edwards LifeSciences*, 2011 WL 446203, *14-15 ("A permanent injunction would not change the fact that [Cisco] was the first to bring its technology to market. . . . . [XU] does not explain how the alleged competitive market advantage it alleges [Cisco] established before the trial would be remedied by a permanent injunction stretching into the future."). XU has not satisfied the first *eBay* factor of irreparable injury.

## ii. Adequacy of a Remedy at Law

In arguing that legal remedies are inadequate, XU repeats the arguments it made in asserting it had suffered irreparable harm, and further asserts that the patents are directed at the "core technology" of Cisco's infringing products. (D.I. 703 at 7). In response, Cisco points to XU's willingness to license the patents, a situation in which money damages are rarely inadequate. (D.I. 720 at 10) (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F.Supp.2d 554, 560 (D. Del. 2008)). Indeed, money damages are rarely inadequate for a patentholder that is willing to forego its exclusive right for some manner of compensation. *Advanced Cardiovascular Sys.*, 579 F.Supp.2d at 560; *Belden Techs. Inc. v. Superior Essex Comm's LP*, 802 F.Supp.2d 555, 578 (D. Del. 2011) (finding legal remedies to be adequate where plaintiffs offered to license the patents). XU does not cite any evidence whatsoever to

29

support its assertion that the patents represent the core technology of the infringing products. In short, XU has not shown any reason why money damages would be inadequate.

### iii. Balance of Harms

XU asserts that the balance of harms favors an injunction because the harm to Cisco from stopping selling its products is minimal compared to XU's inability to exploit the market by achieving a superior licensing deal. Cisco responds that because XU has failed to prove it would suffer any hardship at all without an injunction, it cannot show the balance of harms would tip in its favor. Cisco asserts it would suffer harm from the uncertainty that would stem from issuing an injunction covering infringing products and colorable imitations thereof.

XU has not shown that the balance of harms favors an injunction. As explained in the context of XU's claim of irreparable injury, XU has not shown that it would substantially benefit from an injunction, nor that it would suffer additional harm without one. The Court notes, without concluding, that the parties' dispute over the new version of Remote Expert at this stage lends credence to Cisco's assertion that an injunction may create harmful uncertainty as to what products XU may assert are covered.

### iv. Public Interest

XU asserts the public interest favors a strong patent system and small innovative companies like XU. Cisco responds that the public interest in patent enforcement cannot compel an injunction, as it is present in every patent case. *See ActiveVideo Networks, Inc. v. Verizon Comm's, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012) ("If the general public interest in upholding patent rights alone was sufficient to mandate injunctive relief when none of the other three factors support injunctive relief, then we would be back to the general rule that a patentee should

30

always receive an injunction against infringement. But the Supreme Court rejected the idea that there is a general rule that courts should issue permanent injunctions against patent infringement" in *eBay*.). Cisco also asserts XU is not a source of innovation, given XU's lack of customers and a commercial product. Cisco goes on to argue an injunction would harm the public interest because XU's patents are only small components of the accused products, such that the injunction would disproportionately block consumer access to non-accused technologies.

The Court has no record from which to evaluate the proportion of the accused products covered by XU's patents. Whether XU had customers or a commercial product is not dispositive of whether it was innovative, but there is no other record evidence to suggest that XU was particularly innovative. (*See* D.I. 703 at 8, citing D.I. 704 Ex. 3, Trial Tr. at 996 (providing only a cursory opinion that small companies are generally innovative)). This leaves only XU's assertion that the public interest favors a strong patent system, which is insufficient to compel an injunction. *See ActiveVideo*, 694 F.3d at 1341. XU has not shown any additional reason why an injunction would be in the public interest.

## D. Enhanced Ongoing Royalties

In the alternative to an injunction, XU seeks an enhanced ongoing royalty for the life of the patents for future sales of Remote Expert and Expert Advisor according to the relevant factors in *Georgia-Pacific v. United States Plywood Corp.*, 381 F.Supp. 1116 (S.D.N.Y. 1970) and *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992). In response, Cisco again notes that it has stopped selling Expert Advisor and has designed around the Remote Expert feature found to infringe in favor of Google Translate, such that there are no future infringing sales on which to base a royalty. Cisco asks the Court to first direct the parties to negotiate a license

31

among themselves, and then, if necessary, to hold an evidentiary hearing to address the factual issues underlying an ongoing royalty. Cisco goes on to dispute XU's arguments under *Georgia-Pacific* and *Read*.

A court may decide that the award of an ongoing royalty is necessary to effectuate a remedy, but the provision of such relief does not follow as a matter of course any time permanent injunctive relief is denied. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314-15 (Fed. Cir. 2007). Like the decision to grant or deny injunctive relief, it is within the court's equitable discretion to determine whether an ongoing royalty need be imposed. As explained *supra*, Cisco stopped selling Expert Advisor, and XU has failed to show that the new version of Remote Expert infringes. There are therefore no future sales of any infringing product upon which to base an enhanced ongoing royalty. XU's request is denied.

### V. XU's Motion for Attorneys' Fees

XU seeks attorneys' fees, asserting this was an exceptional case under 35 U.S.C. § 285. XU asserts the fraud verdict shows Cisco's disregard for XU and its rights; that Cisco's launch of a new version of Remote Expert (which XU asserts infringes) justifies fees for XU's patent infringement case; and that Cisco's withholding of discovery regarding Remote Expert caused discovery proceedings to be multiplied. (D.I. 703 at 22-23). In response, Cisco points to the small percentage of XU's original case on which XU prevailed, and proposes that fees are not appropriate in that context. (D.I. 720 at 21, *citing Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1554 (Fed. Cir. 1989)). Cisco also argues that this is not an exceptional case, because there was no willful infringement pre- or post-trial, and because the Court resolved the

32

discovery issues surrounding Remote Expert raised by XU in Cisco's favor. *(See* D.I. 571, 591, 598, 601 at 4, 612 at 164-65).

The fraud verdict has been removed from the analysis. As explained above, the Court is not convinced that the new version of Remote Expert infringes, and therefore it cannot justify attorneys' fees on that basis. The Court found Cisco had not acted improperly in the context of the discovery dispute. There thus is no basis for finding this was an exceptional case.[12]  XU's motion is denied.

## CONCLUSION

For the reasons stated herein, Cisco's Motion for Judgment as a Matter of Law is granted as to the fraud verdict and denied as to patent infringement, and the remainder is dismissed as moot; Cisco's Motion for Enforcement of the Parties' Agreement to Limit Liability is dismissed as moot; and Cisco's motion for an order holding the patents unenforceable is denied. XU's Motion to Alter or Amend the Judgment is denied as to the request for pre-verdict infringing sales; granted as to the request for pre- and post-judgment interest, at the prime rate compounded quarterly; denied as to the request for a permanent injunction; and denied as to the request for enhanced ongoing royalties. XU's Motion for Attorneys' Fees is denied.

An appropriate order will follow.

---

[12] The Court notes that the fact testimony at trial about the features of Expert Advisor and Remote Expert provided a reasonable basis to assert that there was no infringement. (D.I. 677, Trial Tr. vol. 5, 1493-1527, 1543-61; D.I. 678, Trial Tr. vol. 6, 1889-1922).

33

EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,                       )
                                           )
        Plaintiff and Counterdefendant,    )
                                           )
        v.                                 )    C.A. No. 09-157 (RGA)
                                           )
CISCO SYSTEMS, INC.,                       )
                                           )
        Defendant and Counterclaimant.     )

## <u>NOTICE OF CROSS-APPEAL</u>

NOTICE IS HEREBY GIVEN that Defendant Cisco Systems, Inc. appeals to the United

States Court of Appeals for the Federal Circuit from the final judgment entered January 30,

2014, and each and every part thereof.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Jack B. Blumenfeld (#1014)

OF COUNSEL:                                 Jennifer Ying (#5550)

                                            1201 North Market Street
Kathleen M. Sullivan                        P.O. Box 1347
Cleland B. Welton II                        Wilmington, DE 19899
QUINN EMANUEL URQUHART & SULLIVAN, LLP      (302) 658-9200
51 Madison Avenue                           jblumenfeld@mnat.com
22nd Floor                                  jying@mnat.com
New York, NY 10010
(212) 849-7000

                                            *Attorneys for Defendant-Counterclaimant*
Daniel H. Bromberg                          *Cisco Systems, Inc.*
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000

Brett M. Schuman
MORGAN, LEWIS & BOCKIUS LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

Kell M. Damsgaard
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

February 28, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2014, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 28, 2014, upon the following in the manner indicated:

Philip A. Rovner, Esquire                        *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Richard J. Holwell, Esquire                      *VIA ELECTRONIC MAIL*
Michael S. Shuster, Esqurie
Brendon DeMay, Esquire
HOLWELL SHUSTER & GOLDBERG LLP
125 Broad Street, 39th Floor
New York, NY 10004

Stephen D. Susman, Esquire                       *VIA ELECTRONIC MAIL*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002

Allen M. Sokal, Esquire                          *VIA ELECTRONIC MAIL*
Donald R. Dunner, Esquire
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER LLP
901 New York Avenue, NW
Washington, DC 20001-4413


Jack B. Blumenfeld (#1014)

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,                         )
                                             )
                    Plaintiff,               )
                                             )
            v.                               )    C.A. No. 09-157- RGA
                                             )
CISCO SYSTEMS, INC.,                         )
                                             )
                    Defendant.               )

## FINAL JUDGMENT

This matter was tried before a jury, commencing on March 11, 2013 with the Honorable

Richard G. Andrews presiding. On March 22, 2013, the jury returned its verdict (D.I. 667).

Plaintiff XpertUniverse, Inc. ("XpertUniverse") filed a Motion to Alter or Amend the Judgment

Pursuant to Federal Rule of Civil Procedure 59(e) and Motion for Attorneys' Fees Pursuant to 35

U.S.C. § 285 (D.I. 702). Defendant and Counterclaimant Cisco Systems, Inc. ("Cisco") filed a

Motion for Judgment as a Matter of Law under Rule 50(b) and, in the Alternative, for Remittitur

or New Trial Under Rule 59(a)(1) (D.I. 699); a Motion for Enforcement of the Parties'

Agreement to Limit Liability (D.I. 697); and a motion for an order holding the patents in suit

unenforceable due to inequitable conduct (D.I. 706) (together, the "Post-Trial Motions"). On

November 20, 2013, the Court issued its Memorandum Opinion and Order on the Post-Trial

Motions (D.I. 768-69). On January 30, 2014, the Court issued a Memorandum and Order (D.I.

773-74), which further addressed one Post-Trial Motion (D.I. 699) and amended the November

20, 2013, Order. (D.I. 769).

In accordance with the jury's verdict and the Court's pre- and post-trial orders, it is

hereby ORDERED, ADJUDGED AND DECREED that:

1.      Cisco's "Expert Advisor" product directly infringed claim 5 of U.S. Patent No.

7,366,709 (Count I).

2.      Cisco's "Expert Advisor" and "Remote Expert" products directly infringed claim 12 of U.S. Patent No. 7,499,903 (Count II).

3.      Claim 5 of U. S. Patent No. 7,366,709 is not invalid.

4.      Claim 12 of U. S. Patent No. 7,499,903 is not invalid.

5.      XpertUniverse shall recover for damages caused by Cisco's infringement of XpertUniverse's patents by the "Expert Advisor" product in the amount of $15,463.00, plus pre-judgment interest at the prime rate, compounded quarterly, and post-judgment interest in accordance with 28 U.S.C. § 1961(a).

6.      XpertUniverse shall recover for damages caused by Cisco's infringement of XpertUniverse's patent by the "Remote Expert" product in the amount of $18,920.00, plus pre-judgment interest at the prime rate, compounded quarterly, and post-judgment interest in accordance with 28 U.S.C. § 1961(a).

7.      All other relief requested by the parties and not expressly awarded herein is DENIED.

8.      Judgment is entered for Cisco on all other XpertUniverse claims other than those expressly addressed in paragraphs 1-6 above.

9.      Judgment is entered for XpertUniverse on Cisco's counterclaims.

IT IS SO ORDERED this _30th_ day of _January_, 2014.

_Richard G. Andrews_
United States District Judge

1131815

2

# EXHIBIT L

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,                    )
                                        )    Civil Action No. 09-157-RGA
            Plaintiff,        )
                                        )
    v.                                )
                                        )
CISCO SYSTEMS, INC.,                    )
                                        )
            Defendant.        )

## XPERTUNIVERSE, INC.'S (i) MOTION TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e); AND (ii) MOTION FOR ATTORNEYS' FEES PURSUANT TO 35 U.S.C. § 285

Plaintiff XpertUniverse, Inc. ("XU") respectfully moves to alter or amend the judgment pursuant to Federal Rule of Civil Procedure 59(e). Specifically, XU moves the Court to alter or amend the judgment to grant XU:

1.     supplemental damages based on pre-verdict infringing sales and for any accounting that may be necessary;

2.     prejudgment interest on the awarded damages under 35 U.S.C. § 284;

3.     post judgment interest under 28 U.S.C. § 1961; and

4.     ongoing royalties for Cisco Systems, Inc.'s continued infringement after entry of the judgment or, in the alternative, a permanent injunction.

XU also moves for attorneys' fees pursuant to 35 U.S.C. § 285. In support of these motions, XU relies on the accompanying Declarations of Walter Bratic and Jason M. Sobel filed contemporaneously herewith, and upon the papers, records and pleadings on file with the Court.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
Kenneth L. Stein
Jason M. Sobel
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

By: /s/ Philip A. Rovner
    Philip A. Rovner (#3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

Dated: May 6, 2013
1105072

*Attorneys for Plaintiff XpertUniverse, Inc.*

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that, on May 6, 2013 the within document was

electronically filed with the Clerk of the Court using CM-ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading from CM-ECF.

I further certify that on May 6, 2013, the within document was electronically

mailed to the following persons:

Jack B. Blumenfeld, Esq.
Jennifer Ying, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19899
jblumenfeld@mnat.com
jying@mnat.com

Colm F. Connolly, Esq.
Morgan Lewis & Bockius LLP
1007 Orange Street, Suite 501
Wilmington, DE  19801
cconnolly@morganlewis.com

John V. Gorman, Esq.
Kell M. Damsgaard, Esq.
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
jgorman@morganlewis.com
kdamsgaard@morganlewis.com

Franklin Brockway Gowdy, Esq.
Brett M. Schuman, Esq.
Ryan L. Scher, Esq.
Rachel M. Walsh, Esq.
Esther K. Ro, Esq.
Dennis J. Sinclitico, Jr., Esq.
Morgan Lewis & Bockius LLP
One Market Street
Spear Street Tower
San Francisco, CA  94105
fgowdy@morganlewis.com
bschuman@morganlewis.com
rscher@morganlewis.com
rwalsh@morganlewis.com
ero@morganlewis.com
dsinclitico@morganlewis.com

Kathleen M. Sullivan, Esq.
Cleland B. Welton, II, Esq.
Quinn Emanuel Urquhart &Sullivan, LLP
51 Madison Avenue
New York, NY  10010
kathleensullivan@quinnemanuel.com
clelandwelton@quinnemanuel.com

Daniel H. Bromberg, Esq.
Quinn Emanuel Urquhart &Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
danbromberg@quinnemanuel.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

913090

EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-157 (RGA) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CISCO'S MOTION FOR LEAVE
## TO FILE A MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Cisco Systems, Inc. ("Cisco") respectfully moves for leave to file a

motion for partial summary judgment on Cisco's patent invalidity counterclaim (Counterclaim I)

and XpertUniverse, Inc.'s claims for trademark infringement (Counts VII and VIII).

## I.    INTRODUCTION

There is good cause for the Court to permit Cisco to move for summary judgment

on these issues now. First, undisputed evidence establishes that both of the patents that plaintiff

XpertUniverse, Inc. ("XU") is asserting against Cisco in this case are invalid based on

application of statutory bars to patentability set forth in 35 U.S.C. § 102(b). *See* Exhibit A

(Cisco's opening brief in support of its proposed motion for partial summary judgment).[1]

Further, undisputed evidence establishes that XU has no valid, enforceable trademark right in the

designation "Expert on Demand." *See id.*

This case has been pending for three years and the issues raised by Cisco's

proposed motion are ripe for adjudication. XU's current complaint is a sprawling affair, having

grown to sixteen claims. It accuses at least ten Cisco products or solutions of patent

---

[1]     Exhibit A is the current draft of the opening brief that would be filed if the Court grants
leave for Cisco to file its motion. As indicated therein, it would be supported by a
declaration from Cisco's counsel and by the referenced exhibits.

infringement.  Resolving the issues raised by Cisco's proposed motion for partial summary judgment would simplify the issues in this case, resulting in a major conservation of resources for the Court and the parties.

It cannot be a matter of dispute that the resolution of these issues would have that effect.  Resolving the claims raised in Cisco's proposed motion would obviate the need to litigate and adjudicate XU's claims of infringement of the 7,366,709 and 7,499,903 patents (Claims I and II) and four of Cisco's pending counterclaims.  *See* D.I. 82 and 157.  If the Court were to grant Cisco's motion for partial summary judgment, a total of <u>nine</u> claims and counterclaims would be eliminated from this case, inclusive of the claims that are the subject of the motion.

Other serious challenges to the validity of XU's patents, as well as further litigation of infringement/non-infringement across at least ten different Cisco products/solutions, promises to be a costly and time consuming process for both the parties and the Court.  Those other issues would also require claim construction by the Court.  There will be no point in litigating those issues if, as Cisco demonstrates in its proposed motion for partial summary judgment, the patents are invalid based on the statutory bars set forth in Section 102(b).  Further, XU cannot need any additional discovery on the issues raised by Cisco's proposed motion.  Cisco's proposed motion focuses exclusively on the validity of XU's patents and purported trademark.  XU should also want to have these issues resolved promptly because it cannot have any legitimate interest in litigating patents and a trademark that are invalid.

## II.   THE ISSUES RAISED BY CISCO'S PROPOSED MOTION ARE RIPE FOR ADJUDICATION IN FAVOR OF CISCO

### A.   <u>U.S. Patent Nos. 7,366,709 and 7,499,903 Are Invalid.</u>

Under well-established principles of patent law, the "on sale" and "public use" bars set forth in 35 U.S.C. § 102(b) render patents invalid due to certain activities that occurred

more than one year prior to the filing of the patent applications. The '709 and '903 Patents are invalid, as a matter of law, based on these bars to patentability. Undisputed evidence adduced in discovery establishes that the purported inventions claimed in these patents were embodied in a XU product (XpertSHARE) that was offered for sale more than one year prior to the filing of the applications that issued as the patents in suit. *See* Ex. A at pp. 11-17. The undisputed evidence includes the fact that XU was paid $1 million from a deployment of XpertSHARE at Allstate Insurance in <u>December 2002</u>.

Further, XU continues to prosecute patent applications claiming priority to the '709 patent in suit. In that ongoing prosecution, the patent examiner has independently researched the history of XU and XpertSHARE and denied XU's pending application based on the Section 102(b) statutory bars. The examiner has come to the conclusion that XU has not been candid with the Patent Office in its patent prosecution activities. *See* Ex. A at p. 7.

**B.**     <u>**XU Owns No Rights To The Descriptive Phrase "Expert On Demand."**</u>

It is undisputed that XU did not attempt to register the mark "Expert on Demand" with the Patent and Trademark Office or with the State of California. XU has nevertheless sued Cisco for using the descriptive phrase "expert on demand" in connection with its products/solutions, alleging that it owns the legal rights to that phrase vis-à-vis Cisco and the rest of the marketplace. *See* D.I. 84 at ¶¶ 206-223. Thus, XU's seventh (Lanham Act) and eighth (common law trademark infringement) claims both fail as a matter of law.

The undisputed evidence establishes that XU has no valid claim to the phrase "expert on demand." As a defunct company that, by its own admission, never sold a product called "Expert on Demand" to any customer, XU cannot establish any association in the market between its product and the descriptive phrase "expert on demand." As XU admitted in deposition, others in the market are using the same phrase in connection with other products, and

no evidence exists of any customer confusion resulting from Cisco's use of the phrase "expert on demand" in connection with its products/solutions. *See* Ex. A at pp. 18-20.

## III.  GOOD CAUSE EXISTS TO HEAR CISCO'S MOTION NOW

Deciding the issues raised by Cisco's proposed motion now would promote judicial efficiency and save the parties untold time and money that would be spent litigating *invalid* patents and a *non-existent* trademark. Claim construction would be unnecessary.[2] Further litigation of (1) non-infringement of at least ten accused Cisco products, potentially involving expert retentions and discovery, and (2) Cisco's many other challenges to the validity of XU's patents, also including potential expert discovery, would be unnecessary. Potential market studies, expert reports and discovery regarding the meaning and use of the descriptive phrase "expert on demand" in the market would also be unnecessary.

Indeed, resolving the claims raised in Cisco's proposed motion would obviate XU's claims for alleged infringement of the '709 and '903 patents (Claims I and II), and Cisco's counterclaims for declaratory relief re: noninfringement (Counterclaim II), unenforceability regarding offer to sell (Counterclaim III), unenforceability regarding failure to disclose material prior art references (Counterclaim IV), and unenforceability regarding omission of a co-inventor (Counterclaim V). *See* D.I. 82 and 157. Thus, if the Court granted Cisco's motion for partial summary judgment, a total of nine claims and counterclaims potentially would be eliminated from this case, substantially streamlining the litigation.

---

[2]    XU may point out that it initially took the position that not a single term in either of its patents required construction by this Court. That was a purely tactical decision by XU. As Cisco anticipated when it proposed terms for construction, XU's infringement claims are based on impermissibly broad constructions that are supported in many instances solely by XU's retained claim construction expert, Dr. Nourbakhsh. *See* D.I. 133.

## IV.  CONCLUSION

Cisco submits that good cause exists to permit it to file its proposed motion for partial summary judgment now.  Resolution of the motion in Cisco's favor would streamline the litigation for the parties and promote judicial economy.  Cisco respectfully requests the Court grant its motion for leave to file its proposed motion for partial summary judgment.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

February 28, 2012

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1</u>

I hereby certify that counsel for defendant Cisco Systems, Inc. has made
reasonable efforts to reach an agreement on the attached motion with counsel for plaintiff
XpertUniverse, Inc., but that no agreement could be reached.

Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 28, 2012, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Joseph Diamante, Esquire                                     *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason Sobel, Esquire
Alex Solo, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038

Jack B. Blumenfeld (#1014)