K. Lee Marshall (SBN 277092)
Alexandra C. Whitworth (SBN 303046)
BRYAN CAVE LEIGHTON PAISNER LLP
Three Embarcadero Center, 7th Floor
San Francisco, CA  94111-4078
Telephone: (415) 675-3444
Facsimile: (415) 675-3434
klmarshall@bclplaw.com
alex.whitworth@bclplaw.com

J. Bennett Clark (*pro hac vice*)
Daniel A. Crowe (*pro hac vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
ben.clark@bryancave.com
dacrowe@bryancave.com

Joseph J. Richetti (*pro hac vice*)
Alexander D. Walden (*pro hac vice*)
BRYAN CAVE LEIGHTON PAISNER LLP
1290 Avenue of the Americas
New York, NY  10104
Telephone: (212) 541-2000
Facsimile: (212) 541-4630
joe.richetti@bclplaw.com
alexander.walden@bclplaw.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| XPERTUNIVERSE, INC., a Delaware Corporation, | Case No. 17-cv-3848 |
| Plaintiff, | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF XPERTUNIVERSE, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| CISCO SYSTEMS, INC., a California Corporation, | Date: July 27, 2018 Time: 10:30 a.m. |
| Defendant. | Courtroom: 3 Judge: Hon. Richard Seeborg |

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

Pursuant to Federal Rule of Evidence 201, Plaintiff XpertUniverse, Inc. ("XpertUniverse") by and through its attorneys of record, hereby requests that the Court take judicial notice of the following documents in support of its Opening Claim Construction Brief:

**Exhibit A:**   Order on Claim Interpretation, entered in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on March 20, 2013.

**Exhibit B:**   Joint Claim Construction Statement filed in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on January 27, 2012.

**Exhibit C:**   Plaintiff's Opening Claim Construction Brief filed by XpertUniverse, Inc. in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on February 15, 2012.

**Exhibit D:**   Defendant Cisco Systems, Inc.'s Responsive Claim Construction Brief filed by Cisco Systems, Inc. in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on February 29, 2012.

**Exhibit E:**   Plaintiff's Reply Claim Construction Brief filed by XpertUniverse, Inc. in the United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on March 7, 2012.

**Exhibit F:**   Transcript of Markman Hearing before Judge Richard G. Andrews, in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA, held on March 15, 2012.

**Exhibit G:**   Memorandum Order, entered in United States District Court for the District of Delaware, Case No. 1:09-cv-00157-RGA on April 20, 2012.

Federal Rule of Evidence 201(b) allows this Court to take judicial notice of any fact "not subject to reasonable dispute because it" is either (1) "generally known within the trial court's

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

BRYAN CAVE LEIGHTON PAISNER LLP
THREE EMBARCADERO CENTER, 7TH FLOOR
SAN FRANCISCO, CA 94111

1   territorial jurisdiction" or (2) "can be accurately and readily determined from sources whose

2   accuracy cannot be reasonably be questioned."

3        This Court may take judicial notice of pleadings and court orders in related proceedings.

4   *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n. 1 (9th Cir. 1996).  This Court

5   may therefore take judicial notice of the pleadings and court orders from the related proceeding

6   attached as Exhibits A, B, C, D, E, and G.  Additionally, this Court may take judicial notice of

7   court transcripts from related proceedings because the contents of the transcripts can be

8   "accurately and readily determined from sources whose accuracy cannot be reasonably

9   questioned."  *Allstate Ins. Co. v. Pira*, No. C 11-3511 CW, 2012 WL 1997212, at *4 (N.D. Cal.

10  June 4, 2012).  This Court may therefore take judicial notice of the markman transcript attached as

11  Exhibit F.

12

13

14

15  Dated:    May 21, 2018                    **BRYAN CAVE LEIGHTON PAISNER LLP**

16                                           By:  */s/ Joseph J. Richetti*
                                                  Joseph J. Richetti
17                                                Attorneys for Plaintiff
                                                  XPERTUNIVERSE, INC.
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| XPERTUNIVERSE, INC., | ) |
| | ) Civil Action No. 09-157 (RGA) |
| Plaintiff, | ) |
| | ) |
| vs. | ) JURY TRIAL DEMANDED |
| | ) |
| CISCO SYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

## ORDER ON CLAIM INTERPRETATION

Below are the meaning of some of the words of the claims of the '709 and '903

Patents that are at issue in this case. These definitions must be accepted as correct. For any

words in a claim for which no definition is provided, their common meaning should be applied.

The following definitions govern for terms in the '709 patent:

- "subject list style" means "a representation of the logical structure of a

list of inquiry criteria and values and their respective relationships."

- "inquiry type(s)" means "question topics"

- "inquiry criteria" means "pre-selected subject categories"

- "underlying criteria" means "subject categories"

- "values" means "choices"

- "interactive problem definition page" means "an interactive graphical

user interface"

- "inquiry criteria values" means "preselected subject category choices"

- "plurality of monitors" means "two or more monitors"

- "the processor being configured to extract unique combinations from the database and evaluate the combinations" means "the processor being programmed to extract unique combinations from the database and evaluate the combinations."

The following definitions govern for terms in the '903 patent:

- "having a one-to-one correspondence" means "satisfying the property that each member of each of the one or more layers of inquiry types maps exactly to a predetermined semantically expressed inquiry type"

- "predetermined semantically-expressed inquiry type" means "terms that organize and identify categories of assistance requested, created prior to use and expressed using language that is humanly understandable"

- "underlying plurality of criteria groupings" means "two or more groups of underlying criteria"

- "layer(s) of inquiry type(s)" means "a defined set of predetermined semantically expressed inquiry types"

- "inquiry type(s)," in the context of the '903 patent only, means "term(s) that organize and identify categories of assistance requested, created prior to use and expressed using language that is humanly understandable"

IT IS SO ORDERED this 20th day of March, 2013.

Richard G. Andrews

United States District Judge

1099063

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

XPERTUNIVERSE, INC.,          )
                              )      Civil Action No. 09-157-RGA
          Plaintiff,          )
                              )
     v.                       )      **JURY TRIAL DEMANDED**
                              )
                              )
CISCO SYSTEMS, INC.,          )
                              )
          Defendant.          )

## JOINT CLAIM CONSTRUCTION STATEMENT

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
Alexander Solo
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorney for Plaintiff XpertUniverse, Inc.*

Dated:  January 27, 2012

Jack B. Blumenfeld (#1014)
MORRIS, NICHOLS, ARSHT & TUNNELL
LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com

OF COUNSEL:

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA  19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
(45) 442-1000

*Attorneys for Defendant Cisco Systems, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,     )
                                 )    Civil Action No. 09-157-RGA
            Plaintiff,     )
                                 )
          v.              )    **JURY TRIAL DEMANDED**
                                 )
                               )
CISCO SYSTEMS, INC.,     )
                                 )
           Defendant.    )

## JOINT CLAIM CONSTRUCTION STATEMENT

Plaintiff XpertUniverse, Inc. ("XU" or "Plaintiff") and Defendant Cisco Systems, Inc.

("Cisco" or "Defendant") hereby file this Joint Claim Construction Statement in accordance with

the Court's Scheduling Order (D.I. 76) as amended by the Court's Order granting the parties'

Joint Stipulation to Extend Time (D.I. 123).

This statement addresses the claim construction positions of the parties regarding U.S.

Patent No. 7,499,903 ("the '903 patent") and U.S. Patent No. 7,366,709 ("the '709 patent").

Copies of the '903 and '709 patents are included in the accompanying Appendix as Exs. 1 and 2.

Copies of excerpts of the prosecution histories for the '903 and '709 patents are included in the

accompanying Appendix as Exhibits 3 and 4, respectively.

Cisco identified 12 claim terms from the '903 patent, and 10 claim terms from the ''709

patent, for construction. XU asserts that the claim terms identified by Cisco would be readily

understood by one of ordinary skill in the art and that therefore no construction is necessary for

the terms and phrases that Cisco seeks to construe. Therefore, XU objects to Cisco's proposed

constructions on that basis; however, XU nonetheless discloses its proposed constructions for

each claim term in the event the Court elects to construe the terms and phrases identified by

Cisco. XU's proposed construction of these terms is not intended to indicate that XU agrees that those terms need to be construed by the Court.

### A.    Terms On Which the Parties Agree

Subject to the foregoing objection, the Parties have reached agreement on the construction of certain claim terms as set forth in Exhibit A.

### B.    Proposed Constructions for Disputed Terms

The parties have set forth their proposed constructions for the disputed terms in the attached exhibits:

XU's and Cisco's proposed constructions of each disputed claim term of the '903 patent are set forth in Exhibit B.

XU's and Cisco's proposed constructions of each disputed claim term of the '709 patent are set forth in Exhibit C.

In addition to XU's and Cisco's proposed constructions, Exhibit D further contains the intrinsic evidence that each party intends to rely upon in support of their proposed constructions with respect to the '903 patent.

In addition to XU's and Cisco's proposed constructions, Exhibit E further contains the intrinsic evidence that each party intends to rely upon in support of their proposed constructions with respect to the '709 patent.

The parties reserve the right to update and/or supplement their proposed claim constructions and support thereof as discovery proceeds.

POTTER ANDERSON & CORROON LLP

By: */s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Jonathan Choa (#5319)
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
Alexander Solo
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400
Counsel for Plaintiff

MORRIS NICHOLS ARSHT & TUNNELL
LLP


By: */s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com

OF COUNSEL:

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

3

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000
Counsel for Defendant

4

## EXHIBIT A: TERMS AGREED UPON

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,499,903 Construction |
|---|---|---|
| 1. | "computer database"<br><br>(claims 1 and 12) | "records organized in computer readable/writeable memory" |
| 2. | "having a one-to-one correspondence"<br><br>(claim 1) | "satisfying the property that each member of each of the one or more layers of inquiry types maps exactly to a predetermined semantically expressed inquiry type" |
| 3. | "predetermined semantically-expressed inquiry types"<br><br>(claims 1, 12) | "terms that organize and identify categories of assistance requested, created prior to use and expressed using language that is humanly understandable" |

Exhibit A
Page 1 of 1

# EXHIBIT B: DISPUTED TERMS IN THE '903 PATENT

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,499,903 | |
| --- | --- | --- | --- |
| | | XU's Proposed Construction | Cisco's Proposed Construction |
| 1. | "underlying plurality of criteria groupings"<br><br>"underlying criteria grouping(s)"<br><br>(claims 1, 6-10, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"sets of collections of types of assistance requested, wherein each collection can be a member of zero or more sets" | "two or more groups of humanly understandable descriptors that identify inquiry types"<br><br>"groups of humanly understandable descriptors that identify an inquiry type" |
| 2. | "skill-set database"<br><br>(claims 1, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a digital storage and retrieval information system designed for storing associations between some or all of: agents and resources available, types of assistance requested, and expertise required for types of assistance requested" | "records organized in a computer readable/writable memory constituting the identity of individuals having unique knowledge on specific topics" |

Exhibit B
Page 1 of 5

| Claim Term, Phrase or Clause | U.S. Patent No. 7,499,903 | |
| --- | --- | --- |
| | XU's Proposed Construction | Cisco's Proposed Construction |
| 3. "expert having individualized knowledge" <br><br> (claim 1) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: <br><br> "a person in possession of information or expertise that is relevant or material to a particular query" | "person having unique, specialized knowledge on a specific inquiry type" |
| 4. "unique numerical routing identifier" <br><br> "unique numeric routing identifier" <br><br> "numeric routing identifier" <br><br> (claims 1, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: <br><br> "a mathematically distinct encoding for data relevant to an inquiry" | "fixed number that is associated with a semantically-expressed inquiry type and an inquiry type in its corresponding layer that is used to match and route user queries to an expert" |

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,499,903 | |
| --- | --- | --- | --- |
| | | XU's Proposed Construction | Cisco's Proposed Construction |
| 5. | "match and route system" (claims 12-18) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: <br><br> "an architecture that maps a resource or information request to possible resources or information sources, and provides a link to the identified resource(s) or information source(s)." | "system that identifies an expert skill set that corresponds to a user's query and routes the query based on the expert skill set" |
| 6. | "layer(s) of inquiry type(s)" (claims 1, 6-9, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: <br><br> "a particular grouping of terms that organize and identify categories of assistance requested" | "a defined set of specific groupings of underlying criteria" <br><br> "defined sets of specific groupings of underlying criteria" |

Exhibit B
Page 3 of 5

| | Claim Term, Phrase or Clause | XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|---|---|
| | | **U.S. Patent No. 7,499,903** | |
| 7. | "inquiry type(s)" <br><br> (claims 1, 6-9, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: <br><br><br> "term(s) that organize and identify categories of assistance requested" | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" |
| 8. | "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" <br><br> (claim 10) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | "receiving a user's response through an interactive problem definition page to the display of a first member of the underlying criteria grouping" |
| 9. | "the response triggering the presentation of further members of the underlying criteria grouping" <br><br> (claim 10) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | "the user's response causes further members of the underlying criteria grouping to be displayed on an interactive problem definition page" |

Exhibit B
Page 4 of 5

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,499,903 | |
| | | XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|---|---|
| 10. | "upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type" <br><br> (claim 1) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | "upon a user selecting underlying criteria to identify at least one humanly understandable grouping of underlying criteria using an interactive problem definition page" |
| 11. | "upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type" <br><br> (claim 12) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | "upon receiving from an interactive problem definition page a user's selection of criteria and their corresponding values that identify at least one humanly understandable grouping of underlying criteria" |
| 12. | "the host server communicably connected with an inquiry-type database and a skill-set database" <br><br> (claim 12) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | "the host server directly connected through hardware and software interfaces with an inquiry-type database and a skill-set database" |

# EXHIBIT C: DISPUTED TERMS IN THE '709 PATENT

## U.S. Patent No. 7,366,709

| | Claim Term, Phrase or Clause | XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|---|---|
| 1. | "subject list style" (claims 1, 4, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "the structural format for an interface used to enter information" | "a graphical representation of the logical structure of a list of inquiry criteria and values and their respective relationships" |
| 2. | "member of an organization" "member of the organization" (claims 1, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "person associated with or authorized by an entity that is enabling use of the method or system described" | "person belonging to a predetermined group or company" |

Exhibit C
Page 1 of 5

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,366,709 | |
| --- | --- | --- | --- |
| | | XU's Proposed Construction | Cisco's Proposed Construction |
| 3. | "inquiry type(s)" (claims 1, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "term(s) that organize and identify categories of assistance requested" | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" |
| 4. | "inquiry criteria" (claims 1, 5, 6, 7) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "terms that organize collections of types of assistance requested" | "subject categories used to define a seeker's query displayed to a user in an interactive problem definition page" |
| 5. | "underlying criteria" (claim 1) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | "subject categories used to classify inquiry types according to a client's business objectives and information needs of a user" |

Exhibit C
Page 2 of 5

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,366,709 | |
|---|---|---|---|
| | | XU's Proposed Construction | Cisco's Proposed Construction |
| 6. | "values" (claims 1, 2, 3, 5, 6, 7) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "an object, assigned to a variable, appropriately within the range of possible objects that the variable is intended to represent" | "criteria selections having a relationship to an inquiry criteria and that can be displayed to a user in an interactive problem definition page." |
| 7. | "interactive problem definition page" (claims 1, 6) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "a responsive interface designed to facilitate either the specification of assistance, or facilitate the specification of the categories of assistance" | "an interactive graphical user interface that uses a subject list style displaying user-specific inquiry criteria and values to guide the user in classifying an inquiry" |

Exhibit C
Page 3 of 5

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,366,709 | |
| --- | --- | --- | --- |
| | | XU's Proposed Construction | Cisco's Proposed Construction |
| 8. | "inquiry criteria values" (claims 1, 2, 3, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "an object assigned to a variable representing collections of types of assistance requested" | "selections displayed to a user in an interactive problem definition page" |
| 9. | "plurality of monitors" (claims 5 and 7) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction for the term "monitors" as used in claims 5 and 7: "interactive communication devices" | "two or more computer screens" |

Exhibit C
Page 4 of 5

| | Claim Term, Phrase or Clause | U.S. Patent No. 7,366,709 | |
|---|---|---|---|
| | | XU's Proposed Construction | Cisco's Proposed Construction |
| 10. | "the processor being configured to extract unique combinations from the database and evaluate the combinations"<br><br>(claim 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"the processor being configured to retrieve and analyze the term(s) that organize categories of requests, the object(s) assigned to related variables, and the structural format(s) for the interface used to enter information" | "the processor is programmed to extract unique combinations of a user's query and an expert's skill set from records stored in read/writable memory and to determine in real time the most qualified expert for a user's query" |

Exhibit C
Page 5 of 5

## EXHIBIT D:

### SUPPORT FOR PROPOSED CONSTRUCTIONS FOR THE DISPUTED TERMS IN THE '903 PATENT

| Claim Term, Phrase or Clause | XU Proposed Construction | U.S. Patent No.7,499,903 Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|
| 1. "underlying plurality of criteria groupings"<br><br>"underlying criteria grouping(s)"<br><br>(claims 1, 6-10, 12, 19) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"sets of collections of types of assistance requested, wherein each collection can be a member of zero or more sets." | '903 Specification: Abstract; col. 1, lines 50-55; col. 1, lines 60-62; col. 2, lines 1-4; col. 2, lines 36-43. | "two or more groups of humanly understandable descriptors that identify inquiry types"<br><br>"groups of humanly understandable descriptors that identify an inquiry type" | *See, e.g.,* Figs. 2, 3, col. 1:51-58; col. 2:32-40; col. 4:42-48; col. 5:34-45. |

Exhibit D
Page 1 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | U.S. Patent No. 7,499,903 | | |
| 2. | "skill-set database" (claims 1, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "a digital storage and retrieval information system designed for storing associations between some or all of: agents and resources available, types of assistance requested, and expertise required for types of assistance requested" | '903 Specification: Abstract; Fig. 3; col. 1; lines 55-67; col. 2, lines 4-9; col. 5, line 46-col. 6, line 29. | "records organized in a computer readable/writable memory constituting the identity of individuals having unique knowledge on specific topics" | *See, e.g.*, Figs. 1, 2, 3, col. 1:58-67; col. 4:37-40; col. 5:46-57; col. 6:8-28. |

Exhibit D
Page 2 of 8

| U.S. Patent No. 7,499,903 | | | | |
|---|---|---|---|---|
| **Claim Term, Phrase or Clause** | **XU Proposed Construction** | **Support for XU Proposed Construction** | **Cisco Proposed Construction** | **Support for Cisco's Proposed Construction** |
| 3. "expert having individualized knowledge" (claim 1) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "a person in possession of information or expertise that is relevant or material to a particular query" | '903 Specification: Abstract; Fig. 3; col. 1, lines 5-9; col. 1 lines 58-62; col. 2, lines 28-56; col. 3; lines 35-39; col. 5, lines 46-57; col. 5, lines 65-67. col. 6, lines 54-59. | "person having unique, specialized knowledge on a specific inquiry type" | *See, e.g.*, col. 1:58-67; col. 2:40-43; col. 5:47-57; col. 5:58-6:7. |
| 4. "unique numerical routing identifier" "unique numeric routing identifier" "numeric routing identifier" (claims 1, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "a mathematically distinct encoding for data relevant to an inquiry" | '903 Specification: Abstract; Figure 3; col. 1, lines 62-67; col. 2, lines 3-9; col. 2, lines 39-43; col. 5, lines 51-57; col. 6, lines 13-15. | "fixed number that is associated with a semantically-expressed inquiry type and an inquiry type in its corresponding layer that is used to match and route user queries to an expert" | *See, e.g.*, Figs. 1, 2, 3, Abstract; col. 1:58-67; col. 2:4-9; col. 2:36-43; col. 5:46-57; col. 6:8-28. |

Exhibit D
Page 3 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | U.S. Patent No. 7,499,903 | | |
| 5. | "match and route system" (claims 12-18) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "an architecture that maps a resource or information request to possible resources or information sources, and provides a link to the identified resource(s) or information source(s)." | '903 Specification: col. 1, lines 6-9; col. 1, lines 16-46. col. 2, lines 28-35. | "system that identifies an expert skill set that corresponds to a user's query and routes the query based on the expert skill set" | *See, e.g.*, Fig. 3, Abstract; col. 1:6-9; col. 1:13-18; col. 2:28-35; col. 4:3-13; col. 5:46-6:7. |

Exhibit D
Page 4 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | U.S. Patent No. 7,499,903 | | |
| 6. | "layer(s) of inquiry type(s)" (claims 1, 6-9, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "a particular grouping of terms that organize and identify categories of assistance requested" | '903 Specification: Abstract; Fig. 3; col. 1, lines 51-67; col. 2, lines 1-9; col. 5, lines 17-45; col. 6, lines 15-25. | "a defined set of specific groupings of underlying criteria" "defined sets of specific groupings of underlying criteria" | See, e.g., Figs. 2, 3; Abstract; col. 1:51-58; col. 2:1-4; col. 5:13-33; col. 6:13-25. See, e.g., '903 FH, Non-Final Rejection, 6/20/2007; Amdmt./Req. for Reconsideration, 12/20/2007, pp. 10-12. |
| 7. | "inquiry type(s)" (claims 1, 6-9, 12) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "term(s) that organize and identify categories of assistance requested" | '903 Specification: Abstract; Fig. 3; col. 1, lines 51-67; col. 2, lines 1-9; col. 2, lines 36-43; col. 4, lines 45-48; col. 5, lines 15-67; col. 6, lines 8-25 | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" | See, e.g., Fig. 2,3; Abstract; col. 1:51-58; col. 2:1-4; col. 2:36-40; col. 4:42-5:3; col. 5:13-33; col. 6:13-25. See, e.g., '903 FH, Non-Final Rejection, 6/20/2007; Amdmt./Req. for Reconsideration, 12/20/2007, pp. 10-12. |

Exhibit D
Page 5 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | U.S. Patent No. 7,499,903 | | |
| 8. | "receiving from the user a response to the presentation of a first member of the underlying criteria grouping" (claim 10) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | '903 Specification: Figs. 1-3; col. 3, lines 33-39; col. 3, line 61 0 col. 4, line 2; col. 4, line 42 – col. 5, line 33. | "receiving a user's response through an interactive problem definition page to the display of a first member of the underlying criteria grouping" | *See, e.g.,* Fig. 2; col. 3:1- 15; col. 3:33-36; col. 3:61-4:2; col. 4:3-5; col. 4:19-23; col. 4:48-53; col. 5:17-33. |
| 9. | "the response triggering the presentation of further members of the underlying criteria grouping" (claim 10) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | '903 Specification: Figs. 1-3; col. 3, lines 33-39; col. 3, line 61 0 col. 4, line 2; col. 4, line 42 – col. 5, line 33. | "the user's response causes further members of the underlying criteria grouping to be displayed on an interactive problem definition page" | *See, e.g.,* Fig. 2; col. 3:1- 15; col. 3:33-36; col. 3:61-4:2; col. 4:3-5; col. 4:19-23; col. 4:48-53; col. 5:17-33. |

Exhibit D
Page 6 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | **U.S. Patent No. 7,499,903** | | | | |
| 10 | "upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type" (claim 1) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | '903 Specification: Figs. 1-3; col. 3, lines 33–39; col. 3, line 61 0 col. 4, line 2; col. 4, line 42 – col. 5, line 33. | "upon a user selecting underlying criteria to identify at least one humanly understandable grouping of underlying criteria using an interactive problem definition page" | *See, e.g.,* Fig. 2; col. 2:33-40; col. 3:1- 15; col. 3:33-36; col. 3:61-4:2; col. 4:3-5; col. 4:19-23; col. 4:48-53; col. 5:17-33. |
| 11 | "upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type" (claim 12) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | '903 Specification: Figs. 1-3; col. 3, lines 33–39; col. 3, line 61 0 col. 4, line 2; col. 4, line 42 – col. 5, line 33. | "upon receiving from an interactive problem definition page a user's selection of criteria and their corresponding values that identify at least one humanly understandable grouping of underlying criteria" | *See, e.g.,* Fig. 2; col. 2:33-40; col. 3:1- 15; col. 3:33-36; col. 3:61-4:2; col. 4:3-5; col. 4:19-23; col. 4:48-53; col. 5:17-33. |

Exhibit D
Page 7 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | **U.S. Patent No. 7,499,903** | | |
| 12 | "the host server communicably connected with an inquiry-type database and a skill-set database" (claim 12) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | '903 Specification: Figs. 1-3; col. 4., lines 3-42 | "the host server directly connected through hardware and software interfaces with an inquiry-type database and a skill-set database" | *See, e.g.*, Fig. 1, col. 3:26-35; col. 4:3-13; col. 4:26-37. |

Exhibit D
Page 8 of 8

## EXHIBIT E:

### SUPPORT FOR PROPOSED CONSTRUCTIONS FOR THE DISPUTED TERMS IN THE '709 PATENT

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | **U.S. Patent No. 7,366,709** | | |
| 1. | "subject list style" (claims 1, 4, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "the structural format for an interface used to enter information" | '709 Specification: The entirety of the '709 Patent specification is instructive for the proposed construction of this term. | "a graphical representation of the logical structure of a list of inquiry criteria and values and their respective relationships" | *See, e.g.,* Figs. 2, 3A, 3B, Abstract; col. 1:15-19; col. 1:41-51; col. 3:54-62; col. 4:24-65; col. 5:32-65. *See, e.g.,* '709 FH, Non-Final Rejection, 10/24/2005; Resp. to First OA, 4/24/2006, pp. 5-6. |
| 2. | "member of an organization" "member of the organization" (claims 1, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "person associated with or authorized by an entity that is enabling use of the method or system described" | '709 Specification: col. 2, lines 13-54; col. 7, lines 34-56. | "person belonging to a predetermined group or company" | *See, e.g.,* col. 1:24-34; col. 2:22-37; col. 3:65-4:3. *See, e.g.,* '709 FH, Final Rejection, 7/27/2006; Req. for Cont. Exam., 12/27/2006, pp. 5-8. |

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | **U.S. Patent No. 7,366,709** | | |
| 3. | "inquiry type(s)" (claims 1, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "term(s) that organize and identify categories of assistance requested" | '709 Specification: col. 2, lines 55-67; col. 3, lines 1-24; col. 4, lines 4-22. | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" | *See, e.g.*, Figs. 2, 3A, 3B, col. 2:55-67; col. 3:15-19; col. 4:4-22; col. 5:33-45.  *See, e.g.*, '709 FH, Non-Final Rejection, 10/24/2005; Amdnt./Req. for Reconsideration After Non-Final Rej., 4/24/2006, pp. 5-7; Non-Final Rejection, 3/22/2007; Amdmt./Req. for Reconsideration After Non-Final Rej., 9/24/2007, pp. 6-7; Not. of Allowance and Fees Due, 12/12/2007, pp. 2-4. |

Exhibit E
Page 2 of 8

| | U.S. Patent No. 7,366,709 | | | |
|---|---|---|---|---|
| Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
| 4. "inquiry criteria" (claims 1, 5, 6, 7) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"terms that organize collections of types of assistance requested" | '709 Specification: Abstract; Figs. 2, 3B cols. 1-6. | "subject categories used to define a seeker's query displayed to a user in an interactive problem definition page" | *See, e.g.,* Figs. 2, 3A, 3B, Abstract; col. 1:41-49; col. 2:10-19; col. 2:20-22; col. 2:33-41; col. 2:55-67; col. 3:54-62; col. 4:29-41; col. 5:14-23.<br><br>*See, e.g.,* '709 FH, Non-Final Rejection, 10/24/2005; Amdmt./Req. for Reconsideration After Non-Final Rej., 4/24/2006, pp. 5-7; Non-Final Rejection, 3/22/2007; Amdmt./Req. for Reconsideration After Non-Final Rej., 9/24/2007, pp. 6-7; Not. of Allowance and Fees Due, 12/12/2007, pp. 2-4. |

Exhibit E
Page 3 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | **U.S. Patent No. 7,366,709** | | |
| 5. | "underlying criteria" (claim 1) | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). | '709 Specification: The entirety of the '709 Patent specification is instructive for the proposed construction of this term. | "subject categories used to classify inquiry types according to a client's business objectives and information needs of a user" | *See, e.g.*, Figs. 1, 2, 3A, 3B, col. 2:55-60; col. 3:1-19; col. 6:11-21. |
| 6. | "values" (claims 1, 2, 3, 5, 6, 7) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"an object, assigned to a variable, appropriately within the range of possible objects that the variable is intended to represent" | '709 Specification: Abstract; Fig. 2; col. 1, lines 38-51; col. 3, line 54-col. 5, line 65; | "criteria selections having a relationship to an inquiry criteria and that can be displayed to a user in an interactive problem definition page." | *See, e.g.*, Figs. 2, 3A, 3B, Abstract; col. 1:41-49; col. 3:54-4:19; col. 5:29-43; col. 5:14-23; col. 5:35-65.<br><br>*See, e.g.*, '709 FH, Non-Final Rejection, 10/24/2005; Amdmt./Req. for Reconsideration After Non-Final Rej., 4/24/2006, pp. 5-7; Non-Final Rejection, 3/22/2007; Amdmt./Req. for Reconsideration After Non-Final Rej., 9/24/2007, pp. 6-7; Not. of Allowance and Fees Due, 12/12/2007, pp. 2-4. |

| | | | U.S. Patent No. 7,366,709 | | |
|---|---|---|---|---|---|
| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
| 7. | "interactive problem definition page"<br><br>(claims 1, 6) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a responsive interface designed to facilitate either the specification of assistance, or facilitate the specification of the categories of assistance" | '709 Specification:<br>Abstract;<br>Fig. 2;<br>col. 1, lines 15-20, 49-51;<br>col. 4, lines 39-59 | "an interactive graphical user interface that uses a subject list style displaying user-specific inquiry criteria and values to guide the user in classifying an inquiry" | *See, e.g.*, Fig. 2; Abstract; col. 3:46-62; col. 4:23-58. |

| | Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|---|
| | | | U.S. Patent No. 7,366,709 | | |
| 8. | "inquiry criteria values" (claims 1, 2, 3, 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "an object assigned to a variable representing collections of types of assistance requested" | '709 Specification: col. 4, lines 4-22; col. 4, lines 44-58. | "selections displayed to a user in an interactive problem definition page" | *See, e.g.*, Figs. 2, 3A, 3B, Abstract; col. 1:41-49; col. 3:54-4:19; col. 5:29-43; col. 5:14-23; col. 5:35-65. *See, e.g.*, '709 FH, Non-Final Rejection, 10/24/2005; Amdmt./Req. for Reconsideration After Non-Final Rej., 4/24/2006, pp. 5-7; Non-Final Rejection, 3/22/2007; Amdmt./Req. for Reconsideration After Non-Final Rej., 9/24/2007, pp. 6-7; Not. of Allowance and Fees Due, 12/12/2007, pp. 2-4. |

## U.S. Patent No. 7,366,709

| Claim Term, Phrase or Clause | XU Proposed Construction | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
|---|---|---|---|---|
| 9. "plurality of monitors" (claims 5 and 7) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction for the term "monitors" as used in claims 5 and 7: "interactive communication devices" | '709 Specification: col. 7, lines 65-col. 8, line 25. | "two or more computer screens" | *See, e.g.*, Figs 1, 2, 5, col. 3:46-53; col. 7:60-8:8. |

Exhibit E
Page 7 of 8

| | Claim Term, Phrase or Clause | XU Proposed Construction | U.S. Patent No. 7,366,709 | | |
|---|---|---|---|---|---|
| | | | Support for XU Proposed Construction | Cisco Proposed Construction | Support for Cisco's Proposed Construction |
| 10 | "the processor being configured to extract unique combinations from the database and evaluate the combinations"<br><br>(claim 5) | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"the processor being configured to retrieve and analyze the term(s) that organize categories of requests, the object(s) assigned to related variables, and the structural format(s) for the interface used to enter information" | '709 Specification: The entirety of the '709 Patent specification is instructive for the proposed construction of this term. | "the processor is programmed to extract unique combinations of a user's query and an expert's skill set from records stored in read/writable memory and to determine in real time the most qualified expert for a user's query" | *See, e.g.,* Figs. 1, 4, col. 6:4-10; col. 6:15-19; col. 6:24-29; col. 6:34-41. |

Exhibit E
Page 8 of 8

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | Civil Action No. 09-157-RGA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Dated: February 15, 2011
1047511

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 1

II.     TECHNOLOGY OVERVIEW—XU's '903 patent .................................................... 1

III.    TECHNOLOGY OVERVIEW—XU's '709 patent .................................................... 2

IV.     APPLICABLE LAW ON CLAIM CONSTRUCTION ............................................... 3

V.      CLAIM CONSTRUCTION AND ANALYSIS .......................................................... 4

        A.      '903 Patent Claim Terms ................................................................................. 4

                1.      "underlying plurality of criteria groupings" – claims 1, 6-10 and 12 ...................... 4

                2.      "skill-set database" – claims 1 and 12 ................................................................ 5

                3.      "expert having individualized knowledge" – claim 1 .............................................. 6

                4.      "unique numerical routing identifier," "unique numeric routing
                        identifier," and "numeric routing identifier"– claims 1 and 12 ................................ 6

                5.      "match and route system"– claims 12-18 ............................................................ 7

                6.      "layer(s) of inquiry type(s)"– claims 1, 6-9 and 12 ............................................... 8

                7.      "inquiry type(s)"–claims 1, 6-9 and 12 .............................................................. 9

                8.      "receiving from the user a response to the presentation of a first member
                        of the underlying criteria grouping"– claim 10 .................................................... 9

                9.      "the response triggering the presentation of further members of the
                        underlying criteria grouping"– claim 10 ............................................................. 10

                10.     "upon a user's request for assistance with at least one of the predetermined
                        semantically-expressed inquiry type"– claim 1 .................................................. 10

                11.     "upon the receipt of a user request for assistance with at least one of the
                        predetermined semantically-expressed inquiry type"– claim 12 ............................ 11

                12.     "the host server communicably connected with an inquiry-type database
                        and a skill-set database"– claim 12 ................................................................. 11

        B.      '709 Patent Claim Terms ................................................................................ 12

                1.      "subject list style" – claims 1, 4 and 5 .............................................................. 12

2.  "member of an organization" – claims 1 and 5 ...................................... 13

3.  "inquiry type(s)" – claims 1 and 5 ......................................... 14

4.  "inquiry criteria" – claims 1, 5, 6 and 7 ................................. 15

5.  "underlying criteria" – claim 1 ........................................... 16

6.  "values" – claims 1, 2, 3, 5, 6 and 7 .................................... 16

7.  "interactive problem definition page" – claims 1 and 6 ................... 17

8.  "inquiry criteria values" – claims 1, 2, 3 and 5 ........................ 18

9.  "plurality of monitors" – claims 5 and 7 ................................ 19

10.  "the processor being configured to extract unique combinations from the database and evaluate the combinations" – claim 5 ....................... 19

VI.  CONCLUSION ........................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Dow Chem. Co. v. Sumitomo Chem. Co.*,
    257 F.3d 1364 (Fed. Cir. 2001)..................................................................................... 4

*Harris Corp. v. IXYS Corp.*,
    114 F.3d 1149 (Fed. Cir. 1997)..................................................................................... 4

*Philips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)............................................................... 3, 4

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
    400 F.3d 901 (Fed. Cir. 2005)....................................................................................... 4

*Prima Tek II, LLC v. Polypap, SARL*,
    318 F.3d 1143 (Fed. Cir. 2003)..................................................................................... 4

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)..................................................................................... 3

XpertUniverse, Inc. ("XU") submits this brief in support of its claim constructions. XU also submits the Declaration of Illah R. Nourbakhsh, Ph.D. ("Nourbakhsh Decl."), and the Declaration of Charles E. Cantine ("Cantine Decl.") in support thereof.

## I. INTRODUCTION

This case concerns important computer implemented technology relating to expert location and collaboration systems and methods. XU worked with Defendant Cisco Systems, Inc. ("Cisco") for over two and a half years to develop and market a Cisco offering based on XU's patented technology and other intellectual property. Cisco knew that XU had sought patents on its technology, but chose to take what it had learned from XU and claim it as its own. Having delayed this case for years by filing three motions to dismiss, each of which were essentially denied, Cisco now seeks to obfuscate its infringement by (i) asking this Court to interpret 22 claim terms from the two patents at issue, and (ii) asking the Court to rewrite the claims in an extremely narrow manner—obviously in an effort to support its litigation-induced non-infringement positions. In contrast, XU maintains that the claim terms need no construction at all, as they would be readily understood by one of ordinary skill in the art, as established in the annexed Declaration of Illah R. Nourbakhsh, Ph.D., a Computer Science graduate of Stanford University with over ten years of industry experience and currently Professor of Computer Science at Carnegie Mellon University. In the event the Court elects to construe the claims, however, XU submits that Cisco's constructions are incorrect and that the Court should reject those constructions and adopt XU's constructions in their entirety.

## II. TECHNOLOGY OVERVIEW—XU'S '903 PATENT

XU is the owner of United States Patent No. 7,499,903 ("the '903 Patent"), which addresses issues relating to systems and methods for connecting an individual seeking assistance with a subject matter expert that can provide the appropriate knowledge to address the seeker's inquiry. A

copy of the '903 Patent is annexed as Cantine Decl. Ex. 1. The '903 Patent addresses and overcomes various shortcomings that existed in known expert location and collaboration offerings. For example, many existing systems required the manual construction and maintenance of both the categories of assistance that could be provided, as well as the identification of potential subject matter experts and their associated skills. Nourbakhsh Decl., ¶11. Existing systems also did not generally support scalability, and were generally inflexible and did not take advantage of available media communication technologies. *Id.* at ¶¶12-13.

The '903 Patent overcomes these (and other) shortcomings by using a scalable representation architecture that supports: (i) appropriate forms of abstraction and grouping to enable more flexible scaling of knowledge categories, (ii) more robust connections between experts and knowledge categories in view of future changes to semantics and taxonomies, and (iii) easier and more robust scaling to permit a representation to serve the seeker-expert connection process of multiple organizational entities. Nourbakhsh Decl., ¶¶14-19.

## III. TECHNOLOGY OVERVIEW—XU'S '709 PATENT

XU is the owner of United States Patent No. 7,366,709 ("the '709 Patent"), which addresses issues relating to structuring an inquiry properly in order to search for, access and benefit from the available expertise in an organization. A copy of the '709 Patent is annexed as Cantine Decl. Ex. 2. One of ordinary skill in the art would recognize that one of the key insights of the '709 Patent is to create a means for flexibly organizing and defining the scope of assistance required by a seeker. Nourbakhsh Decl., ¶93. To achieve increased flexibility, the '709 Patent teaches the use of subject list styles as a structure to enable the identification of a seeker's inquiry based on interaction with the seeker as well as through logic applied to other aspects, for example a seeker's profile, an expert's profile, or background rules set up by an organization. *Id.* at ¶94. To achieve this, the '709

Patent includes interfaces that allow the organization to customize a seeker's experience and the resulting expert routing and matching process. *Id.* at ¶95.

## IV.     APPLICABLE LAW ON CLAIM CONSTRUCTION

In *Phillips v. AWH Corporation*, the Federal Circuit set forth the legal principles that govern claim construction. 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc). Under *Phillips*, "the words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art…at the time of the invention." *Id.* (internal quotations marks and citations omitted). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. The Court is "also authorized … to rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries and learned treatises.'" (citation omitted). *Id.* at 1317.

When the ordinary meaning of a claim term is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. For terms having a particular meaning in a field of art, the court looks to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (internal quotations marks and citation omitted).

The Court's claim construction is designed to assist in infringement and validity determinations—it is not designed to obscure or unnecessarily complicate the plain meaning of claim terms. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court."). The goals of claim construction

3

are particularly frustrated by constructions that "contribute nothing but meaningless verbiage to the definition of the claimed invention." *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152-53 (Fed. Cir. 1997).

Importantly, while "the specification is always highly relevant to the claim construction analysis," caution must be used so that the claims are not unduly narrowed by the embodiments or examples recited in the specification. *Phillips*, 415 F.3d at 1315, 1323. ("[The Federal Circuit] has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.") (internal quotations and citation omitted); *see also, Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir. 2003); *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("it is also well established that a claim construction that excludes a preferred embodiment is '*rarely, if ever, correct.*'") (citation omitted).

## V.  CLAIM CONSTRUCTION AND ANALYSIS

### A.  '903 Patent Claim Terms

#### 1.  "underlying plurality of criteria groupings" – claims 1, 6-10 and 12

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "sets of collections of types of assistance requested, wherein each collection can be a member of zero or more sets" | "two or more groups of humanly understandable descriptors that identify inquiry types" |

The '903 Patent describes how a single criteria grouping is a collection of the fields that identify the type of help required by a seeker. Cantine Decl. Ex. 1 at 1:54-55. The criterion selections made by a seeker identify the type of assistance a seeker requires. *Id.* at Fig. 2; 4:41-64. One of ordinary skill in the art would therefore understand that a "plurality" of criteria groups is

4

correctly defined as multiple such collections, or "sets of collections of types of assistance" as proposed by XU. Nourbakhsh Decl., ¶23.

Cisco's definition is incorrect because it adds the additional requirement that "humanly understandable descriptors" identify inquiry types. Cisco's proposed definition suggests a function for descriptor that has nothing to do with its use in the invention, where it is an aspect of criteria groupings, not inquiry types. Cantine Decl. Ex. 1 at 2:37-41; Nourbakhsh Decl., ¶26.

### 2. "skill-set database" – claims 1 and 12

| XU's Proposed Construction | Cisco's Proposed Construction |
| --- | --- |
| No construction necessary; if construed: "a digital storage and retrieval information system designed for storing associations between some or all of: agents and resources available, types of assistance requested, and expertise required for types of assistance requested" | "records organized in a computer readable/writable memory constituting the identity of individuals having unique knowledge on specific topics" |

The skill-set database stores associations that associate one or more experts with inquiry types and layers. Cantine Decl. Ex. 1 at 1:58-60; 5:55. The specification also describes additional embodiments in which multiple experts are ranked for the purposes of finding the best available expert. These ranking factors include profiles relating to experts, seekers, and business interests, as well as resource details such as expert costs and other related factors. *Id.* at 5:65 – 6:7. The skill-set database is the storage area where all such information would be associated with experts, skills and assistance types, as reflected by XU's proposed construction. Nourbakhsh Decl., ¶30.

Cisco's definition is incorrect as it requires the expert have "unique" knowledge on a subject, which is directly contrary to the specification which provides rankings for the case when "more than one expert is associated with a skill-set entry." Cantine Decl. Ex. 1 at 5:58-59. Cisco's definition also suggests a mere listing of individuals, but fails to include associations between those

5

individuals and the inquiry types and seekers, as the proper construction of the term should. Nourbakhsh Decl., ¶¶31-33.

### 3. "expert having individualized knowledge" – claim 1

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "a person in possession of information or expertise that is relevant or material to a particular query" | "person having unique, specialized knowledge on a specific inquiry type" |

The relevance of a person's knowledge with respect to a particular inquiry is a critical component to the invention of the '903 Patent, since the goal of the invention is to successfully connect an expert with relevant information to a seeker's inquiry. Cantine Decl. Ex. 1 at 1:15-16; 2:28-32. The specification explicitly describes how the skill-set database contains the identity of experts with individualized knowledge on topics that are being requested by seekers. *Id.* at 2:41-43. Therefore, identifying an expert with individualized knowledge in terms of expertise relevant to a query is appropriate, and XU's proposed definition embodies this critical aspect of the invention.

In contrast, Cisco is again proposing a "uniqueness" requirement that, as described above, is inconsistent with and directly contrary to the teachings of the '903 Patent.

### 4. "unique numerical routing identifier," "unique numeric routing identifier," and "numeric routing identifier"– claims 1 and 12

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "a mathematically distinct encoding for data relevant to an inquiry" | "fixed number that is associated with a semantically-expressed inquiry type and an inquiry type in its corresponding layer that is used to match and route user queries to an expert" |

The '903 Patent describes using a numerical routing identifier in order to move away from "hard-wired" connections between an expert and inquiry data records that are difficult to modify or expand because of the inflexibility of the hard-wired connections. *Id.* at 1:24-33. One of ordinary skill in the art would understand that the use of a fixed identifier that is unique to the specific

6

association between an inquiry and a skill set provides an important and insightful computer science technique for introducing an abstract link between data that does not vary when other characteristics of the data are varied, such as semantic wording or syntax. Nourbakhsh Decl., ¶39. One of skill in the art would also understand that a unique numerical routing identifier is a very well-understood and defined computational construct that adds robustness to the data architecture by providing a distinct encoding from data to inquiry, as proposed by XU. *Id.*

Cisco's definition is factually incorrect because it suggests that routing identifiers create associations between inquiry types in one or more layers; the '903 patent, however, clearly states that the routing identifiers associate inquiry types with skill set entries. Cantine Decl. Ex. 1 at 1:26-27; 2:4-9; Nourbakhsh Decl., ¶42.

### 5. "match and route system"– claims 12-18

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "an architecture that maps a resource or information request to possible resources or information sources, and provides a link to the identified resource(s) or information source(s)." | "system that identifies an expert skill set that corresponds to a user's query and routes the query based on the expert skill set" |

A match and route system connects demand with supply generally, and in the case of seeker-expert routing, does so by connecting a seeker inquiry with appropriate expert resources. Nourbakhsh Decl., ¶45. The '903 patent describes a match and route system in terms consistent with that understanding, and consistently presents match and route in terms of finding and executing a link between a request for information and a supply of the relevant information. Cantine Decl. Ex. 1 at 1:16-21.

Cisco's definition suggests that the 'match' portion of 'match and route' consists of identifying an expert skill set that corresponds to a user's query, which is contrary to the specification; the specific skills of the expert are but one characteristic that is an input into this

7

process. *Id.* at 4:7-10. Nourbakhsh Decl., ¶47. The 'route' portion of Cisco's definition is also incorrect, as the patent teaches that the routing process includes ranking and multi-media based communication to identify expert availability in real time so that routing can connect the best available expert with the seeker. Cantine Decl. Ex. 1 at 4:9-11; Nourbakhsh Decl., ¶48.

### 6.  "layer(s) of inquiry type(s)"– claims 1, 6-9 and 12

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "a particular grouping of terms that organize and identify categories of assistance requested" | "a defined set of specific groupings of underlying criteria" |

The '903 patent uses the word 'layer' in reference to two different data types, and it is important to understand the distinction when understanding the term "layer of inquiry type." Nourbakhsh Decl., ¶51. While the patent teaches that a first layer of inquiry types is organized from underlying criteria, additional layers of inquiry types representing, for instance, semantically different business language, map directly to the first layer of inquiry types. Thus, all subsequent layers of inquiry types map to the first layer of inquiry types, which serves as a computational grounding, or *interlingua*, between all semantic interpretations that may be valuable across different business units or organizations. Cantine Decl. Ex. 1 at 1:55-57; Nourbakhsh Decl., ¶52. This teaching is clear when subsequent layers of inquiry types are described explicitly as having "one-to-one correspondence with the inquiry types of the first layer are associated with other respective enterprises." Cantine Decl. Ex. 1 at 6:18-20. XU's proposed definition correctly captures the consistent identity of all layers of inquiry types, including both the first layer and all subsequent layers, in identifying that each and every layer is organizing categories of assistance requested.

Cisco's definition improperly generalizes "layer" as a modifier to "criterion selection," and fails to account for the fact that "layer of inquiry type" is defined distinctly from "layer of criterion selection." *Id.* at 5:26-28; Nourbakhsh Decl., ¶54.

8

### 7. "inquiry type(s)"– claims 1, 6-9 and 12

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "term(s) that organize and identify categories of assistance requested" | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" |

The '903 patent describes how inquiry types are an important component of the invention because they afford the representation of information about what type of assistance is required by the seeker. Cantine Decl. Ex. 1 at 1:8-9. XU's proposed definition accurately captures the type of information represented by inquiry types, particularly because of the characterization of a "user's request for assistance with a particular inquiry type." *Id.* at 1:64-65; 5:53-54.

Cisco's definition is incorrect because inquiry types are predetermined by the organization and may be mapped to separate enterprises, they are not based on user criteria selections as suggested by Cisco. *Id.* at 1:6-9; 2:1-2, 36-40; 5:15-16; Nourbakhsh Decl., ¶59.

### 8. "receiving from the user a response to the presentation of a first member of the underlying criteria grouping"– claim 10

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere (to the extent the Court rules that the construction of those terms is necessary). | "receiving a user's response through an interactive problem definition page to the display of a first member of the underlying criteria grouping" |

The '903 patent describes the process by which a user seeking information is presented with a Get Assistance Page, which presents criterion selections for the seeker to select. Cantine Decl. Ex. 1 at FIG. 2; 4:42-49. This is a clear embodiment of the claim phrase in question, as would be readily understood by one of skill in the art. Nourbakhsh Decl., ¶62.

Cisco's definition lends no clarity to the phrase, and also unnecessarily narrows the scope by including the use of "an interactive problem definition page." *Id.* at ¶64. The patent describes an interactive web page as just one possible embodiment of the invention, among many others. Cantine Decl. Ex. 1 at FIG. 2; 3:61 – 4:2; 4:48-53; 6:29-35.

9

### 9. "the response triggering the presentation of further members of the underlying criteria grouping"– claim 10

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere (to the extent the Court rules that the construction of those terms is necessary). | "the user's response causes further members of the underlying criteria grouping to be displayed on an interactive problem definition page" |

The '903 patent describes an embodiment in which responses to four criterion selections on

a Get Assistance page lead to further criterion selection presentations. *Id.* at 4:58-66. The

relationship between further criteria groupings and earlier criteria groups may be hierarchical, non-

hierarchical or entirely independent. *Id.* at 4:64 – 5:3. This serves a clear example of the claim

phrase to one of skill in the art. Nourbakhsh Decl., ¶67.

Cisco's definition again unnecessarily narrows the scope with the phrase, "an interactive

problem definition page." As described above, the '903 patent describes an interactive web page as

just one possible embodiment. Cantine Decl. Ex. 1 at FIG 2; 3:61-4:2; 4:48-53; 6:29-35.

### 10. "upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type"– claim 1

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere (to the extent the Court rules that the construction of those terms is necessary). | "upon a user selecting underlying criteria to identify at least one humanly understandable grouping of underlying criteria using an interactive problem definition page" |

This claim phrase explains that assistance is mapped to an inquiry type, and how the expert

can then be identified because of the association between inquiry type and expert skill that is

embodied by the skill-set database. Cantine Decl. Ex. 1 at 6:60-67. The role of the inquiry type in

the skill-set database is clearly and consistently described throughout the patent, and would be

readily understood by one of skill in the art. *Id.* at 5:49-51, 55-57; 6:8-10; Nourbakhsh Decl., ¶72.

Cisco's definition suggests that user selection results in identification of "humanly

understandable groupings of underlying criteria." This contradicts the specification, which

10

describes that the selection process to route a seeker to an expert requires identification on an inquiry type, not a grouping of underlying criteria.  Cantine Decl. Ex. 1 at 5:49-51; FIG. 3; Nourbakhsh Decl., ¶¶74-77.

### 11. "upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type"– claim 12

| XU's Proposed Construction | Cisco's Proposed Construction |
| --- | --- |
| No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere (to the extent the Court rules that the construction of those terms is necessary). | "upon receiving from an interactive problem definition page a user's selection of criteria and their corresponding values that identify at least one humanly understandable grouping of underlying criteria" |

This claim phrase explains that assistance is mapped to an inquiry type, and how the expert can then be identified because of the association between inquiry type and unique numerical routing identifier, which is embodied by the skill-set database.  Cantine Decl. Ex. 1 at 7:66 – 8:2.  This would be understood by one of skill in the art.  Nourbakhsh Decl., ¶81.

Cisco's definition suffers from the same inaccuracies as described above with respect to "upon the receipt of a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type," which are incorporated herein by reference.

### 12. "the host server communicably connected with an inquiry-type database and a skill-set database"– claim 12

| XU's Proposed Construction | Cisco's Proposed Construction |
| --- | --- |
| No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere (to the extent the Court rules that the construction of those terms is necessary). | "the host server directly connected through hardware and software interfaces with an inquiry-type database and a skill-set database" |

The host server is described as having one or many processors.  Cantine Decl. Ex. 1 at 4:11-13.  One of ordinary skill in the art would understand this to mean that the host server can have a single or distributed physical footprint.  Nourbakhsh Decl., ¶89.  The '903 patent further describes how the connection between the host server and the inquiry-type database and skill-set database

could include wired, wireless, and future technologies. Cantine Decl. Ex. 1 at 3:4-5, 26-32. This would be understood by one of skill in the art. Nourbakhsh Decl., ¶89.

Cisco's definition improperly requires the host server be "directly connected through hardware and software interfaces," which is inconsistent with the range of possible communications technologies described in the patent, including wireless communication. Cantine Decl. Ex. 1 at 3:24-25. Nourbakhsh Decl., ¶91.

**B.    '709 Patent Claim Terms**

**1.    "subject list style" – claims 1, 4 and 5**

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "the structural format for an interface used to enter information" | "a graphical representation of the logical structure of a list of inquiry criteria and values and their respective relationships" |

The '709 patent provides examples of subject lists (FIG. 3A) and subject list styles (FIG. 3B), demonstrating that the subject lists are formats used to narrow and specify the scope of inquiry, and demonstrating that the subject list styles provide structural representations of alternative techniques for instantiating interactions to narrow and specify the scope of inquiry. Nourbakhsh Decl., ¶100. The specification clearly defines the key aspect of subject list styles as providing a way for the overall style of interaction with a seeker to be chosen and specified, both ahead of time and when dynamically narrowed, based on context. Cantine Decl. Ex. 2 at 1:18-19; 4:42-43. The specification further describes, by way of example, that subject list styles can have hierarchical relationships between lists that narrow a seeker's inquiry. In addition, lists can be narrowed independently, and lists have the ability to be narrowed based on context, such as seeker profile, rather than by direct interaction with the seeker and even by managers and others associated with the organization. *Id.* at 4:48-58; 5:54-65. These aspects are captured in XU's proposal.

Cisco's definition incorrectly identifies "subject list styles" as graphical representations, and also improperly narrows the data structure by defining inquiry criteria and values to be in list form. Subject list styles are not merely graphical display tools. Nourbakhsh Decl., ¶105. Cisco's definition also inaccurately reflects the sophisticated information that in fact subject lists contain in relating and organizing criteria and values. Nourbakhsh Decl., ¶¶106-7.

### 2. "member of an organization" – claims 1 and 5

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "person associated with or authorized by an entity that is enabling use of the method or system described" | "person belonging to a predetermined group or company" |

Throughout the specification, the patent describes both the question of "who" makes use of the system, and the question of "how" such persons are identified. Together these teachings clearly indicate the overall scope of "member of an organization" as appropriate to the invention. *Id.* at ¶¶110-112. The specification identifies more than seven categories of individuals who may use the system, including seekers, corporate-level clients, administrators, managers, employees, experts. Cantine Decl. Ex. 2 at 2:23-33, 41-43, 49-54; 3:7-11; 3:65 – 4:3; 4:11-12; 5:2-6. The patent also describes a login process using unique login names together with user profiles in discussing how the system is used. *Id.* at 2:41-44. Because the same person may interact with the system with different roles, for instance both as a seeker and an administrator, the patent teaches how a single login identifier can be associated with multiple profiles or with a parameterized profile that can provide the detail required for all roles. *Id.* at 2:44-54. Because a great diversity of people will interact with the system, and because the mode of registration involves the well-understood unique login name technique, "member of an organization" is correctly interpreted to include all those who have been given login access for particular operations within the system.

13

Cisco's definition improperly narrows the scope of the claims by requiring the member "belong to a predetermined group." Nourbakhsh Decl., ¶115. The phrase "predetermined group" suggests a static nature of a group's identity, whereas the specification describes administrative tools, not static designed so that logins, user profiles and user roles are flexible and easily modified. Cantine Decl. Ex. 2 at 2:44-47; 3:28-30, 65-66.

### 3. "inquiry type(s)" – claims 1 and 5

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "term(s) that organize and identify categories of assistance required" | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" |

The '709 patent describes how inquiry types are an important component in three ways. First, they enable customization of the subject list styles system for individual organizations and clients by organizing sets of underlying criteria. *Id.* at 2:55-59. This means the categories of assistance appropriate to a particular business situation, organizational need, or client need are all specified in terms of inquiry types. Nourbakhsh Decl., ¶118. The inquiry types are the connective logic between seeker inquiries and experts. *Id.* at ¶119. Inquiry types, by organizing types of assistance and also by being associated indirectly with underlying criteria that match against expert's skills, create the relationship that is needed between expert skills and seeker inquiries, and are part of the system logic that enables customization of the scope of assistance offered. Cantine Decl. Ex. 2 at 3:2-3, 18-19; 4:6-7. All of these inquiry type functions establish their role as organizational constructions that are directly associated with the categories of assistance required by seekers, as reflected in XU's proposed definition. Nourbakhsh Decl., ¶121.

Cisco's definition is incorrect because defining inquiry types only in relation to user's criterion selections is incorrect. Inquiry types are predetermined by the organization (Cantine Decl.

14

Ex. 2 at 2:55-59) and even mapped to separate clients. *Id.* at 2:55. User criteria selections, however, do not define or create inquiry types. Nourbakhsh Decl., ¶123.

### 4. "inquiry criteria" – claims 1, 5, 6 and 7

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "terms that organize collections of types of assistance requested" | "subject categories used to define a seeker's query displayed to a user in an interactive problem definition page" |

The role of inquiry criteria is to interactively guide the specification of the nature and scope of a seeker's query. Cantine Decl. Ex. 2 at Abstract; 1:38-43; 2:21-22; 3:54-56. The patent describes how inquiry criteria and values that are most appropriate to the context are dynamically presented, including the specific profile of a seeker (*Id.* at 3:63-64), which enables the seeker to further constrain the scope and nature of their query using a logical organization of sequential selections that is pre-designed to best organize the fields of possible inquiries. *Id.* at 4:29-39; 5:17-23. As such, the inquiry criteria is a knowledge organization tool, and in this case the knowledge being organized is that of the types of assistance required by a seeker. Nourbakhsh Decl., ¶126. FIG. 2 of the '709 Patent provides a direct example of inquiry criteria filling this role in showing the "Line of Business" field (201a) and explicitly labeling this as an example of inquiry criteria. This field selection may be presented broadly (Cantine Decl. Ex. 2 at 4:39-41), may be limited in scope based on the seeker profile (*Id.* at 3:63-65), or may even be partially selected or sub-selected based on administrative settings made by user-managers. *Id.* at 2:33-35. But in all cases the inquiry criteria is an organizational tool, specifically helping to organize the types of assistance that may be requested. Nourbakhsh Decl., ¶127.

Cisco's definition incorrectly defines the purpose of "inquiry criteria" by suggesting only the particular goal: "to define a seeker's query." *Id.* at ¶¶129-30. Inquiry criteria, however, is used both to formulate and characterize a user's inquiry. Cantine Decl. Ex. 2 at 2:20-23; 3:54-55, 63-66;

15

4:6-8, 64-66. Furthermore the act of selecting values for inquiry criteria, for example

hierarchically, enables the inquiry criteria to provide direct guidance to the seeker in better defining

the inquiry. *Id.* at 4:23-26, 42-43; 5:17-23. Cisco's proposed definition fails to capture the full

scope of how inquiry criteria organize types of assistance. Nourbakhsh Decl., ¶¶131-32.

### 5. "underlying criteria" – claim 1

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere (to the extent the Court rules that the construction of those terms is necessary) | "subject categories used to classify inquiry types according to a client's business objectives and information needs of a user" |

The '709 specification describes how underlying criteria enable key relationships between

inquiry types and expert knowledge. *Id.* at ¶135. Specifically, because inquiry types are classified

using underlying criteria that correlate to the specific knowledge categories in question, the

underlying criteria serve as a representational "grounding" for the knowledge organized by the

system. *Id.*; Cantine Decl. Ex. 2 at 2:55-60. Additionally, because expertise is characterized by

relating expert skills with underlying criteria, these same concepts serve as representational

"grounding" for the knowledge available through experts. *Id.* at 3:1-3, 15-19. One of skill in the art

would recognize that the underlying criteria play a critical role in establishing the representational

commonality that leads to the matching of inquiries to best available experts. Nourbakhsh Decl.,

¶135.

Cisco's definition only partially captures the nature of "underlying criteria" because it fails

to explain the relationship between underlying criteria and expert knowledge, and it unjustifiably

narrows the phrase "underlying criteria" by suggesting that the criteria selected must be based on

business objectives and information needs in particular. *Id.* at ¶137.

### 6. "values" – claims 1, 2, 3, 5, 6 and 7

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|

| No construction necessary; if construed: "an object, assigned to a variable, appropriately within the range of possible objects that the variable is intended to represent" | "criteria selections having a relationship to an inquiry criteria and that can be displayed to a user in an interactive problem definition page" |
|---|---|

Values, as described in the '709 patent, have key qualities that are commonly understood from the computational background knowledge of one skilled in the art. Nourbakhsh Decl., ¶140. As the '709 patent describes, the range of possible values can be broad or can be narrowed either statically or dynamically. Cantine Decl. Ex. 2 at 3:57-59; 4:6-11. Possible values are related to other aspects of the invention, including inquiry criteria, seeker profiles, corporation details, etc., and have a relationship that can be hierarchical or independent. *Id.* at 1:43-48; 3:63 – 4:3, 13-15. Furthermore, there can be just one set of possible values associated with a given inquiry criteria (FIG. 2, 201b), or there can be many values associated with a single inquiry criteria. *Id.* at 4:32-33. One of skill in the art would therefore understand that values are broad specifications of possible values to be used in organizing knowledge and inquiries, as reflected in XU's proposed definition. Nourbakhsh Decl., ¶142.

Cisco's definition improperly combines the concept of inquiry criteria selection with that of value selection. Values and inquiry criteria have independent and hierarchical relationships. *Id.* at ¶¶144-45.

### 7. "interactive problem definition page" – claims 1 and 6

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "a responsive interface designed to facilitate either the specification of assistance, or facilitate the specification of the categories of assistance" | "an interactive graphical user interface that uses a subject list style displaying user-specific inquiry criteria and values to guide the user in classifying an inquiry" |

The '709 patent describes two forms of responsive interfaces designed to enable user-managers to choose suitable subject list styles and designed to enable seekers to then define the scope and range of their inquiries in an organized fashion that leads to successful expert guidance.

Nourbakhsh Decl., ¶148. The user-based responsive interface that employs pre-designed, contextually relevant subject list styles is referred to as an interactive problem definition page throughout the patent. Cantine Decl. Ex. 2 at Abstract, 1:50-51; 4:42-43. Furthermore the specification describes that in one embodiment the interactive problem definition page can take the form of a Graphical User Interface. *Id.* at FIG. 2; 4:47-48. The '709 specification however also describes the use of a responsive interface to enable seekers to interactively select the form and substance of subject lists to be presented. *Id.* at FIG. 3B; 2:24-28; 5:32-36). In one example, the specification teaches that the financial services department of a corporation could create the appropriate customized subject lists so as to enable seekers from throughout the corporation to make inquiries regarding financial matters. *Id.* at 2:28-33. XU's proposed definition correctly captures the key elements of an interactive problem definition page, including its responsiveness and its role in guiding the creation, selection and usage of categories of assistance.

Cisco's definition is improperly narrow in that it suggests that the interactive problem definition page is necessarily a graphical user interface. Multiple forms of responsive interfaces can enable customized selection and pre-selection of subject lists, including for example textual interfaces, voice-based interactions and gesture-based interaction. Nourbakhsh Decl., ¶¶152-53.

### 8. "inquiry criteria values" – claims 1, 2, 3 and 5

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed: "an object assigned to a variable representing collections of types of assistance requested" | "selections displayed to a user in an interactive problem definition page" |

One of ordinary skill in the art would understand that "inquiry criteria values" are used in the '709 specification to describe how the range of possible inquiries can be constrained, even before the seeker has actively chosen to define his or her inquiry using subject list styles. Nourbakhsh Decl., ¶156. The key insight is that the range of options offered, the inquiry criteria

18

values, can be narrowed based on user profile information (Cantine Decl. Ex. 2 at 4:6-8), based on user-manager decisions regarding user types (*Id.* at 4:48-54), or by the organizational client as a whole. *Id.* at 4:54-58 ; Nourbakhsh Decl., ¶¶155-56. Therefore, one of ordinary skill in the art would understand that reducing inquiry criteria value options, or pre-selecting inquiry criteria values, means reducing the space of possible inquiries and, therefore, further constraining which experts will be suitable for matching and routing, as reflected in XU's proposal. *Id.* at ¶156.

Cisco's definition only considers a subclass of inquiry criteria values by limiting them to those displayed to a user, or extant in a problem definition page. This is contrary to how one of ordinary skill in the art would understand the phrase. *Id.* at ¶158.

### 9. "plurality of monitors" – claims 5 and 7

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|
| No construction necessary; if construed, the term "monitors" should be construed to mean: "interactive communication devices" | "two or more computer screens" |

The '709 specification refers to responsive interfaces of several types, including a general interactive page (Cantine Decl. Ex. 2 at 1:50; 4:42-43), a graphical user interface (*Id.* at 4:47-48; 8:12), a computer display (*Id.* at 3:53), and a web page (*Id.* at 8:9-11). Furthermore, in explicitly describing interaction modalities, the '709 specification includes multiple types of screen devices, including whiteboards, tablets and other devices (*Id.* at 7:65- 8:4). Therefore, the term "monitors" should be interpreted to mean "interactive communication devices" to reflect the proper scope described in the specification.

Cisco's definition incorrectly narrows the term "monitor" to "computer screens" only, while the patent clearly contemplates other types of devices. Nourbakhsh Decl., ¶165.

### 10. "the processor being configured to extract unique combinations from the database and evaluate the combinations" – claim 5

| XU's Proposed Construction | Cisco's Proposed Construction |
|---|---|

| No construction necessary; if construed: "the processor being configured to retrieve and analyze the term(s) that organize categories of requests, the object(s) assigned to related variables, and the structural format(s) for the interface used to enter information" | "the processor is programmed to extract unique combinations of a user's query and an expert's skill set from records stored in read/writable memory and to determine in real time the most qualified expert for a user's query" |
|---|---|

One of ordinary skill in the art would recognize that interaction with, and extraction from, data stores such as databases is an important part of the '709 patent. *Id.* at ¶168. As described in the specification, data that will be extracted from a database and evaluated includes inquiry criteria and values (Cantine Decl. Ex. 2 at 1:43-46). The specification identifies a parameter that explicitly stores where and how inquiry criteria and values are stored, e.g. in what database, so that they can be extracted (*Id.* at 1:48-49). Additional data to be extracted from databases include: seeker, manager and expert profiles (*Id.* at 2:43-48, 53; 3:36-41), inquiry types (*Id.* at 2:55-60), underlying criteria (*Id.* at 2:58-60), predetermining indicators in seeker profiles (*Id.* at 4:4), pre-selected values (*Id.* at 4:13-15). The specification explicitly states that such information may be stored in a database (*Id.* at 2:66-67). It would be apparent to one skilled in the art that extraction of any data from the database and the subsequent evaluation of that data can include the full diversity of information stored in such a database pertaining to the present invention, which comports with XU's proposed definition. Nourbakhsh Decl., ¶169.

Cisco's definition suggests that all data being extracted pertains to the user's query and an expert's skill set, and that operations on this data must occur in a real-time manner. This is improper as user query information is not stored in a database. *Id.* at ¶171. Furthermore, Cisco unnecessarily narrows the phrase by imposing a real-time constraint, and by suggesting that the expert selected must be "the most qualified." This is inconsistent with the specification, which explains that any attribute of the experts may be used to differentiate and order them in the event that multiple experts match to the same criteria. Cantine Decl. Ex. 2 at 3:20-26.

## VI. CONCLUSION

For the foregoing reasons, the Court should adopt XU's proposed constructions in their

entirety.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Dated: February 15, 2012
1047511

By: */s/ Philip A. Rovner*
    Philip A. Rovner (#3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that, on February 15, 2012, the within

document was electronically filed with the Clerk of the Court using CM-ECF which will send

notification of such filing to the following; that the document was served on the following

counsel as indicated; and the document is available for viewing and downloading from CM-ECF:

### BY CM-ECF AND E-MAIL

Jack B. Blumenfeld, Esq.
Jennifer Ying, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899
jblumenfeld@mnat.com
jying@mnat.com

Colm F. Connolly, Esq.
Morgan Lewis & Bockius LLP
1007 Orange Street, Suite 501
Wilmington, DE 19801
cconnolly@morganlewis.com

I hereby certify that on February 15, 2012 I have sent by E-mail the foregoing

document to the following non-registered participants:

John V. Gorman, Esq.
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
jgorman@morganlewis.com

Franklin Brockway Gowdy, Esq.
Brett M. Schuman, Esq.
Ryan L. Scher, Esq.
Rachel M. Walsh, Esq.
Morgan Lewis & Bockius LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
fgowdy@morganlewis.com
bschuman@morganlewis.com
rscher@morganlewis.com
rwalsh@morganlewis.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

913090

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 09-157 (RGA) |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT CISCO SYSTEMS, INC.'S
### RESPONSIVE CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street, Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

February 29, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.     INTRODUCTION ........................................................................................... 1

II.    CLAIM CONSTRUCTION PRINCIPLES ..................................................... 3

III.   U.S. PATENT NO. 7,499,903 ......................................................................... 4

     A.    "Underlying Plurality of Criteria Groupings" and "Underlying Criteria Grouping(s)" ......................................................... 4

     B.    "Inquiry Type(s)" ................................................................................ 5

     C.    "Layer(s) of Inquiry Type(s)" ............................................................ 6

     D.    "Skill-Set Database" ........................................................................... 7

     E.    "Expert Having Individualized Knowledge" ..................................... 8

     F.    "Unique Numerical Routing Identifier," "Unique Numeric Routing Identifier," and "Numeric Routing Identifier" ....................... 8

     G.    "Match and Route System" ................................................................. 9

     H.    "Receiving From the User a Response to the Presentation of a First Member of the Underlying Criteria Grouping," "The Response Triggering the Presentation Of Further Members of the Underlying Criteria Grouping," "Upon A User's Request For Assistance With At Least One of the Predetermined Semantically-Expressed Inquiry Types," and "Upon The Receipt of a User Request For Assistance With At Least One Of The Predetermined Semantically-Expressed Inquiry Type" ..................................... 10

     I.    "The Host Server Communicably Connected With An Inquiry-Type Database And A Skill-Set Database" ...................... 11

IV.   U.S. PATENT NO. 7,366,709 ......................................................................... 12

     A.    "Inquiry Criteria" ............................................................................... 12

     B.    "Underlying Criteria" ......................................................................... 14

     C.    "Values" .............................................................................................. 14

     D.    "Inquiry Criteria Values" .................................................................... 15

     E.    "Subject List Style" ........................................................................... 16

     F.    "Interactive Problem Definition Page" ............................................... 17

     G.    "Plurality of Monitors" ...................................................................... 18

     H.    "Member of an Organization" ............................................................ 19

     I.    "The Processor Being Configured to Extract Unique Combinations From the Database and Evaluate the Combinations" .................................................... 20

V.    CONCLUSION ................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.,*
    132 F.3d 701 (Fed. Cir. 1997) ............................................................................ 3, 9, 18

*Bicon, Inc. v. Straumann Co.,*
    441 F.3d 945 (Fed. Cir. 2006) ...................................................................................... 5

*Ethicon Endo-Surgery, Inc v. U.S. Surgical Corp.,*
    93 F.3d 1572 (Fed. Cir. 1996) .................................................................................... 18

*Forest Labs., Inc. v. Abbott Labs.,*
    239 F.3d 1305 (Fed. Cir. 2001) .................................................................................. 19

*Gen. Protecht Group, Inc. v. U.S. Int'l Trade Comm.,*
    619 F.3d 1303 (Fed. Cir. 2010) .................................................................................... 2

*Kara Tech. Inc. v. Stamps.com Inc.,*
    582 F.3d 1341 (Fed. Cir. 2009) .................................................................................... 2

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................. 2, 3

*Primos, Inc. v. Hunter's Specialties, Inc.,*
    451 F.3d 841 (Fed. Cir. 2006) ............................................................................... 12, 13

*Scripps Clinic & Res. Found. v. Genentech, Inc.,*
    927 F.2d 1565 (Fed. Cir. 1991) .................................................................................... 3

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,*
    442 F.3d 1322 (Fed. Cir. 2006) .................................................................................... 3

# I.  INTRODUCTION

Plaintiff XpertUniverse, Inc. ("XU") starts its claim construction opening brief (D.I. 131) by accusing Cisco Systems, Inc. ("Cisco") of stealing its technology, delaying this case, and "obfuscating" its alleged infringement, as if those unproven (and baseless) accusations were related to the issues of claim construction before the Court. They are not. In fact, XU is a failed startup whose only product, a software application it called XpertSHARE, was a commercial failure. After years of unsuccessful efforts, XU hired a company called ipCapital to help it identify potentially patentable inventions embodied in XpertSHARE. As set forth in Cisco's proposed motion for partial summary judgment (D.I. 141), XU obtained the asserted patents by withholding from the Patent Office, among other things, its efforts to commercially exploit XpertSHARE long before filing its patent applications. The asserted patents are both invalid.

Generally, XU's asserted patents describe an application that matches seekers to agents or experts who could assist the seekers. This functionality was well known, and many companies — including Cisco — had products with that functionality when XU filed its applications. *See generally* Declaration of Dr. Leonard J. Forys, ¶¶ 24-27. From 2004 to 2006, XU and Cisco pursued a potential business relationship premised on the integration of Cisco's routing products with XpertSHARE's taxonomy. For reasons that are not relevant to this motion, the potential business relationship did not work out. There is no basis for XU's allegations that Cisco stole its technology. XU had no novel ideas, and no Cisco product uses anything similar to the XU taxonomy.

XU's argument that *no term* in the asserted claims requires construction is nothing less than an attempt to broaden the scope of the claims and to preserve far-fetched infringement theories. For example, XU proposes that two distinct terms — "inquiry types" and "inquiry

1

criteria" — have almost the same definition, effectively asking the Court to read a limitation out of the claims. Elsewhere, XU asks the Court to read words out of the claims entirely. For example, XU proposes that an "interactive problem definition page" includes *any* "responsive interface" at all — even interfaces that are not "pages." XU seeks to read its patent claims on Cisco's products that have no "pages," including Expert Advisor, TelePresence Expert On Demand, and Remote Expert.

XU's claim construction positions rely heavily (and, in some cases, exclusively) on the declaration of its expert, Dr. Illah R. Nourbakhsh. It is well-settled that expert testimony is of limited value in determining the meaning of claim terms. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). Dr. Nourbakhsh initially backstops XU's contention that none of the terms in XU's patents need construction because they have plain meaning to one of ordinary skill in the art. These terms, however, are largely unique to the patents and to XU. *See* Forys Decl., ¶¶ 39-41, 54-55. For some terms, Dr. Nourbakhsh's opinions contradict the claim language and specification, and in some places read out claim terms entirely. *See Gen. Protecht Group, Inc. v. U.S. Int'l Trade Comm.*, 619 F.3d 1303, 1310 (Fed. Cir. 2010) ("[A]n expert's subjective understanding of a patent term is irrelevant.") (citations omitted). In other places, Dr. Nourbakhsh's opinions are not reflected in XU's own proposed constructions. Accordingly, his opinions on claim construction should be given little, if any, weight.

In contrast, Cisco's proposed claim constructions are consistent with the intrinsic records of the asserted patents and reflect the true scope of XU's alleged inventions. Thus, Cisco respectfully requests that the Court adopt its proposed claim constructions.

## II.    CLAIM CONSTRUCTION PRINCIPLES

In construing a claim term, the Court must first look to the specific words of the claim. *See Phillips*, 415 F.3d at 1312. "[T]he context in which a term is used in the asserted claim can be highly instructive" and, thus, the "claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. The claims are interpreted in view of the specification, which "is the single best guide to the meaning of a disputed term." *Id.* at 1315.

As the Federal Circuit has noted, "[w]hile a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for . . . claim construction." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326-7 (Fed. Cir. 2006). Considering the accused products is helpful as "it is efficient to focus on the construction of only the disputed elements or limitations of the claims." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991).

Extrinsic evidence is generally viewed as "less reliable than the patent and its prosecution history in determining how to read claim terms . . ." *Phillips*, 415 F.3d at 1318. Expert testimony may be helpful in explaining how an invention works, ensuring that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, and establishing that a particular term has a particular meaning in the pertinent field. *Id.* at 1318. But, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court." *Id.* Further, "any expert testimony that is inconsistent with unambiguous intrinsic evidence should be accorded no weight." *Bell & Howell Doc. Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed. Cir. 1997) (citations omitted).

## III.   U.S. PATENT NO. 7,499,903

U.S. Patent No. 7,499, 903 ("the '903 patent") describes a very specific implementation of a match and route system to connect a seeker with a live expert. The system collects and categorizes a seeker's inquiry using underlying pluralities of criteria groupings. *See* D.I. 125, Ex. 1[1] ('903 patent), col. 2:33-35. The underlying criteria groupings correspond to inquiry types, which are associated with expert skill sets through a unique numerical routing identifier. *Id.* at col. 2:36-43. The '903 patent also describes using different layers of inquiry types that can be presented to users. *Id.* at col. 5:39-45.

### A.   "Underlying Plurality of Criteria Groupings" and "Underlying Criteria Grouping(s)"

Cisco proposes that these terms mean "two or more groups of humanly understandable descriptors that identify inquiry types" and "groups of humanly understandable descriptors that identify an inquiry type." The '903 patent describes a match and route system that uses inquiry types to define a user's inquiry. *See* Ex. 1, cols. 1:50-60; 1:64-67; 2:36-40. These inquiry types are based on underlying criteria, "which are humanly understandable descriptors." *Id.* at col. 1:54-55. The system also uses criteria selections through which the user identifies an inquiry type, or specific grouping of underlying criteria, that corresponds to his query. *Id.* at col. 5:13-16 ("[T]he inquiry type, *which is the specific grouping of underlying criteria predetermined by the organization*.") (emphasis added). In this way, the plurality, or two or more, of underlying criteria groupings identify and help a user characterize his inquiry.

Cisco and XU appear to agree on this much. *See* D.I. 131, at 4. XU's proposed definition, however, adds the phrase "wherein each collection can be a member of zero or more

---

[1] Unless otherwise noted, all exhibits are from D.I. 125, the Joint Appendix of Intrinsic Evidence to the parties' Joint Claim Construction Statement, filed January 27, 2012.

4

sets." This portion of XU's definition finds no support in the patent, and XU cites none. Indeed, XU's own expert provides no support for this portion of its proposed construction. *See, e.g.*, D.I. 133 (Nourbakhsh Decl.), ¶ 23. Additionally, XU writes the word "plurality" out of this term by proposing that a collection can be a member of zero or more sets. *See Bicon, Inc. v. The Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[c]laims are interpreted with an eye toward giving effect to all terms in the claim.").

### B. "Inquiry Type(s)"

For both the '903 patent and U.S. Patent No. 7,366,709 ("the '709 patent"), Cisco proposes that this term means "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections." The inquiry type is defined as "the specific grouping of underlying criteria predetermined by the organization." Ex. 1, col. 5:14-16. Elsewhere, the '903 patent explains that "[t]he semantic routing criteria are organized into predetermined groups that identify an inquiry type." *Id.* at col. 4:45-46. The '903 patent teaches multiple layers of inquiry types; since each layer is related to the other layers, each layer depends on a grouping of underlying criteria.

The same definition holds for the '709 patent. There too, the specification explains that "[e]ach inquiry type is classified using one or more underlying criteria, which are subject categories, correlated to the client's business objectives." Ex. 2 ('709 patent), col. 2:57-60; *see also* col. 3:15-19. Likewise, the specification also discusses how limiting the underlying criteria limits the scope of inquiry types available to a user. *Id.* at col. 4:6-8.

XU states that the inquiry types are "the connective logic between seeker inquiries and experts." D.I. 131, at 14. XU also states that the inquiry types "enable customization of the subject list styles system for individual organizations and clients by organizing sets of underlying

criteria." *Id.* Cisco generally agrees with both statements — neither of which is reflected in XU's proposed construction for this claim term. XU's proposed definition is an attempt to abstract from these principles and broaden the scope of the claims to include any "term(s) that organize and identify categories of assistance requested."

### C.     "Layer(s) of Inquiry Type(s)"

Cisco proposes that this term means "a defined set of specific groupings of underlying criteria." First, the claims of the '903 patent explain that additional layers of inquiry types correspond to a first layer of inquiry types. *See* Ex. 1, col. 6:49-53; 7:52-57. The dependent claims recite that the layers of inquiry types are comprised of the underlying criteria groupings, *e.g.*, composed in different languages, jargon specific to different levels knowledge, or usercentric terms. *Id.* at col. 7:16-25; *see also* col. 5:26-33. In non-asserted claim 19, the different layers of inquiry types can be assigned to different enterprises. *Id.* at col. 8:33-49; *see also* col. 6:18-20. Similarly, the specification explains that the layers of inquiry types are associated with groupings of underlying criteria. *Id.* at Fig. 3, 5:39-41. Cisco's construction reflects these concepts, as the layers of inquiry types are different presentations of the underlying criteria.

Here, the parties' constructions are quite similar. XU appears to take issue with Cisco's construction as not distinguishing between a "layer of inquiry type" and a "layer of criterion selection." *See* D.I. 131, at 8. The claims and specification make clear, however, that the layers of inquiry types correspond to underlying criteria, not "criterion selections." The first layer of pre-determined semantically expressed inquiry types corresponds to groupings of underlying criteria. *See* Ex. 1, col. 5:14-16. Additional layers of inquiry types can have a one-to-one correspondence with the first layer and, at the same time, with the underlying criteria. *See id.* at col. 6:49-53; 5:18-21. Cisco's definition correctly identifies the layers of inquiry types.

6

### D.    "Skill-Set Database"

Cisco proposes the definition "records organized in a computer readable/writable memory constituting the identity of individuals having unique knowledge on specific topics." First, as the specification explains, the claimed databases are "records organized in computer readable/writable memory, and can be located in a datastore, or any other suitable data mass storage device." Ex. 1, col. 4:37-40. Cisco's construction explains that a skill-set database must contain information about individual experts. As the claim language recites, although the skill-set database stores at least one entry that associates an expert to a predetermined, semantically-expressed inquiry type, the skill-set database cannot do so without storing information about, or listing the identities of, the experts.[2] *See* Ex. 1, cols. 6:54-59; 7:58-68; 5:46-49.

XU's proposed definition expands this term far beyond the claim and the intrinsic record. Its definition posits that the skill-set database stores associations "between some or all of: agents and resources available, types of assistance requested, and expertise required for types of assistance requested." This definition finds no support in the claims or specification. The claims recite that the skill-set database contains at least "an entry that associates at least one expert with one of the predetermined semantically expressed inquiry types." Ex. 1, col. 6:54-59; *see also* col. 7:58-60. XU's definition does not require this at all. In addition, XU's definition broadens the claim to cover the availability of "resources" and "agents." These terms and concepts appear nowhere in the intrinsic record. The intrinsic record shows that the alleged invention locates a live expert, not a "resource" or an "agent." *See* Ex. 1, Title ("Semantic to Non-Semantic Routing for Locating A Live Expert"); *see also* Abstract.

---

[2] Cisco maintains that its construction is correct. Cisco, however, would accept the addition of language to this construction that explains that the skill-set database stores associations between at least one expert and a predetermined, semantically-expressed inquiry type.

### E.    "Expert Having Individualized Knowledge"

Cisco proposes that this term mean "person having unique, specialized knowledge on a specific inquiry type." To be considered an "expert" within the claimed system, a person must have some knowledge that others lack regarding an inquiry type. Ex. 1, col. 2:28-32; col. 5:47-49. The skill set of one or more experts having knowledge regarding that inquiry type can be mapped to the specific inquiry type. *Id.* at col. 5:49-51. Within that mapping, each expert has different, that is, unique and specialized, knowledge, so the experts can then be ranked based on the degree of their knowledge, or other criteria. *Id.* at col. 5:58-61; col. 5:65-6:5.

XU reads the word "individualized" out of this term entirely by proposing the definition "a person in possession of information or expertise that is relevant or material to a particular query." XU's definition describes an "expert," not an "expert having *individualized* knowledge." In addition, though Dr. Nourbakhsh's declaration mentions how experts can be ranked based on knowledge, among other factors, XU's proposed definition does not include that possibility. *See* D.I. 133, at ¶¶ 35, 37.

### F.    "Unique Numerical Routing Identifier," "Unique Numeric Routing Identifier," and "Numeric Routing Identifier"

As Cisco proposes, these terms indicate a "fixed number that is associated with a semantically-expressed inquiry type and an inquiry type in its corresponding layer that is used to match and route queries to an expert." The claims and specification explain that the unique numeric routing identifier associates or maps a skill-set database entry to an inquiry-type database entry. *See* Ex. 1, col. 6:60-62; col. 7:61-63; Fig. 3. The mapping between the skill-set database entry and the inquiry type database entry "is accomplished by associating the skill-set entry and the inquiry type to a numerical routing identifier." *Id.* at col. 5:51-53. In addition, Cisco's proposed construction correctly reflects that the alleged invention includes multiple

8

layers of inquiry types associated with one another. *See id.* at col. 5:39-42. The alleged invention uses the association between the inquiry types in different layers, along with the entries in the skill-set database, to match and route queries to an expert. *Id.* at Fig. 3; col. 5:53-57 ("When a user (seeker) requests assistance with a particular inquiry type, step 350, the expert(s) associated with the skill-set entry mapped to the inquiry type by the numerical routing identifier are located and identified.").

XU's proposed construction, "a mathematically distinct encoding for data relevant to an inquiry," is completely divorced from the intrinsic record. *First*, XU reads out the word "routing" from these terms. *Second*, the claims and specification demonstrate that the unique numerical routing identifier does not refer broadly to any "data relevant to an inquiry," as XU contends — rather, it specifically links an inquiry type and its associated layers to an expert skill-set. *See* Ex. 1, col. 5:49-53. Here again, XU attempts to broaden the claim language beyond its proper scope. *Third*, XU relies almost solely on the declaration of its expert, who states that the unique numerical routing identifier "provides a distinct encoding from data to inquiry . . . ." D.I. 133, at ¶ 40. Dr. Nourbakhsh's opinion contradicts the clear intrinsic record and should be given no weight. *See Bell & Howell Doc. Mgmt. Prods. Co.*, 132 F.3d at 706.

### G.   "Match and Route System"

Cisco proposes that this term means a "system that identifies an expert skill set that corresponds to a user's query and routes the query based on the expert skill set." As the specification teaches, the alleged invention matches an expert skill set to a user's inquiry type. *See* Ex. 1, col. 5:49-57. More than one expert may correspond to the inquiry type, so the system may rank the experts according to his or her level of knowledge, criteria associated with the seeker, financial costs, etc. *See id.* at col. 5:58-6:5. Once the expert is located, the system routes

the query in order to connect a seeker with an expert. *See id.* at col. 4:7-9 ("The host server is capable of connecting the seeker and expert via the aforementioned infrastructure.").

XU improperly tries to expand this term to include systems that map user inquiries to "resources" or "information sources." The alleged invention claimed in the '903 patent explicitly concerns matching and routing to *live experts*. Ex. 1, Title ("Semantic to Non-Semantic Routing for Locating a Live Expert"); col. 1:50-51 ("The present invention relates to semantic to non-semantic routing for locating a *live expert*." (emphasis added)). XU's construction also uses the vague concept of "providing a link" to "resources" or "information sources," which is never discussed in the intrinsic record. In fact, XU's lone supporting citation refers to *prior art* systems that connect a seeker to an expert. Ex. 1, col. 1:16-21 ("Match and route systems have been developed which [sic] are capable of connecting a seeker requesting information to an expert . . . ."). Additionally, XU's expert does not support its proposed construction: Dr. Nourbakhsh opines that the alleged invention "provides an algorithm for finding the best available expert resource appropriate for the query . . . ." D.I. 133 at ¶ 47. This concept is not found in XU's definition.

**H.** **"Receiving From the User a Response to the Presentation of a First Member of the Underlying Criteria Grouping," "The Response Triggering the Presentation Of Further Members of the Underlying Criteria Grouping," "Upon A User's Request For Assistance With At Least One of the Predetermined Semantically-Expressed Inquiry Types," and "Upon The Receipt of a User Request For Assistance With At Least One Of The Predetermined Semantically-Expressed Inquiry Type"**

The above-listed terms relate to the process taught in the '903 patent by which a user interacts with the claimed system to select and define an inquiry type. Cisco's proposed definitions for each of these terms incorporates a key concept of the '903 patent: that the user's interactions and selections are made using an interactive problem definition page.

Each embodiment taught in the '903 patent teaches using an interactive problem

definition page to assist a user in defining his query. *See* Ex. 1, Fig. 2, col. 4:3-5 ("host server 14 provides a user interface, such as a Web page(s), using an Internet facility such as the World Wide Web . . ."); col. 4:48-51 ("For example, a user seeking information is presented with a Get Assistance Page 220 . . ."). Even where the specification describes using communication systems other than computers, *e.g.*, "personal digital assistants (PDAs) or smart phones, to a special purpose devices [sic] such as DVB-H enabled mobile devices," each of these devices uses a display function capable of displaying an interactive problem definition page to a user. *Id.* at col. 3:64-66. The specification describes no other way of allowing a user to interact with the system to make selections.

XU contends that Cisco's constructions are incorrect because it fails to capture the pre-selection of criteria by context and user-managers. *See* D.I. 133, at ¶ 77. This feature of the alleged invention, however, is not found in the claim language at issue, nor is it found in the construction proposed by XU.

## I. "The Host Server Communicably Connected With An Inquiry-Type Database And A Skill-Set Database"

Cisco proposes the definition "the host server directly connected through hardware and software interfaces with an inquiry-type database and a skill-set database." This definition captures the relationship between the host server and the inquiry-type and skill-set databases. *See* Ex. 1, Fig. 1, col. 4:26-30. The host server may be implemented using a multi-server architecture in a different embodiment, but it is still directly connected using hardware and software interfaces. *See id.* at col. 4:11-13.

XU proposes no construction for this term, instead arguing that "communicably connected" has little meaning at all. This is again an attempt by XU to impermissibly broaden the scope of its claims to read on Cisco's products. XU appears to agree with Cisco that the host

server is directly connected to the inquiry-type database and the skill-set database. Instead, XU focuses on the manner of the connection: "through hardware and software interfaces." XU contends that Cisco's proposed construction excludes wireless communication. *See* D.I. 131, at 12; D.I. 133, at ¶ 91. One of ordinary skill in the art would understand that a wireless connection includes connections between hardware and software interfaces. *See* Forys Decl. ¶ 49.

## IV. U.S. PATENT NO. 7,366,709

The claims of the '709 patent use a number of distinct terms to describe elements used in the process of helping an organization convert its members' knowledge into a usable form, and later, for a user to formulate her query. These terms include "inquiry types," "inquiry criteria," "underlying criteria," "values," "inquiry criteria values," and "subject list style." A patentee who chooses to claim his alleged invention using different terms strongly indicates that he intended each of these terms to have a distinct meaning. *See Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 847-48 (Fed. Cir. 2006). XU has pointed to no evidence to the contrary, yet proposes that both "inquiry types" and "inquiry criteria" should have the nearly the same definition. This is but the clearest example of XU's attempts to blur limitations in its claims, and to read its patents on Cisco's non-infringing products.

### A. "Inquiry Criteria"

Cisco proposes that this term be construed as "subject categories used to define a seeker's query displayed to a user in an interactive problem definition page." The claim language demonstrates that inquiry criteria are displayed to a user in an interactive problem definition page. For example, claim 1 recites "preselecting . . . a quantity of *inquiry criteria* and values in accordance with a predetermined context," and then that the "presenting step presents the *inquiry criteria* and the values in an interactive problem definition page. . . " Ex. 2, col. 9:8-11; col.

12

9:28-30; *see also id.* at col. 10:8-10 (claim 5).  Figure 2 of the '709 patent shows the inquiry

criteria, as seen below:



*Id.* at Fig. 2, *see also id.* at col. 3:54-62.  The specification also describes the inquiry criteria as

"pre-selected subject categories referred to as inquiry criteria to formulate and characterize a

user's inquiry."  *Id.* at col. 2:20-23.

XU's proposed definition of "inquiry criteria" is nearly the same as its proposed

definition of "inquiry type."[3]  That cannot be right.  *See, e.g., Primos, Inc.*, 451 F.3d at 847-48.

Further, XU's definition is improperly divorced from the role of inquiry criteria, as explained in

the specification and claims.  XU's attempt to broaden this term to the generic "terms that

_____

[3] XU proposes that "inquiry criteria" means "terms that organize collections of types of
assistance requested," while "inquiry type(s)" means "term(s) that organize and identify
categories of assistance requested."  Plugging these definitions back into claim 1 yields
"assigning values corresponding to a *term that organizes and identifies categories of assistance
requested* for at least two *different terms that organize and identify categories of assistance
requested*" and "pre-selecting . . . a quantity of *terms that organize collections of types of
assistance requested* and values in accordance with a predetermined context."  *See* col. 9:6-11.
In this way, XU attempts to collapse together multiple claim limitations.

13

organize collections of types of assistance requested" should be rejected.

**B.     "Underlying Criteria"**

As Cisco proposes, the term "underlying criteria" means "subject categories used to classify inquiry types according to a client's business objectives and information needs of a user."  According to the claim language, the underlying criteria are used to classify inquiry types into a catalog. Ex. 2, col. 9:4-5 (claim 1).  The specification further explains the relationship between the underlying criteria and the other elements of the system.  To set up the claimed system, "[e]ach inquiry type is classified using one or more underlying criteria, which are subject categories, *correlated to the client's business objectives.*"  *Id.* at col. 2:57-60 (emphasis added). Further, "[t]he criteria also reflect information needs of a user."  *Id.* at col. 2:60.  Selecting underlying criteria based on the client's business objectives and the user's information needs comports with the aim of the invention — managing and locating experts within a company.  *See id.* at col. 2:10-15.

XU takes the position that this term does not need to be construed.  XU goes on to explain its understanding of "underlying criteria" in a way that renders the term indistinguishable from "inquiry criteria."  *See, e.g.,* D.I. 131, at 15-16; D.I. 133, at ¶¶ 124-137.  Just as "inquiry type" cannot possibly mean the same thing as "inquiry criteria," "inquiry criteria" cannot possibly mean the same thing as "underlying criteria."

**C.     "Values"**

As Cisco proposes, the term "values" should be construed as "criteria selections having a relationship to an inquiry criteria and that can be displayed to a user in an interactive problem definition page."  Starting with the claim language, "values" have a relationship to inquiry criteria, which can be hierarchical, independent, or a combination of the two. Ex. 2, cols. 9:21-

25; 10:15-19. The figures of the specification show different ways that the values can be displayed in an interactive problem definition page to reflect that relationship; for example, using pull-down lists as in Fig. 2, or in a tree-like arrangement in Figs. 3A and 3B. *See also id.* at col. 3:54-62; 5:54-65. These values help the user categorize his query. *Id.* at col. 3:54-57. The specification teaches that the values can come from a variety of sources, such as a seeker profile, a Get Assistance Page, or a predetermined indicator within a seeker profile. *Id.* at cols. 3:63-65; 4:4-15; 4:19-22. In this way, the values can be selected to further categorize the user's inquiry.

XU's proposed definition — "an object, assigned to a variable, appropriately within the range of possible objects that the variable is intended to represent" — is so vague and broad as to render this limitation meaningless. There is no discussion of "variables" within the specification, and XU relies solely on its own expert's declaration to support its proposed definition. Dr. Nourbakhsh states that "[v]alues are therefore broad specifications of possible values to be used in organizing knowledge and inquiries." D.I. 133, at ¶ 142. This does not support XU's construction, nor does this concept appear in XU's construction. Furthermore, XU's definition removes the concept of values assisting a user in formulating a query, which is specifically addressed in the specification. *See* Ex. 2, col. 3:54-62; 4:44-58.[4]

### D.  "Inquiry Criteria Values"

Cisco proposes that this term means "selections displayed to a user in an interactive

---

[4] XU's expert's arguments also reflect a misinterpretation of the figures in the patent. XU's expert contends, without citing to the specification, that an "inquiry criteria pull-down field . . . instantiates the 'Line of Business' inquiry criteria" in Figure 2. D.I. 133, at ¶ 144. Nowhere in the intrinsic record does it discuss "instantiating" an inquiry criteria. As Figure 2 shows, both "Line of Business" and "Major Coverage" are inquiry criteria, with their respective values listed beneath them. *See* Ex. 2, col. 3:54-57 ("The Get Assistance Page 200 displays the pre-designated inquiry criteria and helps guide seekers in precisely categorizing their inquiries by displaying values 203 for each inquiry criteria 201.").

problem definition page," *i.e.*, the inquiry criteria values are those values actually displayed to the user. This construction is consistent with the claim language, which recites "designating a parameter that indicates a source from which inquiry criteria values are retrieved." Ex. 2, col. 9:26-27 (claim 1). Additionally, the specification describes how inquiry criteria values can be embedded into a user's profile, and in turn, embedded into the Get Assistance Page that the user sees. *Id.* at col. 4:48-52. Where the "values" include the set of all selections associated with inquiry types, the "inquiry criteria values" are those retrieved for display to a user.

XU argues that the key concept in "inquiry criteria values" is the idea that they represent a narrowing of the total range of possible values. *See* D.I. 131, at p. 19; D.I. 133, at ¶ 156. But XU's proposed definition — "an object assigned to a variable representing collections of types of assistance requested" — does not reflect this idea of narrowing, and suffers the same problems as described above with XU's proposed definition of "values." *See* Section IV.C, *infra*.

### E.   "Subject List Style"

The intrinsic record shows that a "subject list style" is, as Cisco proposes, "a graphical representation of the logical structure of a list of inquiry criteria and values and their respective relationships." The preambles of claims 1 and 5 recite "presenting" the inquiry criteria values to a first member, which is done using a subject list style, as the intrinsic record demonstrates. Ex. 2, col. 8:65-67; 9:40-42. The specification and figures explain that a subject list style is a framework for displaying the inquiry criteria and values, and the relationships between them. *See id.* at Figs. 2, 3A, 3B. As shown, "[t]he client has the opportunity to select an overall style for the subject lists to support its products, organizational information, processes, training, consulting services and additional business objectives." *Id.* at col. 4:26-29. In turn, the subject lists within the "overall style" or "subject list style" specify the context of the inquiry criteria and

16

values, organize them into groups, describe the relationships between them, and designate parameters for retrieving them. *Id.* at col. 4:29-39.

XU argues "plain meaning" while attempting to broaden its invention past its proper scope in an attempt to read the claims on voice-based, prior-art call management systems. *See, e.g.*, Forys Decl. ¶¶ 19, 20, 25-27, 57. Its proposed definition, "the structural format for an interface used to enter information," notably includes no reference to the specification's requirement that the subject list style be a ***graphical*** representation. This is inconsistent with the intrinsic record. *See* Ex. 2, col. 4:42-43 ("The subject list styles are presented to a user in an interactive problem definition ***page***.") (emphasis added). XU faults Cisco's construction for allegedly failing to capture the "sophisticated information" contained in subject list styles, but XU's proposed construction is subject to the same criticism. *See* D.I. 131, at 13; D.I. 133 at ¶¶ 105-107. It contains no reference to any of the "sophisticated information" allegedly contained in the subject list style, nor does it refer to the subject list style's role in categorizing and defining a user's query.

### F.    "Interactive Problem Definition Page"

As Cisco proposes, this term means "an interactive graphical user interface that uses a subject list style displaying user-specific inquiry criteria and values to guide the user in classifying an inquiry." Claim 1 of the '709 patent recites that the interactive problem definition page is used to present inquiry criteria and values to a user. Ex. 2, col. 9:28-30. The specification explains that the Get Assistance Page 200 is "also described herein as the problem definition page, [and] allows a seeker to classify the nature of their problem in real-time to get an expert," and further notes that the "problem definition functionality is displayed in a Graphical User Interface." *Id.* at col. 4:44-48. The intrinsic record describes no other way of presenting

the subject list style to a user.

XU's proposed definition reads the term "page" out of this claim entirely in an attempt to stretch the claims to read on interactive voice response systems, which have no "page" or "display" component. *See, e.g.*, Forys Decl. ¶¶ 19, 20, 25-27, 62. Each claim term is presumed to have meaning, and XU has not presented any evidence to rebut this presumption. *See, e.g., Ethicon Endo-Surgery, Inc v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996). In support of its proposed construction, XU relies solely on the declaration of its expert, Dr. Nourbakhsh, who contends that an "interactive problem definition *page*" can include interfaces that are not pages at all, including voice-based interactions and gesture-based interactions. D.I. 133, at ¶ 152; *see also* D.I. 131 at 18. Dr. Nourbakhsh's opinions directly contradict the words of the claims and specification, and should be given no weight. *See Bell & Howell Doc. Mgmt. Prods. Co.*, 132 F.3d at 706.

## G. "Plurality of Monitors"

This term uses simple, easily understood words, so Cisco proposes "two or more computer screens." A "plurality" connotes two or more of something, while a "monitor" connotes a computer screen. The word "monitors" appears only in the claims, but the specification is consistent, describing a multi-media personal computer connected to a network, as well as other devices using a "monitor" or screen. *See* Ex. 2, Fig. 5, col. 7:62-8:4.

While still clinging to the position that plain and ordinary meaning should prevail, XU seeks to broaden this term to include all manners of "interactive communication devices," including a "general interactive page," a computer display, or a web page. D.I. 131, at 19. These other terms, even if mentioned in the specification, are not included in a clear, self-explanatory term like "monitor." As the Federal Circuit has noted, "[w]here claims use different

18

terms, those differences are presumed to reflect a different in the scope of the claims." *Forest Labs., Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001) (citation omitted). Here, in claims 5 and 7, the patentee chose to use a different term to define his invention than in the other claims, so the plain meaning of that term, "two or more computer screens," should control.

### H. "Member of an Organization"

For this term, Cisco proposes a "person belonging to a predetermined group or company." This definition comports with the commonly-understood meaning of this term, that a member is someone who belongs to a certain group. The specification teaches that the goal of the invention is to "enable organizations to tap into an individual's tacit knowledge and to be able to identify experts *within the organization* and to route inquiries to the next best available expert." Ex. 2, col. 1:28-31 (emphasis added). To solve this problem, a client organization provides its members access to the alleged invention. *Id.* at col. 2:20-27. The alleged invention describes how individual members of the organization can have different roles, such as seekers, administrators, managers, employees and experts. *Id.* at cols. 2:34-38; 2:41-47; 3:7-11; 3:65-4:3; 4:11-13. An individual may serve multiple roles in the organization and those roles can change over time, but she is still a member of the organization, belonging to the predetermined group or company. *See id.* at col. 2:45-48.

The "plain meaning" proposed by XU is anything but. XU seeks to broaden this simple term to include anyone who might be able to use the system, for example, someone using a touch-tone telephone system to access help with an account. XU's proposal conflicts with the plain language of the claim and the aim of the invention, which is to allow an organization to manage its internal or tacit knowledge. *See* Ex. 2, col. 1:28-31. Moreover, being a "member" of an organization is not the same as being "associated with" an organization. For example, a

"member" of a sports team wears a uniform and can play in a game. Someone who is merely associated with a sports team cannot.

### I.    "The Processor Being Configured to Extract Unique Combinations From the Database and Evaluate the Combinations"

Cisco's proposed definition for this term, "the processor is programmed to extract unique combinations of a user's query and an expert's skill set from records stored in read/writable memory and to determine in real the most qualified expert for a user's query," accurately reflects the matching process taught in the specification. The specification explains that "[t]he system identifies the possible combinations of choices across the available subject lists, and *assigns each unique combination to at least one expert*, making the combination the expert's skill set." Ex. 2, col. 6:24-27 (emphasis added). In this way, the alleged invention is extracting unique combinations from the database. The specification further explains that "[a]n ultimate match occurs when the identified best expert matches the combination of items selected from all available lists." *Id.* at col. 6:29-31. Thus, the system evaluates the combinations, or expert's skill sets and user's queries as defined by the combinations of choices, to find the best match.

XU's proposed definition reads out the second portion of this term — the element of evaluating the combinations. Also, XU relies on the declaration of its expert, Dr. Nourbakhsh, who posits that the "combinations" can be nearly any criteria or element described in the specification. *See* D.I. 133, at ¶¶ 168-169. His statements are at odds with the explanation given in the specification, and should be given no weight.

### V.    **CONCLUSION**

For the foregoing reasons, Defendant Cisco Systems, Inc. respectfully requests that the Court adopt its claim constructions as set forth above.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jack B. Blumenfeld

Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendant Cisco Systems, Inc.*

OF COUNSEL:

John V. Gorman
MORGAN LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Franklin Brockway Gowdy
Brett M. Schuman
MORGAN LEWIS & BOCKIUS LLP
One Market Street
Spear Street Tower
San Francisco, CA 94105
(415) 442-1000

February 29, 2012
5784685

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2012, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 29, 2012, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
1313 North Market Street
Wilmington, DE 19801

Joseph Diamante, Esquire                                    *VIA ELECTRONIC MAIL*
Charles E. Cantine, Esquire
Jason Sobel, Esquire
Alex Solo, Esquire
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038

Jack B. Blumenfeld (#1014)

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| XPERTUNIVERSE, INC., | ) | |
| | ) | Civil Action No. 09-157-RGA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S REPLY CLAIM CONSTRUCTION BRIEF

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
*provner@potteranderson.com*
*jchoa@potteranderson.com*

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

*Attorneys for Plaintiff XpertUniverse, Inc.*

Dated: March 7, 2012

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    '903 PATENT CLAIM TERMS............................................................................ 2

    A.    "underlying plurality of criteria groupings" and "underlying criteria grouping(s) – claims 1, 6-10 and 12 ................................................................ 2

    B.    "skill-set database" – claims 1 and 12 ............................................................ 3

    C.    "expert having individualized knowledge" – claim 1 ................................... 4

    D.    "unique numerical routing identifier," "unique numeric routing identifier," and "numeric routing identifier"– claims 1 and 12...................................... 4

    E.    "match and route system"– claims 12-18 ...................................................... 5

    F.    "layer(s) of inquiry type(s)"– claims 1, 6-9 and 12 ...................................... 5

    G.    "inquiry type(s)"– claims 1, 6-9 and 12 of the '903 patent and claims 1 and 5 of the '709 patent ..................................................................... 5

    H.    "receiving from the user a response to the presentation of a first member of the underlying criteria grouping," "the response triggering the presentation of further members of the underlying criteria grouping," "upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type," "upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type" – claims 1, 10 and 12............... 6

    I.    "the host server communicably connected with an inquiry-type database and a skill-set database"– claim 12 ............................................................ 6

III.   '709 PATENT CLAIM TERMS............................................................................ 7

    A.    "subject list style" – claims 1, 4 and 5 .......................................................... 7

    B.    "member of an organization" – claims 1 and 5 .............................................. 7

    C.    "inquiry criteria" – claims 1, 5, 6 and 7 ........................................................ 8

    D.    "underlying criteria" – claim 1 ........................................................................ 8

    E.    "values" and "inquiry criteria values" – claims 1, 2, 3, 5, 6 and 7 ............... 9

    F.    "interactive problem definition page" – claims 1 and 6.................................. 9

    G.    "plurality of monitors" – claims 5 and 7........................................................ 10

H.   "the processor being configured to extract unique combinations from the
database and evaluate the combinations" – claim 5..................................................10

IV.   CONCLUSION...........................................................................................................11

# I.    INTRODUCTION

Over the course of its two and a half year relationship with XU, and before this litigation began, Cisco repeatedly described and promoted XU's technology as revolutionary, with broad applications in numerous vertical markets. Before this litigation, Cisco knew full well that XU's patents were not limited to call centers, live experts, web-based applications, or traditional computer work stations. Rather, Cisco knew that XU's inventions, as patented, could apply to virtually any situation where a person (whether an employee, customer, or other authorized user) seeks knowledge or other resources within or from an organization, and does so using any interactive communication device. Cisco understood the true breadth and value of XU's patented inventions, and simply adopted them as its own, in complete disregard of XU's rights.

Now, faced with the consequences of its infringement, Cisco is singing an entirely different tune. According to Cisco and its expert, the patents now only relate to call centers, and do so in a very limited way. In short, Cisco invites this Court to commit reversible error by limiting the claims of the patents to just the preferred embodiments. Despite what it once believed and advocated about the breadth of XU's inventions, Cisco now attempts to strip the patents of their true scope, in an obvious attempt to escape liability. The Court should reject Cisco's attempt and construe the claims to comport with their true scope as reflected in XU's proposed constructions.

Cisco's improper narrowing of the claims is also reflected in its choice of expert (Dr. Leonard J. Forys). Dr. Forys' background is heavily focused on the call center market. D.I. 143 at ¶¶ 2, 4-8. Not surprisingly, Dr. Forys therefore interprets the scope of these patents through the narrow lens of a call center specialist, and thus fails to appreciate the full scope of the disclosed inventions. In fact, the patents disclose methods precisely designed to take the seeker out of call centers, and to enable entire organizations to provide the best possible help at the right time, even in the case of organizations that do not have a call center.

To appreciate the full scope of the patents requires a strongly computational background (as XU's expert possesses), enabling the reader to understand the way in which the claimed data structures are able to scale up, maintain flexibility and efficiently connect a seeker to a resource. Without this computational background, the full scope of the claimed data structures can be overlooked, as reflected in Dr. Forys' flawed analysis. Similarly, Dr. Forys opines that one of ordinary skill of art would have a B.S. in Electrical Engineering or Computer Science with just a few years of experience. This is insufficient. A B.S. would not provide the necessary education required to fully comprehend the efficiency of a well-designed, flexible type of dynamic information system that connects different types of data together while retaining the ability to change details without rewriting the expert-finding logic, as the patents-at-issue provide. Nourbaksh Rebuttal Decl. at ¶¶3-6.[1] Furthermore, an Electrical Engineer would be unqualified for this level of computational analysis. While an Electrical Engineer can understand circuits and systems, they do not have sufficient background in the computational side of computer science to understand and implement the patented inventions. *Id.*

## II.   '903 PATENT CLAIM TERMS

### A.   "underlying plurality of criteria groupings" and "underlying criteria grouping(s) – claims 1, 6-10 and 12

XU contends that this claim term would be well understood by one of ordinary skill in the relevant art. D.I. 133 at ¶23. Cisco's proposed expert contends that the term would not be understood by one skilled in the call center or knowledge management arts, D.I. 143 at ¶39, which, as described above, is irrelevant. In any event, the parties agree that the criteria selections made by a seeker identify the type of assistance a seeker requires, and that a criteria grouping is a collection of the fields that identify the type of help required. D.I. 142 at 4. A "plurality" of criteria groupings

---

[1]   XU submits herewith the Rebuttal Declaration of Professor Illah R. Nourbakhsh, Ph.D. ("Nourbakhsh Rebuttal Decl.") in support of its Reply Brief.

is thus multiple such collections, or "sets of collections of types of assistance" as proposed by XU. XU has therefore not "read out" the plurality aspect of the term as asserted by Cisco. *Id.* at 2, 5.

Cisco's primary argument is with the remainder of XU's proposed construction, namely that "each collection can be a member of zero or more sets." *Id.* at 4-5. This aspect of XU's proposed construction is directly supported in the specification wherein it describes how an organization "can choose to limit the combination of criterion selections to fit within a prescribed notion of what areas are relevant." D.I. 132 Ex. 1 at 5:10-12. That "each collection can be a member of zero or more sets" simply reflects the ability of an organization to pre-determine if a possible combination of criteria is enabled or not. D.I. 131 at 4. Cisco's definition is incorrect because it adds the additional requirement that "humanly understandable descriptors" identify inquiry types, which is incorrect as described in XU's opening brief. *Id.* at 4-5. Cisco has failed to refute this error in its construction.

**B.** **"skill-set database" – claims 1 and 12**

XU demonstrated in its opening brief that Cisco's proposed construction, which only required a listing of experts, was incorrect. *Id.* at 5-6. In response, Cisco has now proposed within its brief an alternative construction for "skill-set database." D.I. 142 at 7, FN 2. Cisco's new proposal is correct in that it reflects that the skill-set database stores more than just a list of experts, but it still falls far short of capturing the entire scope of the associations stored in the database. As reflected in XU's proposed construction, the skill-set database stores associations between expert profiles, seeker profiles, business interests, cost information, and other related factors. Contrary to Cisco's assertions, this aspect of XU's proposed construction finds direct support in the specification. D.I. 132 Ex 1 at 5:65-6:7; See also, D.I. 133 at ¶30 and Nourbaksh Rebuttal Decl. at ¶¶16-18. XU also asserted that Cisco's definition was incorrect as it requires the expert have "unique" knowledge on a subject, which is directly contrary to the specification. D.I. 131 at 5-6. Cisco has failed to address, much less refute, this argument.

C. **"expert having individualized knowledge" – claim 1**

Cisco's proposed definition requires the expert to have "unique" knowledge on a particular matter, which is directly contradicted by the specification. As Cisco admits, when more than one expert is associated with a particular inquiry, the patent provides for ranking of the experts "based on the degree of their knowledge, or other criteria." D.I. 142 at 8 (emphasis added). As recited in the patent, these "other criteria" include, but are not limited to, predetermined factors obtained from a seeker or organization profile, financial costs associated with the experts, as well as availability and importance of the seeker and/or expert. D.I. 132 Ex. 1 at 5:58-6:7. Thus, the patent does not require that the expert have "unique" knowledge in order to assist a seeker as Cisco's proposed definition requires.

D. **"unique numerical routing identifier," "unique numeric routing identifier," and "numeric routing identifier"– claims 1 and 12**

XU contends that a unique numerical routing identifier is a well understood and defined term to one of ordinary skill in the art. D.I. 133 at ¶39. Cisco's proposed expert is silent on this issue, and thus presumably agrees. Even a layman would understand that this term is simply referring to a unique number that the specification refers to as a "routing identifier." Cisco's proposed definition adds unnecessary (and redundant) functional requirements on how this routing number is to be used, which is already recited in the remainder of the claim language. Claim 1, by way of example, recites "mapping each skill-set database entry to the associated inquiry type in the inquiry-type database through a unique numerical routing identifier." Cisco's definition is also incorrect because it suggests that routing identifiers create associations between inquiry types and one or more layers; the '903 patent, however, clearly states that the routing identifiers associate inquiry types with skill set entries. D.I. 132. Ex. 1 at 1:26-27; 2:4-9; D.I. 133 at ¶42.

4

### E. "match and route system"– claims 12-18

XU contends that this claim term would be well understood by one of ordinary skill in the relevant art. *Id.* at ¶44 Again, Cisco's proposed expert is silent on this issue, and thus presumably agrees. A match and route system connects demand with supply generally, and in the context of the '903 patent, does so by connecting a seeker inquiry with appropriate expert resources. *Id.* at ¶45. Cisco's definition improperly narrows the term by requiring identifying an expert skill set that corresponds to a user's query, which is contrary to the specification; the specific skills of the expert are just one characteristic that is an input into this process. D.I. 132 Ex 1 at 4:7-10.

### F. "layer(s) of inquiry type(s)"– claims 1, 6-9 and 12

Claim 1 of the '903 patent recites, in part, providing an inquiry-type database populated with a first layer of inquiry types "organized from an underlying plurality of criteria groupings." Cisco's proposed definition suggests that the layer of inquiry types is comprised of underlying criteria, which implies equivalent to. The claims, however, specifically recite "organized from," which means separate from, but related - a level of abstraction that is an important feature of the patent. Furthermore, subsequent layers are related to the underlying criteria through correspondence with the first layer, not directly - an another important distinction relative to the scope of the patent and reflected in XU's proposed definition. Nourbakhsh Rebuttal Decl., at ¶¶14-15.

### G. "inquiry type(s)"– claims 1, 6-9 and 12 of the '903 patent and claims 1 and 5 of the '709 patent

As described in XU's opening brief, as used in both the '903 and '709 patents, inquiry types are terms defined by the organization to identify and organize the various categories of assistance that may be requested by a seeker. D.I. 131 at 9, 14-15. Cisco apparently agrees with this aspect of XU's definition. D.I. 142 at 5. As XU also pointed out, inquiry types, however, are not based on user criteria selections as required by Cisco's proposed definition. Neither Cisco nor its expert address or refute this point.

**H.** **"receiving from the user a response to the presentation of a first member of the underlying criteria grouping," "the response triggering the presentation of further members of the underlying criteria grouping," "upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type," "upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type" – claims 1, 10 and 12**

Cisco has addressed the four claim terms identified above collectively, as will XU. XU contends that these terms need no construction as they would be readily understood by one of ordinary skill in the relevant art. D.I. 133 at ¶¶61, 66, 71, 80. Cisco's expert apparently agrees, as he offers no opinion on that issue. Nonetheless, the primary dispute concerns Cisco's insistence that each phrase requires the user interact with the claimed system via only an "interactive problem definition page." D.I. 142 at 10-11. Cisco's definitions are improperly narrow, as the patent explicitly describes an interactive problem definition page as just one possible embodiment, among many others. D.I. 132 Ex. 1 at FIG. 2; 3:61-4:2; 4:48-53; 6:29-35. Cisco also contends that each of the various communication devices a user may use to interact with the system "uses a display function capable of displaying an interactive problem definition page to a user," citing the patent at 6:64-66, D.I. 142 at 11. The patent says no such thing. In fact, the very next sentence in the patent describes how, regardless of the physical form of these various communication devices, they each include a local memory, processor and "input/output capabilities to permit interaction with a user," which is clearly broader than the definition proposed by Cisco. D.I. 132 Ex. 1 at 3:66-4:2.

**I.** **"the host server communicably connected with an inquiry-type database and a skill-set database"– claim 12**

The primary dispute between the parties is the proper interpretation of "communicably connected." Cisco contends that "communicably connected" means "directly connected." This is improper, as the patent explicitly describes a wireless connection between the server and the databases as one potential embodiment. D.I. 132 Ex. 1 at 3:16-32. Regardless of whether there are intervening hardware or software interfaces, one of ordinary skill in the art would not consider a wireless connection to be a direct connection. Nourbakhsh Rebuttal Decl., at ¶19.

## III. '709 PATENT CLAIM TERMS

### A. "subject list style" – claims 1, 4 and 5

The parties largely agree that a "subject list style" is a structure (or logical structure as per Cisco) through which a user can define the assistance sought by "entering information" (as per XU) or presenting "inquiry criteria and values" as suggested by Cisco. The remainder of Cisco's proposed construction, however, is incorrect for a number of reasons. First, Cisco asserts that the "subject list style" must be a "graphical representation." This is incorrect. The specification describes how the subject list styles are necessarily linked to other data such as inquiry types, login information, and seeker and expert profiles, to name a few. D.I. 132 Ex 2 at 2:64-67; 2:41-48; 3:35-38; 4:4-8. Thus, the subject lists styles are core structural data, not merely graphical representations as suggested by Cisco. Nourbakhsh Rebuttal Decl., at ¶24. Second, Cisco's definition also requires the data structure (inquiry criteria and values in Cisco's terms) to be in list form. This is improperly narrow, as the specification describes how the subject lists "specify the quantity and nature" of the inquiry criteria, and "organize the inquiry criteria and values into one or more groups, describe whether the relationship between criteria is hierarchical or independent, and designate a parameter that conveys to the system which source to obtain the value for each criterion from." D.I. 132 Ex 2 at 4:29-39. This is much broader than simply presenting the data in list form as suggested by Cisco.

### B. "member of an organization" – claims 1 and 5

Cisco admits that this is a "simple term," but then goes to great lengths to try and limit its application. The '709 patent describes how a great number of people of differing roles and affiliations may be authorized to use the claimed system, and this is captured in XU's proposed definition. In contrast, Cisco's proposal requires the user to belong to a "predetermined group," which suggests an inflexibility that is at odds with the express teachings of the patent. D.I. 132 Ex 2 at 2:44-47; 3:28-30 and 65-66.

7

**C.** **"inquiry criteria" – claims 1, 5, 6 and 7**

Inquiry criteria are described in the specification as the terms used to organize collections of the type of assistance requested. FIG. 2 of the '709 Patent provides a direct example of inquiry criteria filling this role in showing the "Line of Business" field (201a) and explicitly labeling this as an example of inquiry criteria. Cisco's proposed construction is improperly narrow in a number of respects. The patent describes how the inquiry criteria are used to "formulate and characterize" a user's inquiry. D.I. 132 Ex 2 at 2:20-23. This is broader than Cisco's proposed construction, which requires that the inquiry criteria "define" the query. Second, Cisco's definition requires the inquiry criteria be "displayed to a user in an interactive definition page." This is redundant, and improperly narrow, as the claims already require "presenting" the inquiry criteria to a user, and certain of the claims recite presenting the inquiry criteria in "an interactive manner," not just in "an interactive definition page" as suggested by Cisco.[2]

**D.** **"underlying criteria" – claim 1**

Claim 1 requires, in part, "creating a catalogue of inquiry types classified by one or more underlying criteria." XU contends that the term "underlying criteria" needs no construction as it would be readily understood by one of ordinary skill in the relevant art in the context of the subject matter of the invention. D.I. 133 at ¶134. Of course, all the terms at issue must be assessed in the context of the claimed invention, not in a vacuum. Cisco's expert, however, opines that the term can "have diverse meanings within the field," but he offers no opinion on whether the term would have an understood meaning in the context of the patent. D.I. 143 at ¶41. This is improper. Cisco's proposed definition is also redundant, as the claim phrase in question already provides that the inquiry types are classified by the underlying criteria. If Cisco's proposed definition is used the

---

[2] Cisco also asserts that XU's definitions for inquiry criteria and inquiry type are "nearly the same," suggesting that this is somehow improper. D.I. 142 at 13-14. While similar, the two proposed definitions are not the exact same, and thus Cisco's argument is without merit.

phrase would read: "creating a catalogue of inquiry types classified by one or more subject categories used to classify inquiry types according to ….", which is clearly redundant and improper.

### E.    "values" and "inquiry criteria values" – claims 1, 2, 3, 5, 6 and 7

Claim 1 requires, in part, "assigning values corresponding to an inquiry type for at least two different inquiry types in the catalogue." XU contends that the term "values" needs no construction as it would be understood by one of ordinary skill in the relevant art in the context of the subject matter of the invention. D.I. 133 at ¶139. Cisco's expert opines that the term has "no specific meaning in the art," but he offers no opinion on whether the term would have an understood meaning in the context of the patent, nor does he offer a proposed construction. D.I. 143 at ¶55. Cisco's proposed definition is also redundant, as other aspects of the claims already recite that the values are to be "presented" to a user," and certain claims recite that the values are presented in "an interactive manner," which is broader than Cisco's proposed definition which would require presenting the values only in "an interactive problem definition page."

### F.    "interactive problem definition page" – claims 1 and 6

The '709 patent discloses two specific and distinct types of interactive problem definition pages. In one embodiment it is described as a Graphical User Interface. D.I. 132 Ex. 2 at 4:47-48 and Fig. 2. In another embodiment, it is described as a responsive interface to enable users to interactively select the form and substance of the subject list style to be presented to the seeker. *Id.* at 2:20-41. Cisco's proposed construction limits the "interactive problem definition page" to just a "graphical user interface," which is improper. The remainder of Cisco's proposed construction is also redundant, as claim 1 already requires, in part, presenting "the inquiry criteria and the values in an interactive definition page." Thus, "displaying user-specific inquiry criteria and values to guide the user in classifying an inquiry" as Cisco proposes is already reflected in the claim.

9

### G.     "plurality of monitors" – claims 5 and 7

Claim 5, by way of example, recites that the monitors present the inquiry criteria and values to the user "in an interactive manner."  The specification refers to responsive interfaces of several types, including a general interactive page *Id.* at 1:50; 4:42-43, a Graphical User Interface, *Id.* at 4:47-48; 8:12, a computer display *Id.* at 3:53, and a web page *Id.* at 8:9-11, as well as multiple types of screen devices, including whiteboards, tablets and other devices *Id.* at 7:65- 8:4. This is a critical function of the claimed invention, as it permits the user to refine the scope of the assistance being requested.  Cisco's proposed definition, i.e., a computer screen (essentially a non-interactive cathode ray tube) would not permit the interactive functionality of the monitor as claimed. Therefore, the term "monitors" should be interpreted to mean "interactive communication devices" to reflect the proper scope described in the specification.

### H.     "the processor being configured to extract unique combinations from the database and evaluate the combinations" – claim 5

As demonstrated in XU's opening brief, Cisco's definition suggests that the data being extracted pertains to the user's query and an expert's skill set, and that operations on this data must occur in a real-time manner.  This is improper in two respects.  First, user query information is not stored in a database.  D.I. 131 at 20.  Second, Cisco unnecessarily narrows the phrase by imposing a real-time constraint, and by suggesting that the expert selected must be "the most qualified."  This is inconsistent with the specification, which explains that any attribute of the experts may be used to differentiate and order them in the event that multiple experts match to the same criteria.  D.I. 132 Ex. 2 at 3:20-26.  Cisco fails to respond, much less refute, these points.  Instead, Cisco asserts that XU's proposed definition fails to take into account evaluating the combinations.  D.I. 142 at 20. This is not true.  XU's definition explicitly recites retrieving and <u>analyzing</u> the combinations.  D.I. 131 at 19-20.

## IV. CONCLUSION

For the foregoing reasons, the Court should adopt XU's proposed constructions in their entirety.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph Diamante
Charles E. Cantine
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
(212) 806-5400

Dated: March 7, 2012
1050272

By: /s/ Philip A. Rovner
        Philip A. Rovner (#3215)
        Jonathan A. Choa (#5319)
        Hercules Plaza
        P.O. Box 951
        Wilmington, DE 19899
        (302) 984-6000
        provner@potteranderson.com
        jchoa@potteranderson.com

*Attorneys for Plaintiff XpertUniverse, Inc.*

11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that, on March 7, 2012, the within document

was electronically filed with the Clerk of the Court using CM-ECF which will send notification

of such filing to the following; that the document was served on the following counsel as

indicated; and the document is available for viewing and downloading from CM-ECF:

### BY CM-ECF AND E-MAIL

Jack B. Blumenfeld, Esq.
Jennifer Ying, Esq.
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P. O. Box 1347
Wilmington, DE  19899
jblumenfeld@mnat.com
jying@mnat.com

Colm F. Connolly, Esq.
Morgan Lewis & Bockius LLP
1007 Orange Street, Suite 501
Wilmington, DE  19801
cconnolly@morganlewis.com

I hereby certify that on March 7, 2012 I have sent by E-mail the foregoing

document to the following non-registered participants:

John V. Gorman, Esq.
Morgan Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
jgorman@morganlewis.com

Franklin Brockway Gowdy, Esq.
Brett M. Schuman, Esq.
Ryan L. Scher, Esq.
Rachel M. Walsh, Esq.
Morgan Lewis & Bockius LLP
One Market Street
Spear Street Tower
San Francisco, CA  94105
fgowdy@morganlewis.com
bschuman@morganlewis.com
rscher@morganlewis.com
rwalsh@morganlewis.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

913090

# EXHIBIT F

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4

     XPERTUNIVERSE, INC.,           :   CIVIL ACTION
 5                                  :
                      Plaintiff,    :
 6                                  :
         vs.                        :
 7                                  :
     CISCO SYSTEMS, INC.,           :
 8                                  :
                      Defendant.    :   NO. 09-157 (RGA)
 9

10

11                              - - -

12                              Wilmington, Delaware
                                Thursday, March 15, 2012
13                              9:05 o'clock, a.m.

14                              - - -

15
     BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
16
                                - - -

17
     APPEARANCES:
18
                 POTTER ANDERSON & CORROON LLP
19               BY:  PHILIP A. ROVNER, ESQ.

20                       -and-

21

22

23

24                                  Valerie J. Gunning
                                    Official Court Reporter
25
```

```
1    APPEARANCES (Continued):

2

3              STROOCK & STROOCK & LAVAN LLP
               BY:  CHARLES E. CANTINE, ESQ. and.
4                   WILLIAM J. SEYMOUR, ESQ.
                    (New York, New York)
5

6                   Counsel for Plaintiff

7

8

9              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
               BY:  JACK B. BLUMENFELD, ESQ.
10

11                      -and-

12             MORGAN LEWIS & BOCKIUS LLP
               BY:  BRETT M. SCHUMAN, ESQ. and
13                  RACHEL M. WALSH, ESQ.
                    (San Francisco, California)
14

15                  Counsel for Defendant

16                      - - -
17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2

 3                 (Proceedings commenced in the courtroom at

 4       9:05 a.m.)

 5

 6                 THE COURT:  Good morning.  Please be seated.

 7                 (Counsel respond, "Good morning, your Honor.")

 8                 THE COURT:  So this is the Markman hearing in

 9       XpertUniverse, Inc. versus Cisco Systems, Inc., Civil Action

10       No. 09-157.

11                 Can counsel introduce themselves?

12                 MR. ROVNER:  Good morning, your Honor.  Phil

13       Rovner from Potter Anderson on behalf of the plaintiff,

14       XpertUniverse.  And with me at counsel table from Stroock &

15       Stroock & Lavan, Charles Cantine and William Seymour.

16                 THE COURT:  Good morning.

17                 MR. BLUMENFELD:  Good morning, your Honor.

18                 THE COURT:  Mr. Blumenfeld?

19                 MR. BLUMENFELD:  Jack Blumenfeld from Morris

20       Nichols for defendant Cisco Systems with Brett Schuman and

21       Rachel Walsh from Morgan Lewis in San Francisco, and with

22       the Court's permission, they're planning on splitting up the

23       terms this morning.

24                 THE COURT:  That's fine.

25                 So basically my clerk will keep time.  Each side
```

```
 1    has 80 minutes.  Okay?

 2              So I assume either Mr. Cantine or Seymour, one

 3    of you is starting?

 4              MR. CANTINE:  Yes, your Honor.

 5              THE COURT:  I guess Mr. Cantine.

 6              MR. CANTINE:  Thank you, your Honor.

 7              Before I start, I just wanted to, if I may,

 8    introduce in the back in the courtroom here, we have Victor

 9    Friedman, who is the President and CEO of XpertUniverse, his

10    son, Alex Friedman, and next to him is John Steinhoff, one

11    of the inventors of the patent.

12              THE COURT:  All right.

13              MR. CANTINE:  I just wanted to let you know they

14    were here.

15              I think before we get into the nitty-gritty on

16    the claim construction issues, I was going to give you a

17    little background.  I think we all know who Cisco is.

18    Right?  They're a multi-billion dollar corporation with tens

19    of thousands of employees.

20              THE COURT:  I don't really need the background,

21    who the parties are.

22              MR. CANTINE:  Okay.  If I could give you a

23    little bit on XpertUniverse, because I think it's important

24    in the context of what we're talking about.

25              THE COURT:  I doubt it, but if that's how you
```

1    want to spend your time, go ahead.

2              MR. CANTINE:  Okay.  Well, let's move on.

3              I think if you've read the briefings, you've

4    seen that the parties worked together for two-and-a-half

5    years.  Okay?  And this wasn't a case where XpertUniverse, a

6    small company, went knocking on the door of a big company.

7    This is Cisco that came to XpertUniverse and said, we know

8    you have some technology; we're interested in it.

9              The companies signed a nondisclosure agreement

10   and worked together for two-and-a-half years.  And they

11   were in daily contact at all levels of the company.

12   Technical people from XpertUniverse visited Cisco, Cisco

13   visit XpertUniverse.  And eventually, before XpertUniverse

14   could finish the development efforts, Cisco told them

15   they weren't interested in the product anymore, or the

16   project.

17             Unbeknownst to XU, Cisco filed patent

18   applications and what they learned from XpertUniverse, and

19   later introduced their accused products in 2008.  And that

20   was the first time XpertUniverse ever heard about any of

21   this.  They thought Cisco had abandoned the project, but

22   obviously they hadn't.

23             So why don't we jump right up into slide 5.

24   We'll go through some of what products that were out there

25   existed before XU and how the XU patents differentiate from

1     that.  Before we do that, though, we have to talk about some

2     terminology.

3              First, the patents talk about seekers, and these

4     were people that are looking for assistance.  And as this

5     slide depicts, these seekers can be people both within the

6     organization as well as people outside the organization,

7     such as customers.

8              And then you secondly have what the patents call

9     experts, sometimes referred to as subject matter experts.

10    And these are people within the organization that have

11    knowledge that is relevant to a seeker's inquiry.  And the

12    fundamental issue that XU's '903 patent addresses is how

13    best to connect those seekers to those experts so that they

14    can help them find the solution to whatever it is they're

15    looking for.

16             And this is a big problem because the enterprise

17    would allocate just a few experts that are dedicated to

18    helping seekers, and they put them in the call center, which

19    we've put in the upper right hand corner of that box there.

20    And these are people that would typically answer an 800

21    number-type thing.  You call an 800 number to -- you have a

22    problem, and you're going to get connected to one of these

23    experts within the call center.

24             But XpertUniverse recognized, and as this slide

25    depicts, that there's this vast knowledge base of experts

1    within the organization that are not in the call center, and

2    therefore are not being utilized to answer customer

3    inquiries.  And so this is a wide body of knowledge that was

4    available that was just not being utilized.

5           And so the '903 patent really is a whole new way

6    of thinking about the expertise within the company and

7    connecting the seekers to any of the expertise to get them

8    the answers they need.

9           So let's talk a little bit more about how these

10   call center-type of operations work.  And what typically the

11   companies have done to connect seekers to is create these

12   pools of experts.  So we've put circles around these pools

13   of people within the call center.

14          And so this has taken experts that have a

15   similar knowledge base and putting them together in these

16   pools and then locating these pools of experts within a call

17   center.  And this makes a lot of sense for certain types of

18   companies that maybe only offer a few limit number of

19   products, because you can have a few pools and then you can

20   take some of your experts and isolate them into those pools.

21   If you have just a few categories, the system is easy to

22   manage, because every time a seeker comes in, you can

23   connect them to one of these limited number of pools.  And

24   that sounds great, but it has a number of limitations.  One

25   you can see right away that not all the experts again are

1    being utilized to answer these customer inquiries.  Thus,

2    you're not taking advantage of all the expertise in the

3    company.

4         Now, if we go to the next slide, we've

5    highlighted here some of the major problems with this pool

6    base approach.  Again, first, access to the expertise is

7    limited to call centers.  When you do this pool-based

8    approach, you have these large areas of untapped areas of

9    expertise.  And you have these pools, as depicted here.  You

10   only have three kinds of expertise.  Right?  They're in the

11   company.  If the experts within the rest of the organization

12   don't fit into those narrow molds, then you've left them

13   out.

14        And there's also what the patent refers to as a

15   big scaling problem, and that's one of the big innovations

16   of the XpertUniverse technology.  And the types of pools and

17   the pool approach creates a significant maintenance

18   challenge, because every time an expert's skills change or

19   an expert leaves, or they learn something new --

20        THE COURT:  This is what the patent refers to as

21   a data entry problem?

22        MR. CANTINE:  Well, it's related to that, your

23   Honor, but this is kind of background of what the -- what

24   existed out there, what Cisco's expert claims that the XU

25   patents are all about.  He thinks that this call center

1    technology, what I'm trying to go through here is to -- to

2    explain to you in a way that the XpertUniverse patents are

3    not related to call centers.  It's a different animal

4    altogether.  In fact, it was designed to get rid of the

5    entire pool approach and this contact center altogether.

6              And these pool -- let's go back, if you could.

7              It creates a substantial maintenance challenge,

8    is what I was getting at, right, because these pools are

9    limited, people coming in and out all the time.  Companies

10   change, you have to create new pools, so it becomes a big,

11   big problem.

12             So now the XpertUniverse solution -- go to the

13   next slide, Bill.  All right.

14             It gets away with the pools altogether.  It puts

15   a box in the middle here, and we'll go into that in detail,

16   what that box is.  But it avoids all the limitations to

17   having pools.  And instead, it's inclusive.  It allows the

18   seekers to have expert access to the expertise throughout

19   the entire company, and to do that, it created this new

20   technology, which we've labeled there XU's '903 patent.

21             And this technology, it enables the system to

22   interactively understand exactly what the seeker's questions

23   are and interactively connect them to the expertise within

24   the company.  So now when we dive in, we'll see why that's a

25   good idea and how it works.

1    So the benefits of having the single technology,

2    right, that box in the middle as opposed to the pools,

3    again, those enable the seekers to have all access to all of

4    the expertise within the company.  By having just a single

5    maintenance point, it's much more flexible.  And because

6    it's flexible, it's also easier to manage.  It's inclusive

7    of all the seekers and all the experts because it can reach

8    out to every expert within the company.  And it's inclusive

9    to seekers because, as we'll see in a little bit, basically,

10   the form that the seeker is going to fill out in order to

11   try to find the right expert is an interactive form that's

12   based on real-time information, and it's a customized form.

13   It's a customized form of every seeker.  And that's one of

14   the real benefits behind the technology behind both the

15   '903 and the '709 patent and is a way for the system to

16   adapt that form based upon information it knows about that's

17   coming into that system based on that seeker.

18   And then the other concept that's behind both

19   patents is this concept of best available expert.  And this

20   means that the system is able to figure out exactly what the

21   needs of the seeker are and then use that to select the best

22   available expert.

23   And, of course, the benefits to the company are

24   tremendous.  Customer satisfaction goes up because you get

25   to the right person at the right time and the cost of

1    delivery goes down because you're more efficiently

2    connecting questions with answers.

3            So now let's go through some of the technology

4    behind that box.  And this, again, is what the '903 patent

5    is directed towards.

6            First of all, to understand what questions a

7    seeker needs answers for, we have to understand the scope

8    and the type of the question.  All right?  And this is a

9    major innovation of the patent.  It's an idea of interactive

10   criteria definition page, or what the patent sometimes

11   refers to as this get assistance page.  And the concept is

12   that based on all kinds of information about the seeker and

13   the company, the technology can create this interactive form

14   that the seeker is able to fill out, and as they fill out

15   the form, the system gets a better and better idea of the

16   particular question that they have.

17           And that leads to the next element, these

18   inquiry types.  Again, these are terms that are within the

19   claims that we're going to talk about.

20           And so the use of this interactive definition

21   page permits the system to generate what the patent calls an

22   inquiry type; and the inquiry type basically says, here's

23   the type of question I need answered.

24           And once the system generates that particular

25   inquiry type, then it's able to use a routing identifier,

1       and we'll talk more about that later.  But that routing

2       identifier permits the system to select exactly the type of

3       experts from the skill-set database that may have relevant

4       knowledge to answer the question of the seeker.

5               And so this is, again, about interactively

6       extracting from the seeker the most efficient way possible

7       the specific question they have and then turning that

8       extracted question in the best possible identification of

9       which experts can assist in solving that problem.

10              And the last element up there is the skill-set

11      database.  And this is really important because it has to

12      have all the right information within it so that it can

13      connect the inquiry type to the particular expert.

14              And now one of the key novelties of this system

15      is its flexibility.  And one of the key elements of that

16      flexibility is it's able to be used by different types of

17      seekers.  And that is by using these inquiry types and

18      routing identifiers, the system allows us to be able to form

19      the kinds of question that many different seekers ask, and

20      this is depicted in the next slide.

21              So this shows an example of that flexibility.

22              Now, suppose you have someone coming in from the

23      sales department, and we see him on the left there, and we

24      have another person coming in from the engineering side.

25      And basically these two people have the same question.

1    They're looking for the same expertise, but they're doing it

2    in a different way.  And so how does the system handle this?

3               Well, the system automatically creates this get

4    assistance page for the sales seeker based on his log-in

5    information.  The system knows he's from within the

6    organization.  He's from sales.  He creates this get

7    assistance page, this interactive form specifically for

8    him.  And it does the same for the engineer.  When the

9    engineer logs in, the system knows he's coming from

10   engineering, he's from within the company.  It creates a

11   customized form for the engineer.

12              Now, the types of questions and the way we're

13   going to lead them to those inquiry types is different.  A

14   salesperson may come at it from product names whereas an

15   engineer may come at it from product numbers.  At the end,

16   they're both looking for the same thing.

17              So we get to customize the forms these two

18   people get in order to most efficiently capture exactly what

19   it is they're looking for.  And once those selections are

20   made, it results in these inquiry types being generated.

21   And the sales seeker will make his selections and he'll get

22   his inquiry type, the engineer will make his selections and

23   he'll get his inquiry type.

24              Now, again, in this example they're both looking

25   for the same type of expert.  So basically they have the

1　same question, but they're coming at it from two different

2　angles.  And one of the key points of novelty of this

3　technology is these inquiry types that are generated from

4　those get assistance page relate to one another.  And they

5　relate to one another in such a way that the routing

6　identifier can forward the sales path, can still be used on

7　the engineering side.  You don't have to rebuild that top --

8　the top of that graphic here.  Right?  We don't have to go

9　from the inquiry type on the engineering to another routing

10　and identifier to the skill-set database.  It simply

11　piggybacks on the one from the sales side.  And that

12　provided a lot of flexibility into the system, because

13　different kinds of seekers can come in and customize the

14　forms that they interface with and actually specify the

15　question.  And yet all of the smarts of the system that

16　generate that routing identifier and looking through the

17　skill-set database can find the best available expert,

18　connect the expert to that seeker.  All of that technology

19　remained in place and useful even if you add the different

20　types of seekers.

21　　　　So I mean that's an overview of the '903 patent.

22　We'll get into more of the specific details.  But I was

23　going to jump to the '709 patent.

24　　　　THE COURT:  All right.  Are you planning on

25　basically just using your 80 minutes and then turning it

1    over to them?

2            MR. CARMINE:  I was going to run through, your

3    Honor, now to the background and overview of the '709

4    patent, some of the differences between the patents and the

5    prior art, and I will jump into the claim terms.  I'm not

6    going to go through all 22.

7            THE COURT:  I guess I'm just wondering how are

8    the parties are envisioning -- you're going to use your 80

9    minutes and then give it over to them.

10           MR. CARMINE:  I am going to reserve probably 10,

11   15 minutes, and I will give it over to them, and I may have

12   a short rebuttal, if I may.

13           THE COURT:  All right.

14           MR. SEYMOUR:  May I hand up this slides?

15           THE COURT:  Two copies here?  I assume these are

16   just the slides you're using?

17           MR. CANTINE:  Yes.

18           MR. SEYMOUR:  Yes.

19           THE COURT:  All right.

20           (Mr. Seymour handed slides to the Court.)

21           MR. CANTINE:  So the '709 patent, your Honor,

22   it's also about how you connect the seeker to an expert.

23   But it concentrates on basically one aspect of that process,

24   and that's that get assistance page we were looking at.

25           So it's all about how you formulate the

1    question, how the seeker formulates the question.  In other

2    words, how do we extract from the seeker exactly what it is

3    they're looking for.  And it sounds simple, but it is

4    actually a very difficult problem.  And there are two

5    approached people have used and continue to use, each of

6    which have serious limitations.  And these are the prior art

7    systems that Cisco's expert refers to in his declaration and

8    makes the assertion that essentially XpertUniverse's

9    technology is just old technology that other people are

10   doing.

11        So I want to quickly walk through those two

12   prior approaches and point out to you how the XpertUniverse

13   solutions the different.

14        In one approach, what might be called the

15   limited selection approach is, the seeker calls into an 800

16   number, and you get the typical press one for that, press

17   two for that, press three for that.  We've all used those

18   types of systems.  They're not very efficient.  You press --

19   you listen to the options, they're not really what you are

20   look looking for.  Maybe you press one, you go down that

21   path, you don't get what you want, you press two, go down

22   that path.  You start hitting zero, try to get an operator,

23   you get frustrated and hang up.

24        And that's what these kind of, what we would

25   call, or are referring to as these limited selection-type

1    systems.  And it's just not practical.  They have just a

2    small number of options and they don't work well for a

3    company that has a large product or a large service

4    offering.  So they're inefficient.  They leave poor

5    customer satisfaction.  And they're just completely

6    different from what the XpertUniverse '709 patent is

7    directed towards.

8             Now, there's another option, which is sort of

9    the opposite which is commonly used, and this is what

10   Cisco's expert refers to as knowledge management systems.

11   And so let's take a look at those.

12            Essentially what's here is the company provides

13   the seeker with basically a big magnifying glass.  What they

14   do, they throw a whole bunch of documents at you and say,

15   all right.  We think we know what your question is.  We have

16   this repository of documents.  We think these documents

17   might help you with your question.  And essentially they

18   force the seeker to go through and look at all these

19   documents, try to find if one is relevant.  If it's

20   relevant, then the seeker can go up and figure out who the

21   author is.  If they can find the authorization, they can try

22   to find the phone number to contact the author.  Often, the

23   author isn't around anymore.  He might have left the

24   company.

25            So these are very inefficient, indirect,

1    imprecise systems.  It requires a huge amount of work of the

2    seeker.  You're forcing the seeker to go scan all these

3    documents.  These documents may be out of date.  Obviously,

4    not -- all of the not all of the expertise within the

5    company is going to be documented anyway, so it's not

6    offering the full solution.

7              And so the '709 patent breaks away from both

8    these types of prior art systems.  So let's take a look at

9    some of that.

10             The idea behind it is this new technology that

11   permits the seeker to interactively define the problem in

12   just the right way.  So the system can create an answer

13   basically to what the seeker really needs is X.  And that's

14   the issue.  Right?  How are we going to help the seeker to

15   find exactly what the problem is?  And the invention

16   provides a standardized way to do that, to capture that from

17   the seeker.  In other words, interactively extract from the

18   seeker all the necessary data in this nice, standardized

19   form in a way that the system can then use that to generate

20   later that inquiry type and use the routing identifier, to

21   go to the skill-set database.

22             So the two patents kind of overlap in that

23   sense.  The '709 patent is really that get assistance page.

24   The '903 patent is more the broader full concept.

25             So some of the benefits.  Right?  It's more

1    precise.  It's translated to real need of the seeker in real

2    time and it's providing a much better chance of success in

3    connecting the seeker with the right expert.

4            Let's go to the next slide.

5            One of the other real benefits of this

6    interactive problem definition page is that it's directly

7    controlled by the company.  Now, this is important because

8    it provides the flexibility for the company to customize

9    that page for different types of seekers.  And because the

10   company is designing in how to interact how the process

11   works, you can actually design in a way to customize it for

12   different seekers, whether they're speaking different

13   languages, coming from different corporate units or from

14   different market segments within the company.

15           Now let's take a look at some of the details

16   behind it.  And these are some of the claim terms you'll

17   see.  By the way, your Honor, I should point out on the

18   bottom, we've pointed, provided the Court with citations to

19   the intrinsic record for support of all of these.

20           So now we've taken that interactive problem

21   definition page, that gets us to the answer page, and we're

22   blowing it up here to explain some of the terms used in the

23   patent and how this all ties in together.

24           So the fundamental idea, we have all of this

25   knowledge that's maintained by the enterprise.  In this case

1    we can see seeker profile, criteria, values and style

2    structure.  And the enterprise can use all of those fields

3    in order to create this interactive page in order to extract

4    from that seeker exactly what it is, what they're looking

5    for.

6              So the seeker profile, we touched on that a

7    little bit earlier.  But this allows the system to

8    understand exactly how to ask all the right questions

9    because it knows when somebody logs in where they're logging

10   in from.  We saw that with sales engineering, the

11   salesperson, the engineer, and most people to use a type of

12   system like this, they have to log in user name, password.

13   The system automatically knows where that person is coming

14   from and can tailor the interactive page based on that

15   information alone.

16             Now, criterion values and style structure,

17   all components of that interactive form as well, and

18   altogether these formulate the interactive form that the

19   seeker is going to get, be presented with, and they're going

20   to fill out.  And, again, the ultimate issue is, you know,

21   trying to answer that question, what the seeker really

22   needs.

23             So let's take a look at one of those forms,

24   and this comes straight out of the '709 patent.  This is

25   figure 2.

1          And this form is what is generated based on all

2     of that logic we were just talking about, about the profile

3     information, the criteria, the style sheet, and all that

4     kind of stuff.  And when you look at this -- this, again,

5     directly out of the patent, you can see it's labeled with

6     some of the claim terms we're going to be talking about.

7     Right?  Inquiry, criteria, values and subject style.

8          And so we see inquiry criteria on this form

9     would be the line of business, major coverage and form of

10    coverage.  Right?  Those would be inquiry criterias.  And if

11    you look under this line business -- it's a little bit hard

12    to see, but you can see here, this little arrow.  Right?

13    Well, that represents a drop-down list.  Click on that, you

14    get a bunch of choices.  Well, those choices, it would be

15    under major coverage, the first to are values.  Those are

16    the list of choices you have underneath that inquiry

17    criteria, and then the subject style is just the overall

18    form, style of that form.

19         So those, I think, I would hope you would agree

20    with me, these are specific examples of, within the patent

21    of some of the claim terms we're going to be talking about

22    and exactly what they mean and how they're used and in the

23    context of a patent.

24         So I think, your Honor, if I could, just to try

25    together how the two patents work together, we'll walk

1   through a quick example of how someone might use the overall

2   system.

3          So in this example, we have a claims agent.

4   There's a policy question about mold in a policyholder's

5   house in Texas, and this example comes directly out of the

6   patent.

7          So how is a person like that going to use the

8   system?  So they have this question, and now the first thing

9   the seeker does in this case, this claims agent, he's going

10  to lock into the system.  He's going to use his iPad or his

11  iPhone or his computer.  He's going to log in and he's going

12  to say, hey, I've got a question.  He's going to be

13  presented with this get assistance page, and the system

14  already knows that from his log-in information, again, that

15  he's a claims agent.  He knows that he's from within the

16  company.  And so the system will start to develop this

17  particular get assistance page for him based on that

18  information.

19         Now, the system uses everything it knows about

20  them, right, to sort have been presented with this

21  customized get assistance page.  And it's important to

22  realize that this is an interactive form, because as the

23  agent fills it out, one selection can have an impact on

24  other selections.  The patent talks about these various

25  values and the like, can be hierarchical, independent, or

1    some combination.  And this gives the company a lot of

2    flexibility, and, again, extracting from that seeker exactly

3    what that question is that they're looking for.

4              So let's go, again, let's step up to figure 2.

5    Again, this is directly out of the patent.  We just saw

6    this.  Again, this is another example in this case of that

7    agent, insurance agent, trying to find out information about

8    a policy that relates to mold.

9              So you see he has made certain selections of

10   inquiry criteria.  He has chosen property.  The next one

11   under coverage would be building, form of coverage basic.

12   And then we'll see in 201(e) there, he selected mold.

13   Right?  And that would be the inquiry criteria, special

14   exposure.  Mold there would be the value.

15             Now, by filling out this form, the seeker is

16   specifying as best he can the kind of question they have.

17   And then using that, the system receives all of that

18   information from the form and can therefore identify the

19   inquiry type.  Again, the inquiry type is what exactly is

20   this person looking for.

21             And the system now has all the information it

22   needs in order to do -- to define that inquiry type and

23   identify the routing identifier that is relevant to that

24   inquiry type.  And then what it can then do is access the

25   skill-set database to go ahead and search that skill-set

1   database to find all the experts that may have the relevant

2   knowledge about mold policies for a property in Texas, and

3   eventually the system finds the right experts and he puts

4   them in contact with the agent.

5            That's kind of how the overall system works

6   within the two patents.

7            Now I want to get into obviously why we're here.

8   Right?  The purpose of this claim construction.

9            So the Court's role, right, is to define the

10  proper scope of the invention.  And it does so by giving

11  meaning to the claim language that the jury might not

12  otherwise understand.

13           Now, this is important because regardless of

14  what each party says, the Court does not need to construe

15  terms that it does not think need to be construed.  That is

16  if the patent uses common everyday language that the jury

17  can understand in the context of the patent, then the Court

18  does not need to act as a Thesaurus and simply substituting

19  other words for the words in the claim if it does not add --

20  if it wouldn't help the jury.

21           Another important point, obviously, that patents

22  aren't necessarily written to laymen.  They are not written

23  to me, they're not necessarily written to you.  They're

24  written to what the law calls these people of ordinary skill

25  in the art.

1          And so for terms that the jury might not

2     otherwise understand, the role of the Court, then, is to

3     instruct the jury on what those terms mean in the context of

4     their use in the patent as they would be understood by one

5     of ordinary skill in the art, which, of course, begs the

6     question, who is this hypothetical person of ordinary skill

7     in the art?

8          Each party has put forth some proposed

9     definitions of what that person would be.  I'm not going to

10    read them to you.  They're written in the briefs.  But, you

11    know, XU's position is it has got to be someone with a

12    Master's degree in computer science that would have some

13    knowledge of what -- of data representation and structure

14    of, data structure and design, because that's really the

15    subject of patents.

16         Cisco's expert, on the other hand, has opined

17    that someone with an electrical engineering degree or

18    someone with a few years of experience in call center

19    technology.  And we don't think either of those are correct.

20    Electrical engineer, they know things like circuit designs,

21    resistors and capacitors and filters and AC voltage and

22    DC voltage.  That's just not what the patents are directed

23    to.

24         And, similarly, we don't think someone with

25    simply a call center technology background would be able to

1    comprehend and understand the full scope of the patents

2    because, again, as I hope I've shown you, we're not directed

3    to the call center.  We've knocked that whole model down.

4    This is not a call center technology.  This is getting rid

5    of the call centers altogether.

6         So Cisco initially identified 25 claim terms it

7    thought the Court needed to construe.  Unless the Court

8    thinks we -- all the parties were being completely

9    unreasonable, we were able to agree on three of those claim

10   terms initially.  Those terms were computer database, having

11   one-to-one correspondence, and predetermined semantically

12   expressed inquiry types.  And that's reflected in Exhibit A

13   to the Joint Claim Construction Statement, which is that

14   Docket No. 124.

15        Now, for the remaining 22 terms, 12 of them come

16   from the '903 patent, ten come from the '709 patent.  And

17   XpertUniverse's position is that many of those terms would

18   be understood by the jury and don't need to be construed at

19   all.  And for others, we would maintain that the ordinary

20   meaning of those terms would be understood by one of

21   ordinary skill in the art in the context of the patents.

22   And, not surprisingly, Cisco disagrees.  In particular,

23   their expert disagrees.  And in support of his opinion that

24   these terms don't have an ordinary meaning, he apparently

25   ran some Google searches.  And if he couldn't find a hit on

1    a particular term, he used that to support his opinion that

2    it didn't have an ordinary meaning.

3              And we certainly disagree with running a Google

4    search as relevant evidence of whether or not something has

5    an ordinary meaning.  In fact, the relevant question for

6    claim construction purposes is whether it has an ordinary

7    meaning in the context of the patent, not in a vacuum or in

8    a Google search.

9              So we would disagree with running a Google

10   search as support to -- supporting an opinion about whether

11   something has an ordinary meaning.  It's just not something

12   that should be considered.

13             But let's go through, if we could, your Honor,

14   some of those terms that XpertUniverse believes do not need

15   to be construed.

16             First is the term match and route system, and

17   those appears in claims 12 through 18 of the '903 patent.

18             We don't think it needs to be construed.

19   Cisco's expert offers no opinion on how it should be

20   construed.  And we think it's clear in the context of the

21   '903 patent that it's a system that connects a seeker with

22   an expert.

23             Claim 12 -- and, again, this is a phrase, I

24   guess, some would say a term, but it's a phrase that appears

25   in the preamble of the claim, and particularly claim 12.

1    And that claim recites a match and route system operable to

2    locate a live expert.

3            And these are common words.  I think the jury

4    would understand them in the context of the '903 patent.

5    That's what the subject matter of both patents really are,

6    is connecting a seeker to an expert.  Match and route system

7    is something simply -- you know, seek and find.  What other

8    words are you going to use?  Match and route system I think

9    is clear.  I don't think it needs to be construed.  I think

10   the jury would understand it, particularly in the fact that

11   it appears in the preamble of the claim.

12           THE COURT:  Since it appears in the preamble in

13   all the claims from 12 to 18, I mean, it's not going to

14   be -- even if it wasn't clear, is there a reason why I would

15   need to construe it?

16           MR. CANTINE:  I don't think it needs to be

17   construed at all.  I don't think it's a limitation, and it's

18   like necessarily the body of the claim, that would be

19   flawed.  But I think that the rest of the claim certainly

20   says the metes and bounds.  The preamble is unnecessary of

21   that.

22           THE COURT:  So basically your position is -- and

23   I've heard you say also its ordinary meaning, but even if it

24   didn't have an ordinary meaning, it's not part of the claim

25   limitation, so why bother?

1    MR. CANTINE: I would agree with that. That

2    would be our position.

3    THE COURT: All right.

4    MR. CANTINE: Turning to the next one, unique

5    numeric routing identifier. This is in claims 1 and 12 of

6    the '903 patent.

7    And I think when considered in the context of

8    the patent, a jury will readily understand what it means.

9    Cisco's expert -- I'm sorry. Cisco's expert

10   opines that the term is not common in the call center or

11   knowledge management arts, but offers no opinion who how it

12   should be construed in the context of the patent.

13   I think a layman would understand that this term

14   is simply referring to a unique number, that that patent

15   refers to a routing identifier. If I can give you an

16   example, Judge, a phone number. And that's a unique number

17   that is used to route telephone call to a particular person.

18   I think these are common everyday terms that the jury can

19   understand that would be used in the context of a patent and

20   doesn't need to be construed.

21   The next one I want to talk about is values.

22   This is in claims 1, 2, 3, 5, 6 and 7 of the '709 patent.

23   Again, it's not a technical term. Cisco's expert agrees

24   that it has no specific meaning in the art, but he offers no

25   opinion on how it should be construed. And I think, as

1    we've gone through here today, we've pointed out how the

2    patents provide specific examples of what a value is, and in

3    the context of that, I think a jury would understand it.

4    It's simply that the choices underneath those various

5    inquiry criterias.

6            THE COURT:  Right.  Essentially, values means

7    choices?

8            MR. CANTINE:  But you're just substituting --

9            THE COURT:  No, no.  I'm not saying -- it's your

10   choice.

11           MR. CANTINE:  I think that's what it means, but

12   when you try to add some language to that to try to really

13   explain it, it just gets meaningless at the end.  It's a

14   term I think the jury could understand, particularly when

15   you look at a form like this and how it's labeled.

16           The next one is underlying criteria.  This is in

17   claim 1 of the '709 patent.  Again, it's not a technical

18   term.

19           Cisco's expert admits that it does not have any

20   specific meaning in the art.  He also --

21           THE COURT:  What is it you think it does mean?

22           MR. CANTINE:  Well, if you look at -- and we've

23   cited it for you here on the second-to-last bullet item.

24           If you look at it in the context of the claim,

25   right, claim 1 says, creating a catalogue of inquiry types

1 classified by one or more underlying criteria.  So the

2 underlying criteria, the core terms define what a user wants

3 and what kind of expertise the company has.

4    THE COURT:  So what's the relationship between

5 underlying criteria and inquiry criteria?

6    MR. CANTINE:  Inquiry criteria, I have to look

7 exactly -- I want to make sure I get it right, your Honor.

8    Well, inquiry criteria is another one.  Inquiry

9 criteria are similar to inquiry type.

10    THE COURT:  No, but I'm wondering, what's

11 the relationship to inquiry criteria and underlying

12 criteria?

13    MR. CANTINE:  Let me just take a look and see

14 how we use it in a patent, your Honor.

15    (Pause.)

16    MR. CANTINE:  I'm sorry.  So the difference

17 between inquiry criteria and inquiry types, was that the

18 question?

19    THE COURT:  No.  Actually, inquiry criteria and

20 underlying criteria.

21    MR. CANTINE:  Oh, well, I think they are

22 similar.  The underlying criteria as used in this particular

23 aspect of claim 1 relates to the inquiry types.  All right?

24 And the underlying criteria, again, as used in claim 1 also

25 relates to those inquiry criteria and the values.

1      THE COURT:  Well, I mean, I guess my point is,

2  one would think that inquiry criteria means something

3  different than underlying criteria, and I'm wondering if you

4  can tell me what that is.

5      MR. CANTINE:  Well, inquiry -- as we've defined

6  it, as we proposed in the terms of organized collections of

7  types of assistance requested.  And obviously it's a similar

8  term.  I think they're related, but the idea of the criteria

9  is simply -- maybe I can back up and tell you what it's all

10  about and then talk about maybe how to exactly define it.

11      But if you think about an organization that's

12  going to set up a system like this, first, they've got to

13  look at what their products are, what their services are,

14  what customers may be calling in about.  Then they've got to

15  look at who their experts are.  They've got to think about

16  how they're going to relate those two.  And so when they're

17  building the system, they're going to set up the types of

18  questions the seeker is going to ask.  That's all the

19  underlying considerations of how you're going to be able to

20  tie the question to the expertise.

21      And so when they're thinking about designing the

22  system like this and they've got to come up with those

23  inquiry criterias of what we're going to let a seeker ask

24  and how we're going to match it to an expert, that -- it's

25  that concept, that underlying criteria that the company is

1    going to be considering as they're setting up the system.

2    That's what the term means in terms of underlying criteria.

3    I don't know necessarily how to -- better to put that into

4    words that's going to be helpful to the jury than just

5    underlying criteria.  I don't know if that makes sense or

6    not.

7                THE COURT:  Well, let me see, let me ask a

8    question, see whether you would agree with this, which

9    is the underlying -- underlying criteria are not -- it

10    seems like the difference possibly between underlying

11    criteria and inquiry criteria is inquiry criteria is the

12    criteria in this get assistance page or interactive problem

13    definition page, or it's the criteria in connection with

14    the invention, whereas the underlying criteria is whatever

15    the same thing is, but in sort of connection with business?

16                MR. CANTINE:  I think that is right.  You know,

17    the underlying criteria is almost like the thought process

18    and the various considerations the company is going to go

19    for, consider in building the system.  Right?  Matching up

20    its products --

21                THE COURT:  So the inquiry criteria is supposed

22    to reflect the underlying criteria?

23                MR. CANTINE:  I think the inquiry criteria is

24    certainly part of the get assistance page.  Right?  Those

25    are those pre-selected criteria values, those terms that

1    organize the types of assistance that are going to be

2    offered to a seeker.

3              THE COURT:  All right.

4              MR. CANTINE:  Okay?  So I was going to move on

5    to some of the -- we've put in a bucket, right, certain

6    terms that we don't think need to be construed at all.  Now

7    let's go through some of the ones that we think are critical

8    to the interpretation of both patents as we go forward.  As

9    I said, I'm not going to talk about all of them.  But, you

10   know, obviously, I want the Court to look at to help define

11   what those terms mean.

12             We know the intrinsic evidence, the prosecution

13   history.  Then there's extrinsic evidence, the inventor

14   testimony, expert testimony.  The leading case on this is

15   Phillips cited by both parties in their briefs.  I don't

16   think there's any dispute on that.

17             But Cisco does take a number of shots at

18   XpertUniverse in somehow suggesting that we're asking the

19   Court to rely solely on extrinsic evidence in interpreting

20   these patent claims, and we're not doing anything of the

21   like.  We've cited to the intrinsic record within our briefs

22   and in these slides.

23             But, more importantly, there's nothing wrong

24   with the Court considering extrinsic evidence.  Right?

25   Phillips clearly says you're allowed to consider extrinsic

1      evidence so long as it doesn't contradict the intrinsic

2      evidence.  So I don't want the Court to get the impression

3      that somehow it's improper to consider or think about or

4      refer to some of the extrinsic evidence that both sides have

5      put forward in their expert declarations.

6                    That being said, let's move on to inquiry types.

7      All right?  This is, I think, one of the critical terms.

8      It's used in both patents.  Both parties agree that it

9      should be -- however it's interpreted, it should be the same

10     for both patents.

11                   XpertUniverse's proposed construction is terms

12     that organize and identify categories of assistance

13     required.

14                   Now, what's important, what I wanted to point

15     out to the Judge, to your Honor, is that I mentioned

16     earlier, you know, that we were able to agree on three terms

17     that were originally proposed by Cisco.  One of those we've

18     indicated here for you, it's this predetermined and

19     semantically expressed inquiry types.  All right?

20                   So we've got inquiry types.  That's part of

21     what we agreed to already.  And it's predetermined

22     semantically expressed.  What does that mean?  All right.

23     That's this last portion of what we agreed to, created

24     prior to use and expressed using language that is humanly

25     understandable.

1          So what did the parties already agree inquiry

2     types mean?  Here, terms that organize and identify

3     categories of assistance requested, exactly what

4     XpertUniverse is proposing for that term.  Cisco already

5     agreed with that.  We don't see any reason why they should

6     be backtracking on that.  We think it's an appropriate

7     interpretation of inquiry types as reflected, and the

8     parties already agreed to that.  We don't see any reason why

9     that should change, which leads us to layers of inquiry

10    types, another important one.

11         So if we've already agreed that inquiry types

12    refers to terms that organize and identify categories of

13    assistance requested, then what's a layer of inquiry types?

14    XpertUniverse's position is that it's a particular grouping

15    of those inquiry types.  And I created this graphic for you

16    to try to explain that.  All right?

17         So at the top here, we have essentially what is

18    a get assistance page (indicating) that a seeker is going to

19    be presented with.  This one, just to simplify it, we're

20    going to get three choices.  And to simplify it even more,

21    let's assume those choices are simply yes/no.  It doesn't

22    make a lot of sense, but that's an easy example.  Right?

23         So if a user selects yes, yes, yes for those

24    three choices, he may be routed to inquiry type number

25    one.  That may result in inquiry type number one being

1    generated.  If he's presented with the same get assistance

2    page, but he now answers yes, yes, no, then the inquiry type

3    may be number two.  And, again, if he's presented with the

4    same get assistance page, he may answer no, yes, yes, which

5    would lead to inquiry type number three (indicating).

6    All right?

7              So these are all inquiry types that could be

8    generated from the same get assistance page, and that is

9    exactly what a layer of inquiry types is.  All right?

10             So it's a particular grouping of the various

11   terms that organize and identify categories of assistance

12   requested.

13             THE COURT:  And it seems like Cisco's proposal

14   for layer is essentially defined set.  Is there any

15   difference between a defined set and a particular

16   improvement?

17             MR. CANTINE:  You know, I don't know.  They'll

18   have to tell us exactly what they mean by defined set.

19             THE COURT:  Maybe they'll point to that and say

20   they mean that.

21             MR. CANTINE:  Right.  I guess, you know, as long

22   as it's inclusive of the fact that there are -- I don't know

23   the math, whether this is one of those 2 to the N things,

24   but however many choices you're providing, the number of

25   inquiry types that could be generated from one particular

1    get assistance page.  As long as the definition of layer

2    inquiry types would include all of those, I think ours does,

3    their proposal for defined set --

4              THE COURT:  Just using the English language, the

5    difference between a defined set in a particular grouping,

6    it's not clear to me there's actually a difference.

7              MR. CANTINE:  And there may not be, but I would

8    suggest that the remainder of theirs, right --

9              THE COURT:  I understand.

10             MR. CANTINE:  All right.

11             THE COURT:  -- there may be a difference on the

12   remainder.

13             MR. CANTINE:  Right.

14             And maybe we're splitting hairs, but, you know,

15   lawyers, they like their language and not the other guy's

16   language primarily, but there may not be a substantive

17   difference between the defined set and particular grouping,

18   and we can get agreement on that.

19             The next one I want to talk about is skill-set

20   database.  This is out of the '903 patent, claims 1 and 12.

21             XpertUniverse proposed -- had this proposal.

22   Basically, a database for storing associations between all

23   these various fields.  And as we described earlier, as we've

24   gone through the example, I pointed out that skill-set

25   database has to have all that information in order to use

1    the routing identifier to find the right expert that it's

2    looking for.

3              So we had suggested originally this storing

4    associations concept, and then we identified what all those

5    associations may include.

6              Cisco's original proposal is simply that

7    skill-set database included basically a list of the experts.

8    I think they recognized the error in that because in their

9    reply brief, they've now -- they made an offer to change

10   their proposed construction.  I'm not sure if it's a binding

11   offer.  But, anyway, now they recognize that skill-set

12   database is more than just a list of experts, so they've

13   offered up this proposed construction with stores

14   associations, which is, again, similar to what we offered.

15             But, again, I think that they've been too

16   limiting in the various associations that are stored within

17   that skill-set database because it fails to account for all

18   the associations that are found in the patent.

19             The specification -- we provided you the cite

20   there -- specifically says that the skill-set database

21   includes entries that associate one or more experts with one

22   or more inquiry types and its corresponding layers.  And it

23   also, and others say where the database stores association

24   between profiles and seekers, the experts, business

25   interest, cost information, other related factors.  All of

 1    that support -- supports, I'm sorry, the various

 2    associations that XpertUniverse has put forth in its

 3    proposal, and I think it establishes why Cisco's is too

 4    narrow.

 5              And one other -- any questions there?

 6              THE COURT:  Why don't you go on.  I'm thinking

 7    about it.

 8              MR. CANTINE:  Okay.  The other aspect,

 9    obviously, that we would object to in their proposed

10    construction is this concept of unique knowledge.  And this

11    permeates a few of their proposed constructions, which is on

12    the next slide.

13              THE COURT:  Yes.  I'm not sure unique knowledge

14    seems to be -- to be too high of a standard.  I thought

15    somewhere I saw the word "individualized."

16              MR. CANTINE:  Well, that's the claim language.

17              THE COURT:  Right.  It seems like something less

18    than unique.

19              MR. CANTINE:  We would certainly agree with

20    that, your Honor.  I think the patent explicitly supports

21    that.  It contemplates more than one expert being able to

22    answer the question and therefore using some other factor

23    other than their knowledge to rank those experts.

24              One could be because you've got the VIP coming

25    in and you want to give him the best available expert, but

1    if you've got somebody else coming in that's not the VIP,

2    maybe cost would be a consideration of what kind of expert

3    you're going to make available to that person.  So the two

4    experts don't have -- they can have the same knowledge, but

5    the system can use other factors to determine who is going

6    to get a call.

7              So I would agree with you, your Honor, I think

8    this concept of having unique knowledge is contrary to the

9    specification, explicitly contrary to the specification that

10   provides for the situation where two experts can have the

11   same knowledge and makes -- compensates for that, I guess is

12   what I would say.  It accommodates that by using other

13   information in order to figure out who is going to get the

14   call.

15             So why don't we move on to the next one.

16             Interactive problem definition page.  This is in

17   claims 1 and 6 of the '709 patent.  Essentially, Cisco's

18   proposal would limit it to just a graphical user and

19   interface.  Again, this is a situation where we think a

20   specification is explicitly broader than that.  There's no

21   doubt it identifies graphical user interface as one

22   potential option.

23             THE COURT:  By the way, is there any difference

24   between a graphical user interface and a graphic user

25   interface?

1          MR. CANTINE:  Graphic?  I wouldn't -- I can't

2     think of a difference off the top of my head.

3          THE COURT:  All right.

4          MR. CANTINE:  But I think the points we want to

5     make is that a graphical user interface simply is just one

6     option that's identified in the patent.  I think it

7     describes a much broader application.  It refers to simply a

8     responsive interface.

9          THE COURT:  I'm sorry.  Where is that?  That is

10    figure --

11         MR. CANTINE:  Figure 3B in the various cites

12    here we've provided you.

13         THE COURT:  Hold on just a second.

14         MR. CANTINE:  Okay.

15         (Pause.)

16         THE COURT:  So I'm just looking at figure 3B,

17    looking for the words of responsive interface.  I don't see

18    it there, so it must be somewhere in Column 2.

19         So where does the word "responsive" appear

20    exactly, or responsive interface?

21         MR. CANTINE:  I'm looking through our cites as

22    well, your Honor.  I would tell you at column 5, it talks

23    about concept in this pull-down list that we were talking

24    about earlier.  But rather than try to do in on the fly, can

25    I get back to you exactly where that cite is?  My colleague,

1    Bill, I'm sure can be looking for that as we go on.  Maybe

2    he can find that for me.

3                    THE COURT:  Yes.  You can do that in rebuttal.

4                    MR. CANTINE:  All right.  The other point we

5    want to make on this particular one is that the remainder of

6    Cisco's proposed definition, which talks about displaying

7    these inquiry criteria and values, that's already present in

8    other aspects of the claim, claim 1 already requires

9    presenting inquiry criteria and values.  Interactive

10   definition page.

11                   So if you plugged in their definition, we're

12   going to have this presenting step twice.  We think it's a

13   little bit redundant.

14                   THE COURT:  No.  I noticed that in quite a few

15   of their proposals.

16                   MR. CANTINE:  Right.  I think they had a lot of

17   functional -- unnecessary functional-type qualifiers in some

18   of their things, and this is one, again, that kind of

19   permeates a lot of it.

20                   THE COURT:  I don't doubt what you say here, but

21   let me just...

22                   (Pause.)

23                   THE COURT:  Right.  Okay.  Go ahead.

24                   MR. CANTINE:  All right.  So the next one,

25   actually the last one, your Honor, that I wanted to talk

1    about today is plurality of monitors.  Again, this is one

2    that permeates a few -- a few of the proposed constructions.

3    This is the '709 patent, claims 5 and 7.

4              I think the main point we have is, is to the

5    extent Cisco's proposal of two or more computer screens is

6    intended to imply or suggest that that is some sort of dumb

7    terminal, we think the patent is much broader than that.  It

8    refers to a number of responsive interfaces that could be

9    used by a seeker.  We've identified those for you here in

10   this list of specific cites.

11             It talks about white boards and tablets and

12   other devices.  Computer display is just one.  General

13   interactive page.  Graphical --

14             THE COURT:  I can't remember.  It was one of the

15   two patents where it was listing a bunch of things and it

16   said cell phones?  Is that this one?

17             MR. CANTINE:  When it talked about the

18   multi-media computer?

19             THE COURT:  I don't remember.  I just remember

20   seeing cell phones.  Maybe it was in a different context.

21             MR. CANTINE:  I don't remember off the top of my

22   head, your Honor, but certainly that's something --

23             THE COURT:  All right.

24             MR. CANTINE:  -- we'll take a look at.

25             But I think the point that we're trying to make

1    is, certainly in claim 5, right, I quoted it for you at the

2    bottom here.  It talks about the database being connected to

3    this plurality of monitors and presenting these things in an

4    interactive manner.

5              THE COURT:  Well, so, isn't, you know, what you

6    just said about Cisco, isn't this applicable to you here,

7    where the plurality of monitors, if you include interactive,

8    aren't you kind of making that redundant there?

9              MR. CANTINE:  I wouldn't say we're quite as

10   guilty.  No.  I think if you look at, again, in the context

11   of claim 5 here, so a database connected to a plurality of

12   interactive communication devices presenting the quantity of

13   criteria and values --

14             THE COURT:  How can interactive manner be not

15   just redundant under what you have just read?

16             MR. CANTINE:  It's a little bit redundant, I

17   would agree with you.

18             THE COURT:  So doesn't that suggest that

19   interactive is probably not something that you should make

20   as part of the definition of plurality of monitors?

21             MR. CANTINE:  Well, I think to the extent we're

22   going to define -- first of all, this may be another one

23   that doesn't need construction at all, but to the extent

24   we're going to construe it, I think adding the interactive

25   aspect to that monitor, as we've suggested, actually -- it's

1  a little bit redundant, but I think it's important, because

2  it's part of the whole point of the patent, is to have this

3  interactivity with the --

4           THE COURT:  I mean, certainly computer screens

5  by itself doesn't, to me, eliminate interactivity.

6           MR. CANTINE:  In our view, it suggests some sort

7  of cathode ray tube, big old computer screen, and we think

8  certainly a communication device would be something that's a

9  little bit broader than a computer screen, and I think a

10  patent would support the broader interpretation we're

11  offering, leaving the interactive part of it aside.

12           THE COURT:  Well, I mean, I guess to the

13  extent -- if you are looking at your Apple iPhone, you can

14  be looking at a computer screen.  Right?

15           MR. CANTINE:  Right.  I guess we would debate

16  whether there's a computer screen or more of a general

17  communication device.  I'm not trying to split hairs, but

18  I think that computer screen is overly limiting, given

19  support in the spec for other types of communication

20  devices.

21           THE COURT:  The only thing is, communication

22  devices, interactive communication devices includes

23  walkie-talkies.  Right?  Those of you who are old enough to

24  remember what they are.

25           MR. CANTINE:  I remember what they are.  Whether

1    it would include that, I'm not sure in the context of the

2    patent whether a walkie-talkie would be something we would

3    consider to be an interactive communication device.

4           THE COURT:  And maybe there would be other parts

5    of the patent that ruled it out.

6           MR. CANTINE:  Right.

7           THE COURT:  Just the term, interactive

8    communication devices, you know, that, at least to me, that

9    includes intercom systems, and it includes anything, really,

10   other than talking face to face.

11          MR. CANTINE:  I guess let's look at the context

12   right in claim 5 we've quoted there.  The database is

13   connected to this plurality of monitors presenting.  So

14   we've got the presenting step there.  Whether a

15   walkie-talkie is presenting, you know, various choices is

16   probably debatable at best.

17          THE COURT:  Well, right.

18          MR. CANTINE:  Right?  So in the context of the

19   claim, you know, we've got, I think, our suggestion is just

20   a communication device presenting.  It suggests there's some

21   visual aspect of it there, but a lot of these -- let me

22   leave it at that.

23          THE COURT:  Well, I mean, monitor does suggest a

24   visual device, so if you are talking about a communication

25   device with a visual screen, or something like that, would

1    you say that's what it means?

2              MR. CANTINE:  I think it's something along those

3    lines, but, again, you know, are we getting into the realm

4    of we're just adding the words to something that --

5              THE COURT:  Well, and I understand that.

6              MR. CANTINE:  Yes.

7              THE COURT:  Partly, I'm just trying to -- if you

8    figure out what it means, then you can figure out whether or

9    not you're just adding words.

10             MR. CANTINE:  Yes.  I think, clearly, in the

11   context, right, so you've got the seeker has to fill out

12   this interactive form.  So it has to be some sort of

13   interactive concept.

14             The other thing I would point out, what we were

15   talking about earlier about this interactive problem

16   definition page and this graphical user interface,

17   essentially, it would not accommodate blind people if it's

18   simply a graphical user interface, which is against the law

19   these days.

20             I'm sure Cisco wants their products to be

21   compliant with the law and work with everybody.  But we're

22   kind of getting back to the same thing here.  We're talking

23   about in the context of the claim.  Right?  This database

24   needs to be connected to these quote unquote "monitors" to

25   present the inquiry criteria and values to the seeker in an

1    interactive manner.

2            You know, I think presenting those various

3    choices to the seeker via a communication device makes more

4    sense than a computer screen.  If we want to drop off

5    interactive because it's already reflected in the rest of

6    the claim, you know, I think we would be -- we think it

7    should stay, but if that's the choice, we drop interactive

8    and keep communication device rather than computer screens.

9            THE COURT:  All right.

10           MR. CANTINE:  Okay?

11           THE COURT:  Okay.

12           MR. CANTINE:  And, your Honor, again, I touched

13   on about ten of the 22.  I would be happy to talk about some

14   of the things on rebuttal, but we'll stand by our briefs on

15   the remainder of those.

16           THE COURT:  All right.

17           MR. CANTINE:  Thank you very much.

18           MR. SCHUMAN:  Good morning, your Honor.

19           THE COURT:  Good morning.

20           MR. SCHUMAN:  Brett Schuman from Morgan Lewis on

21   behalf of Cisco Systems.

22           We, too, have a very brief background section,

23   and then we'll get right into the claim terms.

24           THE COURT:  Right.

25           MR. SCHUMAN:  As Mr. Cantine indicated, there is

1    a dispute in this Markman hearing to what the level of one

2    of ordinary skill in the art should be.

3            THE COURT:  Well, I mean, I guess in a way I'm

4    just wondering the differences between a Master's degree

5    and a Bachelor's degree and three to five years' experience

6    and stuff.  They're some pretty fine lines, don't you

7    think?

8            MR. SCHUMAN:  I think they are fine lines and I

9    don't think it's particularly relevant as long as the Court

10   is willing to look at these terms and construe them so that

11   the jury can understand them.  And there's some law on this,

12   though, and we just have two slides here.

13           Phillips addresses this concept of interpreting

14   a patent from the perspective of one of ordinary skill

15   in the art.  And what Phillips says is that the starting

16   point is based on the well-settled understanding that

17   inventors are typically persons skilled in the field of the

18   invention.  And there's another case we cite from the

19   Federal Circuit, CCS Fitness, which also says, inventors are

20   assumed to be one of ordinary skill in the art.  The

21   inventors, by definition, have to understand what they have

22   invented and described.  And XpertUniverse has provided a

23   declaration from an expert witness, extrinsic evidence, Dr.

24   Nourbakhsh, who says you have to have a Master's degree to

25   understand the complicated principles in these invention.

1    Not a single one of the inventors has a Master's degree,

2    your Honor.

3              THE COURT:  Is this something that's in the

4    record?

5              MR. SCHUMAN:  It's -- it is in evidence.  It is

6    not in the record here because it was the first time in the

7    reply declaration, which I would submit is inappropriate to

8    begin with.  They submitted a reply declaration where their

9    expert --

10             THE COURT:  All right.  So you say is in

11   evidence, but not in the record.  What do you mean is in

12   evidence?

13             MR. SCHUMAN:  Meaning documents -- in the

14   documents that were produced by XpertUniverse are the

15   credentials and C.V.s of these people.

16             THE COURT:  All right.  But these are not things

17   I have?

18             MR. SCHUMAN:  They're not.

19             THE COURT:  Okay.

20             MR. SCHUMAN:  But the point here, your Honor, is

21   that XpertUniverse has attempted to generate an issue

22   through their reply declaration that Dr. Nourbakhsh is a

23   person with the right skill in the art to help this Court

24   understand the patent because he has a Master's in computer

25   science whereas Dr. Forys does not.  And the point is that

1    none of the inventors do either.

2           So when you look at what the law says about

3    ordinary skill in the art, I would agree with what your

4    Honor said before we started this slide, that we're

5    splitting hairs here a little bit, whether you have a

6    Master's in computer science or not.  The law says a person

7    of ordinary skill in the art here is not somebody with a

8    Master's degree.

9           THE COURT:  Somebody with a B.A. in history.  I

10    like that.

11           MR. SCHUMAN:  I understand these patents, your

12    Honor, and I don't have a B.A. in computer science or a

13    Master's in computer science.

14           These are basic principles.  The briefs, your

15    Honor, the Markman briefs, Cisco is accused of misusing the

16    specification to limit broader claims.  We disagree with

17    that.  And I think your Honor is better with the -- the

18    primary role of the specification in claim construction is

19    really the best place to figure out what the inventors meant

20    because claim language is terse, and if the process works,

21    the specification elaborates on what the claims mean.

22           Very briefly, your Honor, Mr. Cantine described

23    the breadth and scope and I think he used some terms

24    describing the breakthroughs and how XpertUniverse's

25    products, products that embody the invention supposedly

1    broke down the barriers of the call center and reached out

2    into the enterprise and solved this problem of having pools

3    of experts, which made for a very difficult process of

4    creating matching route systems.

5          Very few slides on the technology that we're

6    talking about here.  This is right out of the specification

7    of the '903 patent.

8          What they are saying they invented here -- this

9    is the background of the invention section -- is an improved

10   match and route system, so match and route systems have been

11   developed which are capable of connecting a seeker

12   requesting information to an expert.

13         The same point appears in the '703 patent, your

14   Honor.  The '703 patent, background of the invention,

15   describes that the interface being claimed in that patent

16   is an embodiment of a match and route system platform.

17   And the '709 patent purports to cover the interface and the

18   look and feel of that interface for the match and route

19   system.

20         So we're talking here about match and route

21   systems.  And there are a number of match and route systems

22   that were out there prior to XpertUniverse's filing of these

23   patents, and these are all mentioned in Dr. Forys'

24   declaration, the primary offer of which is to provide the

25   Court with some background on the -- on the technology here,

```
 1    and not to tell the Court what the claim construction should
 2    be.  Dr. Forys and Cisco does not believe that that is the
 3    role of an expert in claim construction.
 4              One of those products -- and this illuminates, I
 5    think, your Honor, one of the points that Mr. Cantine was
 6    making.  This is an example right out of the manual for this
 7    product.  Dr. Forys reviewed it in preparation of his
 8    declaration and described it in his declaration.
 9              This is an example of a match and route system
10    that uses pools or groups of experts.  And the way it works
11    is, you create a routing script.  The example here is given
12    Massachusetts sales script, which will look for the longest
13    available agent in the Northeast sales skill group.  And
14    that's a group of -- it's a pre-populated group of people.
15    You list the people's names:  Chris, Bob, John, Paul.  And
16    then you schedule that script to run whenever there's a call
17    type that comes in that fits the classification
18    Massachusetts sales type of -- it was in the manual.
19              When a caller dials the 800 number from a phone
20    with a 508 area code, he or she is prompted with a menu.
21    The caller enters 1 for sales help.  And then a route
22    request is sent to the match and route software, the ICM
23    software.  The software examines the dialed number, which is
24    the 1800 number.  It examines the CLID value and determines
25    that the prefix is 508, which indicates the call is coming
```

1    from Massachusetts.

2           So now the software knows we have a call coming

3    from Massachusetts.  At step 9, the software also knows that

4    1 has been indicated, a selection has been made, which

5    indicates that it's a sales call.  So now the software know

6    it's a call from Massachusetts seeking sales to this 1800

7    number.

8           The ICM software determines that the call type

9    is Massachusetts sales, and executes the Massachusetts sales

10   script, and then the ICM software assigns the task to a

11   particular agent, which is somebody defined to be included

12   in the Northeast sales skill group.

13          That's one example of a prior art system

14   matching and routing incoming calls, contacts, e-mails,

15   inquiry, what have you, to an agent or an expert who can

16   help.

17          This is another example of a prior art matching

18   and routing system described by Dr. Forys in his

19   declaration.  And this one is different, your Honor.  And

20   here's an example, again, right out of the manual for the

21   Genesys University Routing Solution.

22          The example here is a customer is a premier

23   level client, premier level client from France who wants to

24   make a stock trade, and he requires an experienced agent who

25   is fluent in French and has knowledge of stock trading.  And

1   then the system, Universal Routing, allows you to create a

2   strategy that segments based on skill and skill level and

3   for account level language in stock trading.

4           The interaction could then be routed to an agent

5   who has a high level skill in French and a medium level

6   skill in stocks.  So an expert in stocks or having an

7   expert -- expert level command of French.

8           And here's the key difference between this

9   prior art match and route system and the Cisco prior art

10  match and route system we described.  You do not have to

11  have a group, you do not have to group together agents

12  according to skill type or level in the Genesys solution.

13  Your agent stores agents profiles and creates a list

14  of agents available for each interaction based on the

15  skills needed for handling the interaction.  URS uses stat

16  server to determine the most available agent who has these

17  skills.

18          So this is a different way, a different prior

19  art system for matching and routing.

20          Dr. Forys, your Honor, also describes an

21  application that Genesys had available on the market prior

22  to the time XpertUniverse filed these applications, and this

23  by way of response to what Mr. Cantine said.  I know we're

24  not here to argue would it have been prior art.  But they

25  had an application running on this routing server called

1    Expert Contact, which was explicitly to get outside of the

2    contact center.

3                Mr. Cantine pointed out that one of the features

4    of XpertUniverse's solution embodied in these patents that

5    we are here to talk about today is that it -- I think his

6    quote was, knocked down the whole call center model.

7                First of all, I would just point out, and I know

8    the Court appreciates this, this is not described in the

9    patent.  We're here to interpret the patents.  The patents

10   don't talk about knocking down the call center model.  The

11   patents talk about matching and routing systems.

12               These matching and routing systems, these prior

13   art systems, broke down the call center model long before

14   XpertUniverse filed its patent.

15               Expert contacts from Genesys described by Dr.

16   Forys in paragraph 25 of his declaration used this

17   technology explicitly to route callers, contacts, seekers,

18   users, to call center agents or to experts with expertise

19   outside of the traditional call center.

20               The third and final prior art system I will

21   describe, which also is a match and route system described

22   by Dr. Forys in his declaration, paragraph 24, the Siemens

23   Hi-Path, and is very similar to the Genesys system described

24   in the prior side.  Siemens calls this resumé routing.  This

25   product came out in 1999, so many years before the patent

1    here.  Interestingly, a different company, different manual,

2    a very similar example.  Instead of somebody who speaks

3    French wanting information about stock trade, in the Siemens

4    manual they talk about somebody who wants to get help

5    regarding stock -- stock transaction in Spanish.  Using the

6    ProCenter Suite, you express your customers requirements in

7    simple, yet precise logical expressions.  For example, Acme

8    Capital Management offers brokerage services and financial

9    counseling to their customers.  Some of Acme's customers

10    speak only Spanish.  These customers might require an agent

11    who has both the Spanish skill and the stock funds skill,

12    for example.

13         And this is how the software expresses it,

14    somebody who speaks Spanish with a proficiency level of

15    five and someone who speaks -- someone who has a competency

16    level of seven with stock fund transactions.

17         When defining the call requirements, you define

18    the skills and skill levels defined, required by the

19    transactions.  The ProCenter Suite compares the call

20    requirements to your agents' resumés, so the specific skills

21    listed on the agents' resumes.  To determine which agents

22    are eligible to handle a transaction, the group of eligible

23    agents is called a virtual group.

24         The virtual group of agents qualified to handle

25    Spanish 5 and Stock Funds 7 transaction can be identified as

1    the stocks Spanish Virtual Group, and it's expressed there.

2    And then the call is matched and routed on according to this

3    technology.

4              So these are some of the prior art systems that

5    existed out there prior to XpertUniverse's filing of its

6    patents.

7              Mr. Cantine acknowledges and, of course, the

8    Court knows this, but the '709 patent, the other patent

9    asserted here, covers the look and feel of the interface to

10   the match and route system.  And, of course, there are a

11   number of prior art interfaces that we're all aware of.

12   Obviously, Mr. Cantine described interactive voice response

13   systems, IVRs, and those come in multiple flavors.  One

14   flavor has been around I think Dr. Forys says since the

15   eighties.  Just the touchtone.  You touch one for sales,

16   touch two for support, and so on down the menu.

17             In the nineties, they added voice recognition,

18   so you no longer have to push the buttons.  You can just

19   speak.  We've all used those systems.

20             Chat or e-mail-based interfaces have been around

21   since before XpertUniverse filed the patents.  And also

22   web-based interfaces.  And I think the key point there is

23   that, again, this is just by way of background.  We know,

24   it's widely known that web-based interfaces to match and

25   route systems existed before.

1      The question we're here to decide today is,

2 using the claims that -- using the claim terms we're here to

3 interpret, what specifically was novel and what was patented

4 with respect to the web-based interface described in the

5 '709 patent?  What is different about this one than the

6 prior art interfaces?  That's where these terms were.

7      That's why we think these terms need to be

8 construed.  As Mr. Cantine -- XpertUniverse has taken a

9 different position here, your Honor, than they've taken in

10 all prior briefing.  Initially and through all the briefing,

11 XpertUniverse's position is that none of the terms in either

12 of these patents need to be construed.  Today we heard that

13 at least -- I think I counted five -- need to be construed.

14 We need to construe these terms to understand how these

15 patents are different and claim something different than

16 these prior art systems.

17      So as Mr. Blumenfeld said, Ms. Walsh and I

18 are going to trade off terms.  We'll deal with the '709

19 patent.  And subject to any guidance from the Court, we do

20 plan to just go through the terms that were briefed for the

21 Court.

22      THE COURT:  That's fine.

23      MR. SCHUMAN:  So the '709 patent, your Honor,

24 with only a little bit more background, the '709 patent, the

25 summary of invention section and the disclosure here is

```
 1    pretty thin, but the summary of invention section and the
 2    detailed description of the illustrative embodiments
 3    describes this patent as covering the look and feel of the
 4    interface for a match and route system platform, and this is
 5    from the specification in column 2.  It's at lines 15 to 19
 6    and it appears again at 33 to 38.
 7              Association -- associated with the system, the
 8    match and route system, is a set of inquiry criteria, a set
 9    of clients, a set of users, and a series of user interface
10    configuration selections which control the look and feel of
11    the platform.  And very similar language appears at column
12    2, 33, to 38.
13              So this patent, we view it as the look and
14    feel patent because that's what it describes, and that --
15    we will get to that when we get to what is an interactive
16    problem definition page.  One of the terms that we have
17    said all along needs to be construed here, and that
18    XpertUniverse --
19              THE COURT:  You say you view it as a look and
20    feel patent.  Is that some category I'm supposed to
21    recognize?
22              MR. SCHUMAN:  No, no, no, no.  I'm just reading
23    from the specification, your Honor.
24              THE COURT:  Okay.
25              MR. SCHUMAN:  I'm not talking about product-by-
```

```
 1    process patents, or any of those terms that existed --

 2              THE COURT:  Okay.  Okay.

 3              MR. SCHUMAN:  Yes.

 4              THE COURT:  I just wanted to -- all right.

 5    Good.

 6              MR. SCHUMAN:  I think to simplify, it is as

 7    Mr. Cantine described, there's a relationship between these

 8    two patents, and I think the Court appreciates that.

 9    XpertUniverse had a product.  It was called Expert Share,

10    Knowledge Share, and it embodied these concepts.  The

11    patents are related.  And in order to think about them, the

12    '709, the claims in the '709 explicitly cover this

13    interactive problem definition page.

14              THE COURT:  But the patents, I mean, they do

15    seem to be related, but is there any reference back and

16    forth in any place between the two of them so that things

17    that are in one patent are not intrinsic -- are, you know,

18    somehow relevant to construction in the other patent?

19              MR. SCHUMAN:  So they're same terms, so inquiry

20    types is a term that has been proposed for a construction

21    here today that appears in both patents.  They both describe

22    the match and route system and the background of the

23    invention and then -- and there is unclaimed disclosure,

24    your Honor, in the specification of the '709 patent that

25    describes the routing functionality claimed in the '903
```

```
1    patent.
2              And, similarly, the '903 patent, your Honor, has
3    figure 2, which is the get assistance page, which is also
4    depicted and claimed in the '709.
5              So there's a lot of overlap between the
6    specification and the referencing in both patents.
7              THE COURT:  Exactly the same in both patents?
8              MR. SCHUMAN:  Figure 2, your Honor, of the '709
9    is the get assistance page.
10             THE COURT:  Right.
11             MR. SCHUMAN:  Okay?  Figure 2 of the '903
12   patent, your Honor, is also the get assistance page.  Do you
13   see it down there at the bottom?
14             THE COURT:  All right.  Yes.  I see -- not
15   exactly the same, but it is called get assistance Web page,
16   or get assistance page.
17             MR. SCHUMAN:  Right.  And in column 4 of the
18   '903 patent, your Honor, the disclosure, figure 2.  So the
19   portion of the specification describing that figure I just
20   directed you to.
21             THE COURT:  So figure 4 of the '709 patent?
22             MR. SCHUMAN:  I'm sorry.  Column 4.
23             THE COURT:  Column 4?
24             MR. SCHUMAN:  Of the '903 patent.
25             THE COURT:  I'm sorry.  Column 4 of the '903
```

1      patent.  What am I looking for?

2                    MR. SCHUMAN:  Starting at line 42, where it says

3      figure 2.

4                    THE COURT:  Right.

5                    MR. SCHUMAN:  This describes the get assistance

6      page of the interface and describes inquiry types and

7      inquiry criteria being depicted on that page, which is

8      what's claimed in the '709 patent.

9                    THE COURT:  And I noticed before, I think the

10     inventors on both patents are the same, but they were

11     essentially prosecuted separately?

12                   MR. SCHUMAN:  Well, they were prosecuted

13     concurrently, I would say.

14                   THE COURT:  But I mean --

15                   MR. SCHUMAN:  One is not a divisional of the

16     other.  One is not a continuation of the other.  They were

17     filed -- the '709 claims priority to a provisional

18     application filed in April of 04, but the application itself

19     was filed March 31st, '05, whereas the '903 application was

20     filed January of '05, so they were prosecuted concurrently

21     with the same named inventors.  Correct.

22                   THE COURT:  Okay.

23                   MR. SCHUMAN:  Okay?  So Ms. Walsh is going to

24     address subject list style.

25                   THE COURT:  All right.

1      MS. WALSH:  So here the terms is a subject list

2   style.  And Cisco's construction reflects that a subject

3   list style is a graphical representation of the logical

4   structure of the list of inquiry criteria and values and the

5   relationships that are shown in that list.

6      By contrast, XU's construction states that the

7   subject list style is the structural format for the

8   interface used to enter information.  Basically, the

9   difference between the two comes down to the fact that

10  Cisco's reflects that the subject list style is a graphical

11  representation.

12     And as we see from the specification, in several

13  different places, the specification clearly states that the

14  subject list styles are presented to a user in an

15  interactive problem definition page.

16     So the subject list style is what the user sees

17  in order to formulate his or her query.  So a person in the

18  abstract, such as subject list, is then presented to a user

19  in an interactive problem definition page, and then very

20  similar, if not the same language, again, in column 1 of the

21  '709 patent.

22     And then, again, moving on throughout the

23  specification at column 4, line 42, it states, the subject

24  list styles are presented to a user in an interactive

25  problem definition page.

1           And so that's basically saying that, again, the

2    subject list style is what the user sees in the problem

3    definition page and how it reflects the relationships

4    between the inquiry criteria and values as it also describes

5    the patent.  For instance, those relationships can be

6    hierarchical.  They can be independent of one another.  But

7    subject list style is how the system goes from the logical

8    relationship between those lists to showing the user

9    something that he or she used to work through the query.

10          And, again, in the specification, at column 5,

11   line 32, it states that the client can collect an overall

12   style for the subject list, here subject list style, from

13   some pre-designated standard types or it can be customized.

14   Again, the subject lists are located on the get assistance

15   page.  And in this example they are displayed as a drop-down

16   menu, that being one example of how you can show the subject

17   list style.

18          And, again, going through some examples in the

19   specification, it lists a couple of examples of styles.  For

20   instance, Style 301 is a way of depicting how some of the

21   values come from a get assistance page and some of the

22   subject lists are non-hierarchical.  Yet another example,

23   you have some values from the get assistance page and then

24   the seeker selects some of the values.  Some of the lists

25   are hierarchical and some are dependent.

    1              Turning to the prosecution history, this is a

    2    response to an office action during prosecution of the '709

    3    patent.  And it states, it confirms that the subject list

    4    style is the way that the subject list structure is

    5    represented.

    6              So, for example, in describing the invention,

    7    the patentee states, each subject list style represents the

    8    subject list structure, and identifies a set of component

    9    lists, or the lists that are shown in the subject list

   10    style, unique in the way each of the list components are

   11    related to other list components.

   12              So the subject list style is the structure

   13    through which you see kind of the customized portion of the

   14    interface in the -- in the alleged invention.

   15              And, again, the patent goes through a few more

   16    examples and figures, again, reinforcing the idea that the

   17    subject list style is what's displayed to the user in the

   18    get assistance page.  In the highlighted language, it's

   19    describing some selections of fruit and berries in a

   20    delivery schedule.  And so it's talking about when certain

   21    of the choices are defined by the user's profile, the user

   22    only sees certain lists, so here is list 3 and list 4.

   23              And then continuing on --

   24              THE COURT:  So in terms of your construction, is

   25    an important point the graphical representation part?

1               MS. WALSH:  Yes.

2               THE COURT:  And the rest of the -- the rest of

3   it is just trying to come up with words that mean subject

4   list?  I mean, style, essentially -- and I'm not trying to

5   pin you down to something here, but essentially style means

6   graphical representation.

7               MS. WALSH:  It does.  I would probably go on to

8   say that it's the graphical representation of the logical

9   structure to kind of flesh that out a bit.

10              THE COURT:  But the logical structure -- all

11   right.  I understand.

12              MS. WALSH:  And then moving on to the next term,

13   member of an organization.

14              The '709 patent talks in terms of a member of

15   different -- different members of the organization.  Kind of

16   a high level, the first member selects inquiry types,

17   values, what gets shown to the user, and then the second

18   member of the organization does the selecting.

19              So Cisco's construction is a person belonging to

20   a predetermined group or a company, and this reflects the

21   commonly understood definition of what a member is and what

22   it means to be a member of an organization.  If you are a

23   member, you belong to something.

24              By contrast, XU's definition is a person who is

25   merely associated with or authorized by an entity that is

1    enabling use of the method or system described.  This

2    would sweep in people who aren't actually members of

3    the organization.  They could be someone who just chooses

4    to --

5             THE COURT:  Well, predetermined group.  If you

6    imagine the insurance company where it has independent sales

7    agents who aren't actually part of the insurance company,

8    say, sells insurance for multiple different insurance

9    companies, they could be a predetermined group, could

10   they?

11            MS. WALSH:  They could be part of a

12   predetermined group that includes the insurance company and

13   its agent.

14            THE COURT:  So they -- I mean, they wouldn't

15   have to be a member of the company?

16            MS. WALSH:  They would not, and I think that's

17   why we have --

18            THE COURT:  Right.  I mean, that seemed to

19   be --

20            MS. WALSH:  Yes.

21            THE COURT:  -- that a person belonged to a

22   predetermined group, or -- I'm not sure actually what

23   predetermined means.  Couldn't it just be a person belonging

24   to a group or a company?

25            MS. WALSH:  I believe so.  I think the

1    predetermined kind of ties into the aspects of defining, you

2    know, the set of knowledge that you are trying to represent

3    to the system.

4              THE COURT:  And so predetermined means in a way

5    you would say somebody is a member of a company, and that

6    kind of defines who you're talking about.  And so when you

7    say "predetermined," you almost mean -- you would mean more

8    like just defined?

9              MS. WALSH:  Yes.  I think that captures it.  I

10   think it's defined group.  It's a certain set of people or

11   types of people.

12             THE COURT:  Defined group -- and so your

13   criticism of XU's construction is in light of the fact

14   that -- is what now?

15             MS. WALSH:  It's much broader.  It's saying that

16   a member of an organization is just a person who is

17   associated with or authorized by an entity that is enabling

18   the use of the method or system described, and so that's

19   considerably broader.  That could mean, say, in the context

20   of an invention, somebody who --

21             THE COURT:  And, presumably, maybe part of what

22   we're getting at here is whether random customer is a member

23   of the organization or not?

24             MS. WALSH:  Yes.  Yes.

25             THE COURT:  And basically your view would be

1    the XU definition would allow such a thing and yours would

2    not?

3              MS. WALSH:  Yes.  And the specification shows

4    that, or at least indicates that the problem to be solved by

5    the invention is to leverage knowledge within an

6    organization.

7              THE COURT:  Well, it certainly, generally

8    speaking, I had the impression the '709 patent was much more

9    susceptible to the internal organization construction than

10   the other patent.

11             MS. WALSH:  Yes.

12             THE COURT:  Is that your view?

13             MS. WALSH:  Yes.  Yes.  I agree.

14             THE COURT:  All right.  But in terms of, if

15   you've got some intrinsic evidence you want to show on this,

16   please go ahead.

17             MS. WALSH:  Sure.  At the beginning of the

18   patent, when they're discussing and defining the problem to

19   be solved, they talk about some studies that talk about the

20   problem of organizational knowledge that is stored in the

21   employee's mind.  It's not written down anywhere, it's not

22   in any computer base.  You can't search it.  Nobody can find

23   it except by just picking up the phone, knowing who the

24   right person is and calling that person.

25             And so it goes on to say, accordingly, a need

1     exists to enable organizations to tap into an individual's

2     tacit knowledge, so basically what is in a person's head,

3     and to be able to identify experts within the organization

4     and to route inquiries to the next available expert.

5              And so here it's talking about leveraging an

6     employee's knowledge within the organization.

7              THE COURT:  Is it necessarily the experts are

8     within the organization, or just they're within the

9     organization doesn't mean that somebody outside the

10    organization could be somebody that the organization would

11    like to have tap into the knowledge, does it?

12             MS. WALSH:  It could, but I think going back to

13    kind of the contact in the claim language, I mean, it's a

14    member of an organization and another member of the

15    organization, so --

16             THE COURT:  And so actually part of what you

17    are saying is just member of the organization that has --

18    common understanding of those words would include people

19    who are members who are not members of the organization?

20             MS. WALSH:  Yes.  I think we're kind of starting

21    with the claim language and going from there.

22             THE COURT:  Okay.

23             MS. WALSH:  And then, again, the patent goes on

24    to describe how, if somebody is a member, they can either be

25    a seeker or somebody who is an expert within the

1     organization, depending on how their roles are defined.  And

2     so we think that this captures the idea that a member of an

3     organization is someone who actually belongs to the group or

4     company.

5             And if your Honor doesn't have any more

6     questions, I will turn this over to Mr. Schuman.

7             THE COURT:  All right.

8             MR. SCHUMAN:  So there are a series of terms I'm

9     going to address, your Honor.  Inquiry type, inquiry

10    criteria, underlying criteria, values, and inquiry criteria

11    values.  These are all terms used in the '709 patent, the

12    first of these terms being inquiry type, which

13    XpertUniverse's expert says is critical to understanding the

14    '709 patent.  The definitions are quite divergent.

15            One of the very key distinctions you see here is

16    our definition links inquiry types with inquiry underlying

17    criteria, and this came up during the colloquy with

18    Mr. Cantine as well.

19            Cisco's construction here, your Honor, is almost

20    a verbatim quote from the specification.  This is -- oh, I

21    should point out, as we mentioned before, inquiry type is a

22    term proposed for a construction in both the '903 patent and

23    the '709 patent.  So the intrinsic evidence -- and both

24    parties, your Honor, have, as you would expect, proposed

25    identical definitions for this same term in both patents.

1          So this portion overlaps with the '903 patent.

2    The intrinsic evidence we're referring to here comes from

3    both the '709 patent and the '903 patent.  It's the same

4    term in both patents.

5          A specific grouping of underlying criteria

6    predetermined by the organization and based on a user's

7    criterion selections.  That's our definition.  This is a

8    specification.  After all the criterion selections are made,

9    the system can identify the inquiry type, which is the

10    specific grouping of underlying criteria predetermined by

11    the organization.

12          We moved some words from the end to the

13    beginning, but it's almost a direct quote.  The same

14    language appears later on in the specification, column 2,

15    line 36 to 40.  After the speaker responds to several

16    iterations of semantic identifier presentations, the system

17    is able to select a predetermined semantically expressed

18    inquiry type that is organized from the underlying criteria

19    grouping selected by the seeker.  '709 has the same

20    description in the specification.

21          THE COURT:  Can I interrupt you for a second and

22    ask Mr. Cantine, do you agree that you could just use

23    evidence from both patents interchangeably?

24          MR. CANTINE:  Well, I think if we're talking

25    about inquiry criteria, your Honor -- I'm sorry, inquiry

1    types -- each side has proposed that that term be construed

2    consistently across the patents.

3              THE COURT:  And so to the extent that, for

4    example, I think Mr. Schuman is quoting the '903 -- maybe

5    I'm wrong, but --

6              MR. SCHUMAN:  '903.  Both numbers.

7              THE COURT:  Right.  So at one point using '903

8    evidence, in one he's using '709 evidence.  Both sides agree

9    that's the right way to do it.  Right?

10             MR. CANTINE:  I don't think they're

11   inconsistent, so we don't have a problem with that.

12             THE COURT:  Okay.  All right.  Go ahead,

13   Mr. Schuman.

14             MR. SCHUMAN:  Thank you, your Honor.

15             I want to point out, the problem with

16   XpertUniverse's proposed construction for us, your Honor, is

17   too broad, too general, and it's stripped of the association

18   between inquiry types and underlying criteria that appears

19   in the spec.

20             XpertUniverse's own declarant, expert witness,

21   your Honor, disagrees with their proposed construction.

22   This is one of the dangers of having an expert opine on what

23   the claim terms should mean.  If you look at paragraph -- if

24   you look at paragraph 57 of his declaration, he specifically

25   disowns XpertUniverse's proposed construction of inquiry

1    types.  What he says is, is almost exactly what our

2    definition is.

3           This is from this paragraph 118.  Paragraph 57

4    is where he disagrees with XpertUniverse's construction.  In

5    paragraph 118, inquiry types -- he says, inquiry types

6    organize sets of underlying criteria.  This is a key concept

7    in this patent your Honor.  And our definition correctly

8    reflects the association between inquiry types and sets of

9    underlying criteria, and that is missing from XU's proposed

10   construction.

11          Expert -- this is their expert again saying

12   XpertUniverse -- saying inquiry types are the connective

13   logic between seeker inquiries and experts.  That's also

14   missing from XU's proposed construction.

15          Inquiry criteria.  XpertUniverse has proposed,

16   your Honor, basically the same definition for inquiry

17   criteria as they have for inquiry type, and that's wrong.

18   These are two distinct terms used in the patent that cannot

19   have the same definition.  Very similar, your Honor, to the

20   question you asked Mr. Cantine about the difference between

21   inquiry criteria and underlying criteria.  Again, a

22   different term that cannot have the same definition.

23          Here's a chart, your Honor that shows those

24   three terms and the parties respective proposed claim

25   constructions side by side.

1              THE COURT:  All right.  Let me just look at this

2     for a second.

3              MR. SCHUMAN:  Sure.

4              (Pause.)

5              THE COURT:  All right.  Go ahead.

6              MR. SCHUMAN:  So I'm not going to backtrack, but

7     here's our definition of inquiry type and here's

8     XpertUniverse's.  Now we're on to inquiry criteria.  In our

9     view, there are material differences between those two

10    proposed constructions, yet these are two totally different

11    terms used in this patent.

12             Inquiry criteria, underlying criteria, the

13    question your Honor asked Mr. Cantine, and I think you have

14    it exactly right.  There's a fundamental difference between

15    these two.  Inquiry criteria are used in the interactive

16    column definition page to define the seeker's inquiry.  They

17    are displayed whereas underlying criteria are not.  And

18    we'll get to this in a moment here in the slides.

19             But this definition of underlying criteria is

20    right out of the specification.  Underlying criteria are not

21    displayed.  They're the underlying -- they're the underlying

22    terms that are used to create the inquiry type in the

23    database, in the system, whereas inquiry criteria are what's

24    displayed on this interactive problem definition page.

25             THE COURT:  Do you need the part on the inquiry

```
 1    criteria?  You could, couldn't you, go with subject
 2    categories used to define the seeker's query, end it
 3    there?
 4              MR. SCHUMAN:  If your Honor's question is if
 5    this is redundant of some other claim language, if it's
 6    redundant of other claim language, we don't need it.  I this
 7    I think the critical point, though --
 8              THE COURT:  I think in claim 1 -- let me just go
 9    back a second.  I mean, for example, claim 1, the very last
10    clause, element, as opposed, wherein the presenting step
11    presents an inquiry criteria and the values in the interact
12    problem definition page that includes the first
13    relationship.
14              I don't know.  It seems kind of redundant
15    to have problem definition page be part of inquiry criteria.
16              MR. SCHUMAN:  However, your Honor, the word
17    inquiry criteria appears in other places in the claims where
18    it's not explicitly modified by --
19              THE COURT:  Right.  But it should be interpreted
20    the same each place.  Right?
21              MR. SCHUMAN:  Right.  I would accept, your Honor
22    that as long as the -- the construction requires that it be
23    displayed to a user, if you cut off in an interactive
24    problem definition page because that's described elsewhere
25    in the claim language, that would be acceptable.
```

1          THE COURT:  All right.

2          MR. SCHUMAN:  This is the specification.  On

3     this very point, your Honor -- and I don't take your

4     question as a disagreement with this, but the specification

5     clearly teaches that inquiry criteria, the term we're

6     focusing on here, end values, are selected and presented to

7     a user in an interactive manner.  This is all part of the

8     same excerpt, column 1, 41 to 51.  Such a subject list,

9     they're presented in the subject list, and then the subject

10    list is presented to the user in an interactive problem

11    definition page.

12          This is the -- below is the excerpt that I

13    referred to before describing how this patent covers the

14    look and feel of the user interface, which includes

15    displaying the inquiry criteria in this interactive problem

16    definition page.

17          Here's another portion.  I mean, it's rampant

18    throughout the specification that inquiry criteria are

19    displayed in an interactive problem definition page.  Here

20    it's referred to as the get assistance page.

21          So --

22          THE COURT:  Can you just go back to that?

23          MR. SCHUMAN:  Yes, your Honor.

24          THE COURT:  Right.  Okay.  Go ahead.

25          MR. SCHUMAN:  So if it's just a redundancy

1   point, your Honor, we don't have an objection there. But I

2   think the key point is that inquiry criteria, and this is

3   one of the key fights between the parties --

4         THE COURT: Right. I know what you are saying.

5   Inquiry criteria, built into that is it's displayed as

6   opposed to the underlying criteria, which are not displayed

7   because they went to something else?

8         MR. SCHUMAN: Right. That's the next term.

9         And I don't know if your Honor used the term

10  subset when you were in colloquy with Mr. Cantine, but I

11  think the inquiry criteria, there is a relationship between

12  inquiry criteria and underlying criteria, but the way the

13  patent has used these terms, it's very clear that the

14  inquiry criteria are displayed in the interactive problem

15  definition page whereas the underlying criteria are not.

16  And our definitions reflect that distinction whereas, as we

17  pointed out in our briefs and in the earlier slide,

18  XpertUniverse has really blurred the distinction between

19  these three terms, inquiry type, inquiry criteria, and

20  underlying criteria.

21        So here's our proposed construction of

22  underlying criteria. XU says no construction necessary.

23  Subject categories used to classify inquiry types according

24  to a client's business objectives and information needs

25  of a user. No -- no requirement there that underlying

```
 1    criteria be displayed in an interactive problem definition

 2    page.

 3              And this is right out of the specification as

 4    well.  Subject categories used to classify inquiry types

 5    according to a client's business objectives and information

 6    need of a user.  Each inquiry type is classified using one

 7    or more underlying criteria, which are subject categories,

 8    correlated to the client's business objectives.  The

 9    criteria also reflect information needs of a user.

10              That portion of the specification, again, we may

11    have rearranged the words.  That portion of the

12    specification is almost verbatim our proposed construction

13    of underlying criteria.

14              Values.  Your Honor used the word "choices" with

15    Mr. Cantine and that's in our slide presentation.  I think

16    values really are choices.  The fundamental problem we have,

17    your Honor -- I will be very candid -- I don't understand

18    that and that's not because I don't have a computer science

19    degree.  I don't think a jury would understand that, your

20    Honor.  The point here is to elucidate and illuminate terms

21    of art used in the patent, and I don't think telling a jury

22    to determine whether Cisco's products infringe you need to

23    find inquiry criteria and values, and now this is what

24    values means is going to help.

25              THE COURT:  Yes.  I think as far as XU's,
```

1    I am likely to go with the no construction necessary

2    argument.

3              MR. SCHUMAN:  Well, they don't defend it.  Their

4    expert doesn't defend it.  They don't defend it in their

5    brief either, so I think you're probably right about that.

6              THE COURT:  I mean, I think there is a

7    legitimate question as to whether values isn't actually the

8    obvious.

9              MR. SCHUMAN:  I guess, your Honor, it's hard

10   to -- this is what --

11             THE COURT:  Just because they propose nonsense

12   doesn't mean that it's not obvious.

13             MR. SCHUMAN:  Your Honor, I think there are a

14   couple of key points about values.  A value is a choice, but

15   in this patent, I think it's very important that the

16   specification makes very clear, the values are displayed in

17   a certain relationship, an interrelationship.

18             THE COURT:  Displayed is your key word.  Right?

19             MR. SCHUMAN:  Well, yes, because -- well, it's

20   the patent's key words, your Honor.  This is about the look

21   and feel of the interface, and when you dial an IVR system,

22   your Honor, you may arguably be hearing criteria selections

23   or what XU might call inquiry criteria, but you're not

24   simultaneously seeing the values.

25             And the -- the disclosure in this invention, if

1      there's any novelty here, the key point, which I don't

2      acknowledge, of course, but the -- the specification makes

3      clear that the get assistance page, the interactive problem

4      definition page, displays to the user these inquiry criteria

5      and the values.  And so you get to pick them.  You get to

6      see them.

7                   THE COURT:  So if you would just go back to the

8      last slide for a second.  So if the definition of value were

9      choices displayed to a user?

10                  MR. SCHUMAN:  Yes.  That would be fine, your

11     Honor.  That would be fine.  Choices -- there are criteria

12     selections.  There are also choices, as we say here.

13                  I think one concept that your articulation

14     omitted, though, having a relationship to inquiry criteria,

15     the patent goes on at length about how values, and

16     including, you know, the subject list where you can

17     configure this for the particular user where you may show

18     certain values under a particular inquiry criteria or not,

19     depending on who the user is.  So there's a defined

20     relationship between values.

21                  So I would accept, your Honor, values are

22     choices displayed to a user.  But they're not just displayed

23     anywhere.  They're displayed with a displayed relationship

24     to inquiry criteria.  Both of those things are displayed on

25     this interactive problem definition page.

1          Here's an example of making that very clear.

2     This is the get assistance page, figure 2.  The red,

3     unfortunately, blurs the text, but the values are the

4     choices.  I mean, I think we're all on the same page about

5     that.  The criteria are the -- highlighted in green, major

6     coverage, et cetera.  The choices -- it's a drop-down menu,

7     and you see the choices, and the choices are displayed in a

8     particular relationship with the criteria.  They are not

9     just choices put anywhere on this user interface.

10          THE COURT:  So I understand what you are saying.

11    It sounds reasonable to me.  I mean, there's both the

12    displayed to a user and there's some connection to the

13    inquiry criteria.

14          MR. SCHUMAN:  Right.  That's down here at the

15    bottom.  This is actually claim language.  The presenting

16    step presents the inquiry criteria and the values in an

17    interactive problem definition page that includes the first

18    interrelationship.  This is disclosed in the patent.  It can

19    be hierarchical, it can be independent, but there is a

20    relationship between the values and the criteria.

21          And this presenting step, your Honor, actually

22    was added during prosecution, and this is just a bit of

23    the prosecution history to overcome this Walker reference

24    that the examiner cited.  And XpertUniverse said Walker

25    does not disclose, nor suggest, defining a first

```
 1    interrelationship between inquiry criteria and values in

 2    presenting the first interrelationship in an interactive

 3    problem definition page.

 4            So just to tie it up, your Honor, while I would

 5    agree with your modification, choices presented to a user, I

 6    would just add that this concept of presented in an

 7    interrelationship with inquiry criteria has to be part of

 8    the definition.

 9            In light of your comment, I'm not going to talk

10    about their definition of values.

11            Interactive problem definition page.  I think

12    the issue is pretty clearly joined here, your Honor.  We

13    think this is a graphical user interface, or to answer your

14    Honor's question, that you can't have a graphic user

15    interface, the patent, as we pretty well covered now

16    requires -- it talks about the look and feel.  What does it

17    look like?  Things have to be displayed on the interactive

18    problem definition page.  It has to be a graphical user

19    interface.

20            THE COURT:  Which could be -- maybe this is

21    irrelevant at this point, it could be on an iPhone?  It

22    could be on a laptop?  It could be on anything that is

23    capable of showing a picture of communicating?

24            MR. SCHUMAN:  I would agree with that, your

25    Honor.  An iPhone is both a phone and a computer.  It has a
```

1    monitor, going back to where the subject came up, but it

2    also has a radio and it communicates over the voice channel.

3    That's IVR.  That's not what's covered by this patent.

4              So I don't have a problem with the iPhone being

5    a little computer with a monitor where you could display

6    obviously a graphical user interface on an iPhone and use

7    these pull-down menus and select your values and

8    characterize your inquiry.  As long as we're clear about the

9    limits to which a phone could be used, and --

10             THE COURT:  Well, I appreciate what you are

11   saying.  I understand.

12             MR. SCHUMAN:  And while your Honor is correct,

13   that the specification refers to a smart phone, which is

14   key, not a phone.  A smart phone is defined --

15             THE COURT:  Didn't it say smart phone in the

16   specification?

17             MR. SCHUMAN:  It did, your Honor.  I mean, I

18   believe the portion of the specification that your Honor is

19   referring to is column 3, line 65 of the '903 patent.

20             THE COURT:  Hold on just a minute.  Column 3,

21   line 65?

22             MR. SCHUMAN:  Correct.

23             THE COURT:  Oh, yes, it does say smart phone.

24   Keep going.

25             MR. SCHUMAN:  There's a pretty common

1    distinction between a smart phone and a feature phone, your

2    Honor.  Feature phones typically don't have a browser and

3    typically can't depict browser interfaces.  Smart phone

4    certainly does.

5            THE COURT:  Certainly, when it's personal

6    digital assistance or smart.  It certainly sounds like

7    that's what it's talking about.

8            MR. SCHUMAN:  Right.  It's not talking about a

9    phone call is the only distinction I want to make there.

10           THE COURT:  Got it.

11           MR. SCHUMAN:  The interactive problem definition

12   page, I think the -- the key issue here, I think, as your

13   Honor appreciates, is their definition is an attempt to

14   broaden this to any responsive interface.

15           Your Honor asked Mr. Cantine where responsive

16   interface may be found in the specification.  I would

17   submit, your Honor, that it's not there.  I looked when we

18   got their definition.  I don't think it's there.

19           THE COURT:  But the problem of redundancy comes

20   up here, too, because, like, for example, again, claim 1

21   of the '709 patent, the last paragraph, where it says,

22   wherein presenting step inquiry criteria, the values in

23   interactive problem definition page include a first

24   interrelationship.

25           The definition that you suggest, it sort of

1   includes all the rest of that element, that element in it,

2   or most of it.

3           MR. SCHUMAN:  I would acknowledge, your Honor,

4   there's some redundancy there.

5           THE COURT:  So I was wondering if -- I mean,

6   it's interesting because interactive and page, those seem to

7   be like pretty easy terms to understand.  The only thing

8   that's different here is problem definition, don't you

9   think?

10          MR. SCHUMAN:  Well, I think page, based on the

11  attempt to broaden it to include any responsive interface,

12  which is not just a page.

13          I think, to be very candid, I think a patent

14  describes one type of user interface and that's the get

15  assistance page, which is defined in the patent to be the

16  interactive, the problem definition page.

17          So when XpertUniverse's proposal attempts to

18  broaden that to include a responsive interface designated to

19  facilitate either the specification of assistance or

20  facilitate the categories of assistance, that would include

21  an IVR system, your Honor.  That would write a claim right

22  out of the claim language.

23          THE COURT:  So if your definition, your active

24  problem definition page or your construction was an

25  interactive graphical user interface, period, would that be

1    wrong?

2              MR. SCHUMAN:  It would be almost right.  I

3    would go five words further, that uses the subject style

4    list.

5              THE COURT:  All right.  Interactive graphic, but

6    would use a subject list style, would that be -- would that

7    capture what you are trying to capture?

8              MR. SCHUMAN:  It would, your Honor, and I think

9    it would be consistent with the specification.

10             THE COURT:  All right.

11             MR. SCHUMAN:  I think the rest of the claim

12   language pretty fairly gets at what has to be described in

13   that graphical user interface.

14             THE COURT:  That was covered by maybe other

15   parts of the claim elements?

16             MR. SCHUMAN:  That's my point.  The fact that it

17   has to display user specific inquiry criteria and values may

18   be covered by some of the other claim elements.  You hit on

19   the key part of our definition.

20             THE COURT:  All right.

21             MR. SCHUMAN:  And I think this is a part of the

22   specification that very clearly -- that most clearly, your

23   Honor, supports that construction.

24             The get assistance page, 200, that's figure 2 of

25   the '709 patent, also described here in as the problem

1   definition page.  There's -- you are not going to find too

2   many clear examples of the patentee telling you exactly what

3   they mean by the term we're defining.

4            Allows a seeker to classify the nature of their

5   problem in real-time to get an expert.  The problem

6   definition functionality is displayed in a graphical user

7   interface.  That's an example of it.

8            Your Honor asked, this is the portion of the

9   specification cited by XpertUniverse for their broader

10  construction.  And responsive interface is not there.  And,

11  in fact, the portion of the specification they cite again

12  refers to the look and feel of the platform.  That's a

13  graphical user interface.

14           If there are no other questions, I will move

15  on.

16           Inquiry criteria values.  Similar, but slightly

17  different to values, your Honor.  XpertUniverse's definition

18  of inquiry criteria values is very similar to their proposed

19  definition of values.

20           THE COURT:  And let me just see your definition

21  for a second.

22           MR. SCHUMAN:  Sure.  It's up here on the screen.

23           THE COURT:  I was -- hold on just one second.

24           MR. SCHUMAN:  Sure.

25           (Pause.)

1          THE COURT:  You give in this inquiry criteria

2     values, which has got two other terms.  I think you defined

3     somewhere else inquiry criteria and values.

4          Is your construction there consistent with how

5     you construe the parts?

6          MR. SCHUMAN:  It is, your Honor.  I think we may

7     have been slightly inartful in saying selections, because

8     what inquiry criteria values are are pre-selected selections

9     made for a particular user by the system.  And that's what

10    we meant when we said selections.  In other words, these are

11    selections that have been made.  And I think that is

12    the key distinction between inquiry criteria values and

13    values.

14          Values are presented, and the user gets to

15    choose.  When the patent specification describes the

16    system's capability of pre-selecting, the organization wants

17    to limit particular users only to certain choices.  Those

18    are called inquiry criteria values.

19          So we said selections displayed, meaning these

20    are selections that have already been made, and that may

21    have been inartful.  A better way to put it might say

22    pre-selected, although I don't think that's necessarily an

23    artful term either.

24          Predetermined is the phrase used at column 4,

25    line 4 of the specification, where it's defining inquiry

1    criteria values.

2              THE COURT:  Where did you say it was?

3              MR. SCHUMAN:  Column 4 of the '709 patent, your

4    Honor, starting at line 4, the first full paragraph at the

5    top.

6              THE COURT:  All right.

7              MR. SCHUMAN:  Predetermined indicators in the

8    seeker's profiles can restrict the pool of qualified experts

9    available to the seeker.  Seeker profiles can also restrict

10   those inquiry types available to the seeker by embedding

11   in inquiry criteria values as the predetermined indicators.

12             So these are choices that are effectively made

13   for the user by the -- by the organization that set up the

14   interface.

15             THE COURT:  All right.  Can you do me a favor,

16   because you said maybe it's inartful.  Could you say by the

17   end the tomorrow, with no argument, just submit what you'd

18   like the artful -- Cisco's artful construction to be?

19             MR. SCHUMAN:  Yes.  It will say predetermined.

20             THE COURT:  It would be that, but predetermined

21   before selections?

22             MR. SCHUMAN:  Yes.

23             THE COURT:  Okay.  Well, you don't need to do

24   that, then.

25             MR. SCHUMAN:  And the support for that, and this

 1    is cited in our joint claim construction statement, but it's

 2    column 4, starting at line 4 through line 10.

 3              THE COURT:  All right.

 4              MR. SCHUMAN:  Your Honor, I think we should, in

 5    the interests of time, get through plurality of monitors.  I

 6    think this has come up already.

 7              This is the issue about interactive

 8    communication devices.  As your Honor said, a pager, or a --

 9    a cellphone operating in phone mode could be a communication

10    device, and that is, in our view, not supported by any of

11    the claims or any of the disclosure in the spec.

12              And I think also, in the interests of time,

13    there are a collection of terms, your Honor, in the joint

14    claim construction statement.

15              There are a group of terms, ten -- okay.  We're

16    going to skip this one.

17              THE COURT:  All right.

18              MR. SCHUMAN:  Looking at the clock, your Honor,

19    I see we only have about 15 minutes left and we have one

20    more patent with a few terms to get through.

21              THE COURT:  All right.  Go ahead.

22              MR. SCHUMAN:  This is not a term, a patent term

23    of art, but in thinking about these two patents, we've just

24    discussed quite a bit the '709 patent, which I characterize

25    as the look and feel patent.  And the '903 is the match and

1    route.  This is the one that claims the unique numerical

2    routing identifier that actually gets you from your

3    selections in this interaction process definition page the

4    to the right agent or expert.  So this is the routing or

5    matching functionality is what's claimed in this '903

6    patent.

7              Ms. Walsh is going to address the first two

8    terms.

9              MS. WALSH:  So this term is underlying plurality

10   of criteria grouping.  And before, as Mr. Schuman discussed,

11   there's a relationship between the underlying plurality of

12   criteria groupings.  This is recited in Cisco's

13   construction, which says two or more groups of humanly

14   understandable descriptors that identify inquiry types.

15             XU's construction, the last clause says, wherein

16   each collection of a set of collections of assistance, the

17   type of assistance requested can be a number of zero or more

18   sets.  And that implies that the plurality of criterion

19   grouping doesn't have to be a member of any set at all.  It

20   seems to be not related to anything.

21             And as you see in the specification, this is

22   similar to the intrinsic evidence used for inquiry type.  It

23   says, the inquiry type, which is the specific grouping of

24   underlying criteria, again, at column 5, a couple times, and

25   then again in the '903 patent, in column 1, and again at

1    column 2.

2              And as we set before, XU's construction seems to

3    conflict with the claim language because it says, as I said

4    before, wherein each collection can be a member of zero or

5    more sets.  And here, it talks about how the underlying

6    criteria groupings are associated with the inquiry types and

7    the additional layers.  And so the idea that it's not a

8    member of any set.

9              THE COURT:  Oh, so if XU had said one instead of

10   zero?

11             MS. WALSH:  If it's a member of a set, then,

12   yes, because the zero or more implies that no grouping

13   of --

14             THE COURT:  I mean I think I get you.  I am

15   just wondering if they had said one instead of zero,

16   whether...

17             MS. WALSH:  Could be.  I would have to look at

18   that a bit.  But, yes, I think that's a little bit closer to

19   what's reflected in the claims.

20             And moving on to skill-set database, I believe

21   Mr. Cantine addressed this one earlier this morning.

22             So basically there are three points here.  The

23   '903 patent does not talk about routing to resources.  It

24   does not talk about routing the agent.  It talks about

25   routing to a live expert.  And then also the claim language

1    indicates that the skill-set database has to -- has to

2    contain associated --

3              THE COURT:  So you would say the '903 patent, in

4    just general -- generally, in construing it, you end up with

5    a construction that doesn't make sense in terms of getting

6    the live expert, then you're probably not making good

7    construction?

8              MS. WALSH:  I believe so, yes.  I think

9    resources is too broad because it can sweep in, say a

10   document, the Web page, something like that, something

11   that's not a person.

12             THE COURT:  And basically every time -- I mean,

13   I certainly saw live expert multiple times, but basically

14   you would say a fair reading of the specification is the

15   only thing it talks about is live experts?

16             MS. WALSH:  Yes, or that's the only thing that

17   it's talking in matching and routing, too.

18             THE COURT:  All right.

19             MS. WALSH:  And so the claim language indicates

20   that the skill-set database must contain associations

21   between the inquiry types and the expert skill sets and the

22   experts, and so in Cisco's construction, we believe that's

23   pretty much taken care of by the claim language, and so

24   what's in the database is at least the actual experts.

25             THE COURT:  Well, let me just ask, because I

```
1    take it in your proposed definition, records organized

2    into computer readable/writable memory, I assume that's

3    database?

4               MS. WALSH:  That's database.  I believe --

5    yes.

6               THE COURT:  And you don't think database is --

7    how is that an improvement over database?

8               MS. WALSH:  I believe that we agreed on the

9    construction of database.

10              THE COURT:  Oh, did you?

11              MS. WALSH:  I think so.

12              THE COURT:  So just on your agreed construction

13   on database, why is that something that needs to be

14   construed?

15              MS. WALSH:  It may not.

16              THE COURT:  Isn't that pretty much widely

17   understood by both experts and non-experts?

18              MS. WALSH:  I would say so.  I think so.

19              THE COURT:  All right.  But, in any event, the

20   skill-set database, an important part is -- well, actually,

21   because you've got that word "unique" in there.

22              MS. WALSH:  Yes.

23              THE COURT:  Where are you getting that from?

24              MS. WALSH:  In the claim language, it talks

25   about how the experts have individualized knowledge, which
```

1      is another term that we've discussed this morning.

2                  THE COURT:  Yes.  I don't think individualized

3      means unique.

4                  MS. WALSH:  It does.  It may not.  There may be

5      a better word for that, but within the context of that claim

6      term and within the context of the patent, it means

7      something more than just merely being an expert, so it could

8      mean that that expert has different knowledge.

9                  THE COURT:  Isn't it just having knowledge on

10     specific topics?

11                 MS. WALSH:  An expert could be having knowledge

12     on specific topics.  An expert having individualized

13     knowledge has something more.  Some knowledge in terms

14     of --

15                 THE COURT:  I would have thought individualized

16     could mean, you have five topics and the expert only knows

17     about two of them, and some other expert knows about two

18     others of them.  Right?  That would be individualized

19     knowledge, wouldn't it?

20                 MS. WALSH:  I would say that that refers more to

21     the expert's knowledge of those topics rather than the

22     topics that the expert has, because a lot of the

23     specification is devoted to defining what topics the expert

24     has knowledge on.  And within that, I think that's the part

25     that's individualized.

1         THE COURT:  All right.  Well, I mean, I think --

2    I don't know what's a better word than "unique," but I don't

3    think "unique" is right.  So, in any event, keep going.

4         MS. WALSH:  In XpertUniverse's construction, you

5    see how it could include some or all of several different

6    associations between the experts.  Some means that it could

7    only include two of those groups when actually the claim

8    language indicates what the association that the skill set

9    has.

10         So if you go to the claim language, it recites

11    supplying a skill-set database that includes an entry that

12    associates at least one expert, so you have the experts

13    already in the skill-set database with one of the

14    predetermined semantically expressed inquiry types.

15         THE COURT:  Actually, I guess you did that after

16    the claim construction chart.  And in some ways, I mean,

17    isn't that actually, because we're talking about a skill-set

18    database in regards to this match and route system.  Some of

19    the skills we're interested in are the ones that relate to

20    either the underlying criteria or the inquiry criteria or

21    some kind of criteria.  Right?

22         MS. WALSH:  Yes.  The inquiry type, I would say.

23         THE COURT:  All right.

24         MS. WALSH:  And as I said before, XU's

25    definition includes --

1          THE COURT:  Actually, it's funny if you agree

2     that database is records organized in computer-readable/

3     writable memory, I'm not sure why XU would be saying a

4     digital storage and retrieve information system.  But I

5     don't think that's important, so move on.

6          MS. WALSH:  Okay.  Again, there's the claim

7     language.  It already recites what the relationship

8     between -- or what the entry contains.  To the extent that

9     that is the issue of construction, we think that's already

10    included in the claim language.

11         And, again, going to the prosecution history, it

12    says that, talking about populating inquiry types and

13    underlying criteria that are populated in a database, and

14    then a skill set is linked to the semantic increase.  So

15    you're linking what the expert can give help onto the a type

16    of help that's needed, and experts having the skill that are

17    non-semantically associated with the inquiry type in the

18    database.  So I think that's illuminating as to what's

19    happening in the skill-set database.

20         And, again, going to the specification, it gives

21    a little bit more detail, so it's talking about how the

22    experts, or the entries in the skill-set database are

23    associated with the inquiry types.  And the way it does this

24    is through the unique numerical routing identifier.  And,

25    again, discussing how the specification describes routing to

1    a live expert.

2            And an expert having individualized knowledge.

3    I think we already kind of defined the dispute on unique, so

4    with that, I will turn it over to Mr. Schubert.

5            THE COURT:  All right.  Thank you.

6            MR. SCHUMAN:  Could I just ask, your Honor, how

7    much time do we have left?  We have a few more terms.

8            DEPUTY CLERK:  You have seven minutes left.

9            MR. SCHUMAN:  Seven minutes.  Okay.

10            Unique numerical routing identifier, your Honor.

11    I will crystallize the dispute between the parties here.

12            If you take a look at the language highlighted

13    in red from XU's construction, mathematically distinct

14    encoding for data relevant to an inquiry.  That's way too

15    broad, your Honor.  The specification is very clear and our

16    definition matches it very clearly.

17            A skill set entry and the inquiry type, those

18    are the two things being matched by the unique numerical

19    routing identifier.  It's a number that matches the skill

20    set of the expert stored in the database with this inquiry

21    type, and that's how you get this flexibility that prior

22    art systems supposedly didn't have, because no matter who

23    your experts are, you populate the people.  As long as they

24    have those skills, you're always going to use the same

25    routing number between the inquiry type and those skill

1    sets, and then the database figures out, using this unique

2    numerical routing identifier, you get to the right skill

3    set, then you can get to the right experts.

4              So it is far more specific than distinct

5    encoding for data relevant to an inquiry.  It's a number

6    that associates an inquiry type with a skill set entry in

7    the skill-set database, and that's our construction.

8              Match and route system, your Honor, I appreciate

9    the discussion before.  I don't want to dwell on this.  If

10   your Honor chooses not to construe it, that's fine, but I

11   would like to just point out the stark distinction between

12   the parties' two constructions.  XU did go on and propose a

13   construction.

14             THE COURT:  And just so I know, is your position

15   that this is an element of some claim?

16             MR. SCHUMAN:  I think it breathes life into the

17   claim, yes.  I think it breathes life into claim 5 of the

18   '903 patent because what it does is, the steps described

19   talk about using the unique routing identifier to route, and

20   that's the match and route system.  So I think that's what

21   the cases call breathes life into the claim.

22             But if you just focus for a moment on what they

23   would like to argue to the jury a match and route system is,

24   it's any architecture that maps a resource or information

25   request to possible resources or information sources, and

1      provides a link to the identified information source.

2                  That's a Google search, your Honor.  An

3      architecture that maps an information request -- I type in

4      my query -- to possible resources or information sources --

5      a Web page, and that provides a link to the identified

6      source.

7                  So, again, I would like to use the rest of my

8      time on another term.

9                  THE COURT:  Okay.  Go ahead.

10                 MR. SCHUMAN:  But that can't be right.

11                 Layers.  A significant concept in the '903

12     patent, your Honor, is repairs layers of inquiry type.  And

13     I think it's important that we crystallize what the dispute

14     is between the parties here, because with Mr. Cantine you

15     had a discussion about the differences between our

16     particular definitions.  They're not significant except for

17     the fact that we use underlying criteria, which is exactly

18     the language in the -- in the specification.

19                 The real distinction, your Honor, the real fight

20     here is there's a first layer of inquiry types, and then

21     added in prosecution, the patent requires one or more

22     additional layers of inquiry types.

23                 And our position is that each layer of inquiry

24     types has a corresponding set of underlying criteria.  The

25     patent defines an inquiry type to be a specific grouping of

1    the underlying criteria.

2          So our definition is that each layer in this

3    layered database, two or more, the first layer plus one or

4    more additional layers, is an inquiry type with its

5    corresponding underlying criteria grouping.

6          XpertUniverse says, no, only the first layer has

7    to have underlying criteria.  All the other layers don't.

8    That's the fight.  It's not so much the actual wording of

9    the parties' definitions of what a layer is, it's what has

10    to appear in layers two and -- two and further on down.

11          And I think it's very clear from the dependent

12    claims, part of the intrinsic evidence -- just focus on

13    claim 9 for a moment.  These are all dependent claims

14    describing the additional layers.

15          Claim 9, a method of claim 1, further comprising

16    the step of selecting one of the layers of inquiry type for

17    presentation of the underlying criteria grouping to the user

18    based on a predetermined user profile.

19          The one or more additional layers of inquiry

20    type have to have associated underlying criteria groupings

21    in order for them to be presented, as dependent claim 9

22    requires.

23          Other language in the specification refers to

24    the different layers being presented.  The only thing there

25    is to present are the criteria, the inquiry criteria and the

1    values, those things that are presented on the problem

2    definition page.

3            The inquiry type, your Honor, actually is never

4    presented in this invention.  That's the accumulation of

5    your choices in this interactive problem definition page.

6    The system, once you've made these choices, creates the

7    inquiry type.  It's not displayed to the user.

8            When the patent talks about displaying layers,

9    they're talking about the inquiry criteria that are

10    displayed.  This is further evidence that the -- each of

11    these layers has to have underlying criteria.

12            The patent does not have a figure depicting this

13    layering concept, so we try to be creative.  I think

14    Mr. Cantine had a figure, but it didn't really go to

15    layering.  And here's what they're getting at.  These

16    additional layers are described in the specification as

17    being semantic representations of the first layer use using

18    different jargon, user-centric terms.

19            I think Mr. Cantine referred to an engineer

20    might speak one way using terms and a salesperson might

21    speak another.  That's what these layers are getting at.

22            Hypothetically, we took an auto service shop,

23    and if you have sort of a customer service representative

24    meeting you and you bring your car in for service and he's

25    using this system in this patent, hypothetically, let's say

1    he's Hispanic, so he speaks Spanish and English.  Maybe he

2    speaks one language better than the other, because one layer

3    can be layer one using a different language, Spanish.

4            So the customer goes to Carlos and says, I need

5    help with -- I have a motorcycle and I need help with new

6    tires for the motorcycle and my motorcycle is a BMW.  Using

7    the inquiry criteria, Carlos navigates the system and he

8    gets to an inquiry type, and the inquiry type is a summation

9    of the choices he made -- motorcycle, tires, Harley-Davidson

10   or BMW, whatever I said.

11           But let's say Carlos is more comfortable

12   inputting this information in Spanish, and when Carlos logs

13   into the system, the system knows that Carlos prefers to

14   input his information in Spanish.

15           Layer 2 in the database is a replication of

16   layer 1 in Spanish, so Carlos can use the system and make

17   the same selections in Spanish.  (Speaking Spanish) BMW.

18           And layer 3, I guess we would call jargon.  Same

19   concept, though.

20           The point here, your Honor, is, what has to be

21   in these additional layers?  That's what the fight is about

22   between the parties in the briefs.

23           XpertUniverse says only layer 1 has these

24   underlying criteria associated with them.  We say that can't

25   be right.  It's not right.  The claim language in the

1  specification made very clear that the additional layers, if

2  you are going to select layer 2 for Carlos to present to him

3  in Carlos, then you're infringing claim 9, and what you are

4  presenting is a layer of inquiry type for presentation of

5  the underlying criteria grouping to the user based on the

6  user's predetermined profile.

7          Each of the layers is the same, and they all get

8  you to the same place, which is this inquiry type, which is

9  then matched by this unique numerical routing identifier to

10  an expert skill set in the database, and then the underlying

11  things here, the experts themselves, the live experts, the

12  individuals, can change.

13          And some of the inquiries can change, but you

14  still have this connection, this layer of abstraction that

15  supposedly adds the flexibility to the system.

16          If we have any time left, we have a few terms

17  here.  I don't know if we have time.

18          These terms, your Honor, there's a collection of

19  terms at the end.

20          THE COURT:  It says here you're out of time, so

21  how about if you take one minute to wrap up.

22          MR. SCHUMAN:  The one minute on these terms

23  is, does it have to be displayed in a graphical interface or

24  not in the active definition page?  And these are '903

25  terms.

```
 1              The '709 patent is the one that explicitly
 2    claims the graphical user interface.  The '903, your Honor,
 3    describes no other user interface than figure 2, the get
 4    assistance page.  We had that discussion before about the
 5    overlap.
 6              Figure 2 in the '903 is the get assistance page,
 7    and at column 4, your Honor, line 41 on down of the '903
 8    patent is the only description in the specification of the
 9    type of interface that one can use to access the match and
10    route system of the '903.
11              And so the fight on these terms, your Honor, and
12    these are the -- in the joint claim construction statement,
13    your Honor, these are claims, and they were briefed
14    together, Nos. 8, 9, 10 and 11.
15              THE COURT:  All right.
16              MR. SCHUMAN:  And the fight here is whether
17    these terms require the use of the interactive problem
18    definition page, the graphical user interface or not.
19              And that's the summary of those terms.
20              THE COURT:  All right.  Thank you.
21              MR. SCHUMAN:  Thank you very much, your Honor.
22              THE COURT:  All right.  Mr. Cantine, I guess.
23    Am I mispronouncing it?
24              MR. CANTINE:  That's okay.  Everybody does.
25    It's Cantine, yes.
```

1      Let me just touch on a few points that

2   Mr. Schuman raised.

3      First, with regard to, you know, this person of

4   skill in the art issue, our expert did not say that you had

5   to have a Master's degree.  He said you could have a

6   Master's degree or a sufficient amount of industry

7   experience.  All the inventors on the patents of the XU

8   patents have 25 years or more of industry experience.  So

9   they're certainly persons of skill in the art.

10      Now, Mr. Schuman spent a lot of time talking

11   about these prior art systems, right, and that Genesys and

12   Siemens and others, you know.

13      If all XU was offering when it was already out

14   there, then why did they work with us for two-and-a-half

15   years?  Right?  He does not talk about that.  I mean -- and

16   it's immaterial, actually, to what we're talking about here,

17   your Honor.  It's a precursor to their premature partial

18   summary judgment motion they just filed, which we think is

19   completely ridiculous, because discovery isn't even close to

20   ending and it's a violation of local rules and everything

21   else.  But we'll brief that for you.

22      Let me talk about a few things that he

23   mentioned.  Member of an organization.  All right?  This

24   predetermined group, things like that, you know, our

25   proposed definition talks about someone that's associated

 1    with or authorized by.  All right?  It's someone that's

 2    going to use the system.  We've shown you how that person

 3    can be within the company or it can be a customer outside

 4    the company.

 5              THE COURT:  It seems like you have a better

 6    argument for it being outside the company in the first

 7    patent than in the second patent.

 8              MR. CANTINE:  No.  I think clearly, your Honor,

 9    if you look at claim 1 by way of example, the '709 patent,

10    you'll see -- let me get my glasses on.

11              If you look at the last page of the patent in

12    column 9 there, which is part of claim 1, you have that

13    clause at the top, receiving from a first member of the

14    organization inquiry types reflecting information.  That

15    first member, that could be someone within the organization.

16    That could be the administrator setting up a system.  We

17    don't have a problem with that.  But that's not the only

18    member that's recited here.

19              If you go down to the fourth clause, you will

20    see there pre-selecting, prior receiving an inquiry from a

21    second member of the organization, a quantity of inquiry

22    criteria.  That second member, he's the user of the system.

23    Right?  He's the one logging into that problem definition

24    page.

25              THE COURT:  That's a funny way to define just

1    user of the system if it's user of the system has no

2    limitations.

3           MR. CANTINE:  No, I'm not saying it doesn't have

4    a limitation, but a member of an organization as we've

5    proposed is someone that's authorized to use the system.

6           They had this concept of this predetermined

7    company here or whatever.  But, you know, I'm a member of

8    Costco.  I can walk in.  I've got my little card.  I'm not

9    an employee Costco.  I'm a member of the gym.

10          THE COURT:  I think maybe their definition that

11   had, as I recall, a group, you could be a member of Costco

12   and a member of the organization without being employed

13   by them, but you can't be just a person who is interested

14   in buying a BMW, and log onto BMW and start asking

15   questions.

16          MR. CANTINE:  No, but if part of the -- these

17   products can be employed in a kiosk, let's say, within a

18   store.  A customer is going to come up and start typing in

19   some information, looking for information on the computer.

20   Right?  He's buying a Dell computer and Dell set up this

21   little kiosk to help him do it.  It's someone the system

22   contemplates using, and it's an authorized user in the sense

23   we've made this kiosk publicly available.  He can come use

24   it.

25          I don't think the parties are all that off.

 1    It's just, you know, we don't know exactly what they mean by

 2    predetermined member of a group.  We think our proposal,

 3    that someone has authorized to use the system, or someone

 4    that's associated with a company makes more sense and is

 5    specifically supported by the patent, which contemplates

 6    people both inside and outside the organization using these

 7    products.

 8              Let me touch briefly on inquiry type.  I think

 9    we both spent a lot of time on that.

10              You know, Mr. Schuman didn't address the

11    argument that they've already agreed what that term means,

12    and that the three terms we agreed, one of those being that

13    predetermined semantically expressed inquiry type.  That's

14    one of the slides.

15              If you can go back to that.  Go down, yes.

16    Keep going.  Keep going.  Go up.  There you go.  All

17    right.

18              All right.  So, again, we spent a lot of time

19    talking about these 25 terms Cisco initially identified.  We

20    had a lot of meet and confers, a lot of phone calls amongst

21    the lawyers, and we were able to agree finally on what

22    predetermined semantically expressed inquiry types means,

23    and we both agree, Cisco and XpertUniverse agree, terms that

24    organize and identify categories of assistance requested.

25    Right?  That's clearly talking about inquiry types, because

1    the predetermined semantically expressed, that's the rest of

2    this language.  All right?

3              So we spent a lot of time and effort coming up

4    with that agreement of what is meant by inquiry types, and

5    that's exactly what we've offered as a proposal.  Cisco

6    apparently changed their mind, but Mr. Schuman didn't

7    address that point in his argument to you as to why somehow

8    they shouldn't be held to what they already agreed to.

9              THE COURT:  Yes.  Maybe that's one of the

10   reasons sometimes it's hard to get lawyers to agree to

11   something, because they're afraid it will be used against

12   them in some other context.

13             MR. CANTINE:  Well, I'm not saying it in that

14   context here, your Honor.  I am saying we spent a lot of

15   time identifying what is meant by inquiry types and now all

16   of a sudden they're changing it.  We just think they ought

17   to be held to what they agreed to.

18             Let's go on to inquiry criteria.  Can we show

19   figure 2?

20             This is fine.  We can use this.  That has figure

21   2 from the '709 patent.

22             And, clearly, inquiry criteria.  Right?  You've

23   got this line of business, major coverage and things.

24   That's what inquiry criteria means.  It's the business --

25   the subset of other companies.  And most of Mr. Schuman's

1    arguments seem to be whether or not this had to be displayed

2    to the user, and whether or not that should be within their

3    proposed construction.

4           And I would suggest to you, your Honor, if you

5    look at claim 1 of the '709 patent, this displayed to the

6    user is already there.  Again, it's this redundancy.

7           THE COURT:  No.  I mean, I think redundancy in

8    some of these definitions, that's an issue.  You know, do

9    you think it is the case that if I define something -- let's

10    say I define inquiry criteria and then I read the element

11    that has inquiry criteria in it.  With the definition in

12    there, it ought to make sense?

13           MR. CANTINE:  Yes, I do think it should make

14    sense.  I mean, that's what the jury is going to be

15    presented with.  Right?

16           THE COURT:  Right.

17           MR. CANTINE:  And if it doesn't make sense, is

18    it helpful to them?  I don't think so.

19           And when the clause already says presenting the

20    inquiry criteria and the values in interactive problem

21    definition page, well, again, this whole issue that they

22    keep wanting to plug into their proposed constructions

23    about displaying it to the user and how that's so important,

24    it's already there.  It's in the claim.  We don't need to

25    add it.

1          THE COURT:  There's only one independent claim

2     in the '709 patent; right?

3          MR. CANTINE:  Claim 5 is also dependent.

4          THE COURT:  There are two.  All right.

5          MR. CANTINE:  So, again, on inquiry criteria, we

6     think we ought to go with what we already agree with and

7     this whole display issue is reflected in other parts of the

8     claim.  We don't have to have that in the construction.

9          Let me talk about values really quickly.

10    Mr. Schuman was suggesting that it's somehow a term of art.

11    I don't think so.  I think we all agree it's choices.

12         Again, this whole issue about displaying, we had

13    a lot of discussion with Mr. Schuman about whether or not

14    it's displayed to the user.  Again, it's already in the

15    patent, your Honor.  It's in the claim.  All right?

16         And presenting inquiry criteria and the values

17    and interactive problem definition page.  Right?  So it's

18    the presenting.  It's already there?  The rest of the claim

19    is already provided for.  We don't have to argue about

20    whether it's displayed.  All right?

21         So his suggestion that the choice is displayed

22    to the user, I don't think it's necessary.  That display

23    aspect is already there.  If you want to call it choices

24    versus values, I don't know how that really helps the jury

25    all that much.  I think values is clear enough.

```
 1              THE COURT:  Do you -- never mind.  Go ahead.

 2              MR. CANTINE:  Okay.  Let me move on to the '903

 3    patent.  I'm not going to talk about every term.

 4              THE COURT:  I'm not sure, but you can't have

 5    more than about a minute or two left.

 6              MR. CANTINE:  Okay.  I will do it quick then,

 7    your Honor.

 8              Skill-set database, we'd be happy to go with

 9    what we agreed with.  All right?  The parties agreed what

10    computer database means, computer readable/writable medium.

11    We'd be happy to do that.  All these associations that

12    they're talking about again are already present in the

13    claim.  The skill-set database containing blah, blah, blah,

14    blah, blah.

15              THE COURT:  The definition that you agreed to

16    for database, you're not doing that for the person skilled

17    in the art.  You're doing that for the juror?

18              MR. CANTINE:  Yes.  I mean, the problem is, it's

19    one of those terms that patent lawyers throw around all the

20    time.  Computer readable/writable medium has become kind of

21    the go to language whenever you want to talk about a

22    computer or database.

23              THE COURT:  That strikes me as more confusing

24    for jury than database.

25              MR. CANTINE:  We would be happy to leave it.
```

 1    You know, original proposal was always it does not need to

 2    be construed.  So we think a database -- I think the jury

 3    would understand what database is.  A skill-set database is

 4    just an adjective.

 5              THE COURT:  Well, I mean, it's something if they

 6    don't understand database, I don't think they're going to

 7    understandable readable/writable memory.

 8              MR. CANTINE:  We can explain it to them.

 9    Right?  That's what our job is to do.  I agree with you,

10    I don't think it's another one that needs to be construed.

11              THE COURT:  You have one minute to wrap up.

12              MR. CANTINE:  Let me just, real quickly, the

13    layers of inquiry type, something at the end there.  He's

14    suggesting that there's this, like, replication, and that's

15    simply not the case.  As we pointed to you, the example of

16    sales and the engineer.

17              They're providing their own get assistance page.

18    They're not the same get assistance page.  There's not

19    necessarily the same number of choices they have to make.

20    It's all customized.  They each get to their own inquiry

21    types.  Those inquiry types are related to one another that

22    enables the rest of the system, but to suggest that one

23    layer has to be replicated in another layer is just not

24    consistent with the teaching of the patent.

25              And last on numeric I.D., again, I don't think

```
 1        it's necessary to construe it.  I think adding a whole bunch

 2        of verbiage to a fairly straightforward term isn't going to

 3        be helpful to the jury.

 4                    I appreciate your time.  Thank you, your Honor.

 5                    THE COURT:  All right.  Thank you.

 6                    MR. BLUMENFELD:  Your Honor, before we leave --

 7                    THE COURT:  Yes, yes.  There were one or two

 8        things.  But, yes?

 9                    MR. BLUMENFELD:  One minute, I hope.  This case

10        is about three years old and Judge Schiller set it on the

11        schedule through today and there's no schedule for after

12        today.

13                    THE COURT:  Oh.  Did I say somewhere along the

14        way I would set a schedule after today?

15                    MR. BLUMENFELD:  No, no.  What I was going to

16        do, and I think we talked before this, hopefully, we could

17        get a scheduling conference within the next couple weeks so

18        we could set a schedule for the rest of the case, and that

19        would be good.

20                    THE COURT:  You know, I'm trying to, these cases

21        that I picked up, because of the practice in Philadelphia

22        and I think in New Jersey, too, is pretty much not to set

23        things through to the end --

24                    MR. BLUMENFELD:  Right.

25                    THE COURT:  -- so I certainly would welcome you
```

1    to work with a scheduler.

2              I will ask -- let me remember this.  I will get

3    a Rule 16 scheduled and ask that whatever parts of the

4    standard order that I have that are not already superseded

5    by events, see if you can't agree on dates or whatever and

6    we'll get this scheduled out to the end.  Okay?

7              MR. BLUMENFELD:  Yes.  Thank you, your Honor.

8              THE COURT:  And so I've now got claim

9    construction.  I did see that there had been some kind of

10   motion to leave to file summary judgment or partial summary

11   judgment or something.  And I saw even less of -- I'm

12   reminded that there was also some sort of motion to

13   dismiss.

14             Is any of this -- obviously, claim construction

15   is briefed.  Is any of this other stuff briefed, or where do

16   we stand on that?

17             MR. BLUMENFELD:  On the motion for leave to file

18   partial summary judgment motion, I believe that their

19   response to that is due tomorrow.

20             The motion to dismiss or strike parts of our --

21   of our answer and counterclaim, I think our response to that

22   is due on the 22nd, if I'm remembering correctly, a week

23   from today.

24             THE COURT:  All right.  Well, then, so let's

25   just put that one aside.  And the motion for leave to file

1    partial summary judgment, you know, I don't want an

2    argument, but just what is the grounds, or what is it that

3    you want to have in that motion?

4              MR. BLUMENFELD:  That is a motion, your Honor,

5    directed at invalidity of both of these two patents, but not

6    based on any claim construction issues; based on prior

7    public uses under Section 102(b) of the statute.  And part

8    of the point was that if we're correct about that, these

9    claim construction issues go away because both patents go

10   away.  But that is the basis for the motion.

11             THE COURT:  All right.  Okay.  Well, in any

12   event, so you're going to file something saying why, either

13   because of discovery not being finished, or for whatever

14   reason, you're going to file something saying, don't grant

15   leave to file this?

16             MR. CANTINE:  That would be our side, yes.  Yes,

17   your Honor.

18             THE COURT:  Yes.

19             MR. CANTINE:  That's due tomorrow, unless your

20   Honor wants to rule on it now.  I would be happy to take

21   that.

22             THE COURT:  I don't.  I really literally just

23   saw that there was such a motion, or maybe -- I don't know.

24   I mean, I saw it.  Maybe I saw it physically.  I don't know

25   what I saw, but I don't want to argue that.

1             MR. CANTINE:  And I don't want to argue it here

2   today either.  But in our view, your Honor, they filed three

3   motions to dismiss, trying to get rid of the patents and the

4   trademark.

5             THE COURT:  We're not arguing it.

6             MR. CANTINE:  This is the fourth bite at the

7   apple before discovery has even begun.

8             THE COURT:  All right.  So why don't we just

9   assume for the sake of argument that whether I allow the

10   motion or I don't, that I'm not going to grant the motion

11   for summary judgment, and so you can schedule based on that,

12   and if it turns out I do, I guess you can go to appeal or

13   something.

14             Okay.  All right.  Well, thank you.  I think

15   we're going to be in recess.

16             (Court recessed at 11:53 a.m.)

17                 -  -  -

18

19

20

21

22

23

24

25

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

XPERTUNIVERSE, INC.,    :
   Plaintiff,     :
           :
  v.        :   Civil Action No. 09-157-RGA
           :
CISCO SYSTEMS, INC.,    :
   Defendant.    :

---

## MEMORANDUM ORDER

After having considered the claim construction submissions of XpertUniverse, Inc.

("XU") and Cisco Systems, Inc., and hearing oral argument on the matter, this ⟨⟩ day of April,

2012,

IT IS HEREBY ORDERED that, as used in the asserted claims of United States Patent

Numbers 7,499,903 ("the '903 patent"), and 7,366,709 ("the '709 patent"), the terms below are

construed as follows.

### A. The '903 Patent

The parties have agreed that "having a one-to-one correspondence" can be construed to

mean "satisfying the property that each member of each of the one or more layers of inquiry

types maps exactly to a predetermined semantically expressed inquiry type," and that

"predetermined semantically-expressed inquiry types" can be construed to mean "terms that

organize and identify categories of assistance requested, created prior to use and expressed using

language that is humanly understandable." The Court adopts these constructions for purposes of

this litigation. The Court rejects the parties' construction of "computer database" - "records

organized in computer readable/writeable memory" - as it not does clarify what the patentee

covered by the claims. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.Cir.

1

1997) (emphasizing that the claim construction process should not devolve into an "exercise of redundancy").

    1. *"underlying plurality of criteria groupings"* and *"underlying criteria grouping(s)"*

| XU's Proposed Construction | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "sets of collections of types of assistance requested, wherein each collection can be a member of zero or more sets" |
|---|---|
| Cisco's Proposed Construction | "two or more groups of humanly understandable descriptors that identify inquiry types" and "groups of humanly understandable descriptors that identify an inquiry type" |
| Court's Construction | No construction of "underlying criteria grouping(s)" is necessary. "Underlying plurality of criteria groupings" is construed to mean "two or more groups of underlying criteria." |

    The Court's construction is in accordance with plain and ordinary meaning. The parties' additional proposed limitations do not aid the court or the jury in understanding the term as it is used in the claimed invention, and repeat limitations already present in the claims.

    2. *"skill-set database"*

| XU's Proposed Construction | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a digital storage and retrieval information system designed for storing associations between some or all of: agents and resources available, types of assistance requested, and expertise required for types of assistance requested" |
|---|---|
| Cisco's Proposed Construction | "records organized in a computer readable/writable memory constituting the identity of individuals having unique knowledge on specific topics" |
| Court's Construction | No construction necessary. |

    Neither proposed construction clarifies the original term. *See U.S. Surgical Corp.*, 103 F.3d at 1568. The intrinsic evidence offers no support for the knowledge being "unique."

2

3. *"expert having individualized knowledge"*

| XU's Proposed Construction | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a person in possession of information or expertise that is relevant or material to a particular query" |
|---|---|
| Cisco's Proposed Construction | "person having unique, specialized knowledge on a specific inquiry type" |
| Court's Construction | No construction necessary. |

Neither proposed construction clarifies the original term. *See U.S. Surgical Corp.*, 103

F.3d at 1568. The intrinsic evidence offers no support for the knowledge being "unique."

4. *"unique numerical routing identifier," "unique numeric routing identifier,"* and *"numeric routing identifier"*

| XU's Proposed Construction | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a mathematically distinct encoding for data relevant to an inquiry" |
|---|---|
| Cisco's Proposed Construction | "fixed number that is associated with a semantically-expressed inquiry type and an inquiry type in its corresponding layer that is used to match and route user queries to an expert" |
| Court's Construction | No construction necessary. |

Neither proposed construction clarifies the original term. *See U.S. Surgical Corp.*, 103

F.3d at 1568. The term is readily understandable via the example of a phone number being a

unique number used to route a telephone call to a particular person. (D.I. 155 at 29).

5. "*match and route system*"

| XU's Proposed Construction | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"an architecture that maps a resource or information request to possible resources or information sources, and provides a link to the identified resource(s) or information source(s)." |
|---|---|
| Cisco's Proposed Construction | "system that identifies an expert skill set that corresponds to a user's query and routes the query based on the expert skill set" |
| Court's Construction | No construction necessary. |

The term "match and route system" is a part of the preamble that is of no significance to

claim construction because it does not constitute or explain a claim limitation, and therefore does

not require construction. *See* '903 Patent, col.7 l.41, col.8 ll.3, 6, 12, 16, 18; *Pitney Bowes, Inc.*

*v. Hewlett–Packard Co.*, 182 F.3d 1298, 1305 (Fed.Cir.1999); *see also* (D.I. 155 at 27-29).

6. "*layer(s) of inquiry type(s)*"

| XU's Proposed Construction | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a particular grouping of terms that organize and identify categories of assistance requested" |
|---|---|
| Cisco's Proposed Construction | "a defined set of specific groupings of underlying criteria"<br><br>"defined sets of specific groupings of underlying criteria" |
| Court's Construction | "a defined set of predetermined semantically expressed inquiry types" |

In the '903 Patent, the term "inquiry type" is used as a shorthand term having antecedent

basis in "predetermined semantically expressed inquiry types," for which the parties have agreed

upon a construction. The noun "inquiry type" is never introduced with an indefinite article ("a"

or "an") but rather only with "the," indicating it refers to an earlier term - "predetermined

semantically expressed inquiry type" - and the two terms are used interchangeably throughout

4

the claims. There is no need to inject further language and potential confusion into the claims

when, as here, the claims and context make clear that "inquiry type" refers to "predetermined

semantically expressed inquiry type." *See Personalized User Model LLP v. Google Inc.*, 2012

WL 295048, *24-25 (D. Del. Jan. 25, 2012).

7. *"inquiry type(s)"*

| **XU's Proposed Construction** | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: <br><br> "term(s) that organize and identify categories of assistance requested" |
| --- | --- |
| **Cisco's Proposed Construction** | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" |
| **Court's Construction** | "term(s) that organize and identify categories of assistance requested, created prior to use and expressed using language that is humanly understandable" |

As explained above, the term "inquiry type(s)" is used as a shorthand term having

antecedent basis in "predetermined semantically expressed inquiry type(s)," which the parties

have agreed means "term(s) that organize and identify categories of assistance requested, created

prior to use and expressed using language that is humanly understandable."

8. *"receiving from the user a response to the presentation of a first member of the underlying criteria grouping"*

| **XU's Proposed Construction** | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). |
| --- | --- |
| **Cisco's Proposed Construction** | "receiving a user's response through an interactive problem definition page to the display of a first member of the underlying criteria grouping" |
| **Court's Construction** | "receiving from the user a response to the display of a first member of the underlying criteria grouping" |

The Court agrees with the parties that most of the phrase does not require additional construction, but the term "presentation" would benefit from construction. In construing that term, Cisco argues that terms 8-11 incorporate "a key concept of the '903 patent: that the user's interactions and selections are made using an interactive problem definition page." (D.I. 142 at 10). Cisco points out the '903 patent's many disclosures of a page or display as the user interface, and correctly notes that "[t]he specification describes no other way of allowing a user to interact with the system to make selections." *See id.* (citing fig. 2; col.3, ll.64-66; col.4, ll.3-5; col.4, ll.48-51).

The words "interactive problem definition page" appear only in the '709 patent. The two patents are by the same inventors and generally address the same subject matter, but are not otherwise related. It is not proper to import limitations between unrelated patents. *See Integra Lifesciences I, Ltd. v. Merck KgaA*, 331 F.3d 860, 868 (Fed.Cir. 2003). The Court construes "presentation" to mean "display."

9. *"the response triggering the presentation of further members of the underlying criteria grouping"*

| **XU's Proposed Construction** | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). |
|---|---|
| **Cisco's Proposed Construction** | "the user's response causes further members of the underlying criteria grouping to be displayed on an interactive problem definition page" |
| **Court's Construction** | "the response triggering the display of further members of the underlying criteria grouping" |

The Court construes "presentation" to mean "display" for the reasons set forth in Section 8.

6

10. *"upon a user's request for assistance with at least one of the predetermined semantically-expressed inquiry type"*

| XU's Proposed Construction | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). |
|---|---|
| Cisco's Proposed Construction | "upon a user selecting underlying criteria to identify at least one humanly understandable grouping of underlying criteria using an interactive problem definition page" |
| Court's Construction | No construction necessary. |

The parties agreed upon a construction for "predetermined semantically-expressed

inquiry type," and no further construction of this term is required.

11. *"upon the receipt of a user request for assistance with at least one of the predetermined semantically-expressed inquiry type"*

| XU's Proposed Construction | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). |
|---|---|
| Cisco's Proposed Construction | "upon receiving from an interactive problem definition page a user's selection of criteria and their corresponding values that identify at least one humanly understandable grouping of underlying criteria" |
| Court's Construction | No construction necessary. |

The parties agreed upon a construction for "predetermined semantically-expressed

inquiry type," and no further construction of this term is required.

7

12. "*the host server communicably connected with an inquiry-type database and a skill-set database*"

| **XU's Proposed Construction** | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). |
|---|---|
| **Cisco's Proposed Construction** | "the host server directly connected through hardware and software interfaces with an inquiry-type database and a skill-set database" |
| **Court's Construction** | No construction necessary. |

The parties disagree only on whether "communicably connected" must be construed; it

does not.

## B. '709 Patent

1. "*subject list style*"

| **XU's Proposed Construction** | No construction necessary. However, if the Court rules that one is necessary, XU proposes the following construction: "the structural format for an interface used to enter information" |
|---|---|
| **Cisco's Proposed Construction** | "a graphical representation of the logical structure of a list of inquiry criteria and values and their respective relationships" |
| **Court's Construction** | "a representation of the logical structure of a list of inquiry criteria and values and their respective relationships" |

The '709 patent describes subject list styles as being used to categorize a user's inquiries,

as selected by the client. Col. 4, ll.23-29. Combinations of subject list styles are depicted in

figure 3B. *Id.* col.1, ll.66-67. The subject list styles are not limited to graphical representations

as Cisco argues, or information entry as XU argues, but rather, are broader, conceptual

relationships between criteria. *See id.*; *id.* Fig.3B. Other parts of the claims provide that the

values are "presented" via an "interactive problem definition page" - the mode of such

presentation (*e.g.*, graphically or otherwise) is not a limitation on the term "subject list style" as

8

Cisco argues. *Id.* col.8, ll. 65-67; col.9, ll.40-42.

2. "*member of an organization*" / "*member of the organization*"

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"person associated with or authorized by an entity that is enabling use of the method or system described" |
|---|---|
| Cisco's Proposed Construction | "person belonging to a predetermined group or company" |
| Court's Construction | No construction necessary. |

Neither proposed construction clarifies the original term. *See U.S. Surgical Corp.*, 103

F.3d at 1568.

3. "*inquiry type(s)*"

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"term(s) that organize and identify categories of assistance requested" |
|---|---|
| Cisco's Proposed Construction | "a specific grouping of underlying criteria predetermined by the organization and based on a user's criterion selections" |
| Court's Construction | "question topics" |

XU's proposed construction tracks the parties' agreed-upon construction for

"predetermined semantically-expressed inquiry types" for the '903 patent, while Cisco's

proposed construction is drawn from the '903 patent itself at column 5, lines 13-16.  Both

proposed constructions are essentially based on extrinsic evidence; limitations from the '903

patent do not limit the meaning of the term here, as used in the unrelated '709 patent. *See*

*Integra Lifesciences*, 331 F.3d at 868.  The plain meaning of the term, which is preferable to the

parties' constructions based on what is essentially extrinsic evidence, is "question topics."

9

4. *"inquiry criteria"*

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"term(s) that organize and identify categories of assistance requested" |
|---|---|
| Cisco's Proposed Construction | "subject categories used to define a seeker's query displayed to a user in an interactive problem definition page" |
| Court's Construction | "pre-selected subject categories" |

The '709 patent clearly defines "inquiry criteria" as "pre-selected subject categories."

Col.2, ll.20-23; *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)

("[A] patentee may choose to be his own lexicographer and use terms other than their ordinary

meaning, as long as the special definition of the term is clearly stated in the patent specification

or file history.").

5. *"underlying criteria"*

| XU's Proposed Construction | No construction necessary beyond those terms in the phrase, whose construction is identified elsewhere in the chart (to the extent the Court rules that the construction of those terms is necessary). |
|---|---|
| Cisco's Proposed Construction | "subject categories used to classify inquiry types according to a client's business objectives and information needs of a user" |
| Court's Construction | "subject categories" |

The '709 patent clearly defines "underlying criteria" as "subject categories."  Col.2,

ll.55-60; *see Vitronics Corp.*, 90 F.3d at 1582 ("[A] patentee may choose to be his own

lexicographer and use terms other than their ordinary meaning, as long as the special definition

of the term is clearly stated in the patent specification or file history.").  Cisco's additional

proposed limitations describing how the underlying criteria function in the system are addressed

by other claim terms.  Col.2, ll.55-60; col.9, ll.4-5.

10

6. *"values"*

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"an object, assigned to a variable, appropriately within the range of possible objects that the variable is intended to represent" |
|---|---|
| Cisco's Proposed Construction | "criteria selections having a relationship to an inquiry criteria and that can be displayed to a user in an interactive problem definition page" |
| Court's Construction | "choices" |

At oral argument, both XU and Cisco agreed that "values" in the context of the '709 patent means "choices." (D.I. 155 at 30, 81-82).  Cisco's additional proposed limitations are already represented by other claim terms. '709 Patent, col.9, ll.9-30; *id.* col.10, ll.1-19, 37-39.

7. *"interactive problem definition page"*

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"a responsive interface designed to facilitate either the specification of assistance, or facilitate the specification of the categories of assistance" |
|---|---|
| Cisco's Proposed Construction | "an interactive graphical user interface that uses a subject list style displaying user-specific inquiry criteria and values  to guide the user in classifying an inquiry" |
| Court's Construction | "an interactive graphical user interface" |

The word "interactive" does not need to be construed.  As for "problem definition page," the '709 patent provides that "[t]he problem definition functionality is displayed in a Graphical User Interface."  Col.4, ll.44-48.  Cisco's other proposed limitations are already represented by other claim terms.

11

8. *"inquiry criteria values"*

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"an object assigned to a variable representing collections of types of assistance requested" |
|---|---|
| Cisco's Proposed Construction | "selections displayed to a user in an interactive problem definition page" |
| Court's Construction | "preselected subject category choices" |

Combining the Court's constructions of "inquiry criteria" and "values" for "inquiry criteria values" logically captures the specification's description of inquiry criteria values as "predetermined" values linked to inquiry criteria. '709 Patent, col.4, ll.4-22.

9. *"plurality of monitors"*

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction for the term "monitors" as used in claims 5 and 7:<br><br>"interactive communication devices" |
|---|---|
| Cisco's Proposed Construction | "two or more computer screens" |
| Court's Construction | "two or more monitors" |

The term "monitor" does not require construction. *See U.S. Surgical Corp.*, 103 F.3d at 1568. The construction of "plurality" is in accordance with plain meaning.

10. "*the processor being configured to extract unique combinations from the database and evaluate the combinations*"

| XU's Proposed Construction | No construction necessary.  However, if the Court rules that one is necessary, XU proposes the following construction:<br><br>"the processor being configured to retrieve and analyze the term(s) that organize categories of requests, the object(s) assigned to related variables, and the structural format(s) for the interface used to enter information" |
|---|---|
| Cisco's Proposed Construction | "the processor is programmed to extract unique combinations of a user's query and an expert's skill set from records stored in read/writable memory and to determine in real time the most qualified expert for a user's query" |
| Court's Construction | "the processor being programmed to extract unique combinations from the database and evaluate the combinations" |

Construction is only required and helpful for the word "configured." *See U.S. Surgical Corp.*, 103 F.3d at 1568.

United States District Judge