UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| XPERTUNIVERSE, INC., <br> Plaintiff, <br> v. <br> CISCO SYSTEMS, INC., <br> Defendant. | Case No. 17-cv-03848-RS <br><br> **ORDER CONSTRUING CLAIMS** |

## I. INTRODUCTION

This is a case about the databases that back "remote expert" platforms. Such platforms allow users to locate and consult in real-time with experts on the problem that the user is facing. Plaintiff XpertUniverse ("XU") holds a patent, US 7,499,903 ("'903 Patent"), on a novel database structure backing such platforms. XU contends that defendant Cisco's Remote Expert product infringes on the '903 Patent. The parties now seek construction of ten terms in the '903 Patent, pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).

## II. BACKGROUND

XU is a technology company that develops expert location, real-time interaction, and business intelligence solutions. The company seeks to develop improved computer-based systems and techniques that enable individuals who need assistance or have questions about certain topics to connect and interact in real-time with the best available experts. Among the patents that XU has been awarded by the U.S. Patent and Trademark Office ("PTO") is the '903 Patent, entitled "Semantic to Non-Semantic Routing For Locating a Live Expert." The claims of the '903 Patent

are directed, *inter alia*, to a novel data representation architecture to locate appropriate experts and connect them with individuals who are seeking assistance with a particular inquiry. The '903 Patent purports to improve upon prior remote expert platforms by using a flexible database structure which can easily be updated. Claim 12 of the '903 Patent ("Claim 12")—which XU contends Remote Expert infringes—defines a "match and route system" that locates live experts.

In March 2009, XU filed a complaint against Cisco in the U.S. District Court for the District of Delaware, which included a claim for infringement of the '903 Patent. *See XpertUniverse, Inc. v. Cisco Systems, Inc.*, No. 09-cv-00157 (D. Del.) ("Delaware Action"). In the course of those proceedings, the district judge issued an order construing several terms in the '903 Patent after a *Markman* hearing. *Id.*, ECF No. 168 (Apr. 20, 2012). In a 2013 trial, a federal jury found that versions 1.5 and 1.8 of Cisco's Remote Expert product infringed the '903 Patent. In a post-trial ruling, the district court set aside the jury's finding of fraud by concealment and its damages award but did not disturb the jury's findings on the issue of infringement. XU appealed the fraud claim decision to the Federal Circuit, which affirmed the lower court on January 21, 2015.

XU filed the present action in July 2017, alleging continued infringement of Claim 12 in Cisco's Remote Expert versions 1.9 through 11.0 and products that incorporate Remote Expert. The parties fully briefed the claim construction issue, and a *Markman* hearing was set for July 2018. However, one month prior to the hearing, the PTO granted Cisco's request for reexamination of Claim 12. The case was stayed for almost a year, at the end of which the PTO found that the patent remained valid. The parties were subsequently given leave to file supplemental claim construction briefing in order to incorporate the reexamination proceedings.

### III.  LEGAL STANDARD

Claim construction is a question of law to be determined by the Court. *Markman*, 52 F.3d at 979. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v.*

1  *Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should
2  be construed in a manner "that stays true to the claim language and most naturally aligns with the
3  patent's description of the invention." *Id*. (quoting *Renishaw*, 158 F.3d at 1250).

4        The first step in claim construction is to look to the language of the claims themselves. "It
5  is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the
6  patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water,*
7  *Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim
8  term should be construed in a manner consistent with its "ordinary and customary meaning,"
9  which is "the meaning that the term would have to a person of ordinary skill in the art in question
10 at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at
11 1312–13. The ordinary and customary meaning of a claim term must take into account the context
12 of the claim's overall language. *See id*. at 1314 ("[T]he use of a term within the claim provides a
13 firm basis for construing the term."). Additionally, the use of the term in other claims may provide
14 guidance regarding its proper construction. *Id*.

15       A claim should also be construed in a manner that is consistent with the patent's
16 specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of
17 which they are a part."); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.
18 Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis."). In
19 limited circumstances, the specification may be used to narrow the meaning of a claim term that
20 otherwise would appear to be susceptible to a broader reading. *See SciMed Life Sys., Inc. v.*
21 *Advanced Cardiovascular Sys., Inc*., 242 F.3d 1337, 1341 (Fed. Cir. 2001). Courts may not,
22 however, impose limitations that are not supported by the language of the claim. *Laitram Corp. v.*
23 *NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the
24 written description into the claims."); *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182,
25 1186 (Fed. Cir. 1998) ("[C]laims are to be interpreted in light of the specification, [but] it does not
26 follow that limitations from the specification may be read into the claims."); *SRI Int'l v.*
27 *Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("It is the *claims*

28

that measure the invention.") (emphasis in original).

A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office ("PTO") regarding the scope of the invention. *See Markman*, 52 F.3d at 980. Courts may also consider extrinsic evidence, such as expert testimony, dictionaries, or technical treatises, especially if such sources are "helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980). Ultimately, while extrinsic evidence may aid the claim construction analysis, it cannot be used to contradict the plain and ordinary meaning of a claim term as defined within the intrinsic record. *Phillips*, 415 F.3d at 1322–23.

## IV.  DISCUSSION

### A.  Collateral Estoppel

Despite submitting conflicting briefing about whether collateral estoppel bars the construction of certain disputed terms, the parties now seem to agree that the constructions adopted during the Delaware Action are informative but not binding on this action. The issues to be decided here—that is, how the disputed terms and phrases should be construed—are non-identical to the issues decided in the Delaware Action. *See Hydranautics v. FilmTec Corp.,* 204 F.3d 880, 885 (9th Cir. 2000) (requiring identical issues for collateral estoppel to apply). In particular, the reexamination record provides additional context informing how the disputed terms and phrases should be construed. *See Golden Gate Bridge Tech., Inc. v. Apple Inc.*, 937 F.Supp.2d 490, 496 (D. Del. 2013) ("[A]dditional prosecution history…does not necessarily mean that the scope of any disputed limitations changed. However, the court cannot simply ignore the new prosecution history that was not of record in the [prior] litigation."); *Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.*, No. 08-cv-00309, 2009 WL 4928029, at *17 (D. Del. Dec. 18, 2019). Thus, this order will reference the Delaware Action where it is informative but not as binding precedent.

### B.  Prosecution History Disclaimer

Prosecution history disclaimer requires that the claims of a patent be interpreted in light of

the proceedings in the PTO during the application process. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012) (extending the doctrine to reexamination proceedings). It precludes inventors from "recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a "clear and unmistakable" disclaimer that would have been evident to one skilled in the art. *See Elbex Video, Ltd. v. Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1371 (Fed. Cir. 2007). It must overcome the presumption that claims carry their full ordinary meaning by showing that the alleged disclaimer is neither "ambiguous" nor "amenable to multiple reasonable interpretations." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016). However, even if the standard for disclaimer is not met, the inventor's reexamination statements are part of the intrinsic record and therefore remain "relevant as reinforcing the evident meaning of the claim language at issue." *D'Agostino v. MasterCard Int'l Inc.*, 844 F.3d 945, 949 (Fed. Cir. 2016). The PTO examiner's interpretations also carry "significant weight" for claim construction since "an examiner in reexamination can be considered one of ordinary skill in the art." *St. Clair Intellectual Prop. Consult., Inc. v. Canon Inc.*, 412 F. App'x 270, 276 (Fed. Cir. 2011).

Thus, in construing each of the following terms, XU's own statements during the reexamination proceedings will be considered binding on it to the extent that Cisco can show those statements are "unambiguous." Where Cisco does not carry that burden, XU's own statements will be considered merely informative. The PTO's Examiner's statements will also be considered persuasive but not binding.

### C. Disputed Term Constructions

*1. "database"*

The term "database" appears numerous times throughout Claim 12. XU contends that it does not need construction, or alternatively proposes "computer memory containing structured data (*e.g.*, organized into records with one or more fields) that can be accessed, updated, and

searched." Cisco offers the same construction but replaces "*e.g.*" with "*i.e.*".[1] The dispute, then, is isolated to whether a database *must*, or merely *can*, be "organized into records with one or more fields."

It is true that some databases are not organized into records with fields. In the context of the '903 Patent, however, every representation of a database at every point in the proceedings has been of one organized into records with fields. *See, e.g.*, Declaration of Kenneth Ross (Nov. 13, 2018), at 11, 13; Patent Owner's Response to Final Official Action (Feb. 13, 2019), at 20, 24. The specification itself depicts a database organized into records with fields. *See* '903 Patent, Figure 2. Thus, in order to construe the term in a manner consistent with the patent specification as well as the rest of the intrinsic record, this term shall mean "computer memory containing structured data (*i.e.* organized into records with one or more fields) that can be accessed, updated, and searched."

2.   *"entry"*

Since "database" has been construed, the parties agree that no construction need be adopted for "entry." The plain and ordinary meaning of the term is clear. Thus, no construction shall be adopted for "entry."

3.   *"skill-set database"*

This term appears numerous times throughout Claim 12. XU contends that "skill-set database" does not require construction.[2] In the alternative, XU proposes "a database that includes information about skills possessed by experts." Cisco offers "database separate from the inquiry-

---

[1] The parties have proposed different constructions in the course of their briefing. During the *Markman* hearing, however, they represented that they have limited the dispute to whether the construction should contain an "*e.g.*" (XU) or an "*i.e.*" (Cisco). Furthermore, the parties jointly proposed a construction for "computer database" during the Delaware Action, which was rejected because it failed to clarify the term. That rejection does not estop a construction for "database" from being adopted for the purposes of this action because: (1) "computer database" and "database" are not identical terms and (2) as the "computer database" construction was jointly proposed, it was not "actually disputed." *See e.Digital Corp. v. Futurewei Techs., Inc.*, 772 F.3d 723, 726 (Fed. Cir. 2014).

[2] XU's argument is based, in part, on the Delaware court's declining to adopt a construction for this term. However, as discussed above, that decision is not binding here.

type database that contains the identity of the expert, or group of experts, that have the individualized knowledge on the topic being requested by the seeker." XU argues that Cisco's definition imports three non-essential requirements—(1) that the skill-set and inquiry databases be separate ("separateness requirement"), (2) that the skill-set database contain expert identities, and (3) that the experts have individualized knowledge on the requested topic—into an otherwise straightforward definition.

The separateness requirement is well-supported by the intrinsic record and is an essential element of the invention. Claim 12 lists the inquiry and skill-set databases as separate limitations. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct component[s] of the patented invention." (internal quotations omitted)). Claims dependent on Claim 12 similarly refer to multiple "databases." *See* '903 Patent at 8:12–17. XU itself has confirmed multiple times that the databases are indeed separate. *See, e.g.*, Deposition of John Steinhoff (Aug. 15, 2019), at 96; Hearing Transcript (Apr. 12, 2018), ECF No. 95, at 33. Furthermore, the separateness requirement is essential to the novelty of the invention; the PTO rejected Claim 12 as indistinguishable from prior art until XU clarified that what made the invention novel was the use of two separate databases. *Compare* Official Action in Ex Parte Reexamination (Dec. 13, 2018), at 24–27, *with* Declaration of John Steinhoff (Feb. 13, 2019), at 6. Even if the reexamination history is not so unambiguous as to be binding on XU, it is certainly informative. Thus, the separateness requirement is not only clear from the record but also essential to defining a "skill-set database."

XU's arguments to the contrary are unavailing. First, XU disputes that the separateness of the databases is not clear from the face of the patent because, it says, Figure 1 illustrates one large database. However, as Cisco rightly points out, the specification clearly explains that Figure 1 is an illustration of a "communication network"—*not* of the database schema. *See* '903 Patent at 2:57–59. Second, XU argues that Claim 12 describes the "conceptual/logical arrangement of the system," not "any particular physical-level characteristics," and thus "skill-set database" should

not be construed so as to describe the physical implementation of the system. Yet XU has previously represented that Claim 12 is a "structure-based claim." *See* Hearing Transcript (Apr. 12, 2018), ECF No. 95, at 35 ("This is setting out the structure, the database structure…."). Finally, XU claims that its reexamination statements about the separateness of the databases are about their separate *definitions* in Claim 12, not separate physical implementations. That reading strains credulity given how clear the reexamination statements are, but even accepting it does not save XU's position, since the specification is clear that multiple databases exist.

On the other hand, it is not so clear that the skill-set database must contain the identity of each expert or that the experts must have individualized knowledge. Parts of the specification, including other claims, contain these requirements. *See* '903 Patent at Abstract, 2:41–43, 6:57–59; 8:30–32. Others—notably Claim 12—do not. To read this requirement into Claim 12 where it is explicit in other places would violate the rule against surplusage. *Cf. Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) ("[W]hen a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim." (internal quotations omitted)). Furthermore, the reexamination history is not so unambiguous as to bind XU to importing these requirements into the definition of "skill-set database." For example, in response to a question about whether the skill-set database need contain the expert identities, the XU expert said "[The skill-set database] would presumably…need to *return*"—not "contain"—the identity of the expert. *See* Deposition of Kenneth Ross (Apr. 10, 2018), at 65. Thus, because these latter requirements are neither clear from the intrinsic record nor obviously part of the definition of "skill-set database," they should not be imported into the construction. Thus, "skill-set database" shall mean "a database separate from the inquiry-type database that contains information about skills possessed by experts."

    4. *"a unique numeric routing identifier linked to each skill-set database entry and to the associated inquiry type in the inquiry-type database"*

This phrase is the sixth of seven limitations in Claim 12. XU contends that this phrase does

not require construction.³ In the alternative, XU proposes "a unique number related to each skill-set database entry and the one inquiry type associated with the expert(s)." Cisco offers instead "using index variables or pointers to connect a unique number to both: (1) each skill-set database entry; and (2) the one inquiry type associated with the expert, but not the expert himself." That is, the parties agree on the core of this construction, but Cisco additionally contends that: (1) to "link" means to "use index variables or points to connect" and (2) the unique numeric routing identifier ("UNRI") cannot be linked directly to the expert.

During reexamination proceedings, the PTO examiner defined "link" as "to connect two elements in a data structure using index variables or pointer variables." *See* Notice of Intent to Issue Ex Parte Reexamination Certificate (Mar. 5, 2019), at 6. This definition was in response to XU's own contention that other methods of "linking," such as adding a text string to a database, were not encompassed by Claim 12. *Id.* That differentiation was part of what separated Claim 12 from prior art. *Id.* at 7. While an examiner's statements do not alone amount to prosecution history disclaimer, *see Salazar v. Proctor & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005), they are nevertheless relevant to claim construction, *see D'Agostino*, 844 F.3d at 949. That the PTO adopted this definition of "link" is thus informative as an outer bound on the definition of the term. *See Facebook, Inc. v. Pragmatus AV, LLC*, 582 F. App'x 864, 866 (Fed. Cir. 2014) ("When the Board reexamines an unexpired patent, it construes the claims under the broadest reasonable interpretation consistent with the specification."). Not to import this requirement into the definition of the phrase at issue would be to permit XU to "recaptur[e] through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1323.

---

³ XU argues that the phrase need not be construed because the constructions that exist for its component terms—"skill-set database," "inquiry type," and "inquiry type database"—render a composite definition superfluous. What that argument forgets is that the proposed construction of the phrase does not attempt to redefine any of the already-construed terms, and that the remaining unconstrued terms—in particular, "unique numeric routing identifier" and "linked"—are essential to the definition of the phrase.

As to the UNRI, XU itself has represented that the "separation of the experts and the inquiry types—by removing the direct links there between—is a critical feature of the claimed invention. Indeed, this is precisely the feature that is identified in the background section of the patent as being a significant problem in the prior art and as being addressed by the '903 Patent." *See* Declaration of Kenneth Ross (Nov. 13, 2018), at 47. It is hard to imagine a more unambiguous statement that the experts and inquiry types are not directly linked and that the lack of direct linking is crucial to the patentability of XU's technology. Thus, Cisco's proposed construction must be adopted. This phrase shall mean, "using index variables or pointers to connect a unique number to both: (1) each skill-set database entry; and (2) the one inquiry type associated with the expert, but not the expert himself."

>    5.  *"entry that associates the expert with one of the inquiry types and its underlying criteria grouping"*

This phrase appears in one of Claim 12's limitations and describes what is contained in the skill-set database. XU contends that this phrase also does not require construction. Alternatively, XU offers "one or more entries in the skill-set database that indirectly relate the expert(s) to one of the inquiry types and its underlying criteria grouping." Cisco proposes "entry, which is separate and distinct from the unique numeric routing identifier, that indirectly connects the expert with both: (i) one of the inquiry types; and (ii) that inquiry type's underlying criteria grouping."

Cisco derives the "separate and distinct" requirement from XU's reexamination statement that "the 'association' between the expert and the inquiry type/underlying criteria grouping is separate and distinct from the numeric identifier 'link[ing]' that inquiry type with each of the skill-set entries." *See* Patent Owner's Response to Non-Final Official Action (Nov. 13, 2018), at 61. However, Cisco uses that statement in a misleading way; to say that the "associations" are distinct from the UNRIs is not to say that the UNRIs cannot also appear in the skill-set database entries alongside other associations.[4] That is, what is "separate and distinct" from the UNRI is not the

---

[4] That the UNRIs can appear in the skill-set database is well illustrated by a graphic which was provided by XU during reexamination. *See* Patent Owner's Response to Final Official Action

"entry" but rather the "association;" Cisco's requirement modifies the wrong word. Including the "separate and distinct" requirement in the disputed phrase at issue as Cisco requests is thus misleading. It is also unnecessary, as the presence of a separate limitation defining the UNRI indicates the existence of the UNRI *in addition* to any association by the skill-set database entries. *Cf. Becton, Dickinson*, 616 F.3d at 1254.

Once the "separate and distinct" requirement is eliminated, so are, almost entirely, the differences between the parties' proposed constructions, as well as between the proposed constructions and the phrase itself. Especially given the adopted constructions for component terms "inquiry type" and "underlying criteria grouping," the meaning of the phrase is clear on its face. Thus, no construction shall be adopted for this phrase.

> 6. *"identify the expert associated with the predetermined semantically-expressed inquiry type requested by the user"*

This phrase appears in the final limitation of Claim 12 and describes the functionality of the patented "match and route system" imagined by the entire claim. XU contends that this phrase also does not require construction. In the alternative, XU proposes "identify the one or more individuals who have been associated, through the [sic] at least one skill set database entry, with the requested inquiry type." Cisco offers "identify an expert who has individual expertise with the category of assistance being requested by a seeker (not someone who perhaps is simply able to point the seekers to his/her request related content)." Thus, the parties' primary dispute is how to construe the term "expert" within this phrase, i.e. must an expert have "individual expertise with the category of assistance being requested by a seeker."

This "individual expertise" requirement again comes from a statement by XU during the reexamination. *See* Patent Owner's Response to Non-Final Official Action (Nov. 13, 2018), at 13. However, that statement is not as unambiguous as Cisco makes it out to be. In thousands of pages of records, it appears one time in an introductory sentence to a paragraph providing a general

---

(Feb. 13, 2019), at 20.

overview of the '903 Patent—not in the context of Claim 12 or this limitation. Furthermore, it is contradicted by other parts of the reexamination history in which one of the named inventors specifically defined "experts" as persons "who may not know an answer themselves but know where one may be found." *See* Deposition of John Steinhoff (Aug. 15, 2019), at 88. Ambiguity in the reexamination history thus precludes prosecution history disclaimer.

Perhaps even more informative is that the parties are not seeking a construction for the term "expert." That term appears four times within Claim 12 itself—and many more times in the '903 Patent generally—but the parties have never sought construction of that term. It makes little sense to import a definition for "expert" into the construction of the disputed phrase at issue, but to assume that the term does not require construction in any other part of the patent, including in other phrases for which the parties request constructions. Furthermore, as Cisco itself points out, the specification describes an "expert" as one with "individualized knowledge" numerous times throughout the specification, though not in the particular limitation at issue; adopting Cisco's even more limited construction of the term for this single appearance is not only unnecessary but also misleading. *Cf. Amgen*, 314 F.3d at 1326. Thus, no construction shall be adopted for this phrase.

## V.  CONCLUSION

The disputed terms in the '903 Patent are construed as set forth above. Furthermore, the constructions that the parties have jointly agreed upon for "inquiry type(s)," "predetermined semantically-expressed inquiry types," "layer(s) of inquiry type(s)," and "underlying plurality of criteria groupings" are adopted. The action shall proceed in accordance with these constructions.

**IT IS SO ORDERED**.

Dated: November 25, 2019

_____
RICHARD SEEBORG
United States District Judge